| | |
|---|---|
| DISTRICT COURT, ADAMS COUNTY STATE OF COLORADO 1100 Judicial Center Dr. Brighton, Colorado 80601 | DATE FILED: February 22, 2024 10:00 AM FILING ID: 90054D629C4B1 CASE NUMBER: 2024CV30302 |
| **Plaintiffs:** CINDY McCORMICK; RONALD McCORMICK; and TRUPP LAND MANAGEMENT LLC, v. | |
| **Defendants:** HRM RESOURCES, LLC, a Delaware limited liability company; HRM RESOURCES II, LLC, a Delaware limited liability company; HRM RESOURCES III, LLC, a Delaware limited liability company; HRM RESOURCES IV, LLC, a Delaware limited liability company; L. ROGER HUTSON, an individual; TERRY PAPE, an individual; PAINTED PEGASUS PETROLEUM, LLC, a Texas limited liability company; and JOHN HOFFMAN, an individual. | ▲COURT USE ONLY▲ |
| **Attorneys for Plaintiffs:**<br><br>Christopher P. Carrington, #37004<br>**Richards Carrington, LLC**<br>1444 Blake Street<br>Denver, Colorado 80202<br>Phone Number: 303-962-2690<br>Email: chris@richardscarrington.com<br><br>Camille Sippel (*pro hac vice* forthcoming)<br>**ClientEarth USA, Inc.**<br>501 Santa Monica Blvd. #510<br>Santa Monica, California 90401<br>Phone Number: 424-387-7031<br>Email: csippel@clientearth.org<br><br>Scott C. Borison (*pro hac vice* forthcoming)<br>**Borison Firm, LLC**<br>1400 S. Charles Street<br>Baltimore, Maryland 21230<br>Phone Number: 301-620-1016<br>Email: scott@borisonfirm.com | Case No.<br><br>Division: |
| **CLASS ACTION COMPLAINT AND JURY DEMAND** | |

Plaintiffs Cindy McCormick, Ronald McCormick, and Trupp Land Management, LLC (collectively "Plaintiffs"), through counsel and for their Class Action Complaint and Jury Demand against Defendants HRM Resources I-IV, LLC; Painted Pegasus Petroleum, LLC; L. Roger Hutson; Terry M. Pape; and John Hoffman, allege as follows:

## INTRODUCTION

1.      This case concerns a massive fraud that is, to this day, endangering Coloradans. Without the Court's intervention, Plaintiffs (and the Class members) will remain at risk of both economic and physical harm from hundreds of oil and gas wells unlawfully abandoned on their properties, and Defendants will walk away with millions of dollars they wrongfully diverted from legally required clean-up obligations.

2.      Colorado's Uniform Fraudulent Transfer Act ("CUFTA"), C.R.S. Section 38-8-101 *et seq.*, protects creditors when debtors transfer away assets or liabilities in an effort to hinder, delay, or defraud the creditor's ability to collect on a claim.

3.      Under CUFTA, a creditor who can establish that a transaction was fraudulent is entitled to certain remedies, including without limitation an avoidance of the transfer, a judgment "for one and one-half the amount necessary to satisfy the creditor's claim," injunctive relief, or "[a]ny other relief the circumstances may require." C.R.S. § 38-8-108.

4.      Pursuant to Colorado law, oil and gas operators are required to plug their oil and gas wells and reclaim and remediate the surface land when the wells are no longer being utilized for production or it is no longer reasonable for the wells to burden surface owners' property (both of which are true here). The requirement to properly plug wells and reclaim and remediate land is called an "asset retirement obligation" or "ARO".

5.      Generally, oil and gas operators are vocal about their commitments to landowners, reclaiming and remediating land, and the environment.

6.      For example, the Defendant referenced collectively below as "HRM" reassures the public via its website as follows:



**Resources**

Home    Sustainability    Company

## Plug, Remove & Restore

We strive to restore all lands to their original condition. Once an oil and gas property reaches the end of its productive life, HRM has worked closely with regulatory agencies to properly set physical barriers and insert cement plugs in the wellbore so that the well can be welded shut at the surface with no long term concerns. All surface equipment is then dismantled and removed. The entire area is reworked with top soil and reseeded with natural grasses as determined by the proper regulatory authority. All work is completed under the close eye of state or federal inspectors and can take years to be given final authorization for release.



**Reclaiming & Restoring the Land**

HRM believes that stewarding our environment is our most important legacy and we strive to restore our production sites to a state even better than we found them. Through a collaborative approach with regulators and landowners, we are committed to exceeding reclamation requirements.

7.    But the reality of the American oil and gas industry does not match this rhetoric, and this is for one simple reason: Plugging wells and reclaiming and remediating land costs money. As such, some companies look for ways to avoid these liabilities. And that is, essentially, what this case is about.

8.    This case concerns a web of individuals and companies who, rather than abide by their legal obligations and duties to landowners and the environment, instead conspired to avoid millions of dollars of oil and gas well asset retirement obligations by fraudulently transferring hundreds of defunct and uneconomic oil and gas wells to a shell company, which then filed bankruptcy.

9.    In so doing, these Defendants kept any profits obtained from operating the oil and gas wells while jettisoning the liabilities, leaving Plaintiffs with unplugged, dangerous wells and simultaneously saddling taxpayers and Colorado's Orphaned Well Program with cleaning up their mess.

10.    At issue in this action are approximately 200 oil and gas wells fraudulently transferred by Defendant HRM to Painted Pegasus Petroleum, LLC ("Painted Pegasus") ("the Transfer").

11.     A far cry from HRM's professed belief that "stewarding our environment is our most important legacy and we strive to restore our production sites to a state even better than we found them," HRM's conduct caused, as of September 2022, the ***largest*** single operator orphaning and abandonment of oil and gas wells ***in Colorado history***.

12.     With this civil action, the Plaintiffs seek to hold these Defendants accountable for their obligation to plug the at-issue wells and reclaim and remediate the associated surface properties, and for the ongoing torts committed daily by virtue of the unplugged, defunct oil and gas wells and related equipment these Defendants have left on Plaintiffs' land.

## PARTIES

13.     **Plaintiffs Cindy and Ronald McCormick** are landowners who own property in and are citizens of Colorado. They have an at-issue well on their property, located in Adams County, Colorado.

14.     **Plaintiff Trupp Land Management, LLC** is a landowner that owns property in Adams County, Colorado, on which one of the at-issue wells is located. It is a citizen of Colorado.

15.     **Defendants HRM Resources, LLC ("HRM I"), HRM Resources II, LLC ("HRM II"), HRM Resources III, LLC ("HRM III")** and **HRM Resources IV, LLC ("HRM IV"),** are Delaware LLCs with a principal place of business in Denver, Colorado (collectively "HRM").

16.     HRM is the transferor of the at-issue wells.

17.     HRM I, II, III and IV are mere continuations of each other.

18.     HRM displays a pattern of forming entities, divesting from them, and starting again. For example, HRM I was formed around 2002 and was divested in 2011. HRM II popped up around 2008 and was divested in 2017. HRM III subsequently arose in 2017 and was divested in 2022. HRM IV was formed in 2022.

19.     These entities transfer assets between one another. For example, certain of the wells at-issue here were transferred from HRM I to HRM II.

20.     Each entity shared a continuation of management and ownership, including that each entity was founded and run by Defendant L. Roger Hutson, employed substantially overlapping sets of employees (such as Defendant Terry Pape and others), and received its financial backing from Kayne Anderson Capital Advisors, L.P. ("Kayne Anderson"), a large California-based private equity firm.

