**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**Civil Action No. 1:24-cv-00823-CNS-MEH**

CINDY McCORMICK;
RONALD McCORMICK; and,
TRUPP LAND MANAGEMENT LLC,

      Plaintiffs,

v.

HRM RESOURCES, LLC,
HRM RESOURCES II, LLC,
HRM RESOURCES III, LLC,
HRM RESOURCES IV, LLC,
L. ROGER HUTSON,
TERRY PAPE,
PAINTED PEGASUS PETROLEUM, LLC, and
JOHN HOFFMAN,

      Defendants.

---

**MOTION TO DISMISS OF HRM DEFENDANTS, L. ROGER HUTSON, AND TERRY PAPE OR, IN THE ALTERNATIVE, MOTION TO STRIKE**

---

Defendants HRM RESOURCES, LLC ("HRM I"), HRM RESOURCES II, LLC ("HRM II"), HRM RESOURCES III, LLC ("HRM III"), HRM RESOURCES IV, LLC ("HRM IV"), L. Roger Hutson, and Terry Pape (collectively, "HRM Defendants"), through counsel, move to dismiss the Complaint or, in the alternative, move to strike certain allegations from the Complaint.

## I.      INTRODUCTION

The three plaintiffs in this putative class action—two individuals and a limited liability company—allege that they are landowners in Colorado. Oil and gas wells, according to Plaintiffs, sit idle on their properties. These wells, Plaintiffs contend, are past the point that it would be economically viable to continue to produce oil or gas from them. So Plaintiffs believe that Colorado law requires these inactive wells be plugged and their lands reclaimed and remediated. Plaintiffs have filed this class action to try to get that relief for themselves and for others allegedly similarly situated.

Not surprisingly, Plaintiffs contend that the last owner of the about 200 wells at issue—Defendant Painted Pegasus Petroleum, LLC ("P3")—should be responsible for decommissioning them. But Plaintiffs also name as a defendant the wells' *prior operator*, who sold the wells to P3 six years ago. Plaintiffs assert that this company, which they do not identify but lump in with three other Defendant entities sharing similar names, had a duty to plug and abandon these wells. They also allege the unidentified prior operator Defendant sought to avoid its plugging and abandoning obligations by offloading the wells to P3 in a fraudulent transaction. Plaintiffs contend that all four HRM-named Defendants, along with two of their executives, must be held responsible

1

for the wells' plugging and remediation. Yet Colorado law did not require operators to plug and abandon these wells at the time of transfer and does not require prior operators to plug wells that become inactive after they sell them. Plus, Plaintiffs allege that three of the four HRM companies did not even exist at the time of the P3 sale, with one not formed until four years after the sale.

While P3 is unrelated to any of the four HRM companies, according to Plaintiffs, P3 was not an unwitting participant in the HRM companies' alleged plan to skirt millions in decommissioning costs. One of the HRM companies (though it is unclear which one), P3, and executives from the companies allegedly conspired for P3 to buy the wells in 2018 and *then three years later* to declare bankruptcy. Plaintiffs contend that P3 even knew the wells were not economically viable when it bought them. Thus, according to Plaintiffs, this years-long plot was intended to free *both* the HRM companies and P3 from their plugging and abandoning obligations for the wells.

But why P3 would knowingly agree to buy "defunct" wells and participate in the alleged fraud only to file for bankruptcy three years later is left to the reader's speculation. The only plausible explanation is that the sale of the wells to P3 was not fraudulent. There was no duty to plug the wells before their transfer. Unexpected events after the 2018 sale—a global pandemic that collapsed energy prices and new costly Colorado regulatory requirements—left P3's operations too expensive. So P3, like many operators during this time, went bankrupt.

Plaintiffs recognize their theory of prior-owner liability is novel. Yet they assert it is actionable through Colorado statutory claims for fraudulent transfer and common-law

claims for trespass, negligence, and unjust enrichment. They also add civil conspiracy and aiding and abetting claims. There is, however, a difference between novel claims and meritless ones. And the face of the Complaint establishes that the claims against the HRM companies and executives are the latter. Plaintiffs' shotgun pleading should be dismissed under Rules 12(b)(1) and 12(b)(6).

This Court lacks subject matter jurisdiction because Plaintiffs have failed to exhaust their administrative remedies at the Colorado Energy and Carbon Management Commission ("ECMC"), which they must do before suing for an injunction to stop alleged violations of the state's oil-and-gas rules. Plaintiffs also fail to plead an injury in fact traceable to the HRM companies' or executives' conduct sufficient to confer Article III standing. Any harm that Plaintiffs allege is contingent, speculative, and not plausibly tied to the HRM Defendants.

Even apart from the Complaint's jurisdictional deficiencies, it fails to plausibly state a claim for relief. Plaintiffs' claims rest on a few conclusory assertions that P3 gratuitously accepted millions worth of remediation costs in 2018 for no benefit to itself and that all the defendants plotted P3's bankruptcy years later.

Finally, even if any claims could survive dismissal (which they cannot), the Court should strike Plaintiffs' inflammatory, irrelevant allegations pertaining to two non-parties.

## II.  BACKGROUND

### A.  Under Several Novel Theories, Plaintiffs Seek to Hold Past Operators Liable for Wells Orphaned by an Unrelated Entity.

Plaintiffs allege they are landowners with unplugged orphaned oil and gas wells

on their property. Compl. ¶¶ 13–14. The wells were last owned and operated by P3; P3

filed for bankruptcy on November 23, 2021. *Id.* ¶¶ 98, 104, 123. The wells are in

ECMC's Orphan Well Program ("OWP"), meaning they are under the oversight of

ECMC (formerly the Colorado Oil and Gas Conservation Commission ("COGCC")). *Id.*

¶ 120. Wells in the OWP are inspected for safety and environmental reasons and

ultimately will be plugged and abandoned. *See* Decl. of R. Bacaj ("Decl."), Ex. A at 4.[1]

Plaintiffs seek to circumvent this process. *E.g.*, Compl. ¶ 158. They allege that the at-

issue wells were low-producing[2] and were underwater relative to their plugging costs as

far back as 2005. *Id.* ¶¶ 78, 96, 100. Still, each well was sold at least three times

between 2005 and 2018 in sales involving non-parties to this case. *Id.* ¶ 104.

Lumping together the four HRM companies, Plaintiffs contend that "HRM

acquired the at-issue wells from 2013–2015." *Id.* ¶ 106. Plaintiffs do not allege which of

the HRM companies eventually transferred the wells to P3. But according to Plaintiffs'

allegations about when the four HRM entities were created and divested, only HRM III

existed at the time of the 2018 transfer. *See id.* ¶ 18. P3 bought the wells in 2018 and

filed for bankruptcy in 2021. *See id.* ¶¶ 98, 123. P3 could not afford to plug the wells, so

---

[1] For ease of review, public documents—like Exhibit A to the Declaration—cited in this Motion are attached as exhibits. Because "[c]ourts may consider public documents on a motion to dismiss without converting it into a motion for summary judgment." *WildEarth Guardians v. Extraction Oil & Gas, Inc.*, 457 F. Supp. 3d 936, 945, 954 (D. Colo. 2020), this motion to dismiss should not be converted into a motion for summary judgment.
[2] "Low producing" is a regulatory term first defined by the 2022 Financial Assurance rules. *See* Decl. ¶ 8, Ex. F at 16. In that rulemaking, ECMC recognized that the thresholds for "low producing" wells "reflect a level where the well is still producing in sufficient quantities to potentially be profitable." *Id.*

they entered the OWP. *Id.* ¶ 120.

