**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

**Civil Action No. 1:24-cv-00823-CNS-MEH**

CINDY McCORMICK; RONALD McCORMICK; and TRUPP LAND MANAGEMENT
LLC,
        Plaintiffs,

v.

HRM RESOURCES, LLC, a Delaware limited liability company;
HRM RESOURCES II, LLC, a Delaware limited liability company;
HRM RESOURCES III, LLC, a Delaware limited liability company;
HRM RESOURCES IV, LLC, a Delaware limited liability company;
L. ROGER HUTSON, an individual; TERRY PAPE, an individual;
PAINTED PEGASUS PETROLEUM, LLC, a Texas limited liability company; and JOHN
HOFFMAN, an individual
        Defendants.

---

**RESPONSE TO MOTION TO DISMISS OF HRM DEFENDANTS, L. ROGER
HUTSON, AND TERRY PAPE OR, IN THE ALTERNATIVE, MOTION TO STRIKE**

---

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION AND BACKGROUND………………………………...  1

II. STANDARD OF REVIEW……………………………………….........  3

III. ARGUMENT…………………………………………………………  4

  A.  Defendants' Rule 12(b)(1) Arguments Fail……………………….....  4

    1.  Plaintiffs Are Not Required to Exhaust Administrative Remedies (and There Are No Administrative Remedies to Exhaust)…………  4

      a.  The Agency Lacks the Authority to Address Plaintiffs' Claims..  4

      b.  Exhaustion is Inapplicable in this Action Between Private Parties……………………………………………………………  5

      c.  No Adequate Remedy Exists for Plaintiffs at the Agency……..  7

    2.  Plaintiffs Plead Actual Injury Traceable to HRM Defendants' Conduct……………………………………………………………  8

  B.  Defendants' Rule 12(b)(6) Arguments Lack Merit……………………  9

    1.  The HRM Defendants Are Trespassers on Plaintiffs' Land……….  9

      a.  Plaintiffs Clearly Plead the Elements of Trespass…………….  9

      b.  The Trespass is Continuing……………………………………  10

    2.  HRM Defendants Negligently Caused Plaintiffs' Injuries………….  12

    3.  Plaintiffs State a Claim for Relief Under CUFTA……………..…..  15

      a.  HRM Fraudulently Transferred Liabilities…………………….  15

      b.  Plaintiffs Plead Actual Fraudulent Transfer Under CUFTA……  17

        i.  Plaintiffs' Claims Render Them Creditors Under CUFTA…  17

        ii.  Plaintiffs Allege Fraud With Particularity……………………  18

i

iii.  Plaintiffs Need Not Plead Badges of Fraud; But Have Done So…………………………………………………………...   19

iv.  The Transfer Was Fraudulent at the Time it Occurred…….   20

c.  Plaintiffs Do Not Allege Constructive Fraudulent Transfer……   21

4.  HRM Was Unjustly Enriched…………………………………………   22

5.  Plaintiffs Sufficiently Allege Aiding and Abetting Trespass………..   24

6.  Plaintiffs Sufficiently Plead Specific Allegations as to Each HRM Entity…………………………………………………………………   26

7.  Huston and Pape Are Liable for Their Own Tortious Acts………...   29

C.  HRM's Motion to Strike Arguments are Without Merit…………………   31

1.  The Challenged Paragraphs are Material and Pertinent…………..   31

2.  The Challenged Paragraphs are Not Scandalous…………………..   34

IV.  CONCLUSION…..………………………………………………………   35

## TABLE OF AUTHORITIES

**Cases**                                                                                    **Page**

*Adams v. Corr. Corp. of Am.,*
  187 P.3d 1190 (Colo. App. 2008)……………………………………….....  7

*Am. Fam Mut. Ins. Co. v. Allen,*
  102 P.3d 333 (Colo. 2004) …………………………………………...........  5

*A-W Land Co., LLC v. Anadarko E & P Co., LP,*
  2010 WL 3894107 (Colo. 2010) …………………………………………....  9

*Barry v. Bally Gaming, Inc.,*
  320 P.3d 387 (Colo. App. 2013) …………………………………………....  6

*Blakeland Drive Inv'rs, LLP IV v. Taghavi,*
  532 P.3d 369 (Colo. App. 2023) …………………………………………....  12

*Burt v. Beautiful Savior Lutheran Church of Broomfield,*
  809 P.2d 1064 (Colo. App. 1990) …………………………………………...  10

*Cablevision of Breckenridge, Inc. v. Tannhauser Condo. Ass'n,*
  649 P.2d 1093 (Colo. 1982) …………………………………………...........  23

*Catalan v. Vermillion Ranch Ltd. P'ship,*
  2007 WL 38135 (D. Colo. Jan. 4, 2007) ………………………………………  18

*CB Richard Ellis, Inc. v. CLGP, LLC,*
  251 P.3d 523 (Colo. App. 2010) …………………………………………....  15

*City & Cnty. of Denver v. United Air Lines, Inc.,*
  8 P.3d 1206 (Colo. 2000) …………………………………………...............  7

*CMCB Enters. v. Ferguson,*
  114 P.3d 90 (Colo. App. 2005) …………………………………………......  27

*Davilla v. Enable Midstream Partners,*
  913F.3d 959 (10th Cir. 2019)…………………………………………..........  11

*Dias v. City & Cnty. of Denver,*
  567 F. 3d 1169 (10th Cir. 2009) …………………………………………....  4

*Egelhoff v. Taylor,*
   312 P.3d 270 (Colo. App. 2013) …………………………………………….... 6

*Farmers Grp., Inc. v. Williams,*
   805 P.2d 419 (Colo. 1991) …………………………………………........... 7

*FDIC v. Mars,*
   821 P.2d 826 (Colo. App. 1991)……………………………………........ 11

*Fitness Together Franchise, L.L.C. v. EM Fitness L.L.C.,*
   2020 WL 6119470 (D. Colo. Oct. 16, 2020) …………………………… 28

*Gerrity Oil & Gas Corp. v. Magness,*
   946 P.2d 913(Colo. 1997) …………………………………………........... 5,13

*Grant Bros. Ranch, LLC v. Antero Res. Piceance Corp.,*
   409 P. 3d 637 (Colo. App. 2016) …………………………………………... 6

*Greenberg v. L M Operations LLC,*
   2023 WL 3937472 (Colo. Dist. Ct., Feb. 28, 2023) ………………………… 24

*HealthONE v. Rodriquez,*
   50 P.3d 879 (Colo. 2002) …………………………………………............ 12

*Hendricks v. Allied Waste Transp., Inc.,*
   282 P.3d 520 (Colo. App. 2012)…………………………………….......... 6

*Hoang v. Arbess,*
   80 P.3d 863 (Colo. App. 2003) …………………………………………...... 29,30

*Hoery v. United States,*
   64 P.3d 214 (Colo. 2003)……………………………………………........... 9,12

*Horrell v. Dep't of Admin.,*
   861 P.2d 1194 (Colo. 1993)…………………………………………........... 7

*In re Blair,*
   594 B.R. 712 (Bankr. D. Colo. 2018)……………………………………… 20

*In re Skinner,*
   636 F.App'x 868 (3rd Cir. 2016)……………………………………….......... 23

*In re Tronox Inc.,*
   503 B.R. 239 (Bankr. S.D.N.Y. 2013)……………………………………… 16

*KAABOOWorks Servs. LLC v. Pilsl,*
  2019 WL 1979927 (D. Colo. May 3, 2019)…………………………………… 31

*KCooper Brands, Inc. v. Ezzigroup Inc.,*
  2022 WL 1500775 (D. Colo. May 12, 2022)………………………………… 30

*Levin v. Five Corners Strategies, LLC,*
  541 F.Supp.3d 1262 (D. Colo. 2021)………………………………………… 30

*List Interactive, Ltd. v. Knights of Columbus,*
  303 F. Supp.3d 1065 (D. Colo. Mar. 20, 2018)……………………………… 30

*Marcus v. Kane,*
  18 F.2d 722 (2nd Cir. 1927)……………………………………….............. 17

*McAnulty v. Standard Ins. Co.,*
  81 F.4th 1091 (10th Cir. 2023)……………………………………………...... 23

*McEvoy v. Diversified Energy Co. PLC,*
  2023 WL 2808469 (N.D. W. Va. Apr. 4, 2023)……………………………… 13,15,
                                                                  18,21

*McGill v. Corr. Healthcare Companies, Inc.,*
  2014 WL 2922635 (D. Colo. June 27, 2014)………………………………… 32,33

*Moore v. Pyrotech Corp.,*
  13 F.3d 406 (10th Cir. 1993)……………………………………….............. 28

*Pulte Home Corp., Inc. v. Countryside Cmty. Ass'n, Inc.,*
  382 P.3d 821 (Colo. 2016)…………………………………………............. 22,23

*Ridge at Red Hawk, L.L.C. v. Schneider,*
  493 F.3d 1174 (10th Cir. 2007)……………………………………….......... 3

*Schempp v. Lucre Mgmt. Grp., LLC,*
  18 P.3d 762 (Colo. App. 2000)……………………………………….......... 16

