# EXHIBIT B

HRM Defendants' 12(c) Motion to Dismiss

Excerpts of Deposition Transcript of

Matthew Lepore

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 1:24-cv-00823-CNS-CYC

---

DEPOSITION OF: MATTHEW J. LEPORE - JUNE 2, 2026

---

CINDY MCCORMICK, RONALD MCCORMICK; and TRUPP LAND MANAGEMENT, LLC,

Plaintiffs,

v.

HRM RESOURCES, LLC, a Delaware limited liability company; HRM RESOURCES II, LLC, a Delaware limited liability company; HRM RESOURCES III, LLC, a DElaware limited liability company; HRM RESOURCES IV, LLC, a Delaware limited liability company; L. ROGER HUTSON, an individual; TERRY PAPE, an individual; PAINTED PEGASUS PETROLEUM, LLC, a Texas limited liability company; and JOHN HOFFMAN, an individual,

Defendants.

---

PURSUANT TO NOTICE AND AGREEMENT, the deposition of MATTHEW J. LEPORE was taken on behalf of the Plaintiffs at 675 15th Street, Suite 2900, Denver, Colorado, on June 2, 2026 at 10:05 a.m., before Kimberly A. Ritter, Registered Professional Reporter.

A P P E A R A N C E S

| | |
|---|---|
| For the Plaintiff: | Zigmas Polinauskas, Esq.<br>Abby Schaller - Intern<br>RICHARDS CARRINGTON, LLC<br>1444 Blake Street<br>Denver, Colorado 80202<br>Email:<br>zigmas@richardscarrington.com |
| For the Defendant: | Justin L. Cohen, Esq.<br>Alex Jack, Esq.<br>Matthew C. Arentsen - videoconference<br>Madeleine L. Tayer - videoconference<br>Alexander P. Jack<br>BROWNSTEIN, HYATT, FARBER, SCHRECK, LLP<br>675 15th Street<br>Suite 2900<br>Denver CO 80202<br>Email:<br>jcohen@bhfs.com<br>marentsen@bhfs.com<br>mtayer@bhfs.com<br>ajack@bhfs.com |
| Also Present: | Camille Sippel |

INDEX


| | | PAGE |
|---|---|---|
| EXAMINATION OF MATTHEW J. LEPORE: | | |
| June 2, 2026 | | |
| By Mr. Polinauskas: | | 5 |

| DEPOSITION EXHIBITS | | MARKED |
|---|---|---|
| Exhibit 1 | Expert Report | 6 |
| Exhibit 2 | Rebuttal Report | 6 |
| Exhibit 3 | HRM26901 | 93 |
| Exhibit 4 | Email | 101 |
| Exhibit 5 | Rules May 1st thru Dec 29th, 2018 | 110 |
| Exhibit 6 | 2021 Amendment | 115 |
| Exhibit 7 | Oil and Gas Severance Tax Stripper Well Exemption July 2020 | 140 |
| Exhibit 8 | Email from Gina Payne to Julie Murphy | 147 |
| Exhibit 9 | Email (Plaintiffs_017368) | 159 |
| Exhibit 10 | Complaint | 191 |
| Exhibit 11 | Cost Estimate | 218 |


INFORMATION REQUESTED:

None

QUESTIONS INSTRUCTED NOT TO ANSWER:

None

WHEREUPON, the following proceedings were taken pursuant to the Federal Rules of Civil Procedure.

* * * *

THE COURT REPORTER: Good morning. We are going on the record for the videoconference deposition of Matthew J. Lepore. Today is Tuesday, June 2nd, 2026 and the time is 10:05 a.m.

Counsel, would you enter your appearances and affiliations for the record, beginning with the noticing attorney. 10:05

MR. POLINAUSKAS: Zigmas Polinauskas of 10:05
Richards Carrington, with Abby Schaller, on behalf of 10:05
the Plaintiffs. 10:05

MR. COHEN: Justin Cohen and Alex Jack on 10:05
behalf of the HRM Defendants and on behalf of and 10:06
defending the witness, Matt Lepore. 10:06

THE COURT REPORTER: Mr. Lepore, would you 10:06
raise your right hand for me, please. 10:06

(Witness oath administered.) 10:06

THE DEPONENT: I do. 10:06

THE COURT REPORTER: Thank you. 10:06

MATTHEW J. LEPORE, 10:06
having been first duly sworn to state the whole truth, 10:06
testified as follows: 10:06

CONFIDENTIAL

the -- I'm sorry -- I'd rather read it than paraphrase it. 02:08

It would have been difficult, if not impossible, for P3 to have anticipated such a seismic shift in Colorado's regulatory environment or how disruptive it would be to their business model. 02:08

Don't you think that gives a bit of a heads-up that there's going to be a shift in the regulatory environment? 02:09

MR. COHEN: Objection, form and foundation. 02:09

A. So, first, P3 was not an operator in July of 2018. 02:09

I have no recollection that this executive order was widely circulated among operators. So there is no evidence that I have seen in the record that P3 saw this executive order for starters. 02:09

Second, while iii, A, P3 talks about a system of financial assurance. This executive order was primarily focused on plugging and abandoning the existing orphan wells in the state. 02:10

This executive order came a couple of months after the Colorado legislature increased the amount of money allocated to the Commission for plugging wells from $445,000 to $5,000,000. So the legislature -- legislature had increased by a factor of 10 the dollars 02:10

available to the Commission to plug and abandon orphan wells. 02:10 02:10

Governor Hickenlooper in some ways jumped on that bandwagon and said, let's plug as many wells of the high and low priority as we can using that money, that newly available money. 02:10 02:10 02:10 02:10

That was the thrust of this executive order, in my opinion and understanding of having been very close to the issue of orphan wells and financial assurance towards the end of my tenure. 02:11 02:11 02:11 02:11

Operators who were paying close attention, like those who might have participated in the technical working group, perhaps recognized that the trend in Colorado was towards more stringent financial assurance primarily and an emphasis on getting the existing orphan wells plugged. 02:11 02:11 02:11 02:11 02:11 02:11

And I have no evidence that P3 ever saw this or heard anything about it. 02:11 02:11

Q. Do you have any evidence that anyone at P3 read the regulations related to flaring? 02:11 02:12

MR. COHEN: Objection, form and foundation. 02:12

A. I have seen -- I can't tell you which deposition -- but in the record, that P3 did due diligence around the Commission's regulations. 02:12 02:12 02:12

Q. (By Mr. Polinauskas) So did that due 02:12

That's like a building contractor hires a foundation company, they go build the foundation, they don't oversee the project. 04:54 04:54 04:55

Q. (By Mr. Polinauskas) Okay. So then in terms of the Plaintiffs' Complaint and the -- the relief that is being sought, where do you take it from the Plaintiffs' Complaint that Plaintiffs are asking an administrator to oversee plugging and abandonment of wells instead of the orphan well program's oversight? 04:55 04:55 04:55 04:55 04:55 04:55

A. Okay. I need you to show the Complaint so I can look at it before I can answer the question. 04:55 04:55

Q. You already wrote this opinion. So I'm trying to understand where your basis for this comes from. 04:55 04:55 04:55

A. Can I see the Complaint? 04:55

Q. Without seeing the Complaint, do you have an answer to that question? 04:55 04:55

A. Not that I haven't already given you. 04:55

Q. Okay. Anything else that you used to base the opinion that this would contravene the Commission's longstanding statutory and regulatory processes? 04:55 04:56 04:56

A. Yeah. To my knowledge, since the creation of the Environmental Response Fund in 1990, which is the funding source for the orphan well program, no person or entity has ever removed wells from the orphan well 04:56 04:56 04:56 04:56

program to take over plugging, abandonment, reclamation and remediation, as I believe the Plaintiffs' Complaint seeks to do. 04:56

Furthermore, because the Colorado General Assembly in 1990 established the Environmental Response Fund and it has remained in place for 36 years and been augmented by numerous statutory amendments, regulatory amendments, approval by the governors of both parties, I believe that Colorado has very clearly stated the way it believes the state should manage orphaned wells. 04:57

And I don't think that there's any basis for changing that approach. 04:57

Q. So you're saying that because of those reasons, Courts should not enforce fraudulent transfer law? 04:58

MR. COHEN: Objection, form, and foundation. 04:58

A. I have no idea what fraudulent transfer laws are. 04:58

Q. (By Mr. Polinauskas) I mean that's related to -- 04:58

A. Not my opinion, not anything I opined on, not anything that I have held myself out to be an expert in. 04:58

Q. So is your opinion limited to only Plaintiffs' claims that don't involve fraudulent 04:58

transfer claims? 04:58
MR. COHEN: Objection, form and foundation, calls for a legal conclusion. 04:58 04:58
A. My opinion is driven by the fact that Colorado has a very, very well-established program for handling orphan wells. If -- yeah, I'll stop there. 04:58 04:58 04:59
Q. (By Mr. Polinauskas) Well, that -- so you're opining about the relief Plaintiffs seek and how it affects -- or not necessarily affects. Your opinion is that it contravenes Colorado's longstanding statutory and regulatory processes? 04:59 04:59 04:59 04:59 04:59
A. Yeah, if the -- yes. If the Plaintiffs' relief is take the wells out of the orphan well program and give them to an undefined, unidentified third-party administrator to essentially stand up a private version of the orphan well program to selectively plug and abandon the P3 wells as opposed to all the other wells in the orphan well program. 04:59 04:59 04:59 04:59 04:59 05:00 05:00
Q. So if the relief does not ask for the orphan -- or for the wells to be taken out of the orphan well program, does that mean you concede your Opinion 7? 05:00 05:00 05:00 05:00
MR. COHEN: Objection, form, foundation. 05:00
A. You're asking me a hypothetical about if something is true. And I don't know that it is true. 05:00 05:00

You're -- 05:00
Q. (By Mr. Polinauskas) I didn't ask you whether it's true or not. I just said if it's true what would be your answer, right? 05:00
A. If it were true -- 05:00
Q. I'm not done with the question yet. 05:00
MR. COHEN: Objection, form, foundation. 05:01
A. Was there even a question there? 05:01
Q. (By Mr. Polinauskas) Okay. So let's go over it again then. 05:01
Your opinion is that -- I don't have to re-read your Opinion 7. You see it right in front of you. 05:02
If Plaintiffs are, in fact, not asking to remove wells from the orphan well program, do you still have this Opinion 7? 05:02
MR. COHEN: Objection, form. 05:02
A. If they're not asking to remove the wells from the orphan well program, I guess I need a better understanding of what they are, in fact, asking for. 05:02
Q. (By Mr. Polinauskas) So wait, does that -- 05:02
A. I'm not going to answer anymore questions unless you show me the Complaint and explain to me what you think the remedies are. 05:02
Q. I mean so are you saying I'm not allowed to 05:02

remediation obligations back onto HRM, the Court would be taking the wells out of the orphan well program and requiring HRM to carry out the remaining aspects of plugging, abandonment, reclamation, and remediation that were required to finally close those sites. 05:43

Q. (By Mr. Polinauskas) So are you saying it shouldn't be able to do that, the Court? 05:43

MR. COHEN: Objection, form, foundation. 05:43

A. I'm saying it would contravene the state longstanding statutes, rules, regulations for the way that Colorado has decided orphan wells should be managed. 05:44

Q. (By Mr. Polinauskas) So when Colorado decided how orphan wells should be managed, based on your opinion, did it -- did it completely exclude common law remedies from that management? 05:44

MR. COHEN: Objection, form and foundation. 05:44

A. The Act does not completely supplant common law remedies between private-party plaintiffs. I can't speak to as it relates to the orphan well program. 05:44

Q. (By Mr. Polinauskas) Why can't you speak to that? 05:45

A. I have never considered that particular set of circumstances. I mean the Act says actions by the Commission don't preclude private-party claims. 05:45

Q. Okay. And then going back to the Complaint, the G and H, so, first of all, under G, If appropriate, create a fund from -- from damages awarded against the Defendants to be used to plug and otherwise decommission Plaintiffs' wells and remediate their land. 05:45

Do you interpret that to mean that the wells would be taken out of the orphan well program? 05:45

MR. COHEN: Objection to form. 05:45

A. Standing alone, paragraph G does not explicitly -- would not necessary -- would not necessarily require the wells to be taken out of the orphan well program. 05:46

Q. (By Mr. Polinauskas) And when you are alluding to that piece, you said the orphan well program has money to plug wells? 05:46

A. Yes. 05:46

Q. Okay. And so you think it doesn't need extra money to plug wells? 05:46

MR. COHEN: Objection, form. 05:46

A. Well, yes. The answer to your question is no, I do not believe it needs extra money right now. 05:46

Q. (By Mr. Polinauskas) Why not? 05:46

A. For a couple of reasons, the first of which is that with the financial assurance rule-making, the 05:46

Commission also created something called the Orphan Well Mitigation Enterprise Fund, which is designed to result in a $10 million annual input from operators based on the fee they pay for every well they own that has not been plugged on an annual basis. Not that hard to do the math for how many wells are in a state, how many dollars each operator contributes per well to get to $10 million. 05:46 05:46 05:46 05:46 05:47 05:47 05:47 05:47

So that was established in, I think, 2022. That's $10 million that the Commission didn't have before. 05:47 05:47 05:47

In addition, in the Infrastructure Investment and Jobs Act passed by the federal government in 2020, rough guesstimate, the federal government made billions of dollars available to states for orphan well plugging and abandonment. Colorado has applied for and received $50 million in grants already. These numbers might be slightly off, although I might cite them in my report. And they applied -- the Commission has applied for additional grants from the federal government totaling another $34.4 million. 05:47 05:47 05:47 05:47 05:47 05:47 05:47 05:48 05:48 05:48

So I'd say they have enough money to plug wells for a while . 05:48 05:48

Q. (By Mr. Polinauskas) How many wells are in the orphan well program currently? 05:48 05:48

CONFIDENTIAL

A. Approximately 900. 05:48
Q. And how many orphan sites? 05:48
A. Approximately 1,900. 05:48
Q. In the past five years has the orphan well number gone down from year to year at any given point? 05:48
MR. COHEN: Objection, form. 05:48
A. No. 05:48
Q. (By Mr. Polinauskas) Okay. And when did Colorado start receiving federal funds for orphan well plugging and abandonment? 05:49
A. The Commission received $25 million in August of 2022 and an additional $25 million in September of 2024. 05:49
Q. Where are you looking for that information? 05:49
A. In my report on page 18. 05:49
Q. So I'm just trying to compare it with the number on page 19 of your report in Table 1, because they just don't match. 05:49
I don't know if there's an explanation of why they don't match. 05:49
A. Sure, there's an explanation. They received $25 million. They didn't spend $25 million. They spent $10 million in '24, they spent 6.7- in '23, 10.1- in '24, and 5.8- in '25. 05:50
There was a little hiccup, I know, in I think 05:50

Q. I'll represent to you that's $87,889,080? 05:55
A. Should we just say 88 million? 05:55
Q. Sure. 05:55
A. Okay. 05:55
Q. Looking at that number, you know, roughly $25 million left from federal grants -- sorry -- how much did you say that new mitigation fund is supposed to provide to the OWP annually? 05:55
A. 2 million -- sorry, $10 million annually. 05:55
Q. Okay. So how long would it take to plug all the wells in the OWP currently at that rate of funding? 05:55 05:56
MR. COHEN: Objection, form. 05:56
A. How long would it take? 05:56
Q. (By Mr. Polinauskas) Yeah. So we're going back to your original statement that the OWP doesn't need extra money because it has enough money to plug and abandon all of its wells; is that correct? 05:56
A. I don't think they are hard pressed for money right now, yeah, that's correct. 05:56
Q. Okay. And currently you will agree with me that the liability, based on the average from 2021, the liability of all the OWP wells is at least 88 million? 05:56
A. Based on the $92,000 average cost, yes. 05:56
Q. Okay. And how much does the OWP have right now based on the information you looked at about 05:56

federal and state funding? 05:56
A. I mean I don't know. They have -- they get $10 million annually. They got $50 million from the federal government. They get bond money. They have historically gotten $5 million a year from the -- allocated from the General Assembly from money based on a mill levy that the industry pays. So I don't know. 05:56 05:57 05:57 05:57 05:57 05:57
There's also a limit, as you can see from Table 1, on how much money they can actually spend every year. They -- yeah. 05:57 05:57 05:57
Q. Right. 05:57
A. There are resource limitations. 05:57
Q. So is your opinion that they would plug more wells, but for research limitations or funding limitations? 05:57 05:57 05:57
MR. COHEN: Objection, form. 05:57
A. Both. No, I don't think they have funding limitations right now. I'm sorry, I correct myself. They don't have funding a limitation right now. They have human resource limitations. 05:57 05:57 05:57 05:58
Q. (By Mr. Polinauskas) Let's go back to your rebuttal report. 05:58 05:58
So let's see. Before you read that over, so you think -- you said you think they have resource limitations. 05:58 05:58 05:58

What do you base that opinion on? 05:58

A. I base it in part on my experience as a -- the director when there were, you know, essentially always limitations on human resources, how many staff there are. There are -- there are constraints on every single aspect of plugging and abandoning and reclaiming and remediating wells. There are constraints on how many plugging well, um, trucks there are. There are constraints on environmental remediation resources, including laboratories and sampling and time, all of those things. 05:58 05:58 05:58 05:58 05:58 05:58 05:58 05:59 05:59 05:59

And at the Commission itself, you know, there are limits on the number of employees. And that limit is determined by the legislature. 05:59 05:59 05:59

So the Commission can't just decide we need 25 new orphan well program people. They have to go to the legislature and say we think we need a bunch more. And the legislature gets to decide how many more they get. 05:59 05:59 05:59 05:59 05:59

Those are real world constraints that are reflected in the dollars that they spend to plug and abandon and all of the other things that are orphan wells. 05:59 05:59 05:59 05:59

Q. So if I'm sectioning this properly, first, you're basing that opinion on your experience as the 05:59 05:59