# EXHIBIT E

HRM Defendants' 12(c) Motion to Dismiss

Excerpts of 30(b)(6) Deposition Transcript of ECMC

* CONFIDENTIAL *

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

Civil Action No. 1:24-cv-00823-CNS-CYC

CINDY McCORMICK, RONALD McCORMICK and TRUPP LAND MANAGEMENT LLC,

Plaintiffs,

vs.

HRM RESOURCES, LLC, a Delaware limited liability company; HRM RESOURCES II, LLC, a Delaware limited liability company; HRM RESOURCES III, LLC, a Delaware limited liability company; HRM RESOURCES IV, LLC, a Delaware limited liability company; L. ROGER HUTSON, an individual; TERRY PAPE, an individual; PAINTED PEGASUS PETROLEUM, LLC, a Texas limited liability company; and JOHN HOFFMAN, an individual,

Defendants.

---

VIDEO-RECORDED 30(b)(6) DEPOSITION OF COLORADO ENERGY AND CARBON MANAGEMENT COMMISSION
(through JULIE MURPHY)
October 22, 2025

---

* CONFIDENTIAL *

APPEARANCES:

ON BEHALF OF THE PLAINTIFFS:

BEN HUDGENS, ESQ.
ZIGMAS POLINAUSKAS, ESQ.
Richards Carrington, LLC
1444 Blake Street
Denver, Colorado 80202
Phone: 303-962-2690
Email: ben@richardscarrington.com
zigmas@richardscarrington.com

and

CAMILLE SIPPEL, ESQ. (via videoconference)
SETARAH HOMAYONI, ESQ. (via videoconference)
BENJAMIN SEGAL, ESQ. (via videoconference)
ROSA E. ACHESON, ESQ. (via videoconference)
JACLYN LEE, ESQ. (via videoconference)
ClientEarth USA, Inc.
4192 Marcasel Avenue
Los Angeles, California 90066
Phone: 605-397-7951
Email: csippel@clientearth.com
shomayoni@clientearth.com
bsegal@clientearth.com
racheson@clientearth.com
jlee@clientearth.com

ON BEHALF OF THE HRM DEFENDANTS:

MATTHEW C. ARENTSEN, ESQ.
MADELEINE L. TAYER, ESQ.
ALEX JACK, ESQ.
Brownstein Hyatt Farber Schreck, LLP
675 15th Street, Suite 2900
Denver, Colorado 80202
Phone: 303-223-1100
Email: marentsen@bhfs.com
mtayer@bhfs.com
ajack@bhfs.com

FOR THE DEPONENT:

CAITLIN STAFFORD, ESQ.
KYLE DAVENPORT, ESQ.
Colorado Department of Law
1300 Broadway, Tenth Floor
Denver, Colorado 80203
Phone: 720-508-6000
Email: caitlin.stafford@coag.gov
kyle.davenport@coag.gov

Also Present: Dustin Brown, videographer

* CONFIDENTIAL *

PURSUANT TO WRITTEN NOTICE and the appropriate Rules of Civil Procedure, the video-recorded 30(b)(6) deposition of COLORADO ENERGY AND CARBON MANAGEMENT COMMISSION through JULIE MURPHY, called for examination by the Plaintiff, was taken at the offices of Brownstein Hyatt Farber Schreck, LLP, 675 Fifteenth Street, Suite 2900, Denver, Colorado, commencing at 9:35 a.m. on October 22, 2025, before Bonnie Carpenter Johnshoy, CSR, RPR, CRR.

I N D E X


| EXAMINATION: | | PAGE |
|---|---|---|
| By Mr. Hudgens | | 8 |
| By Mr. Arentsen | | 225 |
| By Mr. Hudgens | | 304 |
| EXHIBITS: | | PAGE |
| Exhibit 1 | Notice of Fed.R.Civ. P. 30(b)(6) Deposition of Non-Party Colorado Energy and Carbon Management Commission | 9 |
| Exhibit 2 | Declaration of Colorado Energy and Carbon Management Commission Director Julie Murphy | 72 |
| Exhibit 3 | Excerpt of deposition notice with notes | 95 |
| Exhibit 4 | 1/11 and 1/28/22 email thread between Roger Hutson and Patrick McGraw HRM0029978 | 101 |
| Exhibit 5 | 1/28/22 email from Roger Hutson to Julie Murphy HRM0029934 | 101 |

* CONFIDENTIAL *

* CONFIDENTIAL *

EXHIBITS (Continued)


| | | PAGE |
|---|---|---|
| Exhibit 6 | 2/23/22 email from Roger Hutson to Julie Murphy HRM0020025 | 106 |
| Exhibit 7 | 8/26/22 email thread between Deborah Lutz and Gina Payne HRM0030053 and 30054 | 107 |
| Exhibit 8 | HRM III reclamation Report by Operator HRM0030055 | 112 |
| Exhibit 9 | 1/11 and 12/16/22 email thread between Roger Hutson, Julie Murphy, Grant Melvin, and Patrick McGraw HRM0029953 | 114 |
| Exhibit 10 | 1/28/22, 3/17/22, and 1/24/23 email thread between Julie Murphy, Scott Cuthbertson, Roger Hutson, and Greg Deranleau Plaintiffs_017734 through 17736 | 119 |
| Exhibit 11 | 1/11/22, 12/16/22, and 1/24/23 email thread between Roger Hutson, Patrick McGraw, Scott Cuthbertson, and Julie Murphy Plaintiffs_017737 through 17746 | 124 |
| Exhibit 12 | 12/15/22 and 4/26/23 email thread between Deborah Bracey, Patrick McGraw, Roger Hutson, and Julie Murphy HRM00299062 through 29966 | 126 |
| Exhibit 13 | 11/18/22, 12/15/22, and 4/26/23 email thread between Scott Cuthbertson, Julie Murphy, Roger Hutson, Deborah Bracey, and Patrick McGraw Plaintiffs_017751 through 17754 | 131 |
| Exhibit 14 | 4/26/23 email from Deborah Bracey to Scott Cuthbertson and Julie Murphy Plaintiffs_017755 | 133 |

* CONFIDENTIAL *

| EXHIBITS (Continued) | | PAGE |
|---|---|---|
| Exhibit 15 | 8/26/22 and 6/5/23 email thread between Gina Payne, Deborah Lutz, and Patrick McGraw HRM0031840 and 31841 | 136 |
| Exhibit 16 | 6/12, 6/13, and 6/14/23 email thread between Deborah Lutz, Roger Hutson, Julie Murphy, and Patrick McGraw HR0029967 and 29968 | 139 |
| Exhibit 17 | 8/26/22, 6/5/23 and 7/19/23 email thread between Deborah Lutz, Patrick McGraw, and Gina Payne HRM 003011 through 30113 | 143 |
| Exhibit 18 | 8/26/22, 6/5/23, 7/19/23, and 7/21/23 email thread between Roger Hutson, Julie Murphy, Patrick McGraw, Scott Cuthbertson, and Deborah Lutz HRM00030049 through 30051 | 145 |
| Exhibit 19 | 10/10/23 email thread between Deborah Lutz, Patrick McGraw, Roger Hutson, and Julie Murphy HRM0031755 | 157 |
| Exhibit 20 | 10/10 and 10/11/23 email thread between Deborah Lutz, Patrick McGraw, Roger Hutson, Scott Cuthbertson, and Julie Murphy Plaintiffs_017820 through 17824 | 160 |
| Exhibit 21 | 3/4/23 email from Julia Rhine to Julie Murphy HRM0031861 | 170 |
| Exhibit 22 | 3/4/23 letter from Julia Rhine to Julie Murphy HRM0031862 through 31864 | 170 |
| Exhibit 23 | 3/27/25 email from Thomas Hoak to Roger Hutson, Patrick McGraw, Morgan McKay, and L. Dillard CCRA_00000725 | 174 |

* CONFIDENTIAL *


| EXHIBITS (Continued) | | PAGE |
|---|---|---|
| Exhibit 24 | 9/3/20 email from Jeremy Ferrin to Karen Spaulding with attachment Payne_CORA 0000192 | 177 |
| Exhibit 25 | 9/4/20, 9/15/20, 11/3/20, and 11/4/20 email thread between Denise Arthur, Lou Colby, and Jeremy Ferrin Payne_CORA 0005288 through 5292 | 181 |
| Exhibit 26 | Well Scout Card, API-05-087-08013 | 188 |
| Exhibit 27 | HRM Resources II and II, Agenda, June 26, 2018 | 192 |
| Exhibit 28 | HRM Resources II and III, Agenda, July 11, 2018 | 197 |
| Exhibit 29 | 8/28/18 Warning Letter to HRM Resources II | 199 |
| Exhibit 30 | 5/6/19, 5/7/19, 5/8/19, and 5/9/19 email thread between John Hoffman, Gina Payne, Jeremy Pate, Roger Hutson, Terry Pape, and Patrick McGraw | 201 |
| Exhibit 31 | HRM Defendants' Notice of Fed. R. Civ. P. 30(b)(6) Deposition of Non-Party Colorado Energy and Carbon Management Commission | 204 |
| Exhibit 32 | OWP Average Costs as of 10/8/2025 | 207 |
| Exhibit 33 | 4/3/23 email thread between Megan Castle, Scott Cuthbertson, and Robert Schuwerk Payne_CORA 0003350 and 3351 | 294 |

* CONFIDENTIAL *

P R O C E E D I N G S 09:02:21

VIDEOGRAPHER: Good morning. We are on 09:35:19 record at 9:35 a.m. on October 22nd, 2025.

This is the video-recorded deposition of 09:35:27 Julie Murphy as 30(b)(6) witness for Colorado Energy and Carbon Management Commission.

My name is Dustin Brown, here with our 09:35:35 court reporter, Bonnie Johnshoy.

The deposition is being held at 675-15th 09:35:41 Street in Denver, Colorado.

The caption of the case is Cindy McCormick, 09:35:47 et al., versus HRM Resources, LLC, et al.

Please note audio and video recording will 09:35:57 take place unless all parties agree to go off record.

Counsel will now introduce themselves, 09:36:03 beginning with the noticing attorney.

MR. HUDGENS: This is Benjamin Hudgens on 09:36:07 behalf of plaintiffs.

MR. ARENTSEN: Matt Arentsen on behalf of 09:36:10 the HRM Defendants.

MS. STAFFORD: Caitlin Stafford on behalf 09:36:21 of ECMC.

MR. DAVENPORT: And Kyle Davenport on 09:36:27 behalf of ECMC, as well.

JULIE MURPHY, 09:36:27

* CONFIDENTIAL *

having been first duly sworn, was examined and testified as follows: 09:36:29

MR. DAVENPORT: Thank you. Kyle Davenport again. I just want to confirm on the record that pursuant to paragraph 8 of the protective order in this case that all testimony will be confidential automatically for 30 days following this deposition. 09:36:49

MR. ARENTSEN: And this is Matt Arentsen. The parties have agreed that all objections to the form of a question will be preserved by making an objection to form, and that if one party makes an objection to a question, it serves as an objection for the other parties. 09:37:02

MR. HUDGENS: Those are the preliminaries. 09:37:23

EXAMINATION 09:37:24

BY MR. HUDGENS: 09:37:24

Q. Ms. Murphy, my name is Ben Hudgens. I am an attorney for a class of surface rights owners in a lawsuit against the HRM Defendants and a couple of other individuals. 09:37:24

Are you familiar with that lawsuit? 09:37:35

A. I am. 09:37:37

Q. What do you know about it? 09:37:37

A. I know that it was filed roughly the beginning of 2024. It was sent over to me by one of ECMC's stakeholders. And I've been kind of aware of it 09:37:39

* CONFIDENTIAL *

Adams County, which is one of the topics, there's an identification of an average cost of plugging, access prep, prep, flow lines, and decommission --
A. Decommissioning. 15:21:45
Q. -- decommissioning of $64,350? 15:21:46
A. That is the average of the 108 instances. 15:21:49
Q. And similarly and separately for 15:21:54 reclamation, there's an average cost of $68,622; is that right?
A. That's what our data shows as of 15:22:01 October 8th, 2025.
Q. Just to be clear, those are two separate 15:22:05 costs that are associated with P&A, remediation and reclamation?
A. They are two of the three costs. What is 15:22:11 not reflected and was not included in Number 11 is remediation.
Q. And I assume this also answers my question 15:22:21 about Weld County.
A. It does about Weld County. It does not 15:22:26 about the State.
Q. Okay. Number 12 asks about the estimate of 15:22:29 costs to plug and reclaim the specific wells at issue in the case which are listed in attachment 1.
Does ECMC have any estimate for the costs 15:22:39

* CONFIDENTIAL *

of plugging those wells?

MR. ARENTSEN: Objection. Form. 15:22:42

A. We do not. 15:22:44

Q. (By Mr. Hudgens) How does the ECMC 15:22:47 estimate plugging and reclamation costs? It might just be answered by historical data, but ...

MR. ARENTSEN: Objection. Form. 15:22:56

A. So if I can provide a little bit of context 15:22:57 about estimating plugging and reclamation costs, I think about estimates as different from averages or actuals. And so the data that we provided you is a reflection of an aggregation of actual invoice costs, subject to the limitations that we've described above each dataset. So I haven't thought of those as within the scope of what -- what was -- what the ask was with 12 and 13, which was really a forward-looking estimate of costs.

How our Orphaned Well Program manages its 15:23:30 work flow is it's through the State procurement process. We've entered into master service agreements with certain third-party contractors to perform the work on our behalf that we monitor in compliance with State statutes, and if we're spending the Federal funding, in compliance with the Federal regulatory requirements.

Within those master service agreements, we 15:23:51 package together different projects of orphaned well work

* CONFIDENTIAL *

based on the priority and the location. And I think some of this is detailed in my declaration, so I won't belabor it.

And so we send that request for a project out to a contractor under that MSA and ask them to bid the work. When they bring that bid back to us, we look at it with the benefit of our own cost experience to make sure that it's reasonable -- right -- and that we're not, you know, approving exorbitant costs or that they're not so under-estimating costs that we're going to have a surprise on the back-end. 15:24:05

Q. (By Mr. Hudgens) Understood. With respect -- so topic Number 15. I think you've written the answer here. We asked the question of how much ECMC and/or the Orphaned Well Program has spent on plugging and reclaiming wells, locations, pits, and/or equipment that were at any point operated by HRM. There's two numbers written there, so if you want to just tell me what they mean. 15:24:37

A. I would love to. And I first want to start to say that we don't -- our system is not designed to track by prior operators. And so I am aware that one of the HRM entities has been involved with at least P3 and Wolverine and those are costs that I aggregated from our orphaned well reports over the last few years. And so my 15:24:59

* CONFIDENTIAL *

A. I think this is hard and I know we talked a little bit about what people can or can't do with our approval or registration earlier today. And fundamentally, like anybody can go do anything they want. I wouldn't recommend it. Right? We would prefer to have somebody registered with us and performing that work in a way that's consistent with the expectations we have set out for plugging and abandonment work in Colorado from a registered operator. 16:35:54

Q. (By Mr. Arentsen) So in Colorado, if someone is plugging and abandoning a well on fee land, it's ECMC's preference that that is done with ECMC's review, oversight, and approval? 16:36:20

A. I think -- yes. That's correct. And I think that if somebody did it without that, we would have to look at the circumstances to understand whether we would pursue enforcement. And if we pursue enforcement, it's an alleged violation until it's generally adjudicated by the Commission. 16:36:34

Q. What authority over orphaned wells does the OWP have? 16:36:57

A. My high-level response is that we have exercised control over who may operate them to the exclusion of anybody else. Of any other entities. 16:37:05

Q. So while an oil and gas well is in the OWP, 16:37:26

* CONFIDENTIAL *

does the OWP have control over that well?
A. I think that's what I said, yes. And I mean, I also want to acknowledge that we've talked a lot about wells, but we also have orphaned sites and they're just different and so I want to make sure that ... 16:37:37
Q. So it would have control both over the wells -- orphaned well and the orphaned site? 16:37:49
A. Right. And there are some sites that don't have wells that are in the program that are also being managed for remediation and reclamation depending on the circumstances. 16:37:55
Q. How does the OWP prioritize the plugging and abandoning of wells? Could you explain that to me? 16:38:03
A. I can. And I know that some of this is detailed at a high level in my declaration, but, functionally, say, a batch of new wells comes into the Orphaned Well Program after going through our -- our enforcement process and Commission hearing. Once that has been added to the Orphaned Well Program, that's the general process. 16:38:09
The team then sits down to understand the scope and scale of the different tasks that are required to take the wells that we received in the program in their current condition and plan for their eventual plug, abandonment, decommissioning, reclamation, and 16:38:31

* CONFIDENTIAL *

contractor standpoint, we'll fold those in, as well.

Q. Who is responsible for choosing the high, medium, or lower prioritization of a well in the OWP? 16:40:26

A. It's a -- a group effort within the Orphaned Well Program team. 16:40:33

Q. So no one single person chooses? 16:40:38

A. Correct. 16:40:40

Q. Do wells ever come out of the Orphaned Well Program? 16:40:48

A. To my knowledge, we have not had wells come out of the Orphaned Well Program. Early on, my recollection is that we -- an operator named Benchmark orphaned a significant number of wells in northeastern Colorado and somebody who we've mentioned already today, Jimmy Walker, on behalf of Petron, at some point talked to me about some interest in -- in pulling those off of the Orphaned Well Program, but nothing came of that. 16:40:52

I think I've also been approached by Own Resources also -- who also operates in the northeastern quadrant of the state about whether they could pull orphaned wells off of that list, but nobody has ever made a real effort at it and I -- I think that, you know, it's -- we recognize -- you know, we would want to understand what their plan is to bring those wells back into production, we would want to understand if they had a 16:41:24

* CONFIDENTIAL *

real understanding of what the wellbore integrity said, you know -- reflected for that particular well before we'd take it off because it kind of had already been orphaned once.

Q. So, in ECMC's opinion, for an operator to take a well out of the Orphaned Well Program, ECMC would need to approve that? 16:42:05

A. In -- generally speaking, I think we would expect some sort of formal process, likely before the Commission, to move that and, in part, because I think by becoming an operator of those wells, we would have to have a -- a pretty robust conversation about financial assurance and what is appropriate in that circumstance. 16:42:20

Q. Would ECMC allow an oil and gas operator that does not operate in the State of Colorado to take wells out of the Orphaned Well Program and plug and abandon them? 16:42:42

MS. STAFFORD: Objection. Form. 16:42:56

A. I don't know that we are allowed to discriminate operators based on where they do or don't operate in that way. I think that's why we generally use a public process to manage those kinds of questions with ... 16:42:58

Q. (By Mr. Arentsen) So that's not something that you would decide yourself unilaterally? 16:43:13

* CONFIDENTIAL *

plugged and abandoned, would you typically trust that to be an accurate reflection of the status of a well?

A. Yes, I would. 16:47:59

Q. And why is that? 16:48:02

A. Because, generally speaking, that is 16:48:04 consistent with how we confirm that orphaned wells have been plugged is through the Form 6 and then that -- the Form 6 process, which updates the information in our system after a period of time. One to two days' rate.

Q. Does the OWP intend to plug and abandon all 16:48:27 of the P3 wells in the OWP?

A. The -- my -- my intent and goals for the 16:48:35 Orphaned Well Program are to plug any well that is orphaned in Colorado, reclaim and remediate it, whether it's Painted Pegasus -- whether it's from Painted Pegasus or anybody else.

Q. And you've already done that for some of 16:48:51 the wells?

A. Yeah. 16:48:53

Q. In this case, the plaintiffs seek to have 16:49:00 the Court order, it seems, HRM or some combination of the HRM entities to plug and abandon the P3 wells in the OWP.

Are you familiar with that allegation? 16:49:16

A. Again, not with that degree of specificity. 16:49:19 When I read the complaint 18 months ago, I looked more at

* CONFIDENTIAL *

the claims rather than the prayers for relief.

Q. If a landowner with one of these P3 wells on their property wanted the OWP and its contractors to plug and abandon and reclaim a wellsite instead of an HRM entity, what would you think about that? 16:49:27

MR. HUDGENS: Objection. Form. 16:49:50

A. I would have to take a look at the request and understand how it would intersect with our program and their priorities. 16:49:52

After the lawsuit was filed, I had a conversation with Greg Dean in Adams County, given the level of anxiety that I presume had -- had to be experienced by the plaintiffs to file a lawsuit like this about whether we should affirmatively completely up-end our process and go plug their wells. 16:50:02

And ultimately, we elected to not up-end the process, given that we hadn't heard from anybody and -- and reorienting our entire process -- re -- for me to reorient the entire Orphaned Well Program is not -- not insignificant. 16:50:22

Q. (By Mr. Arentsen) Could you explain that a bit more? Why you decided not to go ahead after the lawsuit was filed -- ECMC -- and plug and abandon all of the issues at issue in the OWP? 16:50:43

A. You know, there are a couple of different 16:50:56

* CONFIDENTIAL *

components involved in it, as ever. Our Orphaned Well Program is really designed to maximize efficiency with time and dollars. And -- and so that program is running as it's designed to deviate from that and to redirect resources reduces efficiencies -- right -- and -- and may not be the best use of dollars is kind of one component of that analysis.

Another component of the analysis related 16:51:22 to the fact that neither Mr. Dean nor I had ever heard from the parties about it, and so it was hard to think about how to engage on that front.

Q. What do you mean, you never -- you never 16:51:37 heard from the parties?

A. Sorry. I never heard from the plaintiffs. 16:51:38

Q. So do you mean they never submitted a 16:51:41 complaint or a request to ECMC?

A. Not to my knowledge, no. I ... 16:51:45

Q. Do you know whether any of the putative 16:51:47 class members in this lawsuit ever submitted a complaint or request to ECMC about the well on their property? Or wells?

A. Given that I don't know who the putative 16:52:00 class is in relation to the database of complaints that we track and receive, I don't know that I could answer that today.

* CONFIDENTIAL *

Q. Was there any higher volume of complaints regarding the wells at issue in this lawsuit than, you know, wells elsewhere in the State of Colorado? 16:52:11

A. I would take a step back and say I don't know that we've received too many requests for orphaned well work to get out on folks' property. 16:52:21

I think we've heard more requests from local governments to accelerate work in their particular jurisdiction to help better serve their citizens and better prepare -- you know, return the surface to the use of the surface owner. 16:52:30

Q. Do you know whether HRM Resources IV operates in the State of Colorado? 16:52:47

A. Not off the top of my head. 16:52:51

Q. Do you think a landowner with a P3 well on their property has a right to decide whether that well remains in the OWP or goes under Court control in this lawsuit? 16:53:05

A. I -- I don't know that that's within -- I don't really even know how to answer that question. Can you try again? Sorry. 16:53:17

Q. So a landowner with a P3 well on their property, would you agree that that P3 well is currently being overseen by the OWP? 16:53:24

A. Yes. 16:53:39

* CONFIDENTIAL *

Q. And so that P3 well, based on your testimony before, I understand has either been P&A'ed or will eventually be P&A'ed by the OWP; is that right? 16:53:40

A. Based on what we know today, yes. 16:53:52

Q. And their lands have either already been reclaimed or will be reclaimed? 16:53:54

A. I'm not sure that we've achieved reclamation on many of the P3 locations, if any, but yes, as part of the -- my intent is for all wells and sites in the Orphaned Well Program to ultimately be plugged, abandoned, reclaimed, and remediated in -- in compliance with our regulatory requirements. 16:54:03

Q. As we sit here today, is there any reason for ECMC to believe that that won't happen? 16:54:21

A. Not to my knowledge, no. 16:54:26

Q. Do you believe that the OWP has the funding necessary to make that happen? 16:54:28

A. We don't right now, but I think we have a path to that funding based on the fee on industry. 16:54:34

Q. And so the fee on industry will help to fund the OWP and PA&R the wells? 16:54:42

A. The -- the fund on industry is designed to, yes, support the work of the Orphaned Well Program based on the scope and scale of the orphaned wells and sites. 16:54:50

Q. Do you think that the goal of the OWP will 16:55:06