# EXHIBIT F

## HRM Defendants' 12(c) Motion to Dismiss

## Excerpts of Transcript of Class Notice Hearing

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 24-CV-00823-CNS-CYC

CINDY MCCORMICK;
RONALD MCCORMICK; and
TRUPP LAND MANAGEMENT LLC,

Plaintiffs,

vs.

HRM RESOURCES, LLC, a Delaware Limited Liability Company;
HRM RESOURCES II, LLC, a Delaware Limited Liability Company;
HRM RESOURCES III, LLC, a Delaware Limited Liability Company;
HRM RESOURCES IV, LLC, a Delaware Limited Liability Company;
L. ROGER HUTSON, an individual;
TERRY PAPE, an individual;
PAINTED PEGASUS PETROLEUM, LLC, a Texas Limited Liability Company; and
JOHN HOFFMAN, an individual,

Defendants.

---

REPORTER'S TRANSCRIPT
Motion Hearing

---

Proceedings before the HONORABLE CHARLOTTE N. SWEENEY, Judge, United States District Court for the District of Colorado, commencing at 11:17 a.m., on the 13th day of May, 2026, in Courtroom A-702, United States Courthouse, Denver, Colorado.

Proceeding Recorded by Mechanical Stenography, Transcription Produced via Computer by Janet M. Coppock, 901 19th Street, Room A-257, Denver, Colorado, 80294, (303) 893-2835

APPEARANCES

Scott Craig Borison of Borison Firm, LLC, 1801 Century Park East24th Floor, Los Angeles, CA 90067

Setareh Homayoni, ClientEarth USA, Inc., 501 Santa Monica Boulevard, Suite 510, Santa Monica, CA 90401

Zigmas Polinauskas and Benjamin Hudgens of Richards Carrington, LLC, 1444 Blake Street, Denver, CO 80202, appearing for the Plaintiffs.

Matthew Charles Arentsen, Justin L. Cohen and Madeleine L. Tayer of Brownstein, Hyatt, Farber, Schreck, LLP, 675 15th Street, Suite 2900, Denver, CO 80202, appearing for the Defendants.

* * * * *

PROCEEDINGS

*THE COURT:* We are here in 24-CV-823, McCormick, et al. v. HRM Resources, et al.

May we have entries of appearances, please?

*MR. BORISON:* Good morning, Your Honor. Scott Borison on behalf of the plaintiffs.

*MR. HUDGENS:* Good morning, Your Honor. Benjamin Hudson and Zigmas Polinauskas as well.

*MR. ARENTSEN:* Good morning, Your Honor. Matthew Arensten, Madeleine Tayer and Justin Cohen on behalf of defendants. And also with us is Matthew Lepore, who is identified as a witness on the joint parties' witness list.

*THE COURT:* All right. We are here --

*MS. HOMAYONI:* Good morning, Your Honor. I'm so sorry, Your Honor. I am also appearing on behalf of plaintiffs. This is Setareh Homayoni. I am on video.

*THE COURT:* Good morning.

All right. We are here to talk about the class notice. The parties through your joint statement at ECF 200 have outlined kind of some disputes that are remaining, and each have proposed a different notice. And then Exhibit 1 to that was kind of a red-lined version showing -- kind of combining the two and showing the differences. It seems that what's primarily at issue is the material defendants seek to add on that Exhibit 1 at the bottom of Page 1 continuing on Page 2 and into Page 3, and then the substantive paragraph on Page 5.

So really what might be most helpful -- I read the parties' statements as to the differences in what we're discussing. Why don't I just give each of you a chance to summarize that. And when defendants summarize their position, tell me what your witness would purport to be called for and what you think he is going to add to the mix today. So why don't I start with plaintiffs.

*MR. BORISON:* Thank you, Your Honor.

The issue, the basic issue we have with their proposed additions is it really turns into a legal brief setting forth

the defendants' arguments. Our position is that under the FJC, the Federal Judicial Center, their form, they talk in terms as well as the case law that you're not supposed to make it a legal brief. It's supposed to be a simple notice that basically gives the persons the options.

And in addition, then, we do have a basic problem that their argument is they have to include all these things to in essence imply that if people participate in the class action, that somehow they will be prejudiced in the Orphaned Well Program. And we contest that conclusion for a variety of reasons, including the fact that, one, there is nothing in the Orphaned Well Program statute, the enabling statute, that talks in terms of issues relating to someone that has asserted their private rights or not is a basis to deny entry into the Orphaned Well Program. In fact, the relief sought by the plaintiff is the same relief sought by the Orphaned Well Program, which is addressing environmental concerns.

And then the other part of that is, Your Honor, that they in essence say, well, if you are doing it yourself, there is some sort of problem. And again, we have two problems with that. One of the many things that they'd use that if we were awarded money and one sought to plug and abandon wells, it would be subject to the ECMC's overseeing. And part of that is, Your Honor, ECMC itself does not actually have anybody who goes out and does these wells themselves. They have a list of

contractors. So the plaintiffs would be perfectly able to pick a contractor off an approved list, be subject to what the ECMC's regulations and oversight would be, and they would go forward and plug the well in accordance with any requirements of the ECMC. So there is really no conflict.

The last is there is some sort of implication it's not somehow adding private money. The only difference between our client's plugging the well versus the Orphaned Well Program would be who pays the bill. And there is an implication that somehow you can't add private money to the Orphaned Well Program, and that's even belied by the actual statute. If you look at the statute, which is 34-60-133 under provision (6)(a)(iii), it actually provides for a -- it says that grants or donations can be accepted by this program.

So even if we got to the point where there is an issue, if we're successful in the litigation and there is money available, it could still fall within the Orphaned Well Program because it could be a grant or it could be a donation. So the whole premise seems to be you'll be discriminated against, which sort of assumes that whoever is administering the program would go ahead and discriminate. And usually we don't presume that someone will do something improper such as a discriminating or treating someone unequally because they chose to exercise the rights to petition the Court for relief; and second, that adding money to the program is some sort of

Orphaned Well Program?
*A.* I know that the OWP is funded for 19 full-time employees for fiscal year 2026. I know that in 2025 they had -- actually had 13 full-time employees. They had a few open positions.
*Q.* Do you know what types of expertise these employees have across the numerous employees?
*A.* Yeah, there is an array of expertise. And I think that may be -- well, it's worth explaining. An oil and gas well is one part of an oil and gas facility and one part of an oil and gas location, so the expertise within the OWP covers, for example, the environmental expertise to evaluate potential adverse impacts, create a plan or a strategy to remedy those impacts should there be any, and follow through to make sure that happens, so within the OWP there is environmental expertise.

There is reclamation expertise for the same logic and there is the engineering expertise, the understanding of how wells are built, where their weak points are, what would be necessary to plug them effectively for all time. And then the last piece I would say slightly different from just the wells is the production equipment, things like storage tanks and separators that are also part of an oil and gas location for an oil and gas facility.
*Q.* Who has control and authority over plugging and abandoning wells in the Orphaned Well Program?
*A.* The ECMC Orphaned Well Program does.

*Q.* Because the wells at issue in this lawsuit are in the commission's Orphaned Well Program, what can landowners expect will be done to their wells through the State program?
*A.* It is the mission of the program to plug, abandon, reclaim, remediate all of those well sites completely, fully, in compliance with the commission's regulations which cover all of those activities to the satisfaction of the standards of the commission.
*Q.* So one of Your Honor's questions was that if someone, a private landowner, wanted to take their well that is in the Orphaned Well Program and plug them -- plug it themselves, either themselves directly or through a contractor that's in the Orphaned Well Program. Could you please describe what would need to happen in order for that landowner to take on that plugging and abandoning?
*A.* Yes, I will do so. I will also say that I have never known that to have happened in the past. The first thing that would have to happen is the requirement that the person who plugs the well has to be an operator in the state of Colorado. So to my knowledge -- there may be private owners who also are operators. I won't say that that's not a possibility, but that would be the first thing.
*THE COURT:* Let me just have you assume that we are not talking about landowners doing it themselves, so they would hire one of the approved contractors.

*THE WITNESS:* Sure.

*THE COURT:* So maybe take it from there.

*A.* So it's still a little bit challenged because the contractors are going to work for somebody, and it's the somebody that I think would have to be the operator. If the plugging crew was a recognized operator, then I think that would be okay. So the homeowner, the property owner could hire that person and they could either adopt the plans for plugging, just to use plugging, that the Orphaned Well Program had already created or they would have to create their own plan which the Orphaned Well Program would approve.

*BY MR. ARENTSEN:*

*Q.* In order for someone to become a permitted or licensed operator in the state of Colorado in order to undertake the plugging and abandoning of a well, what involvement with ECMC, if any, would there need to be?

*A.* They would need to register as an operator in the state. They would need to provide financial assurance for whatever wells they were taking responsibility for. And in most circumstances there is a change of operator form that would be required. That form has gotten much more complicated in recent years in terms of the accounting for not only all of the equipment, but also accounting for ongoing remediation or reclamation. So sort of if you think of those things in terms of a liability that's associated with the site, then that has

to be divvied up who's taking that liability and who's keeping that liability.
*Q.* Who decides in the State of Colorado whether someone can become a licensed operator for plugging and abandoning a well?
*A.* I would say the director of the commission does that. And if there was a dispute about it, it would be taken up to the commission itself for a hearing.
*Q.* Does anyone to your knowledge other than the ECMC decide that issue?
*A.* No. It would be an ECMC decision.
*Q.* So one of the statements in the HRM defendants' disputed version of the class notice reads: The ECMC's Orphaned Well Program plugs, abandons, and remediates wells and related surface lands in the program, for which there is no longer a responsible operator, based on a state-created priority system. Is that statement accurate?
*A.* It is.
*Q.* Do you know how the plugging, abandonment, reclamation, and remediation of wells in the Orphaned Well Program is prioritized?
*A.* Yes, I can describe that. So the Orphaned Well Program uses a three-tier system, so wells locations are ranked high priority, medium priority, low priority. The prioritization focuses around potential impacts, threats or actual impacts to public health, safety, welfare, environment, and wildlife, so

that process of plugging and abandoning the at-issue wells according to its priority system?

*A.* Yes, it is.

*Q.* Do you know whether any of the wells at issue in this lawsuit have already been plugged and abandoned through the Orphaned Well Program?

*A.* My understanding from reading through the Orphaned Well Program reports is that several, many of the wells, many of P3's wells have been plugged.

*Q.* Can landowners find out what priority level is designated for their well?

*A.* Yes, they can, by looking at the Orphaned Well Program's annual reports that are on the ECMC's web page.

*Q.* So in the HRM defendants' version of the proposed class notice, the HRM defendants wrote: If the plaintiffs prevail in this lawsuit and are granted the injunctive relief they seek, a federal court will take any at-issue wells on your property out of the ECMC's Orphaned Well Program.

Are you aware of any instance when a court ordered ECMC to transfer wells in the Orphaned Well Program to a new operator?

*A.* I am not.

*Q.* Another statement in the HRM defendants' version of the proposed class notice reads: "There is no assurance that once removed from the ECMC's Orphaned Well Program, the at-issue

wells will be plugged and abandoned sooner than if they remained in ECMC's Orphaned Well Program." Do you believe that is an accurate statement?

*A.* I think it's an accurate statement to say that there is no assurance that taking them out of the program means they'll end up being plugged and abandoned sooner than they otherwise would. There are many, many complicating factors.

*Q.* Would you explain those.

*A.* So it is largely true -- if I may refer to plaintiffs' counsel's comment that ECMC hires the consultants that do the field work. That is largely true. It is also true that the ECMC is staffed with the experts that I've described who oversee that work and who often go to the field to oversee that work. So ECMC doesn't have a bunch of large equipment and machinery to do that work, but they have a lot of experience in all the other aspects of that.

If they were -- if the wells were taken out of the program and handed to a third party, the third party has to hire those contractors. It's not just one most likely. It's not just the person with the plugging rig. It's the persons that can take the storage tanks off the site, well, inspect them, empty them and so forth, take them to wherever they are going, you know, to be recycled or wherever they are going.

Same on the environmental side, same on the reclamation side, so there is all of those steps in the

process. ECMC by the Orphaned Well Program has mapped that out for many or all of the wells down some amount of time into the future. ECMC has access to those plugging well operators. A third-party administrator, if that was the remedy, would have to contract with those people. And sure, they can find them in the phone book or find them from the list. They have to enter into contracts with those folk. There is not an infinite number of those people. There are at times constraints on those resources.

And again, just the same for reclamation, the same for environmental investigation, monitoring, remediation, having groundwater samples taken quarterly, sent to a lab, analyzed, come back, look at the results, you know, move the plan forward. So I guess what I am trying to say is if you think about plugging a well, as what's happening here, you're missing this kind of the tip of the iceberg. And at ECMC's disposal in the Orphaned Well Program is that package, both the internal subject matter experts and of the contractors who they have worked with for many, many years as part of the Orphaned Well Program.

*Q.* So earlier you said that in order for someone to plug and abandon a well, they need to be an approved operator by the ECMC; is that right?

*A.* Yes, that's my recollection as a requirement of being able to plug the well.