# EXHIBIT G

HRM Defendants' 12(c) Motion to Dismiss

Rebuttal Expert Report of Matthew Lepore

INSIGHT ENERGY LAW

***McCormick, et al. v. HRM Resources LLC, et al.***
**Case Number 24-cv-008230-CNS-MEH, District of Colorado**
Expert Rebuttal Report of Matthew J. Lepore
May 20, 2026

## I. Nature of Engagement

I am the founder and principal of Insight Energy Law, LLC, a private law firm and policy consultancy in Littleton, Colorado. I have been requested by Defendants HRM Resources, LLC, HRM Resources II, LLC, HRM Resources III, LLC, HRM Resources IV, LLC (collectively, the "HRM Defendants"), L. Roger Hutson and Terry Pape to tender this report regarding my independent review and analysis of the expert opinions contained in the reports of Plaintiffs' experts Mr. Dwayne C. Purvis, Mr. Gregory E. Scheig, and Mr. J. Daniel Arthur dated April 20, 2026.

My opinions are based on my experience as Director of the Colorado Energy and Carbon Management Commission ("Commission" or "ECMC"; f/k/a the Colorado Oil and Gas Conservation Commission) between August 2012 and March 2018; my tenure as a Colorado Assistant Attorney General representing the Commission in all litigation, administrative, and rulemaking matters between 2009 and 2011; my tenure as Colorado's Governor-appointed representative to the Interstate Oil and Gas Compact Commission ("IOGCC") between 2013 and 2018; my 33 years of experience as an environmental and natural resources attorney in Colorado; and the pleadings, discovery documents, deposition transcripts, Plaintiffs' experts' reports, history and evolution of the Colorado Oil and Gas Act, the Commission's rules, orders, policies, and reports, and other documents I have reviewed, which are listed below.

I am being compensated for my work on a time and materials basis at a rate of $450 per hour, except for deposition and trial preparation and testimony, for which the rate is $550 per hour.

## II. Qualifications

I received a Juris Doctor from Stanford University School of Law in 1993 and was admitted to the Colorado Bar that same year. I was admitted to the U.S. District Court, District of Colorado in February 1995. My private law practice focused on environmental and natural resources law, including litigation, and compliance counseling. From 2009 to 2011, I served as counsel to the Colorado Oil and Gas Conservation Commission while an Assistant Attorney General in the Colorado Attorney General's Office. I became the Director of the Commission in August 2012 and served in that position until March 2018. In 2013, I was appointed by Governor Hickenlooper to be Colorado's official representative to the Interstate Oil and Gas Compact Commission. I served as the Chairman of the IOGCC's Legal and Regulatory Affairs Committee and as First Vice-Chair of the IOGCC during my tenure as Colorado's Representative. Since 2018, I have counseled state and local governments, non-governmental organizations, and large and mid-sized exploration and production operators in Colorado, New Mexico, and Utah regarding oil and gas

regulatory and policy matters, and compliance and enforcement matters in Colorado. Additional qualification details are provided in my Curriculum Vitae, attached to my April 20, 2026 expert witness report at Appendix A.

## III. Documents and Databases Reviewed

Please refer to **Appendix R-A** for a listing of the documents and databases reviewed and considered for purposes of the opinions below.

## IV. Analysis of Expert Report of Dwayne Purvis, P.E.

Mr. Purvis was retained by the Plaintiffs' counsel to opine on the value of future oil and gas production, compared to the associated decommissioning liabilities of approximately 215 vertical wells in the Denver Julesburg Basin (the "DJ Basin") that Painted Pegasus Petroleum, LLC ("P3") acquired from HRM Resources II, LLC ("HRM II") in September 2018. Based on his post-hoc economic analysis, Mr. Purvis opines that P3 could not reasonably have expected that the acquired wells would generate enough revenue to cover their decommissioning costs. His opinion rests on the faulty assumptions that P3 would lose the "legal right to operate" and be compelled to decommission the wells almost immediately after acquiring them. Neither of those assumptions are true under the Commission's regulations at the time. Mr. Purvis also contends that the acquired wells were at or near their "economic limit." However, many variables determine a well's profitability, and Mr. Purvis's contention is belied by a decades-long history of so-called stripper wells in the DJ Basin, which shows that low-producing wells can be very profitable.

P3 had a much longer runway to increase production from the wells than Mr. Purvis assumed, and P3 reasonably believed it could profitably increase production from the wells. P3's business failure stemmed largely from the unprecedented changes to the regulatory landscape occasioned by Senate Bill 19-181, which took effect in April 2019, which P3 could not have foreseen when it acquired the wells.

### A. Mr. Purvis misconstrues the Commission Rules governing plugging of and financial assurance for inactive wells when P3 acquired the wells.

In Part II of his Report, "Independent evaluation of value at transfer," Mr. Purvis misconstrues the Commission Rules governing inactive wells and plugging obligations in effect when P3 acquired the wells in 2018 until it filed for bankruptcy in 2021. Mr. Purvis incorrectly asserts that wells connected to the Third Creek gas gathering system (the "Third Creek wells") "*did not or soon would not have the legal right to produce* oil and gas without significant investment" because they were already shut-in.[1] He then asserts, again incorrectly, that "it was obvious that the legal requirement of decommissioning would come due in the near future."[2] Based on these erroneous

[1] Expert Witness Report of Dwayne C. Purvis dated April 20, 2026 ("Purvis Rep."), p. 14 (emphasis added). He juxtaposes the Third Creek wells with the "Non-LP" wells, "only some of which were already shut-in, and which *did have the legal right to operate*." *Id.* (emphasis added).

[2] *Id.*, p. 17. Mr. Purvis does not specify what "near future" means.

assumptions, Mr. Purvis wrongly concludes that P3 would be compelled to spend at least $3.7 million to plug all the Third Creek wells very soon after acquiring them.[3]

1. *No Commission Rule Revoked an Operator's Legal Right to Operate, or Compelled an Operator to Plug, its Inactive Wells on a Fixed Timeframe.*

No Commission Rule in 2018 dictated a deadline by which an operator was required to plug a Shut-in ("SI") or Temporarily Abandoned ("TA")[4] well. Rather, a SI or TA well could remain inactive indefinitely, provided the well passed a periodic Mechanical Integrity Test ("MIT").[5] Furthermore, provided an operator had the required amount of financial assurance, the Commission had no authority to revoke the operator's right to operate a well simply because it remained inactive for an extended time. Thus, two core assumptions of Mr. Purvis's analysis—that P3 would lose the "legal right to operate" the Third Creek wells and the wells would require decommissioning "in the near future" merely because they were inactive—are wrong.

Additionally, in 2018, an Inactive Well was defined as a SI well "from which *no production* has been sold for a period of twelve (12) consecutive months," or a well that has been TA'd for six consecutive months.[6] It was commonplace for operators to produce an otherwise SI well just often enough to keep it out of Inactive Well status and avoid the excess Inactive Well financial assurance obligations discussed below. While returning the SI or TA'd wells to production likely would have required some capital outlay, P3 did not face a looming doomsday deadline when it would lose the legal right to operate the Third Creek and other SI wells or be ordered by the Commission to plug and abandon them.

2. *The Commission Properly Imposed Excess Inactive Well Financial Assurance on P3 in September 2021.*

While the Commission did not impose a plugging timeline for inactive wells, it did require additional financial assurance for "excess" inactive wells.[7] When P3 acquired HRM II's wells in September 2018, it posted a $100,000 "blanket" plugging bond, a $25,000 Surface Owner Protection Bond, and a $180,000 Inactive Well bond.[8] The excess Inactive Well financial assurance requirement was $20,000 per well, 60% less than the $50,000 per well Mr. Purvis assumed P3 would be compelled to pay to plug its inactive wells.[9] Further, financial assurance requirements are most frequently met through surety bonding, as P3 did, and not paid in cash.[10] To secure a surety bond, an operator pays an annual premium, which is typically a small fraction of the bond amount. For example, P3 paid a premium of $675 for a $25,000 bond, about 2.7% of

---

[3] *Id.* pp. 15, 17. Mr. Purvis assumes a decommissioning cost of $50,000 per well.

[4] A well that is either SI or TA is not producing hydrocarbons, and both are often referred to as "inactive wells." Wells can be SI or TA'd for a variety of operational reasons, for varying durations. A TA'd well has had mechanical work performed that would make it more time-consuming and costly to return the well to production.

[5] 2 CCR 404-1, Rules 319.b., 326 (2018). Those Rules changed effective April 30, 2022, after P3 had filed for Chapter 7 Bankruptcy. *See* 2 CCR 404-1, Rule 434.c. (2022).

[6] 2 CCR 404-1, 100-Series Definitions (2018).

[7] *See* Expert Witness Report of Matthew J. Lepore dated April 20, 2026 ("Lepore Rep."), pp. 13–14 (describing Commission process for excess Inactive Well financial assurance).

[8] *Id.*, pp. 14–15; 2 CCR 404-1, Rules 703, 706, 707 (2018).

[9] *See* Purvis Rep., p. 17.

[10] *See* HRM0001429; *see also* LEXON000022, LEXON000053, LEXON000096.

the bond amount.[11] Assuming, hypothetically, that all 76 Third Creek wells actually were Inactive Wells in September 2018 and that the Commission had required P3 to provide excess Inactive Well financial assurance immediately, P3 could have obtained a surety bond and the wells could have remained inactive indefinitely, while P3 continued working to return them to production. In other words, in that scenario, the Commission would not have ever required P3 to plug, abandon, reclaim, and remediate ("PAR&R") those wells, especially not all at once. As the wells began to produce and were no longer Inactive, P3's bonding requirement would have been reduced or, if P3 had paid a cash bond, its money returned. The imminent decommissioning risk of $3.7 million imagined by Mr. Purvis is purely fictional and has no basis in Colorado's regulatory scheme at the time.

In June 2019, P3 submitted a plan to the Commission to return many of its inactive wells to production or plug and abandon them on an approved schedule, in lieu of posting additional Inactive Well financial assurance.[12] The available record indicates that P3 did not obtain the Commission's approval for its plan, but it did continue operating and the Commission did not require additional Inactive Well financial assurance at that time. However, in September 2021, three years after P3 acquired the wells from HRM II, the Commission sought an additional $1.46 million in Inactive Well bonding from P3.[13] Notably, the Commission never required P3 to PAR&R any wells. Unfortunately, P3 did not have the means to meet that obligation and filed for Chapter 7 Bankruptcy in November 2021.

**B. Mr. Purvis' assumptions concerning a well's economic limits are contradicted by the actual economic performance of tens of thousands of low-producing Colorado wells.**

A core tenet of Section I of Mr. Purvis' report, "How to fund decommissioning of oil and gas projects," is that hydrocarbon production from a well declines over time.[14] While this is generally true, there are many tools for increasing a well's production and countless variables that operators analyze to determine whether a well's production volume will be profitable at a given time. For example, from my experience as a former Director of the Commission, operators have many techniques available, such as swabbing a well, repairing or replacing associated equipment, using enhanced oil recovery techniques, or penetrating a new hydrocarbon formation to potentially improve a well's production. Operating costs vary widely among operators, and commodity prices fluctuate. Mr. Purvis acknowledges these truths in passing, but his hypothetical examples inevitably emphasize downside risks and paint a false picture of P3's inability to succeed.[15]

---

[11] LEXON000001.

[12] *See* Lepore Rep., p. 15; 2 CCR 404-1, Rule 707a. (2018).

[13] *Id.*

[14] *See* Purvis Rep., pp. 4–14.

[15] *See id.* p. 9: "Of course, the specifics vary from protect to project, and commodity prices can fluctuate both up and down;" *id*., p. 6, suggesting commodity prices could fall by 20% and, simultaneously, decommissioning costs could be underestimated by 20%. Obviously, the opposite is also possible: *see* p.8 (hypothesizing that decommissioning costs could rise faster than the rate at which the operator is paying down that liability). Mr. Purvis ignores the near certainty that money set aside for future decommissioning would be held in an interest-bearing account in which the interest rate exceeded the inflation rate for decommissioning.

The history of oil and gas production in the DJ Basin belies Mr. Purvis's assumptions about a well's economic limits. The DJ and other Colorado basins have been producing oil and gas for decades, and wells are routinely transferred to different operators through the well's lifecycle. Permitting and drilling a well are capital-intensive, time-consuming activities. In my experience, operators, like Amoco Petroleum Co. that drilled many DJ Basin wells, anticipate recovering these high up-front costs early in the well's lifecycle, during "flush production." A subsequent operator, like HRM II or P3, does not bear those costs, and often has fewer employees and lower operating costs. These operators can earn a profit even as production declines well below the "stripper" well level of 15 barrels or less of oil per day, or 90 thousand cubic feet (MCF) or less of gas per day.[16]

In 2018, 58% of all oil wells and 73 percent of all gas wells in Colorado were classified as stripper wells.[17] These wells produced only 4% of the state's oil and 15% of the state's gas, yet delivered an estimated gross income of *$1.3 billion* to the wells' owners.[18] The break-even price for oil wells ranged between $10 to $35 per barrel, and for gas wells between $1.10 to $1.70 per MCF in 2018.[19] The State Auditor calculated that an operator with 100 oil wells each producing 1,000 barrels of oil per year (about 2.75 barrels per day, or 72% less than the stripper well threshold), would generate gross income of *$5.80 million* at $58 per barrel.[20]

Based on this stripper well data, P3, with approximately 200 wells capable of producing both oil and gas, could have reasonably anticipated a successful, profitable future. Mr. Purvis's "economic limit" is a constantly moving target and predicting its arrival is an uncertain science at the very best.[21]

### C. Neither the Commission nor HRM II was Obligated to Evaluate P3's Competence to Operate Wells in Colorado.

Mr. Purvis frequently asserts that P3 lacked experience with operations in Colorado or with wells like those it acquired from HRM II.[22] To the extent Mr. Purvis is suggesting P3 was unfit to purchase the HRM II assets, neither the Commission nor HRM II had any obligation under the Colorado Oil and Gas Conservation Act (the "Act") or the Commission's rules to assess a prospective buyer's competence prior to sale.

A mineral owner has a property right to develop its minerals, subject to the Act and the Commission's regulatory regime. *Gerrity Oil & Gas Corp. v. Magness*, 946 P.2d 913, 926 (Colo.

---

[16] Colorado Office of the State Auditor, Oil and Gas Severance Tax Stripper Well Exemption, July 2020, p. 3.

[17] *Id.* pp. 5. A COGCC analysis of 2020 calendar year data found that 77% of producing oil wells and 64% of producing gas wells in the state were stripper wells, accounting for 7% of statewide oil production and 11% of total gas production. COGCC Stripper Well Data, 2020 Calendar Year. Available at https://drive.google.com/file/d/1KsZ8tDVlRBrZPMN0LtKL9gBWYyoUri6S/view

[18] *Id.* pp. 5, 11. The gross income estimate used $58/barrel for oil and $3/ MCF for gas, both of which were the average wellhead price in Colorado in 2018. Mr. Purvis assumed an oil price of $55/ barrel for his calculations, and notes that oil prices were $70/ barrel or more between June and November 2021. Purvis Rep., pp. 22, 54.

[19] *Id.* p. 6.

[20] *Id.* p. 7.

[21] *Id.* p. 4.

[22] *See, e.g.,* Purvis Rep., pp. 14–15, 20–21, 49–50.

1997). The Act has never required, and the Commission has never adopted, a litmus test to determine whether an individual or entity is "qualified" to own or operate an oil or gas well in Colorado. Nor has it ever implemented a process by which it might evaluate a would-be operator's competence. Rather, the regulatory regime is founded on a comprehensive set of operating rules, permits, and orders that an operator must comply with when it conducts oil and gas operations.[23] The Commission has broad inspection authority to monitor compliance, and enforcement powers to penalize non-compliance, including the authority to prohibit an operator from selling its hydrocarbons into the market.[24]

To become a new operator in Colorado, P3 was required to file a Form 1, Registration for Oil and Gas Operations, with the Commission, which it did.[25] To be acknowledged as the operator of the wells it acquired from HRM II, P3 had to provide the financial assurance required by the Commission Rules and file a Form 10, Certificate of Clearance And/Or Change of Operator.[26] P3 satisfied each of these requirements on or about September 18, 2018.[27] Henceforth, P3 was free to pursue its development ambitions provided it complied with the Commission's rules, permits, and orders.

Mr. Purvis notes that P3 lacked experience operating in Colorado,[28] but he does not suggest that HRM II was obliged to "educate" P3 about the prevailing regulatory environment in Colorado.[29] HRM II had no obligation under the Act or Commission Rules to assess a prospective buyer's competence prior to sale. To ensure a smooth transition, HRM II coordinated with P3 and the Commission Staff regarding the amount of blanket and excess Inactive Well financial assurance required from P3, and both P3 and HRM II were required to execute the Form 10.[30] HRM II had no obligation under the Act or Commission Rules to evaluate P3's business plans, income projections, or operational capabilities prior to sale, and P3 had no obligation to disclose such information should HRM II have requested it.

---

[23] The stated purpose of the regulatory regime between 2007 and April 2019 was to "foster the responsible, balanced development, production, and utilization of the natural resources of oil and gas in the state of Colorado in a manner consistent with protection of public health, safety, and welfare, including protection of the environment and wildlife resources." C.R.S. 34-60-102(1), 2007–April 2019.

[24] In 2025, the Commission conducted 29,157 inspections of oil and gas operations and issued 52 enforcement orders that included penalties totaling $33,362,680. The average penalty was $641,590 and the maximum penalty was $8,242,500. Energy and Carbon Management Commission presentation to the Colorado Legislature's Joint Energy Committee, January 16, 2026.

[25] HRM0001429.

[26] 2 CCR 404-1, Rules 302, 312, 700 Series (2018).

[27] HRM0001429, HRM0006253.

[28] Purvis Rep., p. 14: "the acquiring company should consider its background and expertise as well as its other existing operations;" *id.*, p. 15: "it is also clear that this area and type of wells lie within the experience of HRM but outside or mostly outside the experience of P3. The paucity of relevant experience increases the risk of executing an improvement strategy on the package."

[29] *See. e.g., id.,* p. 50: "It may also be noted that the contracts I've seen for buying properties on EnergyNet explicitly disavow the completeness or reliability of the information, and bidders understand that the concept of *caveat emptor* applies, 'buyer beware.'"

[30] See, e.g., HRM0006959; HRM0006253; HRM0001438–40.

### D. Permanent Closure of the Third Creek Gas Gathering System Coupled With Unforeseen Regulatory Changes Imperiled P3's Business Plan.

As Mr. Purvis correctly notes, the Third Creek gas gathering system was shut down by its operator, a subsidiary of Anadarko Petroleum Corporation ("Anadarko"), in the aftermath of a fatal fire and explosion at a residential home on April 17, 2017, in Firestone, Colorado.[31] Mr. Purvis also noted that losing access to the Third Creek system would impede operators' ability to improve oil production and generate revenue from wells connected to the system.[32] Anadarko shut-in more than 3,000 producing vertical wells across counties in northeast Colorado within days of the explosion, but it did not shut-in the Third Creek gathering system until May 29, 2018, more than a year after the tragedy.[33] As Mr. Purvis notes, the "Third Creek [pipeline] continued to gather gas from third parties because it continued to have contracts with them."[34] Additionally, as Mr. Hutson testified, HRM II and other affected operators were talking with Anadarko, and amongst themselves, about alternatives to shuttering the system, including acquiring the pipeline system from Anadarko, connecting to a different gathering system, trucking the natural gas, using the produced natural gas on-site, or flaring the natural gas using enclosed combustors.[35]

Although P3 knew the Third Creek pipeline was shut-in when it acquired the wells from HRM II, it would have been reasonable to believe that either: 1) an alternative gas take-away solution could be found; or 2) the Commission would allow operators to produce oil from the Third Creek wells to prevent waste, even if flaring small volumes of associated gas was necessary.[36] P3 aggressively pursued the gas flaring option, filing Form 4 requests to flare gas at dozens of the seventy-four wells on the Third Creek system, starting in late October 2018, just a month after the transaction was finalized.[37] For every well at which P3 sought approval to flare, it had to purchase a high-efficiency combustion chamber, test the well gas for hydrogen sulfide, meter the gas volumes and

[31] *Id.*, p. 49. Mr. Purvis is wrong, however, in saying that the Firestone home explosion was caused by an out-of-use segment of the Third Creek gas gathering system. *Id.* The Frederick-Firestone Fire Protection District determined that the explosion and fire were caused by unrefined, non-odorized natural gas leaking from a cut, abandoned flow line that had not been disconnected from a nearby oil and gas well. Frederic-Firestone Fire Protection District Releases Results of Investigation Into Origin and Cause of April 17th Home Explosion, May 2, 2017.

[32] Purvis Rep., pp. 49–50.

[33] Anadarko News Release Regarding Colorado Operations, April 26, 2017; HRM0026932.

[34] Purvis Rep., p. 49.

[35] Deposition of Roger Hutson (Nov. 30, 2025) at 194:25–196:4, 197:9–18. As the Commission Director at this time, I met with representatives of affected operators who were pursuing a potential statutory or regulatory basis to preclude Anadarko from permanently shutting down the gathering system. The Commission does not have jurisdiction over gas gathering systems like Third Creek and therefore did not have a statutory or regulatory basis to intervene.

[36] Deposition of John Hoffman ("Hoffman Tr.") (April 22, 2025) at 201:16–202:2 (P3 knew the 3rd Creek Pipeline was closed); *id.* at 58:18–59:13, 61:20–62:19, 81:19–83:13, 107:6–19, 200:24–201:15 (use of combustors or other gas take-away solutions). *See also* 2 CCR 404-1, Rule 912 (2018) (allowing gas to be vented or flared subject to a Form 4 Sundry Notice approved by the Director, but prohibiting the unnecessary or excessive venting or flaring of natural gas). In this circumstance, producing the available oil would prevent wasting of the oil caused by leaving it in the ground. C.R.S. § 34-60-103(12)(a). Mr. Purvis himself recognized that the Third Creek wells "might pay off" if the operator could manage the associated gas under the Commission's Rules. Purvis Rep., p. 15.

[37] *See, e.g.,* Form 4s: Plaintiffs_014613–17; Plaintiffs_013419–23; Plaintiffs_013340–44; Plaintiffs_011334–38; Plaintiffs_010702–06; Plaintiffs_010549–54; Plaintiffs_010493–97.

report them to ECMC monthly, and provide details of any on-site usage of the gas.[38] P3's Sundry Notices explain that future operation of the Third Creek pipeline remains uncertain and that P3 had not identified any viable on-site usage for the associated gas.[39]

Prior to the passage of Senate Bill 19-181 in Colorado, flaring small volumes of associated gas to facilitate oil production almost certainly would have been allowed. What P3 did not and could not reasonably foresee was that the Colorado Legislature, with strong support from then-newly-elected Governor Polis, was about to dramatically alter Colorado's legal and regulatory landscapes for oil and gas development. Senate Bill 19-181, which took effect in April 2019, seven months after P3 acquired the Third Creek wells, changed the Commission's mission from fostering development of the state's oil and natural gas resources to regulating development to protect public health, safety, welfare, the environment and wildlife resources ("PHSWE&W").[40] The Bill also changed the decades-long definition of "waste" to allow oil or gas *not to be produced* if the Commission deemed production would threaten PHSWE&W.[41]

The statutory changes to SB 19-181 meant the Commission could prohibit P3 from producing oil from the Third Creek wells, not because the wells had been shut-in for some period as Mr. Purvis incorrectly assumes, but because the Commission could determine that flaring the associated gas presented a threat to PHSWE&W. The Commission Director ultimately *approved* almost all of P3's requests to flare associated gas for up to twelve months, but did not do so until November 2021, *three years after P3 filed* the requests.[42] By then, P3 had run out of time.

The Commission's lengthy and untimely delay hamstrung P3's ability to implement its business plan to increase oil production from the Third Creek wells while flaring the associated gas and seeking an alternative gas gathering or usage solution. If the Commission had approved P3's requests to flare sooner, the outcome for P3 might have been entirely different.

### E. Executive Order D 2018-12 Focused on Improving the Orphaned Well Program and Potential Future Financial Assurance Rule Changes.

Mr. Purvis cites Governor Hickenlooper's July 2018, Executive Order D 2018-012 ("E.O. 2018-12") as evidence that P3 should have anticipated regulatory reform related to "accountability for plugging" wells.[43] The Governor issued E.O. 2018-12 two months before P3 became an operator in Colorado, and Mr. Purvis cites no evidence that P3 ever saw or heard about it prior to acquiring HRM II's wells. Moreso, the Governor issued E.O. 2018-12 to take advantage of the Legislature's 2018 spending authority increase for the Orphan Well Program ("OWP") from $445,000 to more than $5,000,000,[44] directing the Commission to endeavor to plug, remediate, and reclaim all existing high- and medium-priority Orphaned Wells already in the OWP within five years. This

---

[38] *See id.,* "Conditions of Approval."

[39] *See id.,* "Operator Comments."

[40] Senate Bill 19-181, Section 6, codified at CRS § 34-60-102.(1)(a)(I).

[41] C.R.S. §§34-60-103(43)(b), (44)(b), (45)(b), 34-60-106(2.5)(b); *see also* Lepore Rep., pp. 6–7.

[42] *See* Form 4s cited in fn. 37. The reasons for the delay are unclear. The Covid pandemic, extensive Commission rulemaking to implement SB 19-181, and back and forth between P3 and Commission Staff about the request likely contributed.

[43] Purvis Rep. pp. 17–18; *see* Lepore Rep. Ex. 3, Executive Order D 2018-012.

[44] E.O. 2018-12, §§ III.C., III.F.

effort to PAR&R existing orphaned wells using OWP money was irrelevant to P3's business plans. The Governor also set a deadline for the Commission to promulgate new financial assurance rules by September 1, 2019.[45] However, E.O 2018-12 did not set out what those new financial assurance rules would be, and in April 2019, SB 19-181 amended the statutory financial assurance requirements, effectively rendering moot that part of E.O. 2018-12.[46] The Commission did not adopt new financial assurance Rules until April 30, 2022, five months after P3 had filed for Chapter 7 Bankruptcy.

## V. Analysis of Expert Report of Gregory E. Scheig, CFA, CPA/ABV/CFF, CMA

Mr. Scheig was retained by ClientEarth US and Plaintiffs to render independent, expert opinions regarding the solvency of P3 as of September 25, 2018. In his analysis, Mr. Scheig incorrectly assumed that all 76 of P3's Third Creek wells became "uneconomic" as of May 2018, when the system was shut down by its operator. Mr. Scheig does not define the term "uneconomic." Mr. Scheig also assumed, erroneously, that P3 would be compelled to plug all 76 Third Creek wells following 18 months of inactivity. Mr. Scheig calculated a present value cost of $5,382,757 for P3 to plug and abandon the Third Creek wells, which he assumed P3 would be obligated to pay no later than December 31, 2019. Based on my experience, including as the Director of the Commission, these assumptions, which are central to Mr. Scheig's economic analyses, have no basis in fact and are flatly contradicted by the applicable Commission Rules in place between 2018 and 2021.

### A. The Commission's 2018–2021 Rules Allowed a Well to Remain Inactive Indefinitely.

Mr. Scheig assumes, without citation to any legal or other authority, that the Third Creek wells became uneconomic in May 2018 when the Third Creek gathering system was shut down, and that all the wells would need to be plugged within 18 months thereafter.[47] Mr. Scheig's assumptions are incorrect under the Commission's regulatory regime for inactive wells.

As noted supra, Section IV.A.1, when P3 acquired HRM II's wells in September 2018, the Commission's Rules required an operator to pay additional financial assurance for excess Inactive Wells, but once the financial assurance obligation was met, there was no deadline for plugging a SI or TA well. [48] Rather, a SI or TA well could remain inactive indefinitely, provided the well carried the required amount of financial assurance and passed a periodic MIT.[49] To become the new operator of the Third Creek wells (and others it acquired from HRM II), P3 had to provide

[45] *Id.,* § III.G.

[46] SB 19-181, Section 12, 34-60-106(13).

[47] Expert Witness Report of Gregory E. Scheig dated April 20, 2026 ("Scheig Rep."), p. 7.

[48] *See* 2 CCR 404-1, Rule 707.a. (2018). Mr. Scheig does not say what authority would have compelled P3 to plug the Third Creek wells, but the Commission is the only Colorado regulatory body with such authority. A well that is either SI or TA is not producing hydrocarbons, and both are often referred to as "inactive wells."

[49] 2 CCR 404-1, Rules 319.b., 326 (2018). Those Rules changed effective April 30, 2022, after P3 had filed for Chapter 7 Bankruptcy. *See* 2 CCR 404-1, Rule 434.c. (2022).

the financial assurance required under the Commission's 700-Series Rules.[50] P3's financial assurance obligation included a $100,000 "statewide blanket financial assurance" and $180,00 for excess Inactive Wells, as determined by the Commission.[51] P3 met its full financial assurance obligations in September 2018, which meant there was no pending requirement for it to plug any of the Third Creek wells.[52]

A second fallacy in Mr. Scheig's analysis is his assumption that once the Third Creek wells supposedly became uneconomic in May 2018, they would remain uneconomic (or inactive) forever.[53] Under the Commission's Rules, however, an Inactive Well is defined as a SI well "from which *no production* has been sold for a period of twelve (12) consecutive months," or a well that has been TA'd for six consecutive months.[54] Therefore, if a SI well produced even a small volume of hydrocarbons once per year, the Inactive Well status would be avoided, along with the requirement to provide excess Inactive Well financial assurance. Thus, contrary to Mr. Scheig's assumptions, even assuming P3's Third Creek wells were all Inactive on May 29, 2018, no Commission Rule dictated that the wells must be plugged by December 2019. Mr. Scheig also provides no support for the assumption that there could be dozens of plugging crews available to plug wells that month; that level of plugging in Colorado would be inconsistent with my experience. Indeed, even if that volume of plugging contractors were available, I am not aware whether the Commission would have sufficient staff available to grant permits for and then supervise that scope of plugging work in such a short time period.

### B. The Third Creek Wells Had Future Oil Production and Revenue Potential.

In my experience, including as former Director of the Commission, natural gas is almost universally transported from a well via a pipeline gathering system like the Third Creek system; the same is not true for oil. In the DJ Basin circa 2018, oil was commonly stored in large tanks on or near the well pad and transported by truck. Consequently, closure of the Third Creek system did not directly affect P3's ability to produce or transport oil from the Third Creek wells, as Mr. Scheig assumed.[55]

The challenge facing P3 and other producers was that natural gas can be commingled with the oil and, without a gathering system, the "associated" gas must be used on site, vented to the atmosphere, or burned (flared). When P3 acquired the Third Creek wells, the Commission's Rules allowed associated gas to be flared, subject to a Form 4 Sundry Notice approved by the Director.[56] Mr. Hoffman testified that P3 intended to produce oil from the Third Creek wells and manage the

[50] 2 CCR 404-1, Rules 701-709 (2018).

[51] 2 CCR 404-1, Rules 706.b., 707; HRM0024177, Warning Letter # 401739715.

[52] HRM0001451, Email from M. Ramos, ECMC, to P. McGraw, P3, September 18, 2018.

[53] Scheig Rep., p. 7.

[54] 2 CCR 404-1, 100-Series Definitions (2018).

[55] Scheig Rep., p. 7.

[56] 2 CCR 404-1, Rule 912.d. (2018). The unnecessary or excessive venting or flaring of natural gas was prohibited. *Id.*, Rule 912.a.

associated gas consistently with the Commission's Rules.[57] And P3 did in fact submit forms to the Commission requesting to flare gas from certain of the Third Creek wells.[58] Unfortunately, the Commission delayed approval of P3's requests to flare for almost three years, until November 2021, when P3 was teetering on the brink of declaring bankruptcy.[59] Mr. Scheig erred by assuming that the Third Creek wells were incapable of ever generating future revenue.

### C. Fully Bonded Inactive Wells Do Not Have to be Plugged, and Bonds Typically Are Not Paid in Cash or Returned 30 Days After a Well is Plugged.

Mr. Scheig assumed that P3 made a $405,000 cash payment for financial assurance obligations when it acquired the HRM II wells in September 2018.[60] He also assumed that in November 2019, P3 would be obligated to pay the Commission $20,000 per well in financial assurance for 76 Inactive Wells ($1.52 million) and also would be compelled to expend $6.27 million to plug the Inactive Wells in December 2019.[61] Finally, he assumed P3 would recoup the $1.52 million in financial assurance in January 2020 after it had plugged and abandoned 76 wells in a single month.[62] These assumptions are fundamentally flawed in several ways.

The financial assurance P3 provided to the Commission in September 2018 was paid through surety bonds, not cash.[63] In my experience, these types of bonds typically have small premiums associated with them, and do not require cash payments of the full bond amount.[64] Additional Inactive Well financial assurance is only required for wells that have produced no hydrocarbons for 12 continuous months and that exceed in number an operator's existing bonding.[65] P3 had $280,000 in blanket plugging bonding and excess Inactive Well bonding, which would cover 14 Inactive Wells.[66] Even if P3 owed excess Inactive Well financial assurance on the remaining 62 Inactive Wells it most likely would not have paid cash, as Mr. Scheig suggests. More importantly, however, Mr. Scheig provides no evidence that, as of November 2019, P3 would have 62 additional Inactive Wells, as defined by the Commission. As described above, oil production from the wells was feasible and is what P3 pursued. A flaw in Mr. Scheig's analysis is assuming that P3 would have to plug all Inactive Wells at a given time, even after providing Inactive Well financial assurance. Rather, once P3 provided any necessary excess Inactive Well financial assurance, *it had no obligation to plug the Inactive Wells*, as explained above. *See supra*, Section V.A. Thus, Mr.

---

[57] Hoffman Tr. at 58:18–59:13, 61:20–62:19, 81:19–83:13, 107:6–19, 200:24–201:15. *See also*, *See* 2 CCR 404-1, Rule 912 (2018) (allowing gas to be vented or flared subject to a Form 4 Sundry Notice approved by the Director.

[58] *See, e.g.,* Form 4s cited in fn. 37.

[59] *See id.*

[60] Scheig Rep. pp. 17, 19, Ex. B.7.

[61] Scheig Rep., p. 20.

[62] *Id.*, pp. 10, 20, Ex. C.2.

[63] HRM0001429; LEXON000022; LEXON000053; LEXON000096.

[64] *See, e.g.*, LEXON000001.

[65] 2 CCR 404-1, Rule 707 (2018).

[66] HRM0001451, Email from M. Ramos, ECMC, to P. McGraw, P3, September 18, 2018.

Scheig's Cash Flow Test is based on assumed conditions that would never, and in fact did not, occur under the Commission's Rules.[67]

The errors in Mr. Scheig's Cash Flow Test are fatal to that analysis. As he says:

> In the case of P3, the key cash flow to consider was not a debt repayment but satisfying the company's environmental liabilities associated with the wells transferred from HRM, most notably the expected 2019 bonding and plugging of 76 wells . . . .[68]

Mr. Scheig has misconstrued both the timing and the amount of the environmental liability that he says was the key cash flow consideration in his analysis. He wrongly assumed that P3 would have to pay both $1.52 million in excess Inactive Well financial assurance for the inactive Third Creek wells **and** $6.27 million to plug those same wells. Under no circumstance would P3 be required both to provide additional excess Inactive Well financial assurance and plug all its Inactive Wells. These assumptions form the basis for Mr. Scheig's opinions but have no basis in fact and never came to pass. In September 2021, almost two years later than Mr. Scheig's analysis assumed, P3 was obligated to provide an additional $1.46 million in excess Inactive Well financial assurance, largely because the Commission delayed approval of P3's requests to flare for almost three years.[69] Notably, however, at no time was P3 required to plug those inactive wells.

## VI. <u>Analysis of Expert Report of J. Daniel Arthur, P.E.</u>

Mr. Arthur was retained by Plaintiffs' counsel to estimate the scope and cost of the work he believes would have been necessary to properly "close" a group of oil and gas wells that P3 acquired from HRM II in September 2018.[70] Mr. Arthur performed a desktop evaluation to form his opinions, including reviewing the regulatory framework established by the Commission[71] for plugging and abandonment, remediation, and reclaiming of Orphaned Wells and Orphaned Sites applicable to the wells P3 had acquired.[72] According to Mr. Arthur, his cost estimates were "designed to provide a reasonable approximation for the magnitude of the obligations associated

[67] Mr. Scheig's assumption that 76 wells could be plugged in one month and that the Commission would release P3's bonds one month after the plugging also are unrealistic. The Commission only releases financial assurance after a well has been plugged and abandoned and the location has been fully reclaimed and remediated, which can easily take months and often takes years.

[68] Scheig Rep., p. 20.

[69] *See* fn. 37.

[70] Expert Witness Report of J. Daniel Arthur, dated April 20, 2026 ("Arthur Rep."), p. 1.

[71] The Commission was known as the Colorado Oil and Gas Conservation Commission until July 1, 2023. *See* Senate Bill 23-285.

[72] Arthur Rep. p. 1; *see also* An Orphaned Well "means a Well for which no Owner or Operator can be found, or where such Owner or Operator is unwilling or unable to Plug and Abandon such Well." An ORPHANED SITE means "an Oil and Gas Location or Oil and Gas Facility for which no Operator with unclaimed Financial Assurance or an active Form 1, Registration for Oil and Gas Operations exists, and for which the Commission has not identified a Responsible Party. An Orphaned Site may or may not have Orphaned Well(s) associated with the Oil and Gas Location or Oil and Gas Facility." 2 CCR 404-1, 100 Series Definitions.

with properly closing wells of similar depth, construction, and condition . . . adjusted to a September 2018 dollar basis using industry-specific cost indices."[73]

### A. The Scope and Complexity of the Commission's Rules Governing Plugging and Abandonment, Reclamation, and Remediation of Oil and Gas Wells are Larger Than Mr. Arthur Recognizes.

In Section V of his report, Mr. Arthur discusses five components required by the Commission's regulations to properly Plug and Abandon, Reclaim, and potentially Remediate ("PAR&R") an Orphaned Well or Orphaned Site.[74] Based on my experience as Director of the Commission and my tenure as counsel for the Commission, Mr. Arthur fairly describes the essential PAR&R elements, but he does not address the complexities and complications that likely would arise should a third-party attempt to oversee or take over the PAR&R processes for P3's Orphaned Wells and Sites, as suggested by Mr. Arthur.[75] If that is what Mr. Arthur is suggesting, I am not aware that an Orphaned Well has ever been removed from the OWP by a third party to oversee PAR&R of a well, much less anything like the roughly 200 Orphaned Wells or Sites at issue in this case.[76] In my opinion, removing the P3 Orphaned Wells and Sites from the OWP would be disruptive and counterproductive to the OWP's mission to PAR&R all the Orphaned Wells and Sites in the program as efficiently as possible, consistent with the OWP's risk-based priority ranking.

#### *1. The OWP has Custody and Control Over P3's Orphaned Wells and Sites and Has and Will Continue to PAR&R them.*

In Section V of his report, Mr. Arthur prepared an estimate of the costs a private-party contractor (or multiple contractors) would incur to PAR&R all of P3's Orphaned Wells and Sites, which I understand is part of the injunctive relief that Plaintiffs seek in this lawsuit.[77] To accomplish the PAR&R of the wells and sites, Mr. Arthur's analysis assumes that someone (although it is unclear who—whether it is Plaintiffs, the Court, both, or someone else) would engage a private "third-party professional" to oversee the PAR&R of the wells and sites "and document compliance with ECMC requirements," with the actual PAR&R work seemingly being done by other (and invariably multiple) PAR&R contractors.[78] Yet, all the wells P3 abandoned through its November

---

[73] Arthur Rep., p. 2.

[74] "**PLUGGING AND ABANDONMENT** means the permanent plugging of a Well, the removal of its associated Production Facilities, and the abandonment of its Flowline(s)." "**RECLAMATION** means the process of returning or restoring the surface of disturbed land to its condition prior to the commencement of Oil and Gas Operations or Deep Geothermal Operations." "**REMEDIATION** means the process of reducing the concentration of a contaminant or contaminants in water or soil to the extent necessary to ensure compliance with the concentration levels in Table 915-1 and other applicable Groundwater standards and classifications." 2 CCR 404-1, 100 Series Definitions.

[75] *See* Arthur Rep., p. 12–14.

[76] On or about October 2022, Civitas Resources, Inc. entered into an Agreement for Plugging Operations with the Commission, pursuant to which it voluntarily plugged a small number of Orphaned Wells in the OWP, including two high priority P3 Orphaned Wells. Civitas_0000001. Civitas was an active registered Operator at the time. Under the Agreement, Civitas *only plugged* wells, and did not conduct any other operations, such as reclamation. To my knowledge, the Orphaned Wells remained under the custody and control of the OWP at all times. *See* Murphy Decl. ¶¶ 16, 17.

[77] See *generally* Arthur Rep., pp. 11–14.

[78] *Id.*

2021 bankruptcy were declared by the Commission to be Orphaned Wells and Orphaned Sites and entered the OWP in 2022.[79] And presently, all P3's Orphaned Wells and Orphaned Sites remain in the Commission's OWP. The OWP has custody and control over these wells and sites and is solely responsible for plugging, abandoning, reclaiming, and remediating them to protect public health, safety, welfare, the environment, and wildlife. In other words, because all P3's Orphaned Wells and Sites are presently in the Commission's OWP, only the Commission has the authority to oversee, allow, and approve PAR&R work on the Orphaned Wells. Mr. Arthur's assumption that a "third-party professional" could take over PAR&R of the Orphaned Wells and Sites would require that the wells and sites be removed from the Commission's OWP and that the "third-party professional" or some other third-party become the licensed operator of the wells. All those measures would require Commission approval and involvement and would necessarily put the Orphaned Wells and Sites on a different track for PAR&R.

The OWP assesses Orphaned Wells and Sites as they enter the program and in the normal course of ongoing operations to determine the potential threat they may pose to public health, safety, welfare, and the environment, and ranks each well or site as low, medium, or high priority.[80] Following prioritization, the OWP team defines the work scope for each well and site, which could include:[81]

- Field Operations (signs, labels, locks, tags, fencing, fluid removal from production equipment, and equipment decommissioning including removal, disposal, or salvage);
- Engineering (plug wells and abandon flowlines);
- Environmental (sampling, analysis, and remediation); and
- Reclamation (contouring, grading, seeding, and weed control).

The OWP team works within the state procurement system to issue awards to experienced contractors within each work specialty, and the work is scheduled and executed subject to OWP's oversight. The OWP team verifies the completed work with the contractor and the surface owner, and the team identifies any necessary follow-up monitoring activities for the site.[82]

The OWP began evaluation of and commenced field operations on P3's Orphaned Wells almost immediately after they entered the Program in early March 2022.[83] In a March 29, 2022, report to

---

[79] *See* Order Finding Violation, Commission Order No. 1V-780, Docket No. 211000188, March 9, 2022 (hereinafter, "OFV Order"), pp. 7–8, ORDER ¶ 3. *See also* Fiscal Year 2022 Annual Report, Orphaned Well Program, September 1, 2022, Table 1, available at https://ecmc.colorado.gov/regulation/orphaned-well-program/owp-reports; *see also* Lepore Expert Rep., pp.17–21.

[80] Orphaned Well Program FAQ (hereinafter "OWP FAQ"), Question No. 10, ECMC "Orphaned Well Program FAQ," Available at https://sites.google.com/state.co.us/cogcc-owp/home. The priority ranking for all P3's Orphan Wells and Sites can be found on OWP Annual Reports, Table 4, available at https://ecmc.colorado.gov/regulation/orphaned-well-program/owp-reports.

[81] *Id.*

[82] *Id.*

[83] Fiscal Year 2022 Annual Report, Orphaned Well Program, September 1, 2022, Table 1, Table 3 (showing that the OWP had expended $1,190,352 on P3 Orphaned Sites through June 30, 2022, available at https://ecmc.colorado.gov/regulation/orphaned-well-program/owp-reports .

the Adams County Board of County Commissioners, the County's Oil & Gas Liaison reported that OWP staff had already inspected all 182 Orphaned P3 Wells within the County.[84] Based on my experience as Commission Director, those inspections were part of the OWP's prioritization process for the P3 wells. The OWP continues to oversee ongoing work to plug and abandon, reclaim, and remediate the P3 Orphaned Wells and Sites. Numerous P3 Orphaned Wells are already plugged; many have had production equipment removed and flowlines abandoned; and environmental investigation, monitoring, and remediation are ongoing at other Orphaned Sites.[85]

2. *The Commission Must Approve and Oversee all PAR&R Operations.*

Mr. Arthur correctly states that operators plugging and abandoning an orphaned well "*must follow ECMC regulations*," which includes the operator submitting required forms and notifications, and obtaining Commission approval "before any plugging operations can begin."[86] He briefly notes some of the details required by the Commission's Abandonment – Plugging Rule and the related Form 6, Well Abandonment Report - -Notice of Intent to Abandon.[87] The Commission's recently-released Wellbore Diagram Attachment Guidance, attached as **Appendix R-B**, illustrates the complexities associated with plugging and abandoning a well. Mr. Arthur also observes that:

> Coordination with ECMC inspectors *is assumed throughout the process*, with oversight personnel responsible for documenting plugging compliance and ensuring that well closure and surface restoration are completed in accordance with regulatory standards.[88]

This is an accurate statement and reemphasizes that the Commission and the OWP Staff will continue to be deeply involved with PAR&R of the P3 Orphaned Wells and Sites, even if a third party took over the PAR&R from the OWP (which, again, I am unaware of ever happening).

Mr. Arthur notes that a Form 27 must be submitted to and approved by the Commission when environmental remediation is required. Filing remediation reports and tabulating analytical results are also required, all of which must be sent to the Commission for review and consideration.[89] Similarly, Mr. Arthur acknowledges that reclamation activities require submission of additional Forms to the Commission, to document reclamation progress.[90]

Although Mr. Arthur speaks to the need to file certain regulatory Forms throughout the PAR&R process, he does not delve into the technicalities or address the extended duration required to conduct ongoing sampling and monitoring for environmental remediation and field inspections for

---

[84] AdamsCo_000047, at 000051.

[85] Fiscal Year 2025 Annual Report, Orphaned Well Program, September 8, 2025 (FY25 OWP Rep.), Tables 1, 4.

[86] Arthur Rep., p. 11 (emphasis added).

[87] *Id. See also* 2 CCR 404-1, Rule 434.a. Abandonment – Plugging, Rule 435, Form 6, Well Abandonment Reports, and ECMC Form 6.

[88] Arthur Rep., p. 14 (emphasis added).

[89] *Id.* p. 16; *see also* Commission Form 27, Site Investigation and Remediation Workplan, https://ecmc.colorado.gov/forms/form-27-site-investigation-and-remediation-workplan.

[90] *Id.* p. 18.

reclamation. The Commission's requirements for Closure of Oil and Gas Facilities, and Site Investigation, Remediation, and Closure are extensive and, based on my experience, can take months or years of environmental sampling and monitoring to reach closure.[91] For example, final reclamation on crop land must show no significant unrestored subsidence over two growing seasons, and on non-crop land, plant cover of at least eighty percent (80%) of pre-disturbance or reference area levels, excluding noxious weeds, must be observed through a visual appraisal.[92] The complexity of these elements and the time that often is required to reach final closure of an Orphaned Well or Orphaned Site will compound the challenges facing any third party that would take over the PAR&R processes currently underway and overseen by the expert OWP Staff.

3. *Only an Operator Registered With the Commission Can Plug and Abandon, Reclaim, or Remediate an Orphaned Well or Site.*

Plugging, abandoning, and reclaiming an Orphaned Well or Site are Oil and Gas Operations, as defined by the Commission Rules.[93] An "Operator" is "any person who exercises the right to control the conduct of any operation subject to the regulatory and permitting authority of the Commission.[94] To conduct an Oil and Gas Operation in Colorado, a person or entity must possess a Form 2, Registration and License for Operations.[95] Before operating a well, including to plug and abandon an Orphaned Well, the Operator must provide the Commission the required amount of financial assurance for each well that it would be operating. The Commission adopted new financial assurance Rules in April 2022, pursuant to Single Well Financial Assurance for Low Producing Wells (including Inactive Wells) that could be $130,000 *per well,* plus potentially additional financial assurance for other oil and gas operations and Surface Owner Protection.[96] Additionally, an Operator must carry general liability insurance coverage for property damage, bodily injury to third parties, and sudden and accidental pollution in the minimum amount of $5,000,000 per occurrence, and potentially other fees and financial assurance.[97] Critically, the Operator is responsible for the actions of its contractors.[98] If a contractor caused a reportable spill or other violation of ECMC's Rules during the course of PAR&R operations, any enforcement action the Commission pursued would be against the Operator of record, not the contractor.[99]

---

[91] 2 CCR 404-1, Rules 912, 913, 915, Table 915-1 Cleanup Concentrations.

[92] 2 CCR 404-1, Rule 1004.

[93] 2 CCR 404-1, 100 Series Definitions.

[94] *Id.*

[95] 2 CCR 404-1, Rule 205. An operator who owns wells must pay annual mitigation fees and annual marginal well fees for each well it owns. *Id.*

[96] 2 CCR 404-1, 100 Series Definitions, defining Low Producing Well and Single Well Financial Assurance; Rule 702, Financial Assurance for Plugging, Abandonment, and Reclamation; Rule703, Financial Assurance For Other Oil and Gas Facilities and Operations; Rule 704, Surface Owner Protection Bonds. Prior to April 2022, the financial assurance for Inactive Wells greater than 3,000 feet in depth was $20,000. *See* Lepore Rep., pp. 13–14.

[97] *Id.*, Rule 705, General Liability Insurance; Rule 218, Form 9, Transfer of Operatorship; see also Murphy Decl., ¶ 4.

[98] *See* 2 CCR 404-1, Rules 201.b., 602.

[99] *Id.* This was been true during my tenure as Assistant Attorney General, Commission Director, and in recent enforcement actions in which I have represented Operators charged with the alleged violations of their contractors.

While Mr. Arthur addresses ECMC's involvement during each PAR&R element, he does not broach the subject of who the Operator of record would be or the consequences of assuming that role, if anyone other than the OWP was managing the P3 PAR&R project. Any new Operator would be taking on substantial responsibilities, could incur very high financial assurance obligations, and could be saddled with penalties for its contractors' violations of ECMC Rules, permits, or orders.

#### 4. *Removing P3's Orphaned Wells and Sites from the OWP Would Disrupt and Likely Delay the Ongoing PAR&R Processes.*

Assuming Arthur suggests that a third party oversee PAR&R of the P3 wells by taking the P3 wells out of the OWP,[100] it is my opinion that removing the P3 Orphan Wells and Sites from the OWP would disrupt the PAR&R work on the P3 wells that is already underway, and it would likely delay that work.

As noted, PAR&R operations on P3's Orphaned Wells and Sites commenced in March 2022 and are ongoing today. Those operations were mapped out by the OWP Staff, which is comprised of subject matter experts in the relevant fields, including wellbore integrity, production equipment operations, and environmental and reclamation scientists.[101] Based on their collective expertise, the OWP team has ranked every Orphaned Well and Site based on the program's risk-based scale and is pursuing PAR&R based on those rankings. The OWP is designed to maximize efficiencies based on the in-house expertise, centralized control of the wells in the program, and the ranking system.[102]

Removing the P3 Orphan Wells and Sites from the OWP would likely disrupt and delay the P3 PAR&R work, which has already begun, for the following reasons:

a. A new Operator would be stepping into an ongoing project planned and executed to date by the OWP. Any changes to the workplan a new Operator might want to make would require Commission Staff's review and approval and could inherently delay or disrupt the OWP's ongoing work. Additionally, juggling the planned schedule of operations for P3's Orphaned Wells and Sites could affect planned work on other projects. The OWP considers proximity of wells when conducting plugging operations, for example, and will work seriatim on wells clustered together.[103] A separate Operator for the P3 wells would neither work on nearby wells nor benefit from work being done near to its wells.

b. The OWP can legally access an Orphaned Well or Site by virtue of being the regulatory agency for those operations. The OWP Staff seek consent from surface owners before accessing their property to conduct PAR&R operations, but if necessary, they could access an Oil and Gas Location on the property without consent. That is not the case for an Operator who does not have an active lease on the property. If a surface owner

---

[100] Arthur Rep., pp. 13–14.

[101] The OWP averaged 13 full-time technical employes in fiscal year 2025 and expects to backfill open positions to have 19 full-time technical employees in 2026. FY25 OWP Rep.

[102] *See* F.R.C.P. 30(b)(6) Deposition of the Colorado Energy and Carbon Management Commission through deponent Director Julie Murphy ("ECMC Dep.")259:20-261:7.

[103] OWP FAQ, Question 10.

did not want the new Operator on its property, the Operator would have a difficult time completing the required PAR&R. This is not an uncommon occurrence during the reclamation phase of final closure.[104]

c. The OWP Staff are a vertically integrated team with expertise in each element of PAR&R, which creates efficiencies for planning and executing the projects. A new Operator is unlikely to have the same depth or breadth of expertise, which could result in miscues, do-overs, and delays.

d. The Painted Pegasus Bond Claim Project, as the OWP calls it, is one of the largest in the program by number of Orphaned Wells and Sites. A new Operator dedicated solely to the P3 wells would effectively be taking resources away from the OWP to PAR&R other Orphaned Wells and Sites that may be ranked higher and present greater risks to public health, safety, welfare, the environment, and wildlife resources than some or many P3 wells. Depending on the number of available plugging rigs available at a given time and existing contractual commitments, a new Operator may find itself in competition with the OWP and other well-established Operators and could have trouble securing the consultants necessary for its PAR&R operations.

e. Reclamation and remediation timeframes are often beyond an Operator's control and can extend for months or years. A dedicated Operator for the P3 wells will have limited means to accelerate the pace of remediation and reclamation projects, which can be affected by the weather and other circumstances beyond their control.

PAR&R operations are complex, multi-disciplinary, and prone to unexpected twists and turns. The OWP is comprised of specialists from all disciplines with years of experience. They have prioritized the P3 Orphaned Wells and Sites, plugged many of them, conducted other operations at many more, and will ultimately PAR&R all of them in compliance with the Commission's Rules. A new Operator would face many obstacles and is unlikely to match the OWP's experience. Pulling the P3 Orphan Wells and Sites out of the OWP would adversely affect PAR&R work at other wells. And it is dubious that pulling the P3 wells out of the OWP will result in those wells achieving final closure any sooner than they would in the OWP.

### B. Mr. Arthur's Projected PAR&R Costs Are Substantially Higher Than Recent Commission Calculations.

Mr. Arthur estimated the PAR&R costs of a single P3 well in 2018 dollars to be $240,180.[105] In 2021, the ECMC conducted an exhaustive Financial Assurance rulemaking, in which PAR&R costs were a key element and were subjected to intense scrutiny. In his report, Mr. Arthur cites to an ECMC OWP cost summary of 23 actual PAR&R projects from several producing basins; 10 of the 23 were from the Denver Julesburg Basin, where the P3 wells are.[106] In 2021 dollars, the OWP found the average PAR&R cost was $92,710 and that the median cost was $85,438. The average

---

[104] F.R.C.P. 30(b)(6) Deposition of the Colorado Energy and Carbon Management Commission, October 22, 2025, through J. Murphy, at 266:22–267:17.

[105] Arthur Rep., p. 18.

[106] *Id.,* at p. 12, fn. 14, citing Orphaned Well Program, "Revisions to Orphaned Well Program Costs for Financial Assurance Rulemaking," July 23, 2021.

plugging cost was $52,141; reclamation costs ranged from $0 to $56,768; remediation costs ranged from $0 to $166,698. A second source cited by Mr. Arthur, the Financial Assurance Technical Working Group Final Report, December 1, 2018, states that the average cost to plug, reclaim, and remediate a single-well orphaned location in Colorado was $82,500.[107] In the Commission's 2021 Financial Assurance Rulemaking, the Commission adopted a new "Single Well Financial Assurance" requirement, which requires $130,000 per well financial assurance for a well that is more than 4,000' and less than 8,000' in depth.[108] That amount is based on the most recent Commission data available at the time of potential costs to PAR&R a single well and well site in Colorado.[109] However, the Commission also acknowledged that PAR&R costs can vary widely and, therefore, provided a mechanism for an operator to demonstrate that its actual PAR&R costs are lower than the presumptive costs.[110] The Commission has subsequently approved lower PAR&R costs for operators under this provision of the Rules.

I am not an economist, and I have not done an economic analysis of PAR&R costs in Colorado or the DJ Basin. However, I do have experience with overall PAR&R in the state of Colorado as the former Director of the Commission and in private practice representing clients. In my experience, PAR&R often costs less than the above Commission estimates, depending on the age, depth, and type of well, geographic location, and site topography, to name some of the variables. It is striking that Mr. Arthur's estimate of those costs, as of 2018, is nearly twice as high as the Commission estimated them to be in late 2021 and nearly three times as high as other referenced data. Nowhere does Mr. Arthur account for the difference between the Commission's estimate and his own, which is over twice that of the Commission. From my experience as the former Director of the Commission, taking into account the above Commission calculations, Mr. Arthur's PAR&R estimates in 2018 dollars appear to be significantly overstated without basis.

* * *

The opinions in this report summarize my findings and analysis to date to the best of my knowledge. This analysis is ongoing, and I reserve the right to supplement my opinions, conclusions, findings, and analysis as additional information becomes available (including, but not limited to, information from the depositions of Plaintiffs' experts Messrs. Purvis, Scheig, and

---

[107] Executive Order D 2018-12 Financial Assurance Technical Working Group Final Report, December 1, 2018, p. 7.

[108] 2 CCR 404-1, 100 Series Definitions; *id.*, Rule 702.

[109] Statement of Basis, Specific Statutory Authority, and Purpose New Rules and Amendments to Current Rules of the Colorado Oil and Gas Conservation Commission, 2 C.C.R. § 404-1, Cause No. 1R Docket No. 210600097, Financial Assurance Rulemaking, p.4. March 1, 2022.

[110] 2 CCR 404-1, 100 Series Definitions, Single Well Financial Assurance; Colo. Energy & Carbon Mgmt. Comm'n, Financial Assurance SBP – Final Post-Hearing (2023), https://ecmc.state.co.us/documents/sb19181/Rulemaking/Financial%20Assurance/Financial%20Assurance%20SBP%20-%20Final%20Post-Hearing.pdf.

Arthur). I may also offer additional opinions and analysis related to any additional analysis or opinions disclosed or performed by Plaintiffs or their experts.

Executed this 20th Day of May 2026

Matthew J. Lepore
Insight Energy Law, LLC

# Appendix R-A

## Index of Documents Reviewed

### D. Colo. Case No. 24-cv-00823-CNS-MEH – Filings

1. All documents and filings included on April 20, 2026 Report of Matthew J. Lepore, Appendix B.
2. Joint Statement on Class Notice and Exhibits [Dkt 200]

### D. Colo. Case No. 24-cv-00823-CNS-MEH – Depositions

1. All depositions included on April 20, 2026 Report of Matthew J. Lepore, Appendix B.

### D. Colo. Case No. 24-cv-00823-CNS-MEH – Produced Documents

1. All documents and produced materials included on April 20, 2026 Report of Matthew J. Lepore, Appendix B.
2. AdamsCo_000047
3. Hoffman_000899
4. Hoffman_000904
5. Hoffman_000909
6. Hoffman_000914
7. Hoffman_000919
8. Hoffman_000924
9. Hoffman_000929
10. Hoffman_000934
11. Hoffman_000954
12. Hoffman_000959
13. Hoffman_000964
14. Hoffman_000969
15. Hoffman_000974
16. Hoffman_000984
17. Plaintiffs_002096
18. Plaintiffs_002490
19. Plaintiffs_002547
20. Plaintiffs_002573
21. Plaintiffs_002960
22. Plaintiffs_002973
23. Plaintiffs_003266
24. Plaintiffs_003277
25. Plaintiffs_003316
26. Plaintiffs_003328
27. Plaintiffs_003812
28. Plaintiffs_003827
29. Plaintiffs_003971
30. Plaintiffs_003983
31. Plaintiffs_004382
32. Plaintiffs_004400
33. Plaintiffs_005352
34. Plaintiffs_005358
35. Plaintiffs_005733
36. Plaintiffs_005740
37. Plaintiffs_006045
38. Plaintiffs_006066
39. Plaintiffs_006557
40. Plaintiffs_006563
41. Plaintiffs_007247
42. Plaintiffs_007256
43. Plaintiffs_008255
44. Plaintiffs_008260
45. Plaintiffs_008623
46. Plaintiffs_008629
47. Plaintiffs_009821
48. Plaintiffs_009833
49. Plaintiffs_009925
50. Plaintiffs_009943
51. Plaintiffs_010482
52. Plaintiffs_010493
53. Plaintiffs_010539
54. Plaintiffs_010549
55. Plaintiffs_010697
56. Plaintiffs_010702
57. Plaintiffs_011326
58. Plaintiffs_011334
59. Plaintiffs_013330
60. Plaintiffs_013340
61. Plaintiffs_013403
62. Plaintiffs_013419
63. Plaintiffs_014602
64. Plaintiffs_014613
65. Civitas_0000001
66. LEXON000001
67. LEXON000022
68. LEXON000053
69. LEXON000096

69. June 30, 2025 Expert Report of C. Elaine Carleton and exhibits.
70. April 20, 2026 Report of Plaintiffs' Expert Dwayne C. Purvis, including exhibits, produced work files, and any materials considered by Mr. Purvis as included on Appendix B to that report.
71. April 20, 2026 Report of Plaintiffs' Expert J. Daniel Arthur, including exhibits, produced work files, and any materials considered by Mr. Arthur as included on Appendix A to that report.
72. April 20, 2026 Report of Plaintiffs' Expert Gregory E. Scheig, including exhibits, produced work files, and any materials considered by Mr. Scheig as included on Appendix II to that report.

**Other Sources**

1. All documents and sources included on April 20, 2026 Report of Matthew J. Lepore, Appendix B.

2. Statement of Basis and Purpose (SBP) accompanying the 2021 Financial Assurance Rules, available at https://ecmc.state.co.us/documents/sb19181/Rulemaking/Financial%20Assurance/Financial%20Assurance%20SBP%20-%20Final%20Post-Hearing.pdf.

3. FY 2025 OWP Expenditures, available at https://ecmc.colorado.gov/regulation/orphaned-well-program/owp-expenditures.

4. Frederic-Firestone Fire Protection District Releases Results of Investigation Into Origin and Cause of April 17th Home Explosion, May 2, 2017.

5. Colorado Office of the State Auditor, Oil and Gas Severance Tax Stripper Well Exemption, July 2020.

6. COGCC Stripper Well Data, 2020 Calendar Year. Available at https://drive.google.com/file/d/1KsZ8tDVlRBrZPMN0LtKL9gBWYyoUri6S/view.

7. Anadarko News Release Regarding Colorado Operations, April 26, 2017.

8. Colo. Energy & Carbon Mgmt. Comm'n, Financial Assurance SBP – Final Post-Hearing (2023), https://ecmc.state.co.us/documents/sb19181/Rulemaking/Financial%20Assurance/Financial%20Assurance%20SBP%20-%20Final%20Post-Hearing.pdf.

# Appendix R-B

COLORADO
Energy & Carbon Management Commission
Department of Natural Resources

# Wellbore Diagram Attachment Guidance

The wellbore diagram is intended to visualize the proposed and/or current configuration of a wellbore. Wellbore diagrams may be hand-drawn or computer-generated, so long as the required information to fully illustrate the well configuration is represented and clearly labeled.

## Table of Contents

Wellbore Diagram Attachment Guidance 1
- Table of Contents 1
- Rule Citation 1
- Requirements for the Diagram 2
- Common Errors and Issues 4
- Forms 4
- Examples of Wellbore Diagrams 5
- Additional Resources 7
- Document Change Log 8

## Rule Citation

Rule 308. Form 2, Application to Drill, Deepen, Re-Enter, or Recomplete, and Operate

b. Information Requirements. All Form 2s require the following information.

(2) Wellbore Diagram. A Form 2 to deepen, to re-enter, to recomplete to a different reservoir, or to drill a sidetrack of an existing Well will have a wellbore diagram attached.

Rule 420. Form 17, Bradenhead Test Report

The Operator will submit results of Bradenhead tests to the Director within 10 days of completing the test either by filing a Form 17, Bradenhead Test Report or by another method approved by the Director or Commission. The Operator will include a wellbore diagram if not previously submitted or if the wellbore configuration has changed. The Director may request that the Operator collect samples for analysis of the Bradenhead gas and liquid along with production gas. The Operator will submit the results of any gas and liquid analysis collected using a Form 43.

Rule 435. Form 6, Well Abandonment Reports

a. Form 6, Notice of Intent to Abandon. Prior to the abandonment of a Well, a Form 6, Well Abandonment Report – Notice of Intent to Abandon will be submitted to, and approved by, the Director. The Form 6 – Notice of Intent to Abandon will be completed and attachments included to fully describe the proposed abandonment operations. This includes the proposed depths of mechanical plugs and casing cuts; the proposed depths and volumes of all cement plugs; the amount, size and depth of casing and junk to be left in the Well; the volume, weight, and type of Fluid to be left in the wellbore between cement or mechanical plugs; and the nature and quantities of any other materials to be used in the plugging. The Operator will provide a current wellbore diagram and a wellbore diagram showing the proposed plugging procedure with the Form 6. If the Well is not plugged within six months of approval, the operator will file a new Form 6 – Notice of Intent to Abandon.

Rule 803.g.(6)

D. A wellbore diagram of the Injection Zone depicting the Well's bottomhole location relative to the Precambrian basement.

Rule 803.i.(1)

Wellbore Diagram. An existing and proposed schematic drawing showing all casing strings with cement volumes and tops, plug back total depth, isolation devices, remedial cement work, depth of any existing open or squeezed perforations, setting depths of any existing or proposed bridge plugs, formation tops, planned perforations in the Injection Zone, tubing and packer size, and setting depth.

Rule 803.j.(1)

A. Wellbore Diagram. A final schematic drawing showing all casing strings with cement volumes and tops, plug back total depth, isolation devices, depth of any existing open or squeezed perforations, setting depths of any bridge plugs, formation tops, perforations in the Injection Zone, tubing and packer size, and setting depths.

## Requirements for the Diagram

At a minimum, a wellbore diagram will include the following information, clearly labeled.

1. Diagram header information:

   a. Well name and number
   b. Indication of if the wellbore diagram is "current" (as-is status) or "proposed"; if both current and proposed diagrams are attached, they may either be two separate attachments or in one file.
   c. Legal location (QtrQtr, Section, Township, Range, and Principal Meridian)
   d. API Number
   e. County
   f. Date diagram was drawn
2. Current permanent downhole features:
   a. Hole size
   b. TD of hole and PBTD
   c. Information on cementation:
      i. Quantity (sacks) of cement placed in hole for conductor, surface, intermediate, production casing and liners,
      ii. Top and bottom of cement and verification method (calc or cement bond log),
      iii. Type of cement,
      iv. Yield, and
      v. Slurry weight
   d. Casing information for each string:
      i. Size,
      ii. Weight,
      iii. Top and setting depth, and
      iv. Any stage cementing tools (DV).
   e. Perforation depths
   f. Formation tops
   g. Depth of any:
      i. Bridge plugs,
      ii. Retainers,
      iii. Packers,
      iv. Fish, and
      v. Quantities of cement in place on any of the above.
   h. Kick-off points (KOPs) for sidetracks
3. Proposed permanent downhole features:
   a. Intended TD if deepening
   b. Remedial cement placed in hole:
      i. Top and bottom,
      ii. Quantity,
      iii. Yield, and
      iv. Slurry weight

c. Depth of any reconfigured or intended additional:
    i. Bridge plugs,
    ii. Retainers,
    iii. Packers,
    iv. Fish, and
    v. Quantity of cement placed on top of these features, if any.

d. Any changes to the casing configuration.

e. Depths of any new perforations.

4. Injection wells must show the packer and tubing depths.

# Common Errors and Issues

1. The required wellbore diagram is not attached, or if both proposed and current diagrams are required, only one is attached.
2. The diagram attachment label is incorrect.
3. The wellbore diagram does not include the required diagram labels.
4. The wellbore diagram does not include the required permanent downhole features.
5. Previous or historic work performed is not shown (annular cement, squeezing perforations, etc).
6. The wellbore diagram is difficult to understand. Some computer- generated diagrams can be overly complicated and include too much detail (e.g., each joint of casing); some hand-drawn diagrams can be illegible.
7. The wellbore diagram is not at an appropriate resolution to be easily read both on paper and on screen.
8. All sidetracks are not shown.
9. The diagram is not a visual representation of the specific well, but rather presented as a generic WBD with tables or other text on the side that contain the required data. All information should be incorporated into a visual representation of the wellbore.
10. Horizontal wells are drawn as vertical schematics with no notation that it is a horizontal well.

# Forms

As outlined in the Rule Citations, there are certain Forms that have a wellbore diagram as a required attachment. There are other Forms where including a wellbore diagram as an attachment is recommended to assist with the review. These include the Form 4 for any well repairs or reconfigurations, the Form 5 to assist with the

review, the Form 21 if a plug was left downhole and therefore the configuration has changed.

# Examples of Wellbore Diagrams

Example Well 1

Wellbore Schematic - Current




**Figure 1 Example of a Wellbore Diagram:** Here the header is easy to read with all identifying information included. The hole, casing and cement details provide a clear visual schematic and the information requirements are annotated on the side at the appropriate depths. The perfs are visually represented and annotated with depths. Relevant formation tops are included.



**Figure 2 Example Poorly Scaled Wellbore Diagrams:** Here are four wellbore diagrams with poor scaling making it impossible to read or interpret the diagram. These show too much detail with all the perf data that you cannot see any of the casing or cement data clearly. Additionally, there is nothing on these diagrams that indicated they are actually horizontal wellbores.




**Figure 3 Example Incomplete Wellbore Diagram:** This diagram does not include any hole, casing, cement, perforation information. It is lacking a header identifying the well. Only some plugs are annotated. This is incomplete because it lacks all required information.

## Additional Resources

Operator meeting August 13, 2024 expectations of wellbore diagrams were outlined
Casing and Cement Nomenclature Guidelines (12/10/2013) outlines expectations regarding naming of casing strings and cement jobs.
Suggested Wellbore Diagram Guidelines to be retired - found under Form Instructions

# Document Change Log

**Table 1 Document control**

| Change Date | Description of Changes |
|---|---|
| 02/03/2026 | Document Created |
| | |
| | |
| | |