21.     HRM's website further illustrates the continuing nature of these entities; HRM hardly alters the website and branding when a new version of the company arises. For example, here is a side-by-side of the HRM IV and HRM III websites:



22.     **Defendant Lowell Roger Hutson** is the President, CEO, and founder of HRM Resources IV, LLC, formed in 2022. He was also the President, CEO and founder of HRM I, II, and III.

23.     Upon information and belief, Hutson is a resident of Colorado.

24.     **Defendant Terry M. Pape** served as the Vice President of Operations at HRM. He and Hutson have a long-standing history and have worked together on at least four business ventures since the early 2000's.

25.     At the time of the Transfer, not only was Terry Pape a senior employee and agent of HRM, he was also the President and Founder of Pape Oilfield Service, Inc.

26.     Terry Pape added seven of his own defunct and uneconomic wells (owned by Pape Oilfield Service, Inc.) to the Transfer to be disposed of by Painted Pegasus.

27.     Pape is a resident of Colorado.

28.    **Defendant Painted Pegasus Petroleum, LLC** ("Painted Pegasus") is a now-bankrupt limited liability company headquartered in Houston, Texas.

29.    Painted Pegasus is the transferee of the at-issue wells.

30.    **Defendant John Hoffman** is the founder and CEO of Painted Pegasus and is a resident of Texas.

31.    Prior to Painted Pegasus, Hoffman was the founder and CEO of Black Elk Energy, which operated in the gulf coast and specialized in taking over marginal wells that other companies did not want to operate.

32.    Black Elk notoriously cut corners, racking up hundreds of citations from regulatory authorities before an explosion killed several workers on one of its rigs. The company pled guilty in 2017 to eight federal felonies in connection with the deadly explosion.

33.    Black Elk ultimately ended in bankruptcy.

34.    Hoffman's latest venture, Painted Pegasus, has not appropriately plugged, reclaimed, or remediated the at-issue wells and has instead allowed them to fall into the Orphaned Well Program.

35.    Upon information and belief, Painted Pegasus's sole business operations in Colorado consisted of registering to conduct business in Colorado, then taking ownership of the at-issue wells for a short time, after which Hoffman caused Painted Pegasus to file bankruptcy in Houston, Texas.

## JURISDICTION AND VENUE

36.    This Court has subject matter jurisdiction pursuant to Article VI, Section 9 of the Colorado Constitution.

37.    Defendants are subject to this Court's personal jurisdiction under C.R.S. Section 13-1-124(1)(a), (b), and/or (c). Specifically, this Court has general personal jurisdiction because Defendants have continuous and systematic general business contacts with Colorado. In addition, this Court has specific personal jurisdiction over the Defendants because they have all operated in and transacted business in the State. This Court also has personal jurisdiction over the Defendants because, as this complaint will detail below, they have committed (and continue to commit) tortious acts within the State. Further, this Court has personal jurisdiction

over the Defendants because this dispute arises from Defendants' use and possession of real property situated in this State, namely, oil and gas wells.

38.     Venue is proper in this County under C.R.C.P. 98(a) because this dispute affects real property situated in this County, *i.e.*, the Plaintiffs' land with oil and gas wells located on those properties. Venue is also proper under C.R.C.P. 98(c) because this complaint alleges commission of torts within this County.

## FACTUAL ALLEGATIONS

### I.     General Nomenclature

39.     In Colorado, as in much of the American West, it is common for oil and gas producers to own or lease the rights to subsurface minerals (the "mineral rights") without similarly owning or leasing the rights to the surface land (the "surface rights"). This separation of surface and mineral ownership is called a "split estate".

40.     The fact that the mineral estate is decoupled from the surface estate means that oil and gas producers often have no contractual relationship with the surface landowners on whose property they operate oil and gas wells.

41.     Instead, as owners or lessees of mineral rights, oil and gas producers can access a property's mineral estate via the surface *if* their use of the surface is reasonable and necessary to develop the mineral interest.

42.     Sometimes surface rights owners also own the underlying mineral rights associated with their land, referred to as a "unified estate". Unified estate owners may choose to contract with oil and gas companies to exploit the mineral estate, but they retain their surface rights.

43.     Landowners are entitled to make use of their surface rights as they choose, including by leasing to others.

### II.     The Obligation to Plug and Remediate Oil and Gas Well Sites

44.     The lifecycle of every oil and gas well is essentially the same: Mineral owners execute oil and gas leases with oil companies, which then drill and operate the wells for profit. Eventually the oil or gas production will end or become uneconomical to produce, after which point the oil company is required to plug the well and reclaim and remediate the surface land.

45.     These asset retirement obligations, or AROs, have existed for over a century, and oil and gas companies are well aware of their existence. The obligations exist both in common law (under a reasonable and necessary standard) and by statute.[1]

46.     The importance of timely fulfilling these obligations is underscored by Colorado law, Colo. Code Regs. § 404-1:434, which states that oil and gas companies have a duty to plug and abandon a well within six months of the well becoming "inactive" as defined in Colorado rules and regulations.

47.     The cost of complying with AROs is reasonably calculable and should be accounted for as a liability from the moment a well is drilled.

48.     Averaged over large numbers of wells like those at issue here, ARO costs in any given region are reasonably predictable. The Colorado Oil and Gas Conservation Commission (now known as the Energy and Carbon Management Commission ("ECMC")) estimated that, as of 2021, an orphaned well site costs about $92,710 to plug and reclaim.

49.     Presently, upon information and belief, ARO costs for the at-issue wells are, on average, over $100,000 each.

50.     For these reasons, state governments and regulators often require oil and gas companies to provide "financial assurance" (usually in the form of bonds) for wells that will need to be plugged in the future. However, the bond amount is usually far from adequate to cover the entire cost of plugging, reclamation, and remediation. For example, in a 2024 report, experts estimated that Colorado statewide financial assurance covers only 7% of expected statewide plugging, reclamation, and remediation costs.

## III.     Colorado's Orphaned Well Program

51.     Orphaned wells are unplugged, no-longer-producing wells, with no responsible owner to plug them.

---

[1]     The most recent set of plugging rules can be found here: https://ecmc.state.co.us/reg.html#rules. These obligations have been codified in statute since at least as far back as 1915. *See* Ch. 126, sections 29, 30 & 32, 1915 Colo.Sess.Laws 367, 374–75.

52.     Orphaned wells are a serious and growing problem throughout the United States: "The U.S. population of abandoned oil and gas wells (including orphaned wells and other non-producing wells) is around 3.7 million (with around 2.9 million abandoned oil wells and 0.8 million abandoned gas wells)."[2]

53.     Only "[a]round 42 percent of the abandoned well population in the United States is plugged."[3]

54.     To address this expanding problem, Colorado established the Orphaned Well Program—which is administered by the ECMC.

55.     The Orphaned Well Program identifies, analyzes, prioritizes, and pays to plug, remediate, and reclaim oil and gas facilities statewide in circumstances where the operator cannot be located or otherwise refuses to comply with its asset retirement obligations.

56.     Although the Orphaned Well Program is theoretically funded by oil and gas operators, in reality, these contributions are lacking, leaving the program underfunded and requiring supplementation with taxpayer dollars through federal funding. But because of the massive scale of the orphaned well problem, the Program remains overburdened, and orphaned wells can remain unplugged for years and even decades.

## IV.     The Impact of Orphaned Wells

57.     Once a well is at the end of its useful life and a plugging obligation has accrued, it is no longer reasonable for the well's owner to impose burdens on the surface land.

58.     When well owners fail to clean up their wells, or otherwise unreasonably burden a surface estate, they exceed their rights to access surface property.

59.     In such cases, the holder of the surface rights—whether the landowner and/or their lessee[4]—has claims for trespass against the well operator(s).

---

[2]     U.S. EPA, *Inventory Of U.S. Greenhouse Gas Emissions And Sinks* (1990 – 2021) 3-111 (2023)  https://www.epa.gov/ghgemissions/inventory-us-greenhouse-gas-emissions-and-sinks.

[3]     *Id*.

[4]     References herein to landowners and surface owners encompass lessee rights and claims, as applicable.

60.    Indeed, the impacts of unplugged wells on landowners and surrounding communities are significant.

61.    Defunct oil and gas wells impair surface owners' farming, ranching and other property uses, harm wildlife, present safety hazards to the public (such as the danger of explosion), and pose risks to the environment, including methane leaks into the atmosphere, oil seepage into underground formations and aquifers that provide water for everyday use, and contamination of surface land that leaves once productive lands barren and polluted.

62.    Across the nation, an average unplugged well emits over 100 kg of methane each year, as compared to an average plugged well which emits less than 1 kg of methane per year.[5]

63.    Methane poses acute and chronic hazards to human health and is a primary contributor to ground-level ozone formation (known as smog),[6] which is linked with reduced lung function, asthma, and early death from respiratory and cardiovascular causes.[7]

64.    Among Americans aged 30 years or older, 761 Americans per million people die every year for each 10 metric tons of methane emitted.[8]

---

[5]    U.S. Environmental Protection Agency, *Inventory of US Greenhouse Gas Emissions and Sinks 1990-2018* at 3-102 (2020). Available at: https://www.epa.gov/sites/production/files/2020-04/documents/us-ghg-inventory-2020-main-text.pdf

[6]    *See* United Nations Environment Programme, *Methane Emissions are Driving Climate Change. Here's How to Reduce Them.,* UNEP (August 20, 2021). Available at: https://www.unep.org/news-and-stories/story/methane-emissions-are-driving-climate-change-heres-how-reduce-them

[7]    The White House, *U.S. Methane Emissions Reduction Action Plan*, THE WHITE HOUSE, 3 (November 2021). Available at: https://www.whitehouse.gov/wp-content/uploads/2021/11/US-Methane-Emissions-Reduction-Action-Plan-1.pdf

[8]    United Nations Environment Programme, *Global Methane Assessment: Benefits and Costs of Mitigating Methane Emissions*, UNEP, 167 (2021). Available at: https://www.ccacoalition.org/sites/default/files/resources/2021_Global-Methane_Assessment_full_0.pdf

65.     Methane is also a potent greenhouse gas with a warming impact 28 times greater than that of carbon dioxide over a 100-year period.[9]

66.     These dangers are magnified in Colorado where, according to a recent Colorado State University study, unplugged wells emit methane at a rate 70 times that of the national average.[10]

67.     In addition to methane, unplugged wells leak toxins into the air such as benzene, formaldehyde, and hydrogen sulfide.[11]

68.     Benzene is a known carcinogen that, even at low levels, increases the risk of leukemia, birth defects, and pulmonary edema.[12]

69.     Exposure to formaldehyde affects nearly every tissue in the human body, leading to acute and chronic health effects such as lung damage, dermal allergies, asthma, and a host of neurological, reproductive, and genetic impairments.[13]

70.     Hydrogen sulfide is a toxicant that impacts most organ systems and contributes to a range of short- and long-term neurological, respiratory, and blood-related health problems.[14] Symptoms associated with excess hydrogen sulfide exposure have been found to be prevalent in communities with significant oil and gas production activity.[15]

71.     Unplugged wells do not only spew toxic gases; they can also contaminate groundwater. When in a state of disuse and disrepair (as abandoned

---

[9]     United States Environmental Protection Agency, *Overview of Greenhouse Gases* (last updated Feb. 16, 2024)*,* https://www.epa.gov/ghgemissions/overview-greenhouse-gases#CH4-reference
[10]     Stuart N. Riddick et al., *Methane Emissions from Abandoned Oil and Gas Wells in Colorado,* Energy Institute, Col. St. U., 19 (2023). Available at: https://ecmc.state.co.us/documents/library/Special_Projects/Methane_Emissions_Abandoned_Wells_102023.pdf
[11]     *See generally* Gregg P. Macey et al., *Air Concentrations of Volatile Compounds Near Oil and Gas Production: A Community-Based Exploratory Study*, Envtl. Health 13, 1–18 (2014). Available at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4216869/
[12]     *Id*. at 11.
[13]     *Id*. at 14.
[14]     *Id.*
[15]     *Id.*

wells often are), well casings and screens can corrode, allowing wells to become dangerous conduits for oil, gas, and brine waste to contaminate groundwater.[16]

72.    Beyond their various health and environmental impacts, unplugged wells are associated with depressed property values of around 12% as compared to plugged wells.[17]

73.    Rusting abandoned structures associated with oil and gas wells at the end of their useful lives are not just eyesores, they also attract illegal garbage dumping, for example:



*Abandoned well on property of Plaintiffs Cindy and Ronald McCormick.*

---

[16]    American Geosciences Institute, *Abandoned Wells: What Happens to Oil and Gas Wells When They Are No Longer Productive?* (June 2018). Available at: https://www.americangeosciences.org/geoscience-currents/abandoned-wells

[17]    Harleman et al., *Environmental Hazards and Local Investment: A Half-Century of Evidence from Abandoned Oil and Gas Wells*, J. Assn. Envtl. & Resource Economists, Vol. 9(4), 721, 722 (2022). Available at: https://www.journals.uchicago.edu/doi/full/10.1086/719383?casa_token=kscBtdbl9a QAAAAA%3A_IwCfcB3r7Pvn9kUTN-wCe7ZPYHkhJGLd3AHimPRch5B0rbGGIeH3ZN5R1Y1cLvBPIIbaU2kKg



*Tires dumped near the abandoned well on property of Plaintiffs Cindy and Ronald McCormick.*

## V.        Oil and Gas Accounting: An Open Secret

74.    Unfortunately, certain oil and gas companies do not take their plugging, reclamation, and remediation responsibilities seriously. Instead, after drilling and operating the wells, many companies transfer their declining wells to smaller operators, who similarly operate the wells for a time before sending them to even smaller operators.

75.    Knowing they can easily "pass the buck," these companies fail to account for or maintain sufficient funds in reserve for plugging, reclamation, and remediation. Money that should be earmarked for well-plugging is instead paid out in distributions to owners or dividends to shareholders, or used for other parts of the business.

76.    The Environmental Protection Agency has explained how some of this financial sleight of hand is performed: "Through accounting practices and discounting, the costs associated with plugging wells can be delayed far into the future. This delay effectively reduces the present value of costs to the owners and operators and increases the firm's profitability in the short run. Thus, by changing the financial break-even point for when to close the low producing well,

owner/operators can extend the well's production period and push the decision to shut-in the well further into the future."[18]

77.     But "changing the financial break-even point" on paper does not alter the reality that at some point the value of the remaining oil and gas revenues for a well fall below its clean-up costs.[19] It is at that point that the well becomes financially underwater and is of negative-value; *i.e.* it is no longer a positive asset but is instead a net liability.

78.     For example, the wells at-issue here started in the hands of large oil companies before HRM took them on in or around 2014, before transferring them to Painted Pegasus in 2018. These wells were significantly depleted long before HRM ever touched them and, in the aggregate, were likely underwater as far back as 2005, generally depicted as follows:

---

[18]     U.S. EPA, *Regulatory Impact Analysis of the Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review*, 4-20 (December 2023), https://www.epa.gov/system/files/documents/2023-12/eo12866_oil-and-gas-nsps-eg-climate-review-2060-av16-ria-20231130.pdf.

[19]     This disconnect between artificially delayed break-even points and reality, and the systematic reliance by oil and gas companies on deferring liabilities to a later operator, is exemplified by the recent multi-billion-dollar write-down taken by Chevron with respect to its operations in California. This write-down occurred on the heels of a new California law requiring companies that buy wells to put up bonds ***equal to the cost of their remediation***. If Chevron properly valued the costs of its AROs, California's requirement should have had, at most, minimal impact on the business of such a large and well-funded company. *See* Chevron Self-Inflicts Wound *in* CA; Failed to Plug Low Producing Wells That Yield Only 3 Barrels *of* Oil Per Day, Should Blame Itself Not State *for* 'Impairments', *Sa*ys Consumer Watchdog, PR Newswire (February 2, 2024), https://www.prnewswire.com/news-releases/chevron-self-inflicts-wound-in-ca-failed-to-plug-low-producing-wells-that-yield-only-3-barrels-of-oil-per-day-should-blame-itself-not-state-for-impairments-says-consumer-watchdog-302052277.html



79.     This raises questions that deserve answers, such as why would a smaller operator like HRM purchase negative-value wells from an oil giant like Chevron?[20] The answer is that these transfers and sales make business sense **_only if_** the liabilities are ignored.

80.     Smaller operators, like HRM, typically acquire marginal wells, strip out the last drops of revenue, and then pass the wells further down the chain to companies like Painted Pegasus, who then play their part in the scheme: dissipating liability by declaring bankruptcy or dissolving.

81.     Through this practice of passing around depleted wells without correctly accounting for the liabilities, oil and gas companies effectively steal millions of dollars from taxpayers by shifting the costs of plugging wells and

---

[20]     HRM purchased wells from Noble Energy, Inc. in 2014. Chevron acquired Noble Energy in 2020, in a transaction valued at $5 billion, announcing "noble energy is now chevron." *See Noble Energy is Now Chevron,* Chevron (Oct. 1, 2020), https://www.chevron.com/newsroom/2020/q3/chevron-noble-energy

reclaiming and remediating land to taxpayer funded programs while forcing landowners to deal with polluting, hazardous wells for years.

## VI. The Fraud at Issue: Defendants Dumped Millions of Dollars of Clean-up Obligations on Ordinary Coloradans

### A. HRM's Business Practices and Partnership with Kayne Anderson

82.    As discussed above, HRM repeatedly divests and reincarnates itself as nominally different entities, all of which share the same key personnel, engage in the same basic business, and have the financial backing of (and close partnership with) Kayne Anderson.

83.    Kayne Anderson is a large private equity firm registered in Delaware, and headquartered in Los Angeles, California that claims over $30 billion in assets under management, including substantial energy sector holdings. It describes itself as "a leading alternative investment management firm focused on real estate, credit, infrastructure, energy, and growth capital."

84.    Kayne invests heavily in fossil fuel companies and has a long history of backing companies with poor environmental track records.

85.    For example, the Private Equity Stakeholder Project listed Kayne as one of the "Dirty Dozen" private equity firms "fueling the climate crisis and environmental injustice," and previously reported that two of Kayne's Colorado-based portfolio companies are among the top-5 worst methane polluters in the country.

86.    HRM is one of Kayne's portfolio companies, and Kayne was HRM's first major investor in or about 2007, since which time the two companies have worked closely together:

- Kayne provided key financing of approximately $50 million to the first iteration of HRM (HRM I) in 2007.

- Kayne has continued to be HRM's investor throughout each of its iterations.

- Kayne and HRM share personnel.

- Kayne has intimate knowledge of HRM's operations and works hand in hand with HRM as a partner. Indeed, Hutson has publicly touted that

16

HRM views Kayne "as our partners" and includes them as "part of [HRM's] decision making."

- Kayne representatives attend weekly calls with HRM during which details regarding HRM's finances, operations, strategies, and opportunities are discussed.

- Per Kayne's 2020 ESG Investing Report, "HRM actively requests investor participation in weekly management meetings. HRM has found that the investor insights provided at these meetings improve their capacity for risk management."

87.     HRM, through its various iterations, and with funding from Kayne, embraces a business model of purchasing aging wells from larger oil and gas companies and then transferring them to even smaller operators who repeatedly go bankrupt or otherwise dissolve and abandon their clean-up obligations. For example:

- In 2018, HRM transferred wells to Wolverine Resources LLC, which disappeared and left behind 27 wells to Colorado's Orphaned Well Program.

- In 2013 and 2017, HRM transferred over 100 wells to Extraction Oil and Gas, Inc., which subsequently filed for bankruptcy.

- In 2017, HRM transferred around 65 wells to HighPoint Resources Corp., which offloaded the wells onto KP Kauffman Company ("KPK") before going bankrupt. KPK is currently facing large penalties related to enforcement actions by State regulators for failing to follow a cleanup plan or provide adequate financial assurance, which the company itself notes may lead to bankruptcy, making these wells "orphans in waiting".

88.     As of June 30, 2023, **over 40%** of all wells that were listed in Colorado's Orphaned Well Program's Fiscal Year 2022–2023 Annual Report had previously passed through HRM's ownership.[21]

---

[21]     *See* Colorado Energy and Carbon Management Commission, *Fiscal Year 2023 Annual Report Orphaned Well Program* (Sept. 1, 2023), https://ecmc.state.co.us/documents/reg/Enforcement/Orphan%20Wells/Orphaned_Well_Program_FY2023_Annual_Report_20230901.pdf

89.     To put it simply, HRM has established itself as a company to which large oil companies look when it comes time to offload aging wells and escape ARO liabilities.

B.   <u>The At-Issue Wells Are Transferred to HRM</u>.

90.     The majority of the wells at issue here were transferred to HRM during approximately 2013–2015 from five main companies—Chevron Corporation (via its acquired entity Noble Energy Inc.),[22] Foundation Energy Management LLC, Enervest Operating LLC, Hilcorp Energy Company, and Civitas Resources, Inc. (via its acquired company HighPoint Resources, Inc.).[23]

91.     During this period, Hutson was HRM's President and CEO and Pape was VP of Operations and designated agent for HRM. Both were closely involved in the management of the wells at issue.

92.     An inactive or low producing well in Colorado is defined as an oil or gas well that produces a daily average of less than 2 barrels of oil equivalent per day ("BOE/D") or 10 thousand cubic feet of natural gas equivalent ("MCFE") of gas over the previous 12 months.[24]

93.     At the time each of these large oil companies transferred wells to HRM, the average BOE/D for these well bundles indicated that the wells were inactive, low producing, or nearly so.

94.     For example, Chevron (via its acquired entity Noble Energy) transferred more than 50 of the wells at issue to HRM in November of 2014, at which point average well production was around only 1.5 BOE/D.

95.     As another example, when HRM acquired more than 50 of the wells at issue from Foundation Energy Management in December of 2015, the average well production was around only 2 BOE/D.

96.     By the time HRM acquired the wells at-issue and became the operator, even the best-performing wells were no more than "stripper wells"—marginal wells nearing the end of their economically useful life.

---

[22]     *Supra* note 22.

[23]     *Civitas Resources Acquires HighPoint Resources,* Mergr (last visited Feb. 20, 2024), https://mergr.com/civitas-resources-acquires-highpoint-resources

[24]     *See* definition of "inactive well", 100 Series, 2 CCR 404-1.

97.     Nonetheless, HRM extracted and sold what little oil and gas production remained from these wells.

C.   After Squeezing What Profit Remained, HRM Transfers the Wells to Painted Pegasus.

98.     After eking out what was left in these stripper wells, HRM transferred the wells to Painted Pegasus in September 2018.

99.     Illustrating that Painted Pegasus was a mere dumping ground for liabilities, at the time HRM made the Transfer to Painted Pegasus, HRM employee Terry Pape threw several of his own defunct wells (owned by Pape Oilfield Service, Inc.) into the Transfer:



100.    Not only were these HRM and Pape operated wells financially underwater and of negative-value at the time of transfer to Painted Pegasus, but they had likely been underwater *for more than a decade*.

101.    HRM (and Pape) undertook these transfers to pass off their clean-up liabilities to Painted Pegasus, an entity that was structured to go bankrupt and wash away HRM's liabilities.

102.    Per Defendants' plan, Painted Pegasus took the wells and then filed for a Chapter 7 liquidation bankruptcy on November 23, 2021 in U.S. Bankruptcy Court for the Southern District of Texas.

103.    With the bankruptcy behind them, Defendants' scheme to fraudulently transfer negative-value assets and leave trespassing wells on Plaintiffs' property was complete.

104.    In sum, the life cycle of these particular wells, from drilling and ownership by various large oil companies through the funneling of these wells to HRM and then Painted Pegasus, is generally depicted as follows:



105.    The Plaintiff surface owners—families, farmers, and regular Coloradans—were unaware of the fraudulent transfers by HRM to Painted Pegasus until, at the earliest, November 2023.

D. <u>The Details and Timing Surrounding HRM's Transfer to Painted Pegasus Highlights the Fraudulent Nature of the Transfer</u>.

106.    As noted above, HRM acquired the at-issue wells from 2013–2015.

107.    Shortly thereafter, **in July 2017**, Anadarko Petroleum Corporation ("Anadarko") notified producers that the Third Creek gathering system—the gas pipeline that serviced many of the at-issue wells—would shut down:[25]

**SHALE DAILY**
INFRASTRUCTURE | E&P | NGI ALL NEWS ACCESS

## Anadarko Permanently Shutters One DJ Basin Gas Gathering System

 BY **CAROLYN DAVIS**
June 1, 2018

Share on:   

Anadarko Petroleum Corp.'s Third Creek midstream gathering system in Colorado, which provides service for about 30 natural gas producers, has been taken permanently out of service following an assessment.

. . . .

"After closely assessing the system, we took the Third Creek gas gathering system permanently out of service Tuesday," spokeswoman Jennifer Brice told *NGI's Shale Daily*. "Given the very small volumes currently handled by the system, permanently shutting the system down is the safest and most appropriate decision."

Producers first were notified last July that the system would be shut in to provide them enough time to develop alternative solutions, she said.

---

[25]    Carolyn Davis, *Anadarko Permanently Shutters One DJ Basin Gas Gathering System,* NGI (Jun. 1, 2018), https://www.naturalgasintel.com/anadarko-permanently-shutters-one-dj-basin-gas-gathering-system/

108.   Anadarko Petroleum then permanently closed the Third Creek gathering pipeline system on **May 29, 2018**, citing safety concerns after a 2017 explosion in Firestone killed two people and injured a third.

109.   HRM, Hutson, and Pape were well aware that without a gas pipeline, many of the already negative-value wells at issue would become completely unprofitable and would therefore be at the end of their useful lives. In other words, millions of dollars in asset retirement obligations were coming due.

110.   Upon information and belief, during this time, HRM, Hutson, and Hoffman conspired to transfer the wells to Painted Pegasus.

111.   According to plan, on **August 20, 2018**, Hoffman caused Painted Pegasus to apply for foreign entity authority to transact business in Colorado.

112.   The following day, on **August 21, 2018,** as HRM and Hutson undoubtedly knew was coming, HRM received a formal corrective action letter from the COGCC stating that HRM's inactive well count exceeded HRM's financial assurance:



**COLORADO**
Oil & Gas Conservation Commission
Department of Natural Resources

1120 Lincoln Street, Suite 801
Denver, CO 80203

**WARNING LETTER # 401739715**

HRM RESOURCES II LLC (# 10548)
ROGER HUTSON
lrhutson@hrmres.com

410 17TH STREET #1600
DENVER, CO 80202

This Warning Letter is to inform you that HRM RESOURCES II LLC                ("Operator") may be in violation of the rules and regulations of the Colorado Oil and Gas Conservation Commission ("COGCC") and corrective action is required.

The COGCC has reasonable cause to believe that the Operator has committed one or more violations of the Oil and Gas Conservation Act, or of a rule, regulation, or order of the Commission, or of a permit issued by the Commission.  The Operator is required to comply with this Warning Letter by the **Corrective Action Deadline Date**(s) to resolve the alleged violation(s).  Failure to do so will result in the issuance of a Notice of Alleged Violation and initiation of enforcement proceedings in which COGCC will seek monetary penalties for the alleged violations pursuant to § 34-60-121, C.R.S. and Rule 523, COGCC Rules of Practice and Procedure, 2 CCR 404-1.

Alleged Violation(s) and Required Corrective Action(s):

707 Inactive Wells
Violation Date: 08/21/2018
Violation Discovery Date: 08/21/2018

22

113.    Put plainly, if HRM held onto the wells in question, it would have to increase the financial assurance bonding owed to the State in order to continue operations.

114.    Rather than pay an increased bond, and rather than pay to plug these wells and reclaim and remediate the surface land, HRM and Hutson, with the assistance of Painted Pegasus and Hoffman, hurriedly transferred the wells to Painted Pegasus:



115.    At the time of this transfer to Painted Pegasus, the wells were reported by HRM to be producing at around 1 BOE/D on average, many were not producing anything at all, and most notably, the gas pipeline that would have served many of these wells—and was the only way those wells could even arguably be profitable— had closed four months earlier.

116.    Painted Pegasus's sole purpose for entering Colorado was to absorb HRM's negative-value wells. Indeed, according to ECMC's records, Painted Pegasus never purchased, drilled, or operated any other wells in Colorado.

117.    During its short tenure in operation, Painted Pegasus's operations appeared to consist of (a) applying for and collecting Paycheck Protection Program loans of over $170,000 that were later forgiven; (b) receiving at least 14 notices of violations and warning letters from the ECMC, some of which were for missing or incorrect reporting (an administrative record correction related to this transfer was issued as late as February 22, 2023); and (c) then filing bankruptcy.

118.    As discussed above, oil and gas operators have a duty to plug their oil and gas wells and reclaim and remediate the surface land when the wells are no longer being utilized for production and/or it is no longer reasonable for the wells to burden surface owners' property.

119.    Given that, at the time of the Transfer, the wells had been producing at around only 1 BOE/D and, additionally, the closure of the Third Creek gathering pipeline had rendered many of the wells incapable of economically viable production, HRM and Painted Pegasus knew that their duty to plug the wells had come due and it was no longer reasonable to burden the surface estates.

120.    Furthermore, *all* of the unplugged wells at-issue have fallen into the State's Orphaned Well Program. This program is only for wells that are economically nonviable and require plugging, reclamation, and remediation. As such, it follows that all of the unplugged wells need to be plugged, reclaimed, and remediated.

121.    Therefore, leaving these unproductive and uneconomic wells unplugged, and leaving the surface estate un-reclaimed and un-remediated, was, and remains to this day, unreasonable.

E.  A Closer Look at Painted Pegasus' Bankruptcy Proceedings.

122.    The demise of Painted Pegasus was inevitable; in fact, Painted Pegasus' failure was the plan. It was insolvent as soon as it acquired the wells.

123.    Pursuant to the plan, Painted Pegasus filed for bankruptcy on November 23, 2021 in the United States Bankruptcy Court for the Southern District of Texas, hundreds of miles away from the wells it left behind in Colorado.

124.    Painted Pegasus did not notify the landowner Plaintiffs of its bankruptcy filing, or of any potential for creditor status in the bankruptcy proceedings, leaving Plaintiffs with no reason to know that the wells on their properties were being abandoned or that the well operator was literally skipping town and closing operations.

125.     In the bankruptcy proceedings, when asked by the Trustee ". . . what happened to the operations of Painted Pegasus LLC which caused it to fall into bankruptcy? What were the contributing factors?", a Painted Pegasus representative and member responded:

> Contributing factors first was a pipeline closure that shut in approximately 80 wells so half our revenue was basically gone really from 3 months into the operations in Colorado. [unintelligible] regulatory burdens [unintelligible] hurt our ability to [unintelligible] so production [unintelligible] we were not able to increase production so the burdens were more than the revenues.

126.     This statement was purposefully misleading insofar as Painted Pegasus failed to disclose that the pipeline actually closed four months *prior* to Painted Pegasus taking ownership of the wells.

127.     This statement, however, was not without a kernel of truth. Even while misrepresenting the timing, Painted Pegasus admitted, in court, that the pipeline closure—which happened before Painted Pegasus took possession of the wells—doomed the company to bankruptcy.

128.     As noted above, the court later closed Painted Pegasus' bankruptcy case on February 8, 2024.

F.  "The Largest Single-Operator Well Orphaning in State History."

129.     An analysis by the Adams County Community and Economic Development Department rendered a finding that, as of September 2022, **"[t]he Painted Pegasus transfer is the largest single-operator well orphaning in state history."**[26]

130.     Making matters worse, the Department concluded that the only bond money available to address Painted Pegasus' asset retirement obligations would cover just 1.79% of the actual cost of plugging these wells.

---

[26]     Greg Dean, Oil & Gas Administrator, Adams County Colorado, *Memorandum: Adams County Orphaned Well Review*, 3 (Sept. 23, 2022), https://adcogov.org/sites/default/files/2022-10/AdCo-Orphaned-Well-Review-List-092322.pdf (emphasis added).

131.   As the Department noted, all of the wells "operated by Painted Pegasus Petroleum were added to the orphan well list after the company filed for bankruptcy" but the Department "was only able to secure $305,000 in bonding from the company for the remediation of these sites, though it will likely cost $17 million or more."[27]

G.   <u>Even Post-Bankruptcy Filing, HRM Continues to Treat Painted Pegasus as a Dumping Ground</u>.

132.   Emboldened by its success in avoiding its liabilities through its first transfer to Painted Pegasus, HRM brazenly transferred one additional well to Painted Pegasus on October 10, 2023, ***after*** discovering that the well had remaining asset retirement obligations and ***after*** Painted Pegasus was already in bankruptcy.

133.   Put differently, Painted Pegasus was in a Chapter 7 liquidation at the time of this transfer such that there was no business purpose advantageous to Painted Pegasus to accept a transfer of yet another non-producing well with an ARO—the reality is that HRM, Hutson, and Pape were treating Painted Pegasus as a garbage dump for their liabilities.

134.   The transfer of this last well not only helped HRM avoid long-term reclamation and remediation costs related to the well; it also caused a release of HRM's surety bond(s) (or financial assurance) of $85,000 ***to HRM*** while leaving ownership of the transferred well with a bankrupt company with no capacity to ever properly plug, reclaim, and remediate it.[28]

135.   Like the others, that well site is now in the Colorado Orphaned Well Program.

## **Class Allegations**

136.   The above-named Plaintiffs bring this action as a class action, on their own behalf and on behalf of all others similarly situated, pursuant to Colorado Rule of Civil Procedure 23(a) and 23(b)(2)–(3). Plaintiffs reserve the right to redefine the Class as may be appropriate.

---

[27]   *Id.*

[28]   The bond(s) in question was a "blanket bond" that covered a group of several HRM wells. This particular well was apparently preventing the release of HRM's bond(s). To get around this issue, HRM transferred the well to show it was no longer the "owner".

137.    Plaintiffs define the Class as follows:

**All persons who own, lease, or have an interest in surface land in the State of Colorado where such surface land has or had an oil or gas well that was transferred by HRM to Painted Pegasus.**

138.    Excluded from the Class are Defendants; any entities in which they have a controlling interest; their agents, employees, and any member of Defendants' immediate family; and any Judicial Officer to whom this action is assigned and any member of such Judicial Officer's staff and immediate family.

139.    **Numerosity**. There are more than 100 persons that are members of the proposed Class; *i.e.* the members of the Class are so numerous that joinder of all members is impracticable.

140.    Records from county assessors' offices can be used to identify members of the Class who own property or own an interest in property upon which the wells at issue are located. And landowners' records can be used to identify those members of the Class that are leasing property upon which the wells at issue are located. Members of the Class may be notified of the pendency of this action by mail.

141.    Records maintained by State government regulatory bodies identify well owners and operators and indicate operator-reported production levels during all relevant timeframes.

142.    **Typicality**. The above-named Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by and seek damages resulting from Defendants' wrongful conduct that is complained of herein. The common proof would show the same unlawful acts as alleged against each Defendant in the same method against the entire Class.

143.    **Adequacy**. The named Plaintiffs will fairly and adequately assert and protect the interests of the members of the Class because their interests are the same as the Class members and the named Plaintiffs have no interests antagonistic to or in conflict with those of the Class. Adequate representation is also guaranteed as the named Plaintiffs have retained competent and experienced class counsel.

144.    **Predominance and Commonality**. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. These questions include, but are not limited to, the following:

    a.  Whether Defendants are liable for continuing trespass based upon the failure of the Defendants to fulfill their obligations to plug, reclaim, and remediate the wells on their properties;

    b.  Whether the Transfer was made with actual intent to hinder, delay, or defraud creditors, including Plaintiffs, within the meaning of CUFTA or other applicable fraudulent transfer law and the common law;

    c.  Whether HRM was unjustly enriched by wrongfully avoiding its asset retirement obligations and accessing and retaining funds that should have gone to plugging, reclamation, and remediation;

    d.  Whether Defendants knowingly and willfully conspired to facilitate the fraudulent transfer of the wells and to ultimately continuously trespass on Plaintiffs' land;

    e.  Whether Defendants are liable for negligence;

    f.  Whether the members of the Class have sustained damages and, if so, what is the proper measure of damages; and

    g.  What remedies are available to the Class under Colorado law.

145.    Under C.R.C.P. 23(b)(2), through their practices alleged, Defendants have acted on grounds that apply generally to the class such that final injunctive or declaratory relief is appropriate for the Class as a whole.

146.    Under C.R.C.P. 23(b)(3), the common issues of fact and law are also the predominant issues in this action. The resolution of the common issues will resolve the claims of the Class members.

147.    The likelihood that individual members of the Class will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation and redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

148.    **Superiority**. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Many of the Class members may not have the resources to pursue their own individual actions and a class will permit many similarly situated persons and entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would entail.

## Conformity With C.R.S. Section 13-17-201(2)

149.   In accordance with C.R.S. Section 13-17-201(2), Plaintiffs plead that the Colorado Supreme Court has not yet decided a case in which a plaintiff challenged the transfer of an oil and gas well under CUFTA or otherwise asserted trespass and other torts for purposes of creditor standing pursuant to CUFTA. Plaintiffs bring their claims to establish the meaning and applicability of fraudulent transfer law and related common law claims to the context at issue here. Specifically, Plaintiffs seek to establish as a matter of first impression that (a) the abandonment of unplugged, unreclaimed, and unremediated oil and gas wells on a landowner's property constitutes a continuing trespass and/or negligence and the transfer scheme as described above constitutes a conspiracy as to, and aided and abetted by, the parties that nominally transferred ownership of continually trespassing wells; (b) landowners are creditors (for purposes of CUFTA) who may recover against a solvent entity and its conspirators where that solvent entity intentionally transferred negative-value oil and gas wells into a destined-for-bankrupt entity in an effort to hinder, delay, or defraud transferor's creditors, and as a result were negligent and left a continuing trespass burdening Plaintiffs' land; (c) the Defendants have been unjustly enriched at the expense of the Plaintiffs; and (d) a Court order, via a mandatory injunction or otherwise, requiring or resulting in the plugging of the at-issue wells is an available remedy pursuant to C.R.S. Section 38-8-108.

150.   For the reasons described above, and due to the interlocking nature of the claims, all of Plaintiffs' claims for relief fall into the safe harbor established by C.R.S. Section 13-17-201(2).

## CLAIMS FOR RELIEF

## First Claim for Relief
### (Trespass – Against All Defendants)

151.   Each of the preceding paragraphs is incorporated by reference as though fully set forth herein.

152.   Plaintiffs are all legally entitled to possession of their property.

153.   Defendants HRM and Painted Pegasus have no right to physically occupy or intrude upon the Plaintiffs' properties for any reason other than as reasonable and necessary for the development of the mineral interest.

154.     Defendants have no reasonable basis to continue to burden (by physically occupying) Plaintiffs' property.

155.     The continued physical occupation by Defendants' wells (and the associated equipment and materials) of Plaintiffs' private properties prevents Plaintiffs' use and enjoyment of the properties, causes injury to the properties, and otherwise contravenes the private property "right to exclude."

156.     Defendants have caused and continue to cause a wrongful interference with Plaintiffs' possessory rights. The ongoing presence of unplugged wells, equipment, and material is unreasonable under the circumstances and therefore constitutes a direct, continuing, and physical trespass.

157.     The officers and corporate agents of HRM and Painted Pegasus, namely L. Roger Hutson, Terry Pape, and John Hoffman, approved of, sanctioned, directed, actively participated in, or otherwise cooperated in the trespass set forth herein and, accordingly, Messrs. Hutson, Pape, and Hoffman are liable for their companies' torts.

158.     Plaintiffs are entitled to (i) a declaration that Defendants' wells constitute a continuous trespass, (ii) an injunction directing Defendants to abate the trespass, and (iii) compensatory damages in an amount sufficient to remedy the trespass.

159.     As a result of Defendants' torts, including trespass, Plaintiffs have sustained damages in an amount to be proven at trial.

## Second Claim for Relief
### (Violation of the Colorado Uniform Fraudulent Transfer Act – Against HRM and Painted Pegasus)

160.     Each of the preceding paragraphs is incorporated by reference as though fully set forth herein.

161.     Plaintiffs are creditors of HRM and Painted Pegasus as defined in CUTFA.

162.     Plaintiffs are and have been creditors of HRM, by virtue of HRM's asset retirement obligations, since before the Transfer. Additionally, Plaintiffs are and have been creditors under CUFTA because they hold claims against the Defendants for, among other conduct, Defendants' ongoing trespass, negligence,

conspiracy, and obligations to plug the wells and remediate and reclaim the well sites on Plaintiffs' properties. Colo. Rev. Stat. § 38-8-102.

163.   The Transfer from HRM to Painted Pegasus is avoidable under CUFTA or under otherwise applicable State fraudulent transfer laws.

164.   HRM made this transfer with actual intent to hinder, delay, or defraud its creditors, including Plaintiffs, as described above.

165.   HRM made this transfer without receiving a reasonably equivalent value in exchange for the transfer.

166.   HRM made this transfer with the knowledge that the natural consequence of its actions would be that Painted Pegasus would not have sufficient funding to satisfy the plugging, remediation, and reclamation obligations owed to the creditors, including Plaintiffs.

167.   Painted Pegasus became insolvent as a result of these transfers.

168.   Because this transfer is avoidable under CUFTA, or under otherwise applicable State fraudulent transfer laws, Plaintiffs are entitled to certain remedies, including without limitation an avoidance of the transfer, a judgment "for one and one-half the amount necessary to satisfy the creditor's claim," injunctive relief, or "[a]ny other relief the circumstances may require." C.R.S. § 38-8-108.

169.   As a result of Defendants' fraudulent transfer, Plaintiffs have sustained damages in an amount to be proven at trial.

### Third Claim for Relief
### (Civil Conspiracy to Commit Trespass – Against All Defendants)

170.   Each of the preceding paragraphs is incorporated by reference as though fully set forth herein.

171.   The Defendants knowingly and willfully conspired to facilitate the transfer of negative-value assets (wells whose cleanup liabilities exceeded their potential revenues) into a company they knew would go bankrupt, with the ultimate purpose of avoiding paying for plugging, remediation, and reclamation costs associated with the transferred wells.

172.    The Defendants intentionally and jointly facilitated this transfer with the knowledge that doing so would cause continuing trespasses on Plaintiffs' properties when the asset retirement obligations associated with the wells at issue were abandoned in bankruptcy.

173.    This continuing trespass has caused and continues to cause damages to the Plaintiffs in the form of harmful pollution, diminished property values, and impaired use of properties, among other damages.

174.    At the time HRM transferred the wells to Painted Pegasus, the Defendants knew or constructively knew that the wells' liabilities significantly exceeded the value of any revenues they could be expected to ever generate, and they knew or constructively knew that Painted Pegasus did not have the means to properly plug, reclaim, and remediate those wells.

175.    On information and belief, the Defendants understood that transferring wells to Painted Pegasus was a precursor to Painted Pegasus filing for bankruptcy and foisting all clean-up costs onto private landowners (and any government program that might ultimately pay for plugging, reclamation, and remediation).

176.    Defendants knowingly and intentionally conspired to facilitate a series of tortious trespasses that continue to harm Plaintiffs to this day.

177.    As a result of the Defendants' conspiracy, Plaintiffs have sustained damages in an amount to be proven at trial.

## Fourth Claim for Relief
### (Civil Conspiracy to Commit Fraudulent Transfer – Against All Defendants)

178.    Each of the preceding paragraphs is incorporated by reference as though fully set forth herein.

179.    The Defendants knowingly and willfully conspired to facilitate the fraudulent transfer of negative-value assets (wells whose clean-up liabilities exceeded their potential revenues) into a company they knew would go bankrupt, with the ultimate purpose of avoiding paying for plugging, remediation, and reclamation costs associated with the transferred wells.

180.   The Defendants intentionally facilitated this fraudulent transfer with the knowledge that doing so would cause damages to the Plaintiffs in the form of harmful pollution, diminished property values, and impaired use of properties, among other damages.

181.   At the time HRM transferred the wells to Painted Pegasus, the Defendants knew or constructively knew that the wells' liabilities significantly exceeded the value of any revenues they could be expected to ever generate, and they knew or constructively knew that Painted Pegasus did not have the means to properly plug, reclaim, and remediate those wells.

182.   Therefore, in conducting the Transfer, Defendants understood that the Transfer would pass on extensive financial liabilities in the form of negative-value wells—without representing an equivalent value in exchange—and serve as a precursor to Painted Pegasus filing for bankruptcy. In other words, Defendants knowingly and intentionally conspired to facilitate a fraudulent transfer that continues to harm Plaintiffs to this day.

183.   As a result of the Defendants' conspiracy, Plaintiffs have sustained damages in an amount to be proven at trial.

## Fifth Claim for Relief
### (Unjust Enrichment – Against HRM)

184.   Each of the preceding paragraphs is incorporated by reference as though fully set forth herein.

185.   HRM wrongfully avoided its asset retirement obligations by fraudulently transferring the wells at issue to Painted Pegasus and conspiring to create a continuing trespass on Plaintiffs' properties.

186.   In wrongfully avoiding its obligations, HRM retained and was able to use funds it would or could otherwise have used to pay for its asset retirement obligations.

187.   The obligation to plug, remediate, and reclaim the wells always existed and was imminent prior to, but no later than, the date of the Third Creek gathering pipeline closure, at which point continued operation of many of the wells was unreasonable because there was no longer a prospect of profitable operation.

188.   HRM wrongfully benefitted from access to the capital it would have otherwise used to pay to plug, remediate, and reclaim the wells at issue.

189.    HRM was therefore unjustly enriched by both the wrongful avoidance of obligations and the resulting retention of funds that should have gone to clean-up.

190.    It would be unjust for HRM to retain such benefits without commensurate compensation to the Plaintiffs.

191.    As a result of HRM's unjust enrichment, the Plaintiffs have sustained damages in an amount to be proven at trial.

<u>**Sixth Claim for Relief**</u>
**(Aiding and Abetting Trespass – Against HRM, Hutson, Pape, and Hoffman)**

192.    Each of the preceding paragraphs is incorporated by reference as though fully set forth herein.

193.    HRM, Hutson, Pape, and Hoffman acted in concert with Painted Pegasus to facilitate the continuing trespass of the wells at issue on Plaintiffs' properties.

194.    Defendants' scheme to dump negative-value wells onto Painted Pegasus, and ultimately to leave those wells unplugged and the associated well sites unreclaimed and unremediated, was conceived of and executed with the knowing participation and substantial assistance of HRM, Hutson, Pape, and Hoffman.

195.    Indeed, this scheme's success hinged on and was precipitated by HRM, Hutson, Pape, and Hoffman's participation. Specifically, HRM sought to avoid asset retirement obligations associated with the wells at issue and so it encouraged Painted Pegasus to begin operations in Colorado. HRM then transferred its negative-value wells to Painted Pegasus in order to avoid paying clean-up obligations. It did so knowing and intending that this would lead to the continuing trespass burdening Plaintiffs today.

196.    HRM's scheme was plotted and carried out in large part by Hutson, Pape, and Hoffman. Indeed, Pape was so personally involved that he included seven negative-value wells owned by his own small company (Pape Oilfield Services) as part of the same transfer to Painted Pegasus through which HRM dumped its wells.

197.    Furthermore, HRM (directed by Hutson) has continued its participation in the scheme by continuing to use Painted Pegasus as a dumping ground for unwanted wells, as demonstrated by the October 10, 2023 transfer of a well from HRM to the already bankrupt Painted Pegasus.

198.    As a result of HRM, Hutson, Pape, and Hoffman aiding and abetting in trespass, Plaintiffs have sustained damages in an amount to be proven at trial.

## Seventh Claim for Relief
### (Negligence – Against All Defendants)

199.    Each of the preceding paragraphs is incorporated by reference as though fully set forth herein.

200.    Colorado law, since at least 1915, has established that operators must plug, reclaim, and remediate wells that are no longer being utilized.

201.    The wells on Plaintiffs' properties are no longer being utilized and HRM and Painted Pegasus owe a duty to Plaintiffs to plug such wells.

202.    Despite this duty, HRM and Painted Pegasus have not fulfilled their plugging, reclamation, and remediation obligations.

203.    Messrs. Hutson, Pape, and Hoffman personally oversaw operations at their respective companies, and each of them set policies and followed practices that substantially caused or contributed to HRM and Painted Pegasus' ongoing failure to plug, reclaim, and remediate wells as required by Colorado law.

204.    By failing to plug, reclaim, and remediate wells on Plaintiffs' properties in accordance with their obligations, Defendants breached their duty owed to Plaintiffs.

205.    Defendants' breach of duty has caused harm to the Plaintiffs by interfering with their exclusive use, enjoyment, and possession of their property, diminishing its value, and otherwise causing them annoyance and inconvenience.

206.    The harm to Plaintiffs and their property resulting from Defendants' breach was foreseeable.

207.    As officers and corporate agents of HRM and Painted Pegasus, Messrs. Hutson, Pape, and Hoffman approved of, sanctioned, directed, actively participated in, or otherwise cooperated in the negligence set forth herein. Accordingly, Defendants Hutson, Pape, and Hoffman are liable for their companies' torts.

208.    Plaintiffs are entitled to a declaration that Defendants' failure to promptly plug their wells constitutes negligence that is the proximate cause of their injuries, and to compensatory damages in an amount sufficient to remedy their injuries.

209.    As a result of Defendants' torts, including negligence, Plaintiffs have sustained damages in an amount to be proven at trial.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A.    Enter an order pursuant to C.R.C.P. 23 certifying the proposed Class for the purpose of determining the Defendants' liability to Plaintiffs, appointing the above-named Plaintiffs as representatives of the Class, and appointing the above-named Plaintiffs' counsel as counsel for the Class;

B.    Enforce the Plaintiffs' private property rights by declaring that Defendants' failure to promptly plug, reclaim, and remediate its abandoned wells on Plaintiffs' properties constitutes continuing trespass such that Plaintiffs are entitled to an injunction or other relief directing Defendants to abate the trespass and awarding appropriate damages necessary to remedy their injuries;

C.    Award Plaintiffs damages arising from Defendants' torts;

D.    Award Plaintiffs damages and/or order Defendants to disgorge as necessary to prevent Defendants from being unjustly enriched;

E.    Declare that the Transfer from HRM to Painted Pegasus constitutes a fraudulent transfer as defined by CUFTA;

F.    Avoid the Transfer to the extent necessary to satisfy Plaintiffs' claims and reimpose the plugging, reclamation, and remediation obligations associated with the fraudulently transferred wells back onto transferor HRM; or, in the alternative, enter a judgment for one and one-half the amount necessary to satisfy the claims held by the Plaintiffs; and/or impose other relief the circumstances may require;

G.    If appropriate, create a fund from damages awarded against the Defendants to be used to plug and otherwise decommission Plaintiffs' wells and remediate their land;

      H.      If appropriate, appoint a receiver to take charge of and administer this fund;

      I.      Award costs and attorney's fees and interest as appropriate or otherwise allowed by law; and

      J.      Grant Plaintiffs and all Class members such other and further relief as is just and equitable under the circumstances.

## JURY DEMAND

Trial by jury is demanded for all causes of action so triable.

Dated this 22nd day of February 2024.

Respectfully submitted,

**RICHARDS CARRINGTON, LLC**

By:  */s/ Christopher P. Carrington*
     Christopher P. Carrington, #37004

**CLIENTEARTH USA, INC.**

By:  */s/ Camille Sippel*
     Camille Sippel (*pro hac vice* forthcoming)

**BORISON FIRM, LLC**

By:  */s/ Scott C. Borison*
     Scott C. Borison (*pro hac vice* forthcoming)

*Attorneys for Plaintiffs*

*Original signatures on file at the offices of Richards Carrington LLC pursuant to C.R.C.P. 121 §1-26(7).*