Plaintiffs claim the orphaned wells are part of a fraudulent pattern in the oil and gas industry to concentrate low-performing wells in the ownership of a shell corporation. *Id.* ¶¶ 8, 74–81. Ultimately, the shell corporation files for bankruptcy, orphaning the wells and intentionally avoiding the mitigation costs. *Id.* ¶¶ 8, 80. But Plaintiffs do not allege P3 was a shell corporation or explain the details of the P3 sale—like what benefit P3 got from buying the wells and going bankrupt, how these allegedly obvious fraudulent transfers could have been missed by the bankruptcy court and trustee, or how Colorado's new legislative and regulatory system is now addressing these claimed issues. Instead, Plaintiffs merely allege "HRM sought to avoid asset retirement obligations associated with the wells at issue and so it encouraged Painted Pegasus to begin operations in Colorado" and then transferred the wells to P3 "knowing and intending" P3 would not ultimately plug them. *Id.* ¶ 195.

Plaintiffs generically allege that the transfer of the wells from an HRM entity to P3 was fraudulent, *id.* ¶¶ 160–69, because the duty to plug the wells had already triggered and P3 only accepted the wells to later declare bankruptcy, *id.* ¶ 80. In support, Plaintiffs allege that a *gas* pipeline serving some of these wells shut down on May 29, 2018, but they do not say which wells were affected or the impact on the wells' *oil* production. *Id.* ¶¶ 107–14. They also assert that the wells were low-producing. *Id.*

Based on these threadbare allegations, Plaintiffs assert seven claims against the HRM Defendants: (1) trespass, (2) violation of the Colorado Uniform Fraudulent Transfer Act ("CUFTA"), (3) civil conspiracy to commit trespass, (4) civil conspiracy to

commit fraudulent transfer, (5) unjust enrichment, (6) aiding and abetting trespass, and (7) negligence. *Id.* ¶¶ 151–207. Plaintiffs seek damages for each claim and seek an injunction for the trespass and CUFTA claims to make Defendants plug and remediate the wells. *Id.* Plaintiffs also allege five of the claims against Hutson (the alleged President, CEO, and founder of the HRM companies) and Pape (an alleged V.P. of Operations of the HRM companies) individually.

**B.**   **Since 2018, Colorado Has Significantly Tightened Obligations on Operators. But Even Current Colorado Law Does Not Go as Far as Plaintiffs Allege.**

Plaintiffs allege an oil-and-gas operator's duty to plug and abandon wells in Colorado triggers when "the oil or gas production will end or become uneconomical to produce." *Id.* ¶ 44. When the duty attaches is paramount. Because Plaintiffs allege that the duty to plug automatically triggers for *low producing* wells, Plaintiffs contend the duty to plug the at-issue wells arose *before* P3 bought the wells. *See* Compl. ¶ 119.

But Plaintiffs' recitation of the law is incorrect, both as of the 2018 sale and now. ECMC sets the applicable standards. *See* C.R.S. § 34-60-106(2)(a). Then and now, an oil-and-gas operator could not operate a well unless the operator was registered with ECMC and ECMC had issued a permit for the well. 2018 Rules 302(a), 303(a); 2024 Rules 205(a), 301(a).[3] ECMC would not issue a permit unless an operator posted sufficient "financial assurance," collateral approved by ECMC that would be released

---

[3] For ease of reference, the applicable regulations, 2 Colo. Code Regs. 404-1, are cited as the "2018 Rules" for the regulations in effect when P3 acquired the at-issue wells in September 2018, *see* Decl. ¶ 5, and as the "2024 Rules" for the current rules.

back to the operator upon the transfer of the well to another operator or successful plugging and abandonment of the well. 2018 Rule 702; 2024 Rule 702. Similarly, ECMC oversees transfers of oil and gas wells. Operators are required to submit notices of transfer to ECMC, and no transfer is approved unless the new operator provides financial assurance. 2018 Rules 312(a), 709(d); 2024 Rule 218(b), (h)(3).

2018 Rule 208 permitted COGCC to order a well plugged and abandoned if it was "no longer used or useful in accordance with such reasonable plan as may be prescribed by it." There was no categorical duty to plug (what are now defined as) low-producing wells, or even non-producing wells. Instead, if the wells passed COGCC-required tests, they could remain idle. *See* 2018 Rule 326(b)(1)–(2).[4]

Any plugging order had to follow a public hearing, notice, and an opportunity to be heard. 2018 Rule 505. Such a proceeding could be initiated by the complaint of an aggrieved person—like a surface owner—or by notice from the COGCC. 2018 Rule 502(a), 503(b)(10). Submitting a complaint about a well is simple. ECMC has an online complaint tool, consisting of five questions. *See* Decl. ¶ 6, Ex. B. It also accepts complaints via email. *Id.* And if the public has questions, ECMC has three guides to submitting a complaint and dedicated staff members to assist with the complaint process. *See id.* ¶ 7, Exs. C, D, E.

---

[4] 2018 Rule 326(b)(1)–(2) provides that "[a] mechanical integrity test shall be performed on each shut-in well within two years of the initial shut-in date," and again "on 5 year intervals . . . as long as the well remains shut-in." A shut-in well is one that is not producing, but "capable of production or injection by opening valves, activating existing equipment or supplying a power source."  2018 Rule 100 (definition of "shut-in well"). It is one example of an inactive well. *Id.* (definition of "inactive well").

7

If, following the complaint and public hearing, a well were ordered to be plugged, COGCC rules specified that the then-operator was liable—not prior operators. 2018 Rule 320; *see also* 2018 Rule 100 (defining "operator"). Plus, because plugging is a technical process requiring expert precision and care to ensure that no oil, gas, water, or other substance can migrate out of the reservoir, *see* 2018 Rule 319(a)(1), COGCC required operators to submit a well abandonment report and plugging plan, 2018 Rule 311(a). Only after COGCC approved the plugging plan could an operator commence pumping cement (or another approved substance) into the wellbore to mechanically isolate the surface from the reservoir and complete the plugging. *Id.*; 2018 Rule 319.

Now, Colorado law is stricter on operators—more strict than any other state, in fact. *See* Decl. ¶ 8, Ex. F at 1 (COGCC touting its new financial assurance rulemaking as "the strongest [protections] in the nation"). Yet Plaintiffs in effect ask this Court to judicially override the Colorado General Assembly and ECMC. Again, Plaintiffs allege that operators have a duty to plug *low producing wells*. Compl. ¶ 44. "Low producing wells" are those producing "a daily average of less than 2 barrels of oil equivalent" for the prior year—a level that ECMC has recognized may still be profitable for the operator, *see supra*, note 2. But contrary to Plaintiffs' assertions, operators have no such categorical obligations, either for non-producing or low-producing wells.

Instead, ECMC expressly contemplates non-producing wells remaining safely *un*plugged. 2024 Rule 417(c) (requiring mechanical integrity testing on temporarily abandoned wells "on 5 year intervals . . . as long as the Well remains temporarily abandoned"). If applicable criteria are met, ECMC may order these wells plugged. *See*

8

2024 Rule 211. It also *may* order an operator to plug low-producing wells in specified circumstances: upon application by a surface owner or local government authority and following a public hearing in front of ECMC. 2024 Rule 503(g)(12). The surface owner or local government's application must include three specific criteria: a certification that they conferred with the operator, evidence that the well has been low-producing for at least three years, and evidence that the well is no longer used or useful or a threat to public health, safety, welfare, the environment, or wildlife resources. *Id.* In either instance, the matter "will automatically be assigned to an Administrative Law Judge or Hearing Officer" to decide "all issues of fact and law" in accordance with the specific case management and hearing procedures—which include issuing subpoenas, hearing witnesses, taking evidence, and submitting argument—under Rules 507, 509, 510, and 516. 2024 Rule 503(h). Any final order is subject to judicial review. 2024 Rule 501(d).

If, as Plaintiffs allege, operators have a categorical duty to plug and abandon even low-producing wells—enforceable by court order through a novel application of common law—this entire framework and process is nugatory.

Plaintiffs never mention these state-imposed rules and regulations or policies, let alone the ongoing effort of the legislative and executive branches to produce them. Most notably, in 2019, the General Assembly enacted S.B. 19-181, drastically rewriting the Oil and Gas Conservation Act. *See* Decl. ¶ 9, Ex. G. The General Assembly rewrote the legislative purpose of the law, shifting from "foster[ing] the responsible, balanced development . . . of oil and gas" to "regulat[ing] development and production of . . . oil and gas . . . in a manner that protects public health, safety, and welfare." *Id.* § 6. It

9

directed ECMC to enact rules to meet this mission change—which it did in 2020. *See* Decl. ¶ 10, Ex. H at 1.

Plus, in July 2018, then-Governor John Hickenlooper issued an executive order "to expand existing efforts to plug, remediate, and reclaim existing orphaned oil and gas wells and sites, and to prevent additional wells and sites from being orphaned in the future." *See* Decl. ¶ 11, Ex. I at 1. He directed COGCC to "use its best efforts to plug, remediate, and reclaim Orphaned Wells," to "issue guidance regarding the process for Operators to access Orphaned Wells . . . to conduct voluntary plugging," and to "promulgate rules to ensure the sufficiency of financial assurance, including funding plugging, remediation, and reclamation activities for future Orphaned Wells" by September 2019. *Id.* at 2–3.

This executive order spurred the OWP. *See* Decl. ¶ 3, Ex. A at 1–2; Decl. ¶ 12, Ex. J at 1. Under that program, ECMC takes control of orphaned wells. Using its authority to "[e]nter . . . any lands or waters, public or private" (C.R.S. § 34-60-123(6)(a)), its team physically examines wells and assesses them as high, medium, or low risk, based on consideration of multiple risk factors. *See* Decl. ¶ 3, Ex. A at 4; *see also* Decl. ¶ 11, Ex. I at 1. Then, the OWP team defines the scope of work needed on the wells. *See* Decl. ¶ 3, Ex. A at 4. If a "responsible party"—defined *not* to include prior operators of wells—exists, ECMC may order that party to perform or pay for the necessary work. C.R.S. § 34-60-124(7), (8)(b)(I). If the well does not currently have an operator or responsible party, ECMC may expend funds to cover the cost of the necessary work. *Id.* § 34-60-124(4); Decl. ¶ 12, Ex. J at 2. In these cases, ECMC

oversees and controls all of the necessary work, requiring it to be completed "consistent with technical requirements and any timing limitations of the Orphaned Site Application," and ultimately "verif[ying] work." Decl. ¶ 12, Ex. J at 1, 3.

The at-issue wells are in the OWP, meaning the OWP oversees and exercises control over them. By the OWP's publicly available information, it has already spent over $635,000 on its oversight of the P3 wells and has even plugged some of them. *See* Decl. ¶¶ 13, 14. It categorizes all the P3 wells as "In Progress," meaning that the OWP has inspected them and is conducting ongoing site operations. *See id.* ¶ 14.

## III.    LEGAL STANDARD

"Rule 12(b)(1) permits a party to move to dismiss for 'lack of subject matter jurisdiction.'" *Prairie Protection Colo. v. USDA Aphis Wildlife Servs.*, No. 19-cv-2537-WJM-KLM, at *4 (D. Colo. June 25, 2020) (quoting Fed. R. Civ. P. 12(b)(1)). Article III of the U.S. Constitution limits the jurisdiction of federal courts to the adjudication of cases or controversies. Article III standing requires a plaintiff to plausibly allege: (1) an injury in fact; (2) a causal connection between that injury and the defendant's conduct at issue; and (3) a likelihood that the injury will be redressed by a favorable decision. *E.g.*, *Santa Fe All. For Pub. Health & Safety v. City of Santa Fe*, 993 F.3d 802, 813 (10th Cir. 2021).

To survive a motion to dismiss under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although the Court must accept as true all well-pleaded allegations, it cannot

11

accept as true legal conclusions couched as facts. *Ashcroft*, 556 U.S. at 678.

## IV.    ARGUMENT – MOTION TO DISMISS

The Court should dismiss Plaintiffs' claims under Rule 12(b)(1) for lack of subject matter jurisdiction because Plaintiffs failed to exhaust their Colorado administrative remedies and failed to plead Article III standing. Should any claims survive dismissal under Rule 12(b)(1), the remaining claims should be dismissed under Rule 12(b)(6).

## A.    Plaintiffs' Claims Should Be Dismissed Under Rule 12(b)(1).

### 1.    Plaintiffs Have Failed to Exhaust Their Administrative Remedies.

When a "matter complained of is within the jurisdiction of [an] administrative [agency]," a court "lack[s] jurisdiction over the controversy." *Bd. of Cnty. Comm'rs v. Moga*, 947 P.2d 1385, 1391 (Colo. 1997). Likewise, "[w]here administrative remedies are available and have not been exhausted, the courts lack subject matter jurisdiction and the case must be dismissed." *City of Boulder v. Pub. Serv. Co. of Colo.*, 996 P.2d 198, 204 (Colo. App. 1999). Courts "strictly adhere" to the exhaustion doctrine, which "requires parties to pursue statutory remedies before seeking relief in district court." *Colo. Dep't of Pub. Health & Env't v. Bethell*, 60 P.3d 779, 784 (Colo. App. 2002).

The duty to exhaust one's administrative remedies arises when "complete, adequate, and speedy remedies are available." *Bazemore v. Colo. St. Lottery Div.*, 64 P.3d 876, 878 (Colo. App. 2002). Only two exceptions to the exhaustion doctrine exist: "when it is clear beyond a reasonable doubt that further administrative review by the agency would be futile," or "when the matters in controversy are matters of law that the agency lacks the authority or capacity to determine." *City & Cnty. of Denver v.*

*United Air Lines*, 8 P.3d 1206, 1213 (Colo. 2000). Courts require administrative exhaustion for many reasons: (1) to "prevent piecemeal application of judicial relief"; (2) to "conserve judicial resources"; (3) to enable the agency to "make initial determinations on matters within its expertise"; (4) to "compile a record that is adequate for judicial review"; and (5) to allow an agency "the opportunity to correct its own errors." *State v. Golden's Concrete Co.*, 962 P.2d 919, 923 (Colo. 1998).

Plaintiffs should be ordered to exhaust their administrative remedies here. Plaintiffs seek to have the wells on their properties plugged—whether by this court ordering an injunction or awarding compensatory damages. *E.g.*, Compl., ¶ 158. But this relief must come from ECMC, and Plaintiffs do not allege they contacted ECMC. *See* Compl., ¶¶ 13–15, 73, 105 (sole allegations of Plaintiffs' actions).

Under C.R.S. § 34-60-114, a plaintiff pursuing injunctive relief involving an alleged violation of the Oil and Gas Conservation Act and its related rules and regulations must first "notif[y] the commission in writing of such violation or threat thereof and . . . request[] the commission to sue . . . to prevent any or further violation." *Id.* Only if ECMC does not bring suit may a private plaintiff pursue injunctive relief. *Id.* If an injunction is granted, ECMC must be substituted as the plaintiff. *Id.*

This makes sound policy, particularly in the context of plugging and abandoning wells. ECMC's plugging rules are highly technical and must be carried out by industry experts. *See, e.g.*, 2024 Rule 434(a)(1). Further, because failure to properly plug and abandon a well may pose danger or environmental harm, ECMC must approve plugging and abandonment. *See id.* So injunctive relief from a Court would necessarily lead back

13

to ECMC because a well cannot be plugged without ECMC's involvement. *Id.*

Because the wells orphaned by P3 are in the OWP, ECMC already oversees the inspection and remediation of the wells. Indeed, ECMC has spent over $635,000 in their oversight of the P3 wells, which includes already plugging some of them. Decl. ¶¶ 13– 14. This is relevant for two reasons. First, none of the HRM Defendants have any legal right to access the wells, and thus—absent ECMC's involvement—they could not plug them even if they wanted to. *See* Compl., ¶ 98. Second, because ECMC's efforts are ongoing, a court order for Defendants to plug the at-issue wells would disrupt ECMC's efforts.

Moreover, in Colorado, "when an agency directs a party to follow certain administrative procedures consistent with that agency's governing statutes or ordinances, the party must exhaust those procedures." *City & Cnty. of Denver*, 8 P.3d at 1208. ECMC's regulations direct parties who seek the plugging of a well to "file an application to Plug and Abandon a Well or close an Oil and Gas Location pursuant to Rule 211." 2024 Rule 503(g)(12). That the regulation says a surface owner "*may* file an application" does not relieve Plaintiffs of their duty to exhaust administrative remedies at ECMC. Quite the opposite. "Where a [law] uses the word 'may' to refer to an administrative [remedy], Colorado courts have consistently imposed an exhaustion requirement." *See Colo. Stormwater*, 529 P.3d at 134. And Plaintiffs could easily avail themselves of ECMC's administrative remedies. Submitting a complaint with ECMC is straightforward, Decl. ¶ 6, Ex. B; ECMC has three written guides, Decl. ¶ 7, Exs. C, D, E, and staff dedicated to handling complaints, *id.*

14

Nor would it be futile to go to ECMC. ECMC can provide complete, adequate, and speedy remedies to parties who seek the plugging of a well, or who are concerned with an operator's financial assurances obligations. *See* Decl. ¶ 15, Ex. K (documenting emergency work done on an orphaned well in response to a landowner's complaint). Far from the hapless agency that Plaintiff portrays ECMC to be, ECMC possesses oil and gas expertise; it writes the rules; and, when necessary, it enforces them. Requiring Plaintiffs to turn to ECMC would direct their grievances to the proper channel.

At bottom, it is Plaintiffs' burden to prove that this Court has subject-matter jurisdiction over their claims, and Plaintiffs did not do so. Because Plaintiffs have not pleaded that they have raised the issue with ECMC, *see* ¶¶ 13–15, 73, 105, they have failed to exhaust administrative remedies, as required by section 34-60-114. So, until Plaintiffs do so, the Court should not exercise jurisdiction over their case. "To allow parallel judicial proceedings on these same issues, rather than giving the Commission the first opportunity to decide them, would go against the legislative intent revealed by the Act's declaration, language, and administrative processes." *Grant Bros. Ranch, LLC v. Antero Res. Piceance Corp.*, 409 P.3d 637, 645 (Colo. App. 2016) (cleaned up).

### 2.    Plaintiffs Fail to Plead an Actual Injury Traceable to the HRM Companies' or Executives' Conduct.

It is the plaintiff's burden to plausibly allege Article III standing. *Colo. Manufactured Hous. Ass'n v. Bd. of Cnty. Comm'rs*, 946 F. Supp. 1539, 1543 (D. Colo. 1996). To establish the first prong of standing, a plaintiff must allege an injury that is "concrete . . . not abstract." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021)

(quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016)); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (requiring an injury that is "actual or imminent, not conjectural or hypothetical"). "Allegations of possible future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). Under the second prong of standing, a plaintiff must plausibly allege that its injury is "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party." *Lujan*, 504 U.S. at 560. "[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *Ramirez*, 594 U.S. at 431. Plaintiffs have not alleged an injury-in-fact traceable to the HRM Defendants.

This pleading failure is most glaring for Plaintiff Trupp Land Management LLC, which is mentioned by name in the Complaint just once: "[Trupp] is a landowner that owns property in Adams County, Colorado, where one of the at-issue wells is located." Compl., ¶ 14. As for the McCormick Plaintiffs' allegations of specific harm, they allege that "abandoned structures associated with oil and gas wells at the end of their useful lives . . . attract illegal garbage dumping," and someone dumped tires near the well on their property. *Id.* ¶ 73. But they do not allege who dumped the tires, let alone that a Defendant did it. *Id.* So any harm is not traceable to an HRM Defendant but is traceable to "the independent action of some third party." *Lujan*, 504 U.S. at 560. That is not enough for Article III standing.

The rest of the harms Plaintiffs allege are conclusory, speculative, and not traceable to the HRM companies or executives:

16

- "Plaintiffs . . . *will remain at risk* of both economic and physical harm from hundreds of oil and gas wells unlawfully abandoned on their properties." *Id.* ¶ 1 (emphasis added).

- "This continuing trespass has caused and continues to cause damages to the Plaintiffs in the form of harmful pollution, diminished property values, and impaired use of properties, among other damages." *Id.* ¶ 173; *see also id.* ¶ 180.

- "The continued physical occupation by Defendants' wells (and the associated equipment and materials) of Plaintiffs' private properties prevents Plaintiffs' use and enjoyment of the properties, causes injury to the properties, and otherwise contravenes the private property "right to exclude." *Id.* ¶ 155; *see also id.* ¶ 12.

Being *at risk* for future economic and physical harm from the wells cannot alone confer standing. *Ramirez*, 594 U.S. at 436–37. These allegations are also conclusory and thus not entitled to a presumption of truth. *See Moore v. Texaco*, 244 F.3d 1229, 1231–32 (10th Cir. 2001) (noting that a party must provide a "factual basis"—not "conclusory terms"—to plausibly allege a pollution-related claim). Plaintiffs' allegations that they have been damaged by "harmful pollution" from the wells, Compl., ¶ 173, is also conclusory and must be disregarded, *see Moore*, 244 F.3d at 1231–32. While Plaintiffs describe pollution and sickness that could result from oil and gas wells, Compl., ¶¶ 60–70, they do not link these potential ills to the wells at issue and do not allege that they themselves have suffered any of these injuries from the wells, *cf. List Interactive, Ltd. v. Knights of Columbus*, 303 F. Supp. 3d 1065, 1076 (D. Colo. 2018) (concluding that the plaintiff did not "satisf[y] its burden as it relates to causation because its theory relies on 'speculative inferences' to connect its alleged injury . . . to the [defendant's conduct]"). Plaintiffs' contention that the P3 wells have caused them

17

damages in the form of "diminished property values," Compl., ¶ 173, is similarly unsupported and speculative, *see List Interactive*, 303 F. Supp. 3d at 1076.

Plaintiffs' bald allegations that the wells "and the associated equipment and materials" that "Defendants have left on Plaintiffs' land" have interfered with their use and enjoyment of the properties also do not confer standing. *Id.* ¶¶ 12, 155. Plaintiffs do not allege how or how much the wells and related equipment have interfered with their use and enjoyment of the properties. *See id.* They do not describe the "equipment and materials" or where the wells are located on their properties. *Id.* ¶ 12.

And even if the existence of the P3 wells and equipment remaining on their properties were sufficient standalone harms, Plaintiffs do not plausibly allege these harms are traceable to the HRM companies' or executives' conduct. *See id.* They do not allege who put the wells or equipment on their properties in the first instance. *Id.* Plaintiffs also do not adequately allege that the HRM companies or executives have caused the wells and equipment to remain on their properties. *Id.* Plaintiffs lump together all Defendants and say they are all responsible for the wells and equipment being left—along with all the other conclusory or speculative harms they allege. *E.g.*, *id.* ¶ 155. But that is not plausible from the Complaint.

According to Plaintiffs, HRM IV, Hutson, and Pape never had any ownership interest in the wells. *See id.* ¶ 16. And HRM I, II, and III have had no interest in, or been involved in the operation of, these wells in more than a half-decade. *Id.* ¶¶ 16, 19, 98. It is not even clear they could have plugged and abandoned the wells without causing a trespass to Plaintiffs. *See*, *e.g.*, Decl. ¶ 12, Ex. J at 1 (stating COGCC "will provide

assistance as appropriate" to obtain surface access rights to plug orphaned wells). And the HRM Defendants could not have plugged and abandoned the wells without harming the operator of record, P3. Nor are there any plausible allegations that the HRM Defendants had anything to do with P3's bankruptcy. Compl., ¶¶ 122–28.

Finally, even if the Court ordered a Defendant to plug the wells, the wells are in ECMC's custody and control, and thus, Plaintiffs' alleged injuries cannot "be redressed by a favorable decision." *Santa Fe*, 993 F.3d at 813. In other words, even if Plaintiffs prevail before this Court, Defendants will be unable to plug any of the wells at issue; only ECMC will. Plaintiffs' claims therefore should be dismissed for lack of standing.

**B.   <u>Plaintiffs' Claims Should Be Dismissed Under Rule 12(b)(6).</u>**

**1.   The Complaint Lacks Specific Allegations as to Each of the HRM Companies Sufficient to State Claims for Relief.**

Under Rule 8, a complaint must "make clear exactly *who* is alleged to have done *what* to *whom*, to provide each [defendant] with fair notice as to the basis of the claims against [it]." *Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008). Indeed, when a complaint uses "either the collective term 'Defendants' or a list of the defendants named individually but with no distinction as to what acts are attributable to whom, it is impossible for any of these individuals to ascertain what particular [unlawful] acts they are alleged to have committed." *Id.* (requiring dismissal where complaint made "no mention of which if any of these defendants had direct contact with [the decedent and plaintiffs], and for those defendants who had no direct contact, how they might be individually liable for deprivations of [the decedent's] constitutional rights").

19

The Complaint fails to distinguish between the HRM companies, much less

plausibly allege claims against each. Plaintiffs begin their Complaint by alleging:

> 15.    **Defendants HRM Resources, LLC ("HRM I"), HRM Resources
> II, LLC ("HRM II"), HRM Resources III, LLC ("HRM III")** and **HRM
> Resources IV, LLC ("HRM IV"),** are Delaware LLCs with a principal place of
> business in Denver, Colorado (collectively "HRM").

Compl. ¶ 15. But that is where Plaintiffs' distinguishment between these four separately

named entities ends, as the rest of the Complaint does not allege facts sufficient to state

claims against any of them. Plaintiffs instead generally allege that "HRM is the

transferor of the at-issue wells," and their claims hinge on the idea that HRM

(collectively) funneled and "transferred the wells to Painted Pegasus." *Id.* ¶¶ 16, 104,

181. But Plaintiffs do not allege (plausibly or otherwise) which of the four HRM

companies transferred the wells to P3 or otherwise specify what conduct they are

allegedly responsible for. *Id.* ¶ 162–67. To the contrary, Plaintiffs allege that HRM I and

HRM II no longer existed when the wells at issue were transferred to P3 in 2018. *Id.* ¶

18. And Plaintiffs do not even try to include allegations explaining how HRM IV—which

they allege was not formed until 2022—could have transferred the wells at issue four

years earlier in 2018. *Id.* ¶ 18.[5] By "lump[ing] all the defendants together and fail[ing] to

distinguish their conduct," Plaintiffs have "fail[ed] to give adequate notice to the . . .

defendants as to what they did wrong." *Appalachian Enters., Inc. v. ePayment*

*Solutions, Ltd.*, No. 01-CV-11502 (GBD), 2004 WL 2813121, at *7 (S.D.N.Y. Dec. 8,

---

[5] HRM III and HRM IV are each mentioned three times in the 200-plus paragraph
Complaint. Compl. ¶¶ 15, 18, 21.

2004); *see also Robbins*, 519 F.3d at 1250.

>    **2.**    **The Claims Against Hutson and Pape Must Be Dismissed Because Plaintiffs Do Not State a Corporate Veil-Piercing Claim**.

Hutson and Pape cannot be held liable for the HRM companies' obligations "solely by reason of being a member or acting as a manager," Del. Code tit. 6, § 18-303(a).[6] So Plaintiffs must rely on a veil-piercing theory. Piercing an entity's corporate veil to impose liability on an individual defendant is disfavored, and courts will pierce the veil only in extraordinary circumstances. *Manichaean Cap., LLC v. Exela Techs., Inc.*, 251 A.3d 694, 706 (Del. Ch. 2021). A plaintiff must plead nonconclusory facts supporting at least some veil-piercing factors: (1) the company was undercapitalized; (2) the company was insolvent; (3) the company did not observe corporate formalities; (4) a dominant shareholder siphoned company funds; and (5) the company "simply functioned as a façade for the dominant shareholder." *Trinity Indus. Leasing Co. v. Midwest Gas Storage, Inc.*, 33 F. Supp. 3d 947, 972 (N.D. Ill. 2014) (applying Delaware law). "Effectively, the corporation must be a sham and exist for no other purpose than as a vehicle for fraud." *Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999).

Plaintiffs have pleaded no facts to support any of the factors relevant to piercing the corporate veil. *See* Compl., ¶¶ 109–12, 133. Nor have Plaintiffs alleged facts

---

[6] Federal courts exercising diversity jurisdiction under CAFA look to the entity's state of incorporation to determine whether its corporate veil may be pierced, *see All Plastic, Inc. v. Samdan LLC*, No. 20-CV-01318-NYW, 2021 WL 463625, at *4 (D. Colo. Feb. 8, 2021). Each HRM Defendant is a Delaware LLC. Compl. ¶ 15.

suggesting that the HRM companies were a sham or "little more than a legal fiction." *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 485 (3d Cir. 2001). Plaintiffs thus have not pleaded a claim to pierce the HRM companies' veils.

### 3.     Plaintiffs Have Failed to Plausibly Allege a CUFTA Claim.

Plaintiffs allege two violations of the CUFTA: (1) C.R.S. § 38-8-105(1)(a) on the basis of "actual fraud"; and (2) C.R.S. § 38-8-105(1)(b) on the basis of "constructive fraud." *See In re Blair*, 594 B.R. 712, 741–42 (Bankr. D. Colo. 2018). Because Plaintiffs fail to plausibly allege either claim, this Court should dismiss Plaintiffs' CUFTA claims.

### A.     *Plaintiffs have failed to plead the elements of a CUFTA claim.*

Both "actual fraud" and "constructive fraud" claims under section 38-8-105(1) require a plaintiff to establish that he or she is a "creditor," that the defendant is a "debtor as to [the] creditor," and a fraudulent transfer. A "creditor" is "a person who has a claim," and a "debtor" is "a person who is liable on a claim." C.R.S. § 38-8-102(5), (7). A "claim" is "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." *Id.* § 38-8-102(3). Plus, because CUFTA exists "to afford protection to creditors," *Schempp v. Lucre Mgmt. Grp., LLC*, 18 P.3d 762, 764 (Colo. App. 2000), a plaintiff must show that an allegedly fraudulent transfer "hindered or delayed [the plaintiff's] *ability* to collect what [the debtor] owed her," *Vickery v. Evelyn V. Trumble Living Tr.*, 277 P.3d 864, 869 (Colo. App. 2011) (emphasis in original).

Plaintiffs fail to plausibly establish these elements of a CUFTA claim. To establish their "claim" against each HRM Defendant, Plaintiffs rely on the flawed, novel

theory that each HRM had a duty to plug the at-issue wells—even if they were still producing—and that this duty triggered before they were transferred to P3. Compl., ¶ 119. Put directly, Plaintiffs allege *that the timing* (the duty to plug and corresponding asset retirement obligations triggered in August 2018, and the wells were transferred to P3 in September 2018) *and the circumstances of the transfer* (the wells were low-producing) show fraudulent intent. *Id.* But, as explained above, Colorado has not recognized a categorical duty to plug (what are now defined as) low-producing wells (or even non-producing wells). Because Plaintiffs do not plausibly allege any of the at-issue wells were required to be plugged when they were operated by any HRM Defendant, Plaintiffs never had a right to payment from any HRM Defendant—meaning they lack a "claim" for purposes of CUFTA. *See* § 38-8-102(3). Absent that, Plaintiffs are not "creditors," the HRM Defendants are not "debtors," and Plaintiffs' CUFTA claims must fail. Nor do Plaintiffs plausibly establish a CUFTA injury: namely, that they cannot collect on their alleged "claims" because the P3 transfer moved any HRM Defendants' assets out of their reach. *See Vickery*, 277 P.3d at 869.

Ultimately, Plaintiffs' fraudulent transfer claims are an attempt to force this case into an inapplicable legal theory (and, in effect, judicially rewrite Colorado's strict and thorough plugging and abandoning laws). CUFTA provides "an ancillary remedy," meaning it "offers a creditor with a claim against a debtor the legal means to preserve its right to compensatory redress." *Gulf Ins. Co. v. Clark*, 20 P.3d 780, 782–83 (Mont.

2001).[7] So CUFTA does not support undoing a transaction to impose a duty after-the-fact, as Plaintiffs would have it. Rather, it protects a creditor's ability to recover on another, independent claim. *In re JTS Corp.*, 617 F.3d 1102, 1111 (9th Cir. 2010). CUFTA's remedies focus on that target; creditors may "void[] a previous transfer," "place[] an attachment on a transferred asset," or "enjoin[] either the debtor or transferee from further disposition of the transferred asset." *Gulf Ins. Co.*, 20 P.3d at 783; C.R.S. § 38-8-108(1). Because Plaintiffs have not pleaded the elements of a CUFTA claim against any HRM Defendant, those claims should be dismissed.

**B.     *Plaintiffs have failed to state a claim for "actual fraud."***

To satisfy Rule 8's requirements for an actual fraud claim under CUFTA, Plaintiffs must plausibly allege that <u>each</u> HRM Defendant (*see supra* § IV.B.1) transferred wells to P3 with actual intent to hinder, delay, or defraud an alleged creditor, such as Plaintiffs. *See* C.R.S. § 38-8-105(1)(a). CUFTA sets out a non-exclusive list of eleven factors—or, "badges of fraud"—that may support a finding of actual intent. *See Blair*, 594 B.R. at 742–43; C.R.S. § 38-8-105(2)). While a plaintiff need not prove all eleven factors, "several badges of fraud considered together may [imply] intent to defraud." *Blair*, 594 B.R. at 743. Plaintiffs fail to meet this high standard. In addition, Plaintiffs' claims fail under Rule 9(b)'s requirements applicable to claims of actual fraud under subsection 105(a), which requires plaintiffs to "state with particularity the

---

[7] CUFTA derives from the Uniform Fraudulent Transfer Act. Under C.R.S. § 38-8-112, CUFTA must "be applied and construed to effectuate its general purpose to make uniform the law with respect to [fraudulent transfers]." So out-of-jurisdiction case law construing the Uniform Fraudulent Transfer Act is persuasive.

circumstances constituting fraud" to survive a motion to dismiss. *Touchtone Grp., LLC v. Rink*, 913 F. Supp. 2d 1063, 1076 (D. Colo. 2012).

Plaintiffs fail to state a claim of actual fraud for several reasons. First, after setting aside Plaintiffs' conclusory allegations and incorrect legal assertions about when the duty to plug triggered, Plaintiffs' allegations amount to (1) the HRM companies collectively sold wells to P3—an independent, out-of-state entity; (2) P3 went bankrupt years later; and (3) P3's bankruptcy prevented the HRM companies' from fulfilling their obligations for the wells conveyed to P3 years earlier. Because Plaintiff's allegations "are so general that they encompass a wide swath of conduct, much of it innocent, [they] have not stated a plausible claim." *Titan Feeding, LLC v. Corey Cattle Co., LLC*, No. 19-CV-02541-PAB-SKC, 2022 WL 4182458, at *4 (D. Colo. Sept. 13, 2022).[8]

Second, Plaintiffs have not alleged even one of the eleven "badges of fraud" that CUFTA contemplates for claims of actual fraud. There are no allegations, for example, that P3 is an "insider" of the HRM Defendants, or that the HRM Defendants retained

---

[8] To accept Plaintiffs' theory of the case would require at least three implausible facts to be true. First, the HRM Defendants must have known that P3 would go bankrupt after they transferred their wells. Second, the HRM Defendants must have known that no bankruptcy trustee would have objected to P3's bankruptcy plan, and that the bankruptcy court would approve said plan. Third, the HRM Defendants would have had to convince P3 (a for-profit entity) to buy wells that had no financial value, just so the HRM Defendants could avoid their plugging obligations. No such facts have even been alleged. *See* Compl., ¶¶ 122–28. On top of these implausible facts, Plaintiffs' theory requires this Court to disregard both common sense and recent history: for-profit companies do not do business to intentionally go bankrupt; Colorado's oil and gas industry has undergone significant legal and regulatory changes since 2018 that have made it more expensive for operators; and less than two years after P3 bought the wells, a global pandemic caused the price of oil to plummet.

control or possession of the wells after the transfer, or that the HRM Defendants concealed the transfer or the wells at issue. *See* C.R.S. § 38-8-105(2). To the contrary, COGCC approval of the transfer was required. 2018 Rule 218(b). Plaintiffs' failure to allege a single badge of fraud commands dismissal of their claims.

Finally, "a conveyance cannot become fraudulent at some point ***after its occurrence***. It must be either fraudulent or non-fraudulent when executed." *CB Richard Ellis*, 251 P.3d at 534 (emphasis added) (citing *Turk v. IRS*, 127 F. Supp. 2d 1165, 1169 (D. Mont. 2000)). Therefore, Plaintiffs' actual fraud claim must be dismissed because there are no plausible allegations that the well transfer to P3 was fraudulent when it occurred. According to Plaintiffs, the wells were still producing when they were transferred in September 2018—meaning there could not have been a duty to plug and abandon the wells when they were transferred. *See* Compl. ¶ 119. As Plaintiffs also contend, some HRM company sold its wells to P3 in September 2018, but P3 did not file for bankruptcy until over three years later in November 2021. Plaintiffs rely on P3's eventual bankruptcy to support their position that the sale was a fraudulent transfer, but fail to show that any HRM Defendant knew (or intended), at the time of the sale, that P3 would eventually go bankrupt.

### C. Plaintiffs' "constructive fraud" claim must likewise be dismissed.

#### i. The claim is time-barred.

Plaintiffs' allegations make clear that their constructive fraud claim is barred by the statute of limitations. The statute of limitations for constructive fraud under section

38-8-105(1)(b) is "within four years after the transfer was made or the obligation was incurred." C.R.S. § 38-8-110(1)(b). Plaintiffs allege that an unidentified HRM Defendant sold the wells in September 2018. Plaintiffs thus had four years from 2018 to bring their constructive fraud claim, meaning Plaintiffs had until September 2022 to file their constructive fraud claim. But Plaintiffs did not bring this suit until 2024.

ii.    <u>Plaintiffs have otherwise failed to state a claim for constructive fraud.</u>

Plaintiffs also have not sufficiently pleaded a constructive fraud claim. *In re Vaughan Co., Realtors*, 481 B.R. 752, 763 (Bankr. D. N.M. 2012). A constructive fraud claim under CUFTA requires a plaintiff to show (1) that the debtor did not receive "reasonably equivalent value" in exchange for the transfer and (2) either (a) that the debtor was "engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction," or (b) that the debtor "intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due." C.R.S. § 38-8-105(1)(b).

The Complaint is silent on the "reasonably equivalent value" of the wells. Nor does it allege that any of the HRM Defendants, at the time of the sale, were engaged or about to engage in a transaction for which the HRM Defendants' remaining assets were "unreasonably small," or that they intended to incur debts beyond their ability to pay.

Also illustrative of Plaintiffs' failure to adequately plead constructive fraud is that Plaintiffs' Complaint conflates the term "debtor" as that word is used in CUFTA. Section

27

105(1)(b) requires showing that the debtor—the entity "ma[king] the transfer"—did not receive reasonably equivalent value and that the transfer caused **the debtor** to incur debts beyond its ability to pay. *See CB Richard Ellis*, 251 P.3d at 533. Yet Plaintiffs allege the HRM Defendants sold the wells at issue "without receiving a reasonably equivalent value in exchange," which caused **P3**—not the HRM Defendants—to become insolvent. Compl. ¶ 165–67. As Plaintiffs would have it, the HRM Defendants were collectively the "debtor" when they sold the wells **but P3** became the "debtor" once P3 went bankrupt. *Id.* Plaintiffs seek to misapply the statute.

Finally, again, even if the Complaint did not have the foregoing deficiencies, Plaintiffs have failed to show that the sale of the wells was "fraudulent . . . when executed." *CB Richard Ellis*, 251 P.3d at 534. Instead, Plaintiffs rely on a bankruptcy that occurred over three years after the sale of the wells to suggest that the sale was constructively fraudulent. But that is not the law in Colorado, and Plaintiffs have thus failed to state a claim under either an actual or constructive fraud theory.

### 4. Because the CUFTA Claims Fail, Plaintiffs' Derivative Civil Conspiracy Claims Must Also Fail.

A civil conspiracy "must involve an unlawful act or unlawful means." *Nelson v. Elway*, 908 P.3d 102, 106 (Colo. 1995). Because petitioning for bankruptcy and discharging debts is not an unlawful act, Plaintiffs' civil conspiracy claims turn on the transfer of the wells as an alleged unlawful means: a fraudulent transfer. *See* Compl., ¶¶ 172, 174–75. But, as explained above, Plaintiffs have failed to plausibly allege a fraudulent transfer. *See supra* § IV.B.3. Since Plaintiffs have failed to plausibly state a

28

claim for direct liability, it follows that they have failed to plausibly state a claim for secondary liability under the derivative claim of civil conspiracy. *See Sterenbuch v. Goss*, 266 P.3d 428, 435 (Colo. App. 2011).

> **5.     Plaintiffs' Trespass Claims, Which Also Turn on Their Transfer Allegations, Similarly Fail.**

Trespass requires "a physical intrusion upon the property of another without the proper permission from the person legally entitled to possession of that property." *Hoery v. United States*, 64 P.3d 214, 217 (Colo. 2003). A "continuing trespass" occurs when a person fails "to remove a thing tortiously placed on another's land." *Id.*

Plaintiffs allege that the HRM companies and P3 have "no right to physically occupy or intrude upon the Plaintiffs' properties for any reason other than as reasonable and necessary for the development of the mineral interest" and that "Defendants have no reasonable basis to continue to burden (by physically occupying) Plaintiffs' property." Compl. ¶¶ 153–54. They also allege it was unreasonable for the wells to continue to burden their property as of August 2018. Compl. ¶ 119. But there was no duty to plug these wells, as Plaintiffs allege. *Id.* Indeed, even now, ECMC allows safe and compliant non-producing wells to remain unplugged. *See* 2024 Rule 417(c). ECMC also allows low producing wells—which it has said still may be profitable, *supra* note 2—to remain in use, unless particular criteria are proved before an ALJ. *See* 2024 Rule 503(g)(12). So if Plaintiffs' theory of a trespass claim against an operator were accepted, it would amount to a judicial override of ECMC's regulation of low producing wells.

Further, by Plaintiffs' own admission, no HRM Defendant has physically occupied

29

Plaintiffs' land since the 2018 sale of the wells to P3. Compl. ¶ 98. Nor have Plaintiffs alleged that wells were "tortiously placed." Finally, Plaintiffs have not alleged that the HRM Defendants did not have "proper permission" to operate the wells at issue, or that Plaintiffs terminated any HRM Defendants' permission at any point before 2018. Plaintiffs' trespass claim against the HRM Defendants must therefore fail.

Plaintiffs have also failed to plead a continuing trespass claim against the HRM companies or executives because they fail to plausibly allege that any of these defendants transferred the wells to P3 in bad faith. Section 160 of the Restatement (Second) of Torts, which the Colorado Court of Appeals endorsed in *FDIC v. Mars*, 821 P.2d 826, 829 (Colo. App. 1991), provides that a party may be liable under a continuing trespass theory only when that party has caused a structure to remain on another's land after the landowner has withdrawn its consent. *See also Davilla v. Enable Midstream Partners*, 913 F.3d 959, 969 (10th Cir. 2019) (citing Section 160 and associated commentary with approval). Section 160 also provides that if a party places a structure on another's land, and then in good faith that same party "transfers his legal interest to a third person" ***before*** the landowner has required the structure's removal, then that party "is not liable for a failure of his transferee [to remove the offending structure]." Restatement (Second) of Torts § 160, cmt i. Plaintiffs do not allege that they required the removal of any of the wells ***before*** the sale to P3. Further, the only plausible explanation for the sale—from the face of the Complaint—is that it was done in good faith. This Court should therefore dismiss Plaintiffs' trespass claim.

**6.     Colorado Does Not Recognize Aiding and Abetting Trespass Claims.**

Colorado has not recognized aiding and abetting trespass as a viable claim, and this Court should not either. As the U.S. Supreme Court said in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, aiding and abetting liability in tort cases "has been at best uncertain in application," and its origins were "'largely confined to isolated acts of adolescents in rural society.'" 511 U.S. 164, 181 (1994) (quoting *Halberstam v. Welch*, 705 F.2d 472, 489 (D.C. Cir. 1983)). Claims for aiding and abetting torts are rare and riddled with problems. "[T]he rules for determining aiding and abetting liability are unclear" and "lead[] to the undesirable result of decisions 'made on an ad hoc basis, offering little predictive value.'" *Id.* at 188 (quoting *Pinter v. Dahl*, 486 U.S. 622, 652 (1988)). Even worse, elements of aiding and abetting claims are ill-defined. *See, e.g.*, *Alvarez LLC v. Blazar Tech. Sols., LLC*, No. 17-CV-01339-RBJ, 2019 WL 3205952, at *2 (D. Colo. July 16, 2019) (stating knowledge element is undefined and predicting the Colorado Supreme Court would require defendant to have "actual knowledge" of wrongdoing). The law's present imprecision introduces a host of notice and due process obstacles to liability. So this Court should dismiss Plaintiffs' aiding and abetting claim because it is not recognized in Colorado.

Still, even accepting Plaintiffs' version of the elements, Plaintiffs would have had to plead (1) Plaintiffs suffered a trespass; (2) that the HRM Defendants "knowingly participated" in the trespass; (3) that the HRM Defendants "substantially assisted" in the trespass; and (4) damages. The Court must construe these elements narrowly to ensure "that innocent, incidental participants in transactions later found to be illegal are not subjected to harsh[] civil … penalties." *Invs. Rsch. Corp. v. SEC*, 628 F.2d 168, 177

31

(D.C. Cir. 1980); *see also Twitter, Inc. v. Taamneh*, 598 U.S. 471, 489–90 (2023).

Under that lens, Plaintiffs have not pleaded the latter three elements. There are no

allegations the HRM Defendants knew of P3's financial situation or that the bankruptcy

plan would be approved without undoing the well acquisitions. *See* Compl., ¶¶ 122–28.

There are no allegations the HRM Defendants substantially assisted P3 with the act that

caused the trespass—successfully petitioning for bankruptcy and orphaning the wells.

*See id.* And while there are allegations about the general harms that orphaned wells

may cause, *see id.* ¶¶ 60–70, there is no allegation that Plaintiffs suffered any damages

other than some trash-dumping on their property, which neither P3 nor the HRM

Defendants caused, *id.* ¶ 73. In sum, the allegations are only an "innocent, incidental

participa[tion]" in a transaction that aiding and abetting liability should not capture. *Invs.*

*Rsch. Corp.*, 628 F.2d at 177. This claim thus should be dismissed.

### 7. Plaintiffs Conferred No Benefit on the HRM Defendants, Dooming Their Unjust Enrichment Claim.

To state an unjust enrichment claim, Plaintiffs must plausibly allege that (1) they

conferred a benefit on the HRM Defendants; (2) the HRM Defendants appreciated the

benefit; and that (3) it would be inequitable for the HRM Defendants to retain such a

benefit without compensating Plaintiffs. *Cablevision of Breckenridge, Inc. v. Tannhauser*

*Condo. Ass'n*, 649 P.2d 1093, 1096–97 (Colo. 1982).

This claim fails at the first step. Plaintiffs do not allege they conferred a benefit on

the HRM Defendants. Instead, they allege that "HRM wrongfully benefitted from access

to the capital it would have otherwise used to pay to plug, remediate, and reclaim the

wells at issue." Compl. ¶ 188. Even assuming Plaintiffs' allegation is true, Plaintiffs fail to state a claim because they have not alleged that **they** conferred a benefit on HRM, *Cablevision*, 649 P.2d at 1096–97; *In re Skinner*, 636 F. App'x 868, 870 (3d Cir. 2016), or that the HRM Defendants were unjustly enriched by avoiding a duty to plug that did not exist, *see* 2018 Rules 208, 503(b)(10).

### 8.   Plaintiffs Have Not Alleged Any Element of a Negligence Claim.

To state a negligence claim, Plaintiffs must plausibly allege the four elements of the claim—"a legal duty, a breach of the duty, causation, and damages." *English v. Griffith*, 99 P.3d 90, 93 (Colo. 2004). If one element of the claim is not adequately pleaded, the entire claim fails. *Greenberg v. Perkins*, 845 P.2d 530, 533 (Colo. 1993).

Plaintiffs did not adequately plead each element. Colorado has not recognized a categorical duty to plug non-producing or low-producing wells; its lawmakers have rejected that approach. *See* 2018 Rules 208, 503(b)(10); 2024 Rules 434(c)(1), 503(g)(12). Absent a duty, it follows there can be no breach. And though Plaintiffs allude to general problems that may be caused by unplugged wells, Compl., ¶¶ 67, 71–72, the lone damages that any Plaintiff alleges it has actually suffered is trash-dumping on their property, *id.* ¶ 73. The tenuous connection between these damages and the HRM Defendants owning the wells years earlier lacks facial plausibility. *See Ashcroft*, 556 U.S. at 678. Because Plaintiffs did not adequately plead any element of the claim, Plaintiffs' negligence claim should be dismissed.

### V.   ARGUMENT – MOTION TO STRIKE

### A.   Immaterial, Impertinent, or Scandalous Allegations Should Be Stricken.

33

Fed. R. Civ. P. 12(f) allows a court to "strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." "Immaterial" and "impertinent" allegations have no bearing on the controversy. *Immaterial*, *Impertinent Matter*, Black's Law Dictionary (11th ed. 2019). "Scandalous matters" are "improper in a court paper because [they are] both disgraceful (or defamatory) and irrelevant to an action or defense." *Scandalous Matter*, Black's Law Dictionary (11th ed. 2019). A court should strike allegations that are "needlessly inflammatory, entirely irrelevant," and prejudicial to the defendants. *UMB Bank, N.A. v. Benton*, No. 21-00832-CV-W-BP, 2022 WL 16753765, at *3 n.6 (W.D. Mo. June 29, 2022); *see also Seybold v. Weld Cnty. Sheriff's Off.*, No. 08-cv-00916-DME-MJW, 2008 WL 4489269, at *1 (D. Colo. Oct. 1, 2008).

**B.**     **Should Any Claims Survive Dismissal, Plaintiffs' Allegations about Non-Parties Black Elk and Kayne Anderson Should Be Stricken.**

Plaintiffs have included immaterial, impertinent, and scandalous allegations that should be stricken. In paragraph 32, Plaintiffs allege that Black Elk—a non-party company that allegedly operated wells in the gulf coast and allegedly was founded by Defendant Hoffman—"notoriously cut corners, racking up hundreds of citations from regulatory authorities before an explosion killed several workers on one of its rigs." Plaintiffs further allege in paragraph 32 that "[t]he company pled guilty in 2017 to eight federal felonies in connection with the deadly explosion." By including these allegations, Plaintiffs improperly prejudice Defendants by implying an association between this suit and that tragedy. Plaintiffs' reference to an explosion that predates P3's ownership of the at-issue wells on an offshore oil production platform in the Gulf of Mexico involving a

non-party company is "wholly immaterial to the facts of this case" and is "offensive." *See UMB Bank, N.A.*, at *3 n.6 (reasoning that allegations of bank robbery by relatives of the defendant are offensive, irrelevant, and would be stricken if the court had not granted a motion to dismiss that mooted the issue).

Similarly, Plaintiffs try to prejudice Defendants by improperly including allegations about a non-party private equity firm, Kayne Anderson, that allegedly invested in the HRM companies. In Paragraphs 82–86, Plaintiffs portray Kayne Anderson as responsible for "fueling the climate crisis and environmental injustice," in an attempt to inject irrelevant, inflammatory rhetoric into the case. Compl., ¶¶ 82–86. This is the sort of needless and cruelly derogatory attack on a non-party that courts strike. *See, e.g.*, *Hillside Drilling Inc. v. Goldman Sachs Grp.*, No. C 09–1896 SI, 2009 WL 2246215, at *4 (N.D. Cal. July 27, 2009) (striking "all inflammatory and irrelevant allegations in the complaint regarding defendants' alleged involvement in the national and global economic crisis and use of government bailout funds"). The Court should strike Paragraphs 32 and 82–86 in their entirety and the references to Kayne Anderson in Paragraphs 20 and 87 from the Complaint.

## VI.   CONCLUSION

For the reasons above, Defendants HRM I through IV, Hutson, and Pape ask the Court to dismiss the Complaint with prejudice or, in the alternative, strike the scandalous, impertinent, and irrelevant allegations from the Complaint.

DATED April 22, 2024.

s/ Matthew C. Arentsen

Richard B. Benenson, #32566
Justin L. Cohen, #44811
Matthew C. Arentsen, #45021
Robert Bacaj, #52376
Max Porteus, #56405
BROWNSTEIN HYATT FARBER SCHRECK, LLP
675 15th Street, Suite 2900
Denver, Colorado 80202
Phone: 303-223-1100
Fax: 303-223-1111
Email: rbenenson@bhfs.com
        jcohen@bhfs.com
        marentsen@bhfs.com
        rbacaj@bhfs.com
        mporteus@bhfs.com

*Attorneys for the HRM Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on April 22, 2024, I electronically filed the foregoing **MOTION TO DISMISS OF HRM DEFENDANTS, L. ROGER HUTSON, AND TERRY PAPE, OR, IN THE ALTERNATIVE, MOTION TO STRIKE** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record:

Christopher P. Carrington
**Richards Carrington, LLC**
1444 Blake Street, Denver, CO 80202
Phone: 303-962-2690
Email: chris@richardscarrington.com

Camille Sippel
**ClientEarth USA, Inc.**
4192 Marcasel Avenue
Los Angeles, CA 90066
Phone: 605-397-7951
Email: csippel@clientearth.org

Scott Craig Borison
**Borison Firm LLC**
1801 Century Park East, 24th Floor
Los Angeles, CA 90067
Phone: 301-620-1016
Email: scott@borrisonfirm.com

*Counsel for Plaintiffs*

<u>*/s/ Paulette M. Chesson*</u>
Paulette M. Chesson, Paralegal
Brownstein Hyatt Farber Schreck, LLP
675 Fifteenth Street, Suite 2900
Denver, CO 80202
Phone: 303-223-1100