*Sierra Club v. Tri-State Generation & Transmission Ass'n, Inc.,*
  173 F.R.D. 275 (D. Colo. 1997)…………………………………………...... 31,33

*Skratch Labs LLC v. Delivery Native, Inc.,*
  2021 WL 1406021 (D. Colo. Apr. 14, 2021)………………………………… 34

*Snowden v. Taggart,*
  91 Colo. 525 (Colo. 1932)……………………………………….............. 29

v

*Southwell v. Allstate Prop. & Cas. Co.,*
   2020WL 4287194 (D. Colo. July 27, 2020)……………………………………   31

*Taco Bell, Inc. v. Lannon,*
   744 P.2s 43 (NEED)……………………………………….....................   14,15

*Touchtone Grp., LLC v. Rink,*
   913 F.Supp.2d 1063 (D. Color. 2012)………………………………………   18

*UMB Bank, N.A. v. Benton,*
   2022 WL 16753765 (W.D. Mo. June 29, 2022)……………………………   34

*United Blood Servs. V. Quintana,*
   827 P.2d 509 (Colo. 1992)……………………………………….............   13

**Statutes, Rules, and Other Authorities**

2 Colo. Code Regs. § 404-1 (2018)………………………………………   13

1915 Colo. Sess. Laws………………………………………….....................   14

Am.Jur. Trespass § 33……………………………………………….....................   24

C.R.S. § 34-60-114…………………………………………………   4,15

C.R.S. § 38-8-101…………………………………………………   15

C.R.S. § 38-8-102……………………………………….....................   17

C.R.S. § 38-8-105…………………………………………………   16,19, 20

Fed. R. Civ. P. 9…………………………………….....................   18,20

Fed. R. Evid. 404…………………………………………….....................   32

Restatement (3rd) of Restitution and Unjust Enrichment……………………   24

Restatement (Second) of Torts § 160 (1965) …………………………………   10,11

Plaintiffs respond to the Motion to Dismiss of HRM Defendants, L. Roger Hutson ("Hutson"), and Terry Pape ("Pape") or, in the Alternative, Motion to Strike (the "MTD"):

## I.   INTRODUCTION AND BACKGROUND

At its core, this is a simple fraud case. Plaintiffs allege that the HRM Defendants (including their executives Hutson and Pape) conspired with John Hoffman ("Hoffman") and Painted Pegasus Petroleum LLC ("P3") to fraudulently avoid millions of dollars of clean-up obligations associated with oil and gas wells on Plaintiffs' property, and in so doing caused a dangerous continuing trespass.

In response, the HRM Defendants now argue that (i) Plaintiffs cannot proceed here because they have not exhausted administrative remedies, (ii) Plaintiffs failed to plead traceable injury, and (iii) Plaintiffs failed to plead the elements of any of their claims. These arguments cannot survive even cursory examination.

Plaintiffs bring claims based on Defendants' operation of oil and gas wells on Plaintiffs' land and seek a remedy for the environmental and property damage Defendants left in the wake of their operations. Compl. ¶¶ 10-17. Like with all oil and gas wells, HRM's entitlement to extract oil and gas (and profits) from beneath Plaintiffs' property came with corresponding obligations to remediate the resulting harm to this property. *Id.* ¶¶ 44-45. Those obligations accrued the moment the wells were drilled, and they belonged to HRM the moment it became their operator. *Id.* ¶ 47. At least by the time of the transfer to P3, HRM knew that the wells, collectively, had very little productive life remaining, and that the wells' liabilities significantly exceeded any

revenues the company could generate by operating them. *Id.* ¶¶ 74-75, 87, 93-97. In other words, the wells were financially "underwater".

Worse for HRM, the gas pipeline servicing many of the wells (the Third Creek Gathering Pipeline) was permanently closed on May 29, 2018, ***prior*** to sale, cutting off many of the already-waning wells from the market. *Id.* ¶¶ 107-09. This left HRM in a bind. It owed millions of dollars of clean-up obligations on wells that could not generate even close to enough revenue to cover them. *Id.* ¶ 100. And this is not the first time HRM refused to pay up and clean up. It has repeatedly transferred wells to avoid clean-up liability, including transferring declining wells to destined-for-bankruptcy operators, thereby shedding liabilities and littering Colorado with unplugged, orphan wells. *Id.* ¶ 87.

HRM's executives once again turned to their liability-dumping playbook and hatched a plot here to fraudulently avoid the liabilities for the wells at issue. *Id.* ¶¶ 100-02, 110-14. They sought out a partner to take over the wells, with the understanding that this partner would squeeze out what little revenue remained before shedding the liabilities through bankruptcy and with the knowledge that the multimillion dollar plugging costs would never be paid. *Id.* ¶¶ 115-16, 119. HRM found the ideal partner in P3 and Hoffman, whose track record included serving as CEO of an oil and gas company that went bankrupt after milking marginal wells and precipitating environmental and safety disaster. *Id.* ¶¶ 31-33. With the match made, Defendants conspired together for P3 to become HRM's latest liability junkyard. *Id.* ¶¶ 110-14.

Everything went according to plan. *Id.* ¶¶ 102, 122-23. HRM offloaded its underwater wells to P3, and Pape even dumped several of his personally-owned

underwater wells into the deal. *Id.* ¶ 99. P3 scraped up remnant revenue for a few years and then, as planned, absconded to Texas to file for bankruptcy. *Id.* ¶ 102. P3's representative testified during the bankruptcy proceedings that the Third Creek Gathering Pipeline closure caused the bankruptcy, which was untrue. *Id.* ¶¶ 125-27. The closure of the pipeline could not have caused the bankruptcy because the closure occurred **before** the wells were fraudulently transferred. *Id.* And while P3's bankruptcy proceedings were ongoing, HRM even dumped an additional liability-burdened well into P3's hands. *Id.* ¶¶ 132-35. Then, having fulfilled its role in the fraud and having misled the bankruptcy court about the cause of its demise, P3 completed the bankruptcy and ceased operations in Colorado. *Id.* ¶ 128. At that point, the fraud was complete. HRM and its coconspirators washed their hands of all responsibility, and Plaintiffs were left with dangerous wells and degrading oil and gas infrastructure trespassing on their land. *Id.* ¶¶ 102-05, 129-31.

The Complaint, of course, develops Plaintiffs' allegations in much greater detail, but even the bare-bones summary above is enough to show that Plaintiffs' allegations support all of the claims pled. At the pleading stage, that is all that is required.

## II.    <u>STANDARD OF REVIEW</u>

A complaint must set forth a "short and plain statement of the claim showing that the pleader is entitled to relief." In considering a motion to dismiss, the court must "assume the truth of the plaintiff's well-pleaded factual allegations and view them in the light most favorable to the plaintiff." *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007). The Tenth Circuit has cautioned that granting a motion to

dismiss is a "harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009).

### III.   ARGUMENT

#### A. *Defendants' Rule 12(b)(1) Arguments Fail*

1. Plaintiffs Are Not Required to Exhaust Administrative Remedies (and There Are No Administrative Remedies to Exhaust)

In this action between private parties, Defendants argue that all causes of action must be dismissed because Plaintiffs "failed to exhaust administrative remedies." MTD at 15. But Plaintiffs here were not required to exhaust administrative remedies, and indeed no administrative agency could have provided them an adequate remedy.

a. *The Agency Lacks the Authority to Address Plaintiffs' Claims*

Plaintiffs bring claims under several common law theories, as well as a statutory claim under Colorado's Uniform Fraudulent Transfer Act. Defendants ignore the actual basis of Plaintiffs' claims and instead argue that "[u]nder C.R.S. § 34-60-114, a plaintiff pursuing injunctive relief involving an alleged violation of the Oil and Gas Conservation Act and its related rules and regulations must [exhaust administrative remedies]." *Id.* at 13. But Plaintiffs here do not bring claims for violations of the Oil and Gas Conservation Act (the "Act"), nor do they seek exclusively injunctive relief, so the statute neither requires exhaustion nor authorizes the Colorado Energy and Carbon Management Commission (the "ECMC") to address Plaintiffs' claims.

In fact, the Act *explicitly exempts* the kinds of common-law claims pled here. Section 34-60-114 of the Act states that "[n]othing in this article...shall impair, abridge,

or delay any cause of action for damages which any person may have or assert…." The Colorado Supreme Court has confirmed this "sentence expressly preserves any preexisting common law remedies" and that "section 34-60-114 makes clear that an aggrieved surface owner may bring a common law action in tort against an operator who has used the surface in an unreasonable manner." *Gerrity Oil & Gas Corp. v. Magness*, 946 P.2d 913, 924-26 (Colo. 1997); *see also Am. Fam. Mut. Ins. Co. v. Allen*, 102 P.3d 333, 344 (Colo. 2004) ("We held that these administrative rules did not overrule the common law rule of reasonable surface use").

The claims here, like those in *Gerrity*, are based in common law tort and the law of fraudulent transfer. They are not merely allegations of "violation of the Oil and Gas Conservation Act and its related rules" over which the Act gives the ECMC authority, and Defendants point to no cases that suggest the ECMC has the authority, let alone the exclusive authority, to adjudicate common law tort and fraudulent transfer claims between private parties.[1]

> b.  *Exhaustion Is Inapplicable in this Action Between Private Parties*

Exhaustion of administrative remedies typically applies in a controversy between a private party and the government; it does not apply to a dispute between private

---

[1] Defendants suggest exhaustion is required because the wells have fallen into Colorado's Orphaned Well Program ("OWP"), which is administered by the ECMC. But this does not mean Plaintiffs' tort claims against the responsible parties are subject to any administrative procedure, and Defendants do not explain any mechanism that could make this so. Further, because of the massive scale of the orphaned well problem, the OWP remains overburdened, and orphaned wells can remain unplugged for years and even decades. Compl. ¶ 56. Even if the wells are eventually plugged, Plaintiffs are harmed by the delay Defendants created by instigating this scheme.

parties. *Egelhoff v. Taylor*, 312 P.3d 270, 274 (Colo. App. 2013); *see also Hendricks v. Allied Waste Transp., Inc.*, 282 P.3d 520, 523 (Colo. App. 2012).[2]

Defendants cite only one case that did not involve a governmental party: *Grant Bros. Ranch, LLC v. Antero Res. Piceance Corp.*, 409 P.3d 637 (Colo. App. 2016). But the plaintiffs in *Grant Bros.* brought a claim under the Oil and Gas Conservation Act, and that statute was the exclusive basis for their claim. The *Grant Bros.* plaintiffs were "nonconsenting [mineral] owners" of property from which gas was extracted, and the claim was "one for payment of proceeds arising under sections 34-60-116 and -118.5 of the Act." *Id.* at 642. Contrasting those plaintiffs' statutory claims from other cases where a plaintiff might have contractual or other common law claims, the court noted that it was "undisputed" that the plaintiffs were seeking redress under the statute and that the statute set forth a "comprehensive scheme" for review and remedy of such claims. *Id.* at 642-43. The court therefore held that the plaintiffs were required to exhaust the administrative remedies provided by statute before bringing suit. *Id.* at 645.

*Grant Bros.* represents the unusual situation in which a plaintiff pursues a private party under a statutory scheme that explicitly requires exhaustion. It illustrates how the legislature assigns jurisdiction—by directly stating it in the statute. The Defendants do not point to any statute that states the ECMC has jurisdiction over common law and

---

[2] In other regulatory contexts, courts have confirmed exhaustion is only required where the claim at issue is indistinguishable from a claim falling within an agency's exclusive jurisdiction. *See, e.g., Barry v. Bally Gaming, Inc.,* 320 P.3d 387, 392 (Colo. App. 2013) (claim that casino violated CCPA because it made deceptive statements about a slot machine malfunction was not distinct from the slot malfunction itself, which was under the agency's exclusive jurisdiction). Here, of course, preemption is explicitly disclaimed in the statute, and Plaintiffs' claims involve legal issues beyond the agency's purview.

statutory claims arising from unplugged wells. Exhaustion is not relevant to a dispute between private parties where, as here, the claim is not brought pursuant to a statute that provides, and requires exhaustion of, an administrative remedy.[3]

### c. No Adequate Remedy Exists for Plaintiffs at the Agency

Even where administrative remedies are provided by statute, exhaustion is not required where, as here, "available administrative remedies are ill-suited for providing the relief sought and when the matters in controversy consist of questions of law rather than issues committed to administrative discretion and expertise." *Horrell v. Dep't of Admin.*, 861 P.2d 1194, 1197 (Colo. 1993).

The ECMC has neither the expertise to adjudicate nor the ability to fully remedy Plaintiffs' claims. The ECMC does not adjudicate common law claims. Nor does it handle technical legal issues like fraudulent transfer "because the agency lacks the necessary expertise to address…issues of law that fall squarely in the province of the courts*.*" *City & Cnty. of Denver v. United Air Lines, Inc.*, 8 P.3d 1206, 1213 (Colo. 2000). Even if the ECMC *could* address some of Plaintiffs' claims, exhaustion would be inappropriate because *other* claims would be left to the courts. *See Horrell*, 861 P.2d at

---

[3] Courts "will not lightly infer a legislative abrogation of [a common law] right absent a *clear* expression of intent" *Farmers Grp., Inc. v. Williams*, 805 P.2d 419, 423 (Colo. 1991). Exhaustion requirements must be clear and explicit; access to courts may not be curtailed unless the statute unambiguously imposes an exhaustion requirement. *See Adams v. Corr. Corp. of Am.*, 187 P.3d 1190, 1196 (Colo. App. 2008) ("Our supreme court has repeatedly directed courts to use particular care in interpreting a statute to abrogate the common law when the statute does not expressly do so. Because [the statute] does not by its plain language evidence a legislative intent to abrogate plaintiffs' common law right to assert their claims without exhaustion of administrative remedies, we may not read the statute to do so.") (citations omitted).

1197 (exhaustion unnecessary where "policies of avoiding fragmented adjudication of issues and conserving judicial resources…are not furthered").

Furthermore, as Defendants tacitly admit, exhaustion is inappropriate where damages, as opposed to purely injunctive relief, are sought. MTD at 6, 13, 17-18. Here, Plaintiffs allege injuries beyond those which an injunction can fully remedy, including damages to compensate for injuries and disgorgement of benefits Defendants unjustly retained. ECMC cannot provide this relief. Additionally, because HRM fraudulently transferred the wells (so is not the current operator of record) and P3 lacks the funds to plug the wells because it is bankrupt, the *only* way Plaintiffs' claims can be adequately addressed is via a court that has the authority to 1) recognize HRM's role in the fraud, conspiracy, and trespass, and 2) order relief to make Plaintiffs whole and deter similar conduct. Again, this is well outside ECMC's authority. For these reasons, exhaustion would be unnecessary here even if the statute contemplated it (which it does not).

2.   Plaintiffs Plead Actual Injury Traceable to HRM Defendants' Conduct

Defendants next contend that Plaintiffs have failed to plead an actual injury because Plaintiffs' allegations are "conclusory or speculative." MTD at 15-18. This mischaracterizes the Complaint.

Plaintiffs allege the HRM Defendants (including the executives) intentionally caused trespass and committed negligence by fraudulently transferring wells to a company they knew could not and would not plug wells, with the intention to avoid those obligations. This conduct resulted in continuing trespass, damage to land, loss of property value, and other harms. Compl. ¶¶ 60-73, 151-59, 173, 205 (unplugged wells

and "rusting abandoned structures" block access to Plaintiffs land, cause aesthetic injury, expose Plaintiffs to unhealthy gasses, and lower property values). These injuries are concrete, significant, and directly traceable to the HRM Defendants, without whose tortious conduct the injuries would not have occurred. Detailed discussions of each claim below also show injury is traceable to the HRM Defendants.

Further, although Plaintiffs plead injuries with specificity, they do not need to do so with respect to claims sounding in trespass. Alleging facts showing trespass is enough. *A-W Land Co., LLC. V. Anadarko E&P Co, LP*, 2010 WL 3894107, *4 n.9 (Colo. 2010) (Colorado law "does not require proof of any actual injury" for trespass).

### B.    *Defendant's Rule 12(b)(6) Arguments Lack Merit*

#### 1.   The HRM Defendants Are Trespassers on Plaintiffs' Land

Abandoning dangerous waste on another's land is perhaps the paradigmatic example of trespass. That is what happened here, and it is plainly and repeatedly alleged. Defendants' arguments otherwise amount to sophistry and misdirection.

##### a.   *Plaintiffs Clearly Plead the Elements of Trespass*

"The elements for the tort of trespass are a physical intrusion upon the property of another without the proper permission from the person legally entitled to possession of that property." *Hoery v. United States*, 64 P.3d 214, 217 (Colo. 2003). "The intrusion can occur when an actor intentionally enters land possessed by someone else, or when an actor causes something else to enter the land." *Id.*

Plaintiffs allege that their land is burdened by trespassory unplugged wells and equipment, and highlight the significant impacts of such wells. *See, e.g.,* Compl. ¶¶ 60-

9

73, 155, 173. Plaintiffs further allege that HRM, in a scheme with all Defendants to avoid paying for clean-up obligations, caused this trespass by knowingly and fraudulently transferring wells to a company that intended to leave unplugged wells and associated equipment on Plaintiffs' lands even after they no longer served a purpose in furtherance of the mineral estate. *Id.* ¶¶ 87, 119, 157. This constitutes trespass. *See Burt v. Beautiful Savior Lutheran Church of Broomfield*, 809 P.2d 1064, 1067 (Colo. App. 1990) ("[L]iability for trespass requires only an intent to do the act that itself constitutes, or inevitably causes, the intrusion."); Restatement (Second) of Torts § 160 (1965).

Defendants argue that "there was no duty to plug these wells." MTD at 29. But this argument is directly contrary to longstanding Colorado law. *See infra* Section III.B.2. Moreover, even before the fraudulent transfer, HRM trespassed by unreasonably failing to plug and remediate wells. *See* Compl. ¶¶ 96, 100, 115, 119.

### b.  The Trespass Is Continuing

Defendants allege that Plaintiffs do not plead continuing trespass because they fail to "plausibly allege" misconduct by Defendants in connection with the transfer.[4] Specifically, Defendants argue that "a party may be liable under a continuing trespass theory only when that party has caused a structure to remain on another's land after the landowner has withdrawn its consent." MTD at 30. In furtherance of this argument,

---

[4] The word 'plausibly' is doing a lot of work in this argument. Defendants cannot argue that Plaintiffs failed to allege that the transfer was fraudulent, so they try to argue plausibility. But Plaintiffs' allegations are highly plausible. HRM had a multi-million dollar incentive to dump liabilities. Hoffman and P3 had incentive to access a revenue stream from the still-producing wells so long as they did not intend to plug and remediate them. *See* Plaintiffs' Opposition to Hoffman's MTD at 8-9.

Defendants cite *FDIC v. Mars* and *Davilla v. Enable Midstream Partners*, *id.*, both of which rely on Section 160 of the Restatement (Second) of Torts, which states:

> A trespass may be committed by the continued presence on the land of a structure, chattel, or other thing which the actor or his predecessor in legal interest has placed on the land (a) with the consent of the person then in possession of the land, if the actor fails to remove it after the consent has been effectively terminated, or **(b) pursuant to a privilege conferred on the actor irrespective of the possessor's consent, if the actor fails to remove it after the privilege has been terminated, by the accomplishment of its purpose or otherwise.**

(emphasis added). Although Defendants cite clause (a) of Section 160, MTD at 30, they omit clause (b), the applicable clause here.[5] *FDIC v. Mars,* which involved a prior lease, and *Davilla v. Enable Midstream Partners*, which involved a 20-year easement, both pertain to contracts that require consent from both parties, and so are unlike this case, where mineral owners had a legal privilege to access surface land in furtherance of the mineral estate. This privilege exists without contract or consent, and continuing to disturb surface land after such privilege expires is trespass whether or not consent has been formally withdrawn.

Although Plaintiffs contend that it was unreasonable to leave unplugged wells and equipment on their land, and that each well became trespassory once it was no longer economically viable, there is no need to do a reasonableness analysis here or to otherwise determine when the trespass began. Wells and equipment on Plaintiffs' land now are indisputably trespassory because any privilege P3 possessed expired when P3 ceased to operate the wells. As HRM both intended and expected when it fraudulently transferred the wells, Compl. ¶ 195, P3 did not plug wells, remove equipment, or restore

---

[5] Cmt i, which Defendants also cite to, MTD at 30, falls under Clause (a).

land when that privilege expired. There is thus a continuing trespass, which Plaintiffs allege the HRM Defendants knowingly and intentionally caused.[6] *See Hoery*, 64 P.3d at 218 ("there is a continuing tort so long as the offending object remains and continues to cause the plaintiff harm."); *Blakeland Drive Inv'rs, LLP IV v. Taghavi*, 532 P.3d 369, 375 (Colo. App. 2023) (A trespass may occur when a party "sets in motion a force which, in the usual course of events, will damage property of another.").

2. HRM Defendants Negligently Caused Plaintiffs' Injuries

Defendants argue that Colorado law "has not recognized a categorical duty to plug non-producing or low-producing wells" and that absent a duty there can be no breach. MTD at 33. This argument is contrary to both the common law requirement of reasonable surface use and to longstanding Colorado law. Defendants further argue that Plaintiffs failed to plead damages, *id.*, a clear mischaracterization of the Complaint. Plaintiffs adequately plead every element of the negligence claim.

The elements of a prima facie case for negligence are (i) a legal duty of care on the defendant's part (ii) breach of that duty (iii) injury to the plaintiff and (iv) causation. *See HealthONE v. Rodriguez*, 50 P.3d 879, 888 (Colo. 2002). Defendants restrict their arguments to the "duty" and "injury" elements. Plaintiffs address these in turn.

Defendants argue that they do not have a duty to plug the wells because no such duty is present in the ECMC rules. But Plaintiffs do not allege that Defendants' duty

---

[6] Defendants' theory here would lead to absurd results. HRM and its officers cannot limit or extinguish Plaintiffs' rights through unilateral action of assigning HRM's mineral rights to a third party. Under Defendants' theory, they could fire a rocket at a house and, if they transferred ownership before it hit, avoid liability for the resulting explosion.

arises under the ECMC's rules. Rather, the duty to plug arises 1) as a natural consequence of the limitations on a mineral rights holder's privilege to burden a surface estate; and 2) in response to foreseeable and unreasonable risk of harm to others.[7]

Colorado law prohibits oil and gas operators' use of surface land from exceeding what is "reasonable and necessary to the development of the mineral estate." *Gerrity*, 946 P.2d at 927-29. As here, wells that are no longer being used for any purpose—and were intended to be left that way—are indisputably unreasonable and unnecessary, and exceed the operator's privilege, so must be plugged and reclaimed. Indeed, all wells eventually reach the end of their useful lives, and the right to leave them burdening land inevitably expires. So all wells, from the moment of drilling, saddle their operators with contingent plugging, abandonment, and remediation duties. *See McEvoy v. Diversified Energy Co. PLC*, 2023 WL 2808469 (N.D. W. Va. Apr. 4, 2023). Defendants' argument that no duty existed at the time of the transfer is accordingly wrong. *See* MTD at 6.

Further, "a legal duty to use reasonable care arises in response to a foreseeable and unreasonable risk of harm to others." *United Blood Servs. v. Quintana*, 827 P.2d 509, 519. (Colo. 1992). Whether the law should impose such a duty requires

---

[7] Even so, plaintiffs bringing common law claims may look to the rules as evidence of the applicable standard of care. *See Gerrity*, 946 P.2d at 929 ("Commission rules evidence the standard of care applicable to oil and gas operators' surface use, but do not conclusively establish that standard."). And the many versions of the ECMC rules evidence the clear existence of this duty. *See* 2 Colo. Code Regs. § 404-1:320 (2018) ("The owner and operator of any well … shall be liable and responsible for the plugging thereof..."); 2 Colo. Code Regs § 404-1:1003(b) (2018) ("All disturbed areas … except areas reasonably needed for production operations or for subsequent drilling operations to be commenced within twelve (12) months, shall be reclaimed as early and as nearly as practicable to their original condition.").

consideration of the risk involved, the foreseeability and likelihood of injury as weighed against the social utility of the actor's conduct, the magnitude of the burden of guarding against injury or harm, and the consequences of placing the burden upon the actor. *Taco Bell, Inc. v. Lannon*, 744 P.2d 43, 46. The question of whether a duty should be imposed is essentially one of fairness under contemporary standards—whether reasonable persons would recognize a duty. *Id.* Plaintiffs allege facts to show that such a duty exists here. *See* Compl. ¶¶ 57-73, 74-78, 118-21.

It was foreseeable that failure to plug wells would result in injury to Plaintiffs' property and risks to Plaintiffs' health. *See id.* ¶¶ 57-73; *supra* Section III.B.1.a.This is why Colorado law, since at least 1915, has required operators to plug and remediate wells that are no longer being used. *See* Ch. 126, §§ 29, 30 & 32, 1915 Colo.Sess.Laws 367, 374–75. It was further foreseeable that the transfer to P3 would perpetuate that injury because, as HRM, Hutson, and Pape knew at the time of transfer, the wells generated very little revenue, a major pipeline connecting many of the wells to market had just closed, and the wells' existing and imminent clean-up obligations significantly exceeded any revenue they could conceivably generate. Compl. ¶¶ 78, 93-100, 107, 119. In other words, there was no scenario in which P3 could profit from this deal except by avoiding plugging liabilities, and Defendants knew the transaction was destined to lead to dangerous, trespassory unplugged wells.[8] Plaintiffs allege that all Defendants

---

[8] Furthermore, a cursory web search would have shown Hoffman's terrible track record regarding environmental performance, safety, and bankruptcy. *See, e.g.*, *id.* ¶¶ 31-32. Even if there was no evidence of fraud and conspiracy (there is here), it was unreasonable for HRM to ignore Hoffman's history and to not conduct due diligence in light of the foreseeable harm to property owners with unplugged wells.

conspired together, but even if they had not, HRM's sale of the wells to an entity that had no way of timely plugging any of the wells was, at the very least, grossly negligent. Applying the *Taco Bell (supra)* "fairness" standard, it cannot be fair for Plaintiffs, by no fault of their own, to be saddled with Defendants' dangerous mess.

Finally, and confusingly, Defendants argue that Plaintiffs failed to plead damages. Defendants misleadingly state that the lone damage the Complaint alleges is trash dumping on Plaintiffs' land, and say this is the fault of intervening third parties. MTD at 32-33 This is plainly incorrect; Plaintiffs allege various specific damages which are results of Defendant's torts, such as interfering with the exclusive use and enjoyment of their property and diminishing its value. *See* Compl. ¶¶ 155, 173, 205.

      3. <u>Plaintiffs State a Claim for Relief Under CUFTA</u>

          *a.* <u>*HRM Fraudulently Transferred Liabilities*</u>

Defendants' scheme is precisely the type of conduct that fraudulent transfer acts are designed to prevent, as another federal court recently held. *See McEvoy*, 2023 WL 2808469, at *9. Like the federal Uniform Fraudulent Transfer Act ("UFTA")[9] upon which it is based,[10] Colorado's Uniform Fraudulent Transfer Act ("CUFTA"), C.R.S. § 38-8-101

---

[9] The UFTA is the second in a long line of model acts. It largely replaced the original Uniform Fraudulent Conveyance Act (UFCA), and is succeeded by the Uniform Voidable Transactions Act (UVTA). *See* § 129:5. Legislative history, 4F N.Y.Prac., Com. Litig. in New York State Courts § 129:5 (5th ed.). Interpretations of each are applicable to the others. *See, e.g.*, *CB Richard Ellis, Inc. v. CLGP, LLC*, 251 P.3d 523, 529 (Colo. App. 2010). For the sake of brevity, this Brief uses "UFTA" to refer to all three acts.

[10] As Defendants point out, because states' fraudulent transfer statutes, like CUFTA, are based on the federal UFTA, cases interpreting UFTA or other states' similarly modeled fraudulent transfer statutes are persuasive. *See* MTD at 24, n. 7.

*et seq*, renders transactions fraudulent where they are undertaken in order to avoid fulfilling obligations to creditors.

The purpose of CUFTA is "to afford protection to creditors." *Schempp v. Lucre Mgmt. Grp., LLC*, 18 P.3d 762, 764 (Colo. App. 2000). Usually, this protection is sought against debtors who transfer valuable assets to third parties in order to place them outside their creditors' reach. Less commonly, debtors transfer net liabilities disguised as assets in order to avoid the obligations tied to them. This is the pattern we see here.

Defendants argue Plaintiffs have no "CUFTA injury" because the transfer did not move HRM's "assets out of their reach." MTD at 23. But the relevant CUFTA statute does not require this; it requires the debtor to have made the transfer with "intent to hinder, delay, or defraud" creditors. C.R.S. § 38-8-105(1)(a). This was HRM's intent when it dumped liabilities via the transfers to P3. Compl. ¶ 101. And this liability-dumping pattern of fraud fits squarely within both the language and intent of CUFTA. Here, Plaintiffs allege that the debtor—HRM—transferred "underwater" wells (net liabilities) in order to wrongfully avoid the asset retirement obligations associated with them, knowing that the transferee could not and would not pay for the obligations. *See, e.g.*, *id.* ¶ 171. Transferring liabilities to avoid environmental clean-up obligations is fraudulent. *See In re Tronox Inc.*, 503 B.R. 239, 280 (Bankr. S.D.N.Y. 2013) ("[defendant] acted to free substantially all its assets...from 85 years of environmental and tort liabilities. The obvious consequence of this act was that the legacy creditors would...be 'hindered and delayed' as the direct consequence of this scheme.").

b. _Plaintiffs Plead Actual Fraudulent Transfer Under CUFTA_

Defendants argue that Plaintiffs failed to state a claim of actual fraud because (1) they do not qualify as creditors under CUFTA, (2) their allegations are too general, (3) they have not alleged any "badges of fraud" under CUFTA, and (4) they have not alleged that the well transfer was fraudulent at the time it occurred. MTD at 23, 25-26. All of these arguments fail.

i. _Plaintiffs' Claims Render Them Creditors Under CUFTA_

Defendants argue that "Plaintiffs are not 'creditors'" under CUFTA. _Id._ at 23. But as Defendants acknowledge, CUFTA defines "creditor" simply as "a person who has a claim." C.R.S. § 38-8-102. The term "claim," in turn, is defined as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." _Id._ Official comment #4 to the statute states that the definition of creditor has "substantially the same effect" as the definition of the term under the UFTA. There, "'[c]reditor…means one having a contingent liability as well as one whose claim is certain and absolute." _Marcus v. Kane_, 18 F.2d 722, 723 (2d Cir. 1927).

Plaintiffs hold claims against the Defendants for fraud, ongoing trespass, negligence, conspiracy, and obligations to plug the wells and remediate and reclaim the well sites on Plaintiffs' properties. Compl. ¶ 162. Because they hold these claims, Plaintiffs are creditors for the purpose of CUFTA. Further, as explained above (_supra_ Section III.B.1.b), HRM had a contingent obligation to plug its wells, which it incurred automatically as operator of wells on Plaintiffs' land. This obligation provides a second,

17

independent basis for finding Plaintiffs to be CUFTA creditors. Indeed, in a recent federal court case unmentioned by Defendants but involving substantially similar facts, the court found that fraudulent transfer was adequately alleged and that surface landowners are creditors within the meaning of the statute[11] because:

> Plaintiffs' status as "creditors" depends on the fact that an oil and gas operator drilled a well on their property. That act, which has already occurred, necessarily gives rise to an obligation on the part of the operator or its successor to plug the well, and until the operator or its successor actually plugs the well, the landowner has a contingent and unmatured claim for plugging that qualifies as a "claim" under the [state fraudulent transfer act]. At some point, defendants' obligation to plug the wells on plaintiffs' properties will mature. *The relevant obligation arises not when a specific cause of action under tort accrued, but rather arose when the relevant operator drilled the well and incurred the obligation to eventually plug the well in the future*.

*McEvoy*, 2023 WL 2808469, at *9 (emphasis added). Similarly, Plaintiffs here are landowners to whom HRM owed a contingent obligation from the moment it began operating the wells at issue, so they "are properly 'creditors' with valid existing 'claims'" under the state fraudulent transfer act. *Id.* at 10.

### ii.   Plaintiffs Allege Fraud With Particularity

Defendants incorrectly assert that Plaintiffs' allegations are insufficiently particularized. MTD at 24-25. FRCP 9 "does not require plaintiffs to plead extensive facts" but "only [] that plaintiffs plead the circumstances of the fraud." *Catalan v. Vermillion Ranch Ltd. P'ship*, 2007 WL 38135, at *5 (D. Colo. Jan. 4, 2007). Plaintiffs have done so and stated "the who, what, when, where and how of the alleged fraud." *Touchtone Grp., LLC v. Rink*, 913 F. Supp. 2d 1063, 1076 (D. Colo. 2012).

---

[11] The *McEvoy* court construed Alabama's Fraudulent Transfer Act, which contains language that is virtually identical to CUFTA and UFTA.

For example, Plaintiffs allege that Defendants engaged in a "scheme to fraudulently transfer negative-value assets and leave trespassing wells on Plaintiffs' property," Compl. ¶ 103; that HRM "undertook these transfers to pass off their clean-up liabilities to [P3]," *id.* ¶ 101; that P3 "was structured to go bankrupt and wash away HRM's liabilities," *id*; and that, in September 2018, HRM made the transfer "with actual intent to hinder, delay, or defraud its creditors." *Id.* ¶¶ 98, 165-66.

Plaintiffs also extensively alleged the circumstances of the fraud. For example, Plaintiffs alleged the at-issue wells were "nearing the end of their economically useful life" by the time HRM acquired them, *id.* ¶ 96; the wells were "financially underwater and of negative-value at the time of transfer to [P3]," *id.* ¶ 100; at the time of transfer "the wells were reported by HRM to be producing at around 1 BOE/D on average, many were not producing anything at all," *id.* ¶ 115; P3 purchased the wells *after* the pipeline servicing many of them had closed, *id.* ¶¶ 125-26; the wells were transferred to P3 just one month after HRM received a corrective action letter from the COGCC stating that the company needed to increase its financial assurance bonding, *id.* ¶¶ 113-15; and Pape dumped his own wells into the transaction, *id.* ¶¶ 26, 99.

### iii. *Plaintiffs Need Not Plead Badges of Fraud; But Have Done So*

Defendants argue that Plaintiffs' CUFTA claim fails because they "have not alleged even one of the eleven 'badges of fraud' that CUFTA contemplates for claims of actual fraud." MTD at 25. As an initial matter, Plaintiffs need not plead badges of fraud. The badges are merely illustrative examples that may guide courts' analyses. *See* § 38-8-105 ("consideration may be given, among other factors, to [the badges of fraud.]"); *In*

*re Blair*, 594 B.R. 712, 742–43 (Bankr. D. Colo. 2018) (courts "may consider the listed factors as well as other indicia of actual fraud...the exercise is holistic...[and] flexible[.]"). The relevant inquiry is whether fraud has been alleged with particularity, which as discussed above, the Plaintiffs have done.[12] *See* Fed. R. Civ. P. 9(b).

In any case, Plaintiffs *do* allege several badges of fraud. For example, they allege that the "transfer occurred shortly before or shortly after a substantial debt was incurred[.]" C.R.S. § 38-8-105(2)(j); *see* Compl. ¶¶ 112-13 ("if HRM held onto the wells in question, it would have to increase the financial assurance bonding owed to the State in order to continue operations."); *id.* ¶ 108 ("HRM, Hutson, and Pape were well aware that without a gas pipeline...millions of dollars in asset retirement obligations were coming due."). The corrective action letter HRM received also gave notice that HRM faced potential imminent legal action, *id.* ¶ 112, so Plaintiffs plead the badge that "[b]efore the transfer was made…debtor had been sued or threatened with suit." C.R.S. § 38-8-105(2)(d). Plaintiffs also allege that Defendants conspired together, which makes this a transfer to an insider. *Id.* § 38-8-105(2)(a); Compl. ¶¶ 110, 171, 179-82.

### iv.  The Transfer Was Fraudulent at the Time it Occurred

Defendants' argument that the "actual fraud claim must be dismissed because there are no plausible allegations that the well transfer to P3 was fraudulent when it occurred," MTD at 26, speaks to the very core of this case, and exposes Defendants' misunderstanding of the claims. According to Defendants, if any of the at-issue wells

---

[12] Moreover, the badges of fraud were drafted as examples of circumstances that may exist in the typical fraudulent transfer pattern (hiding assets) as opposed to the pattern here (dumping liabilities), so several are inapplicable to the present case.

were producing any amount of oil and gas at the time of the transfer "there could not have been a duty to plug and abandon the wells when they were transferred." *Id.* This suggestion that contingent obligations may not be fraudulently transferred is wrong on the law, and ignores Plaintiffs' actual allegations.

As explained above, *supra* Section III.B.2, HRM's contingent duty to plug the wells arose as soon as it acquired them. Plaintiffs allege HRM fraudulently transferred the wells in order to avoid that duty, at a time when it was clear the clean-up costs would far exceed the wells' revenues, to a transferee (P3), which would never be able to pay for these costs. *See* Compl. ¶ 195 ("HRM then transferred its negative-value wells to [P3] in order to avoid paying clean-up obligations. It did so knowing and intending that this would lead to the continuing trespass burdening Plaintiffs today."); *see also id.* ¶¶ 166, 177, 179, 185. This is fraud under CUFTA, and was fraudulent when it occurred. *See McEvoy*, 2023 WL 2808469, at *9 ("The relevant obligation arises not when a specific cause of action under tort accrued, but rather arose when the relevant operator drilled the well and incurred the obligation to eventually plug the well in the future.").

### c. <u>Plaintiffs Do Not Allege Constructive Fraudulent Transfer</u>

Defendants incorrectly state that Plaintiffs allege both actual and constructive fraud. *See* MTD at 22. Plaintiffs did not and do not plead constructive fraud, only actual fraud. Compl. ¶ 164. Defendants' arguments regarding a constructive fraud claim, MTD at 26-28, are therefore irrelevant.[13]

---

[13] Constructive fraud would not be time-barred. The transfer was not approved until February 2020, so at the earliest, the statute did not begin to run until that time.

4.  HRM Was Unjustly Enriched

Defendants argue that Plaintiffs fail to state a claim for unjust enrichment because they fail to plead that they "conferred a benefit" on Defendants. *Id.* at 32-33. However, one need not plead that they "conferred a benefit" as this is not an element of an unjust enrichment claim. As the Colorado Supreme Court has recognized, "[t]o prevail on an unjust enrichment claim, a party 'must prove that (1) the defendant received a benefit (2) at the plaintiff's expense (3) under circumstances that would make it unjust for the defendant to retain the benefit without commensurate compensation.'" *Pulte Home Corp., Inc. v. Countryside Cmty. Ass'n, Inc.*, 382 P.3d 821, 833 (Colo. 2016). Accordingly, all that is needed is an allegation that Defendants were enriched at Plaintiffs' expense, which Plaintiffs allege.

Specifically, Plaintiffs allege that Defendants unjustly took a valuable benefit by retaining millions of dollars they should have used for plugging, knowing that the costs would never be paid by HRM or P3. Compl. ¶ 186 ("In wrongfully avoiding its obligations, HRM retained and was able to use funds it would or could otherwise have used to pay for its…obligations"); *see also id.* ¶¶ 1, 8, 185. This benefit came directly at Plaintiffs' expense—Plaintiffs have had to live with dangerous, unsightly, property-value-diminishing trespassory wells and equipment for years. *See id.* ¶¶ 173, 180, 205. It would be deeply unjust for Defendants to retain this ill-gotten benefit.[14] This is exactly the sort of inequitable situation that unjust enrichment claims are meant to remedy.

_____

[14] Even if they plugged the wells today, Defendants would still have benefitted from years of effectively zero-interest loans on the well-plugging costs, and Plaintiffs would still have had to live for years with their injuries.

Defendants cite only two cases to support their argument. First, they draw their "conferred by" language from a 42-year-old case in which the question of whether a benefit had to be conferred by the plaintiff or merely at plaintiff's expense was not at issue. *See Cablevision of Breckenridge, Inc. v. Tannhauser Condo. Ass'n*, 649 P.2d 1093, 1096–97 (Colo. 1982). Since then, the Colorado Supreme Court adopted the "at the expense of" language in *Pulte*, and although courts after *Pulte* still occasionally cite the outdated standard (typically when the distinction between "conferred by" and "at the expense of" is irrelevant and the parties have not raised the issue), the majority of courts (including the Tenth Circuit) now properly follow the Colorado Supreme Court's lead when construing Colorado law. *See McAnulty v. Standard Ins. Co.*, 81 F.4th 1091, 1098 & 1108 (10th Cir. 2023) (applying Colorado law, explaining that "the requirement that the benefit to defendant come at the expense of the plaintiff, does not mean that the plaintiff must have directly conferred that benefit on the defendant" and finding claim for unjust enrichment was stated where benefit accrued to Defendant at "the expense" of, but was not conferred by, the Plaintiff) (internal citations omitted).

Indeed, Defendants' only other citation confirms that courts now use the broader "at the expense of" standard. *In re Skinner*, 636 F. App'x 868, 870 (3d Cir. 2016) ("an unjust enrichment claim would require that [the defendant] be unjustly enriched *at the expense of* [the plaintiff]") (internal citations omitted) (emphasis added).

Furthermore, applying *Pulte*'s "at the expense of" standard, the Tenth Circuit has explicitly recognized that unjust enrichment claims may be brought where one party gains an unjust benefit as a result of trespass. *See McAnulty*, 81 F.4th at 1098 (noting

that the Restatement (3rd) of Restitution and Unjust Enrichment "addresses [unjust enrichment] claims for a defendant's gains 'realized by violation of another's legally protected rights,' including through torts (such as trespass ...)".

This should end the inquiry. Plaintiffs allege that Defendants not only trespassed but also fraudulently transferred the wells and conspired with P3 in such a way as to create a continuing trespass, and in so doing were unjustly enriched at Plaintiffs' expense. That states a cognizable claim under Colorado law.

5.  <u>Plaintiffs Sufficiently Allege Aiding and Abetting Trespass</u>

Defendants say Colorado does not recognize aiding and abetting trespass. *See* MTD at 30-31. That is wrong. Colorado courts have long recognized claims for aiding and abetting torts, including trespass. Just last year, a Colorado state court found, "as a matter of law ... that a trespass claim can be sustained against a party who aids, abets, encourages, or authorizes another in the commission of a trespass…." *Greenberg v. L M Operations LLC*, 2023 WL 3937472, at *1 (Colo. Dist. Ct., Feb. 28, 2023) (internal citation omitted) (citing Am.Jur. Trespass § 33 and collecting cases).

Defendants fail to identify a single case holding the opposite. Rather, they cobble together a handful of citations, largely from other jurisdictions, that note policy arguments against allowing aiding and abetting trespass claims. *See* MTD at 31. But the wisdom of established Colorado law is not at issue.

Defendants advance a secondary argument that, even if aiding and abetting is recognized, Plaintiffs failed to plead "(1) that the HRM Defendants 'knowingly

participated' in the trespass; (2) that the HRM Defendants 'substantially assisted' in the trespass; and (3) damages" (MTD at 31) (list renumbered). Plaintiffs allege all of these.

First, Defendants cannot argue that Plaintiffs fail to plead knowing participation in the trespass. *See* Compl. ¶¶ 100 & 115 (wells were underwater at time of transfer to P3), ¶¶ 101-02, 116 (P3 was purposefully treated as an obligation-dumping ground that would shed all liabilities via bankruptcy); *see also id.* ¶¶ 109-10, 114-15, 119, 171-72, 174, 176. Instead, Defendants argue that Plaintiffs did not allege that the HRM Defendants knew "P3's financial situation" or that "the bankruptcy plan would be approved." MTD at 32. Neither of these is a required element for this tort.[15] Defendants appear to be trying to muddy the issue with irrelevant and misleading red herrings.

Second, Defendants assert that "[t]here are no allegations the HRM Defendants substantially assisted P3 with the act that caused the trespass." *Id.* But the Complaint repeatedly alleges substantial assistance and indeed an intentional course of conduct designed to inevitably cause the continuing trespass. Plaintiffs allege that HRM depleted wells without plugging and abandoning them, then sought out and conspired with P3 to dump millions of dollars of liabilities. *See, e.g.*, *id.* ¶¶ 171, 174, 181 ("At the time HRM transferred the wells to [P3], the Defendants knew or constructively knew that the wells' liabilities significantly exceeded the value of any revenues they could be expected to ever generate[.]"). Plaintiffs further allege that HRM encouraged P3 to begin

---

[15] Though not necessary in order to plead aiding and abetting, Plaintiffs do allege facts regarding knowledge of P3's financial situation and inevitable bankruptcy. Plaintiffs allege HRM knew P3 lacked the means to plug the at issue wells (Compl. ¶¶ 166, 174, 181), HRM knew P3 would use bankruptcy to avoid liabilities (*id.* ¶¶ 101, 122, 171, 179), and HRM's prior practice informed it of the efficacy of such maneuver (*id.* ¶¶ 87-88).

operations in Colorado, and transferred the wells to that built-for-bankruptcy disposal vehicle, with the knowledge that P3 could and would not plug the wells, and planned to indefinitely leave trespassory wells and equipment on Plaintiffs' land. *See id.* ¶¶ 8, 101-02, 122-23, 171-72, 175, 179, 182, 195. These allegations more than adequately plead that HRM substantially assisted in the trespass.

Third, Defendants repeat their assertion that no damages were alleged. But as explained at length above (*see supra* Section III.B.2), the Complaint alleges a number of concrete and specific damages.

Far from Defendants' characterization that "the allegations are only an innocent, incidental participa[tion] in a transaction that aiding and abetting liability should not capture" (MTD at 32) (internal citation omitted), Plaintiffs actually allege knowing, willful participation in a fraudulent scheme to leave trespassory wells on Plaintiffs' land. *See, e.g.*, Compl. ¶ 194 ("Defendants' scheme to dump negative-value wells onto [P3], and ultimately to leave those wells unplugged and the associated well sites unreclaimed and unremediated, was conceived of and executed with the knowing participation and substantial assistance of HRM, Hutson, Pape, and Hoffman."). Such allegations properly and thoroughly plead aiding and abetting trespass.

6. <u>Plaintiffs Sufficiently Plead Specific Allegations as to Each HRM Entity</u>

Defendants argue that Plaintiffs failed to state a claim against the HRM companies because the Complaint refers to them collectively. *See* MTD at 19-21. This misstates both the Complaint and the law. Defendants ignore that Plaintiffs allege that HRM I, II, III and IV are mere continuations of each other (so collective reference is

appropriate). In any event, the Complaint pleads sufficient facts to put each HRM defendant on notice of the specific allegations against it.

First, Defendants complain that the Complaint unfairly "lump[s] all the defendants together" and "fail[s] to give adequate notice" to the individual Defendants. MTD at 20. But the HRM Defendants all have adequate notice of the claims against them because the facts alleged as to the continuing HRM entity are clear and the HRM Defendants know when and where each entity operated.

Moreover, the Complaint alleges that HRM's iterations constitute a mere continuation, so Plaintiffs may treat HRM as a single entity for the purpose of their pleading. Where, like the HRM entities here, an entity transfers its assets to another, the successor can be held liable under the "mere continuation" doctrine.[16] *See CMCB Enters. v. Ferguson*, 114 P.3d 90, 93 (Colo. App. 2005). Successor liability applies where there is "a continuation of directors, management, and shareholder interest and, in some cases, inadequate consideration." *Id.* Determining mere continuation is a holistic, fact-intensive exercise, and common ownership, control, and strategy show "mere continuation" even where only minimal or intangible assets are transferred. Indeed, transfers of intangible assets like branding, strategy, and expertise may be indicia of mere continuation. *See id.* at 93-94 ("mere continuation" found despite transfer of only 1.3 % of assets where same people "controlled and dominated both corporations" and "business operations of both corporations [were] the same"); *Fitness*

---

[16] Pertinently, successor corporations may also be held liable if "the transfer is for the fraudulent purpose of escaping liability." *CMCB Enters*, 114 P.3d at 93.

*Together Franchise, L.L.C. v. EM Fitness* L.L.C., 2020 WL 6119470, at *7 (D. Colo. Oct. 16, 2020) ("mere continuation" found based in part on successor's use of the predecessor's branding and logos); *Moore v. Pyrotech Corp.*, 13 F.3d 406, 1993 WL 513834, at *5 (10th Cir. 1993) ("mere continuation" found where ownership and plans were the same and assets transferred included business expertise and trade secrets).

Here, Plaintiffs allege that the HRM companies are mere continuations of each other, Compl. ¶ 17, as evidenced by their common management, ownership, business strategy, and the transfer of assets between them. Specifically, Plaintiffs allege that the HRM entities were founded and run by Hutson and employ substantially overlapping sets of employees. *Id.* ¶ 20. All four HRM entities share a common financial backer, Kayne Anderson Capital Advisors, L.P., and Kayne treats them alike, including exercising similar oversight over each. *Id.* ¶¶ 20, 82, 86-87. The HRM entities follow a pattern of formation, divestment, and re-formation of substantially similar businesses under new corporate form. *Id.* ¶¶ 15-18, 82. The HRM entities carry on the same business and transfer the same branding, marks, and even websites between entities (and in so doing hold themselves out to the public as the same company, HRM). *Id.* ¶¶ 17, 19, 21. The HRM entities transfer wells between one another. *Id.* ¶ 19. And when each entity was in operation, it participated in the commission and concealment of the fraud at issue. *Id.* ¶¶ 18, 79, 87, 90, 98-101, 106-16, 132-34. Further, Plaintiffs contend that each HRM entity acted as part of the single continuing entity ("HRM") that Hutson repeatedly divested and re-animated for the purpose of dodging liabilities and making misconduct harder to trace. *See id.* ¶¶ 18, 82, 89, 109, 119.

28

These allegations are sufficient to plead that the HRM entities are "mere continuations" of each other. Accordingly, it is appropriate to refer to them collectively as HRM throughout the Complaint, and to hold each of them liable as part of HRM.

### 7.   Hutson and Pape Are Liable for Their Own Tortious Acts

Defendants argue that all claims against Hutson and Pape must be dismissed because individuals "cannot be held liable for…companies' obligations solely by reason of being a member or acting as a manager." MTD at 21 (internal citation omitted). Defendants go on to argue that the only way claims may be brought against individual defendants is by piercing the corporate veil. *Id.* at 21-22. Defendants misstate both the Complaint and the law. Plaintiffs allege that Hutson and Pape personally committed torts, and Colorado law is clear that individuals may be held liable for their tortious conduct even if the corporate veil remains safely intact.

Defendants' contention would allow corporate officers to escape liability for their own tortious acts merely because they act in their official capacity. This is exactly what the Colorado Supreme Court cautioned against in *Snowden v. Taggart,* 91 Colo. 525, 531 (Colo. 1932) ("To permit an agent of a corporation, in carrying on its business, to inflict wrong and injuries upon others, and then shield himself from liability behind his vicarious character, would often both sanction and encourage the perpetration of flagrant and wanton injuries by agents of insolvent and irresponsible corporations.")

Colorado courts over the last century have cemented *Snowden*'s precedent: an officer may be held liable for his torts, even though committed on behalf of the corporation. *See Hoang v. Arbess*, 80 P.3d 863, 867 (Colo. App. 2003). The corporate

29

veil need not be pierced where a tort action is brought against an officer or director and elements of the tort are alleged. *Id.* at 868. This principle is consistently upheld. *See e.g., Levin v. Five Corners Strategies, LLC*, 541 F. Supp. 3d 1262, 1268 (D. Colo. 2021) (noting the "low threshold" for pleading direct involvement); *KCooper Brands, Inc. v. Ezzigroup Inc.*, 2022 WL 1500775, at *6 (D. Colo. May 12, 2022).

Here, Defendants are personally liable because they were "directly involved in the conduct through conception or authorization." *Hoang,* 80 P.3d at 868. Determining direct involvement is a fact-intensive inquiry ill-suited to determination at the pleadings stage. *Id.* A wide range of involvement can support individual liability. *See e.g., KCooper Brands, Inc.,* 2022 WL 1500775, at *6 (denying motion to dismiss against CEO of company accused of fraud because if he "in some way approved of, directed, actively participated in, or cooperated in the tortious conduct, then he potentially could be found individually liable, even if he was acting as [his company's] agent or employee.") (internal citation omitted); *List Interactive, Ltd. v. Knights of Columbus,* 303 F. Supp. 3d 1065, 1078 (D. Colo. Mar. 20, 2018) (denying motion to dismiss claims against individuals based on "overarching allegation that each" made "directorial decisions.").

Plaintiffs sufficiently plead that Hutson and Pape were directly involved in HRM's torts. For instance, Plaintiffs allege that Hutson was founder, President, and CEO of each HRM entity and Pape was VP of Operations (Compl. ¶¶ 20, 22, 24, 91), that Pape added seven of his own uneconomic wells in the transfer to P3 (*id.* ¶¶ 26, 99), that both Hutson and Pape were aware millions of dollars in asset retirement obligations were

coming due when they transferred the wells (*id.* ¶¶ 109-14, 133), and that Hutson and Pape helped conceive of and direct tortious conduct (*id.* ¶¶ 157, 193-97, 203, 207).

### C.  *HRM's Motion to Strike Arguments Are Without Merit*

The bar to strike allegations from a complaint is incredibly high, and Defendants do not come close to clearing it. "Motions to strike are generally disfavored, and will only be granted under the rarest of circumstances. Thus, the moving party's burden of proof is a heavy one." *Southwell v. Allstate Prop. & Cas. Co.*, 2020 WL 4287194, at \*2 (D. Colo. July 27, 2020) (internal citations omitted). Furthermore, "[a]ny doubt about whether the challenged material is redundant, immaterial, impertinent, or scandalous should be resolved in favor of the non-moving party." *KAABOOWorks Servs., LLC v. Pilsl*, 2019 WL 1979927, at \*5 (D. Colo. May 3, 2019) (internal citation omitted).

Defendants move to strike several paragraphs pertaining to the criminal, fraudulent, and negligent activities of Hoffman's prior company (¶ 32, the "Black Elk allegations") and Kayne's role in facilitating HRM's harmful and fraudulent practices (¶¶ 20 and 82-87, the "Kayne allegations"). Defendants argue that such allegations are "immaterial, impertinent, and scandalous…." MTD at 34. They are not.

#### 1.  The Challenged Paragraphs Are Material and Pertinent

Motions to strike allegations for immateriality or impertinence are denied "unless [the allegations] have no possible bearing on the controversy." *Sierra Club v. Tri-State Generation & Transmission Ass'n, Inc.*, 173 F.R.D. 275, 285 (D. Colo. 1997). Even allegations that do not go to the merits currently before a court may be relevant if they

bear on a party's general policies or practices. *McGill v. Corr. Healthcare Companies, Inc.*, 2014 WL 2922635, at *5–6 (D. Colo. June 27, 2014).

Defendants seek to strike the Black Elk allegations because they refer to events that "predate[] P3's ownership of the at-issue wells on an offshore oil production platform in the Gulf of Mexico involving a non-party company [and are] wholly immaterial to the facts of this case." MTD at 34-35 (citation omitted). The allegations, however, are highly relevant.[17] Plaintiffs allege that Hoffman, P3's CEO, directed his company to enter Colorado and buy hundreds of marginal and non-producing wells (the revenue from which could never cover their clean-up obligations) in order to squeeze out revenue before abandoning millions of dollars in liability via bankruptcy. Compl. ¶¶ 99-102, 114-17. Plaintiffs further contend that HRM encouraged and participated in this scheme, and transferred wells to P3 with the full knowledge that doing so would result in trespass. *Id.* ¶ 116, 119, 132, 166, 181. The Black Elk allegations show Hoffman's record of buying and misusing marginal oil and gas assets, then running his companies into bankruptcy. This sheds light on his intentions and credibility. The allegations also bear on the HRM Defendants' motivation in choosing to deal with P3 and Hoffman, their knowledge that P3 would not plug the wells, and, at the very least, their negligence when dumping wells to an individual with such an abysmal track record.

The Kayne allegations are similarly material. Plaintiffs allege that Kayne is a key player without whose help HRM could not have pulled off its fraud. Indeed, Plaintiffs

---

[17] Both the Black Elk and Kayne allegations are likely admissible at trial and so, *a fortiori*, must be relevant at the pleading stage. *See* Fed. R. Evid. 404(b)(2).

allege that HRM's various entities constitute a continuing enterprise in part because of the way in which Kayne facilitates HRM's rinse-and-repeat cycle of divestment and re-constitution. *Id.* ¶¶ 82, 86-87. In addition, Kayne's status as a sophisticated private equity firm (*id.* ¶ 83) with heavy oversight of HRM suggests that HRM can and must do due diligence on its transactions, and so must have known the inevitable consequences of transferring wells to P3. Kayne's environmental track record is also relevant; it shows that Kayne regularly funds environmentally destructive activities where it thinks doing so can generate bigger profits. *Id.* ¶¶ 84-85. This supports Plaintiffs' allegation that Kayne facilitated HRM's scheme to dump environmental liabilities and fraudulently avoid clean-up costs, and bolsters Plaintiffs arguments about HRM's fraudulent practices.

Even if these allegations were immaterial, they are not subject to strike unless Defendants also show prejudice. *Sierra Club,* 173 F.R.D. at 285 ("Even where the challenged allegations fall within the categories set forth in [Rule 12(f)], a party must usually make a showing of prejudice before the court will grant a motion to strike.") The bare contention that "Plaintiffs improperly prejudice Defendants by implying an association between this suit and that tragedy" (MTD at 34) is not enough. Parties must explain *how* they will be prejudiced. *See McGill*, 2014 WL 2922635, at *6 (private prison company objected to allegations of misconduct at facilities beyond the one at issue and argued association with such conduct was prejudicial because it created "adverse publicity" that might "taint the potential juror pool"; court found that likelihood of bad publicity is common in "many lawsuits and is not, in itself, a reason to strike uncomfortable allegations" and that speculative arguments about jury tainting were

"essentially grasping at straws"); *Skratch Labs LLC v. Delivery Native, Inc.*, 2021 WL 1406021, at *5 (D. Colo. Apr. 14, 2021) ("adverse publicity is not, in itself, a reason to strike uncomfortable allegations.") (internal citations omitted).

Here, Defendants do not even attempt to explain how they will be prejudiced; they merely assert a variation on the unsound argument that uncomfortable allegations are somehow inherently prejudicial. That is not enough.

### 2.   The Challenged Paragraphs Are Not Scandalous

Defendants also argue that the challenged paragraphs should be struck as "scandalous." Defendants say "[s]candalous matters are improper in a court paper because [they are] both disgraceful (or defamatory) and irrelevant to an action or defense." MTD at 34 (internal citation omitted). As shown above, all of the challenged allegations are relevant, so by Defendants' own reasoning they cannot be scandalous.

Still, even if the allegations were irrelevant, they are not scandalous. Defendants do not specify which allegations they believe are scandalous, and only four paragraphs in the Complaint contain material that Defendants might plausibly find uncomfortable: ¶ 32 (referring to Black Elk Energy), ¶ 84, ¶ 85, and ¶ 87 (referring to Kayne). These allegations are all straightforward factual assertions based on extensive research, and are truthful, so they cannot be struck as defamatory.

Nor may they be struck as disgraceful. The purpose of Rule 12(f) is not to protect parties from their own moral failings. Rather its bar on scandalous pleadings is meant to filter out allegations that disgrace the court, like gratuitous attacks on parties' family members or wild assertions of violence. *See UMB Bank, N.A. v. Benton,* 2022 WL

16753765, at *3 n. 6 (W.D. Mo. June 29, 2022) (denying motion to strike as moot but expressing displeasure at allegations that party's relatives robbed a bank 50 years prior). The allegations here contain nothing of the disgracefulness of pleadings that may be stricken as scandalous. Indeed, Plaintiffs took pains to only allege facts with a clear and direct connection to the dispute at issue and the modus operandi of the defendants, and they did so in as concise a manner as possible while eschewing unnecessary salacious detail.[18] The relevant and plainly reported allegations in the Complaint all fall squarely in the permitted category.

### IV.    CONCLUSION

Based upon the foregoing, Plaintiffs respectfully request that the HRM Defendants' Motion to Dismiss or, in the Alternative, Motion to Strike be denied.


Dated this 3rd day of June, 2024, in Denver, Colorado.

<div style="margin-left:40%">

*s/ Christopher Carrington*
Christopher P. Carrington
**RICHARDS CARRINGTON, LLC**
1444 Blake Street, Denver, Colorado 80202
Telephone: 303-962-2690
Email: chris@richardscarrington.com
*Attorneys for Plaintiffs*

</div>

---

[18] For example, despite credible sources, Plaintiffs declined to plead allegations about Black Elk working with subcontractors accused of human trafficking or fraud convictions for several of Hoffman's business associates. Likewise, Plaintiffs did not plead long lists of environmental violations committed by Kayne's portfolio companies.

## CERTIFICATE OF SERVICE

I hereby certify that on June 3, 2024, I electronically filed the foregoing **RESPONSE TO MOTION TO DISMISS OF HRM DEFENDANTS, L. ROGER HUTSON, AND TERRY PAPE OR, IN THE ALTERNATIVE, MOTION TO STRIKE** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following email addresses:

Richard B. Benenson
Justin L. Cohen
Matthew C. Arentsen
Robert P. Bacaj
Max Porteus
BROWNSTEIN HYATT FARBER SCHRECK, LLP
rbenenson@bhfs.com
jcohen@bhfs.com
marentsen@bhfs.com
rbacaj@bhfs.com
mporteus@bhfs.com

And via electronic mail:
John Hoffman
johnghoffman@icloud.com

*s/ Dyanna Spicher*
Dyanna Spicher, Paralegal