# EXHIBIT H

## HRM Defendants' 12(c) Motion to Dismiss

## Expert Report of Matt Lepore

INSIGHT ENERGY LAW

*McCormick, et al. v. HRM Resources LLC, et al.*
**Case Number 24-cv-008230-CNS-MEH, District of Colorado**
Expert Report of Matthew J. Lepore
April 20, 2026

## I. Nature of Engagement

I am the founder and principal of Insight Energy Law, LLC, a private law firm and policy consultancy in Littleton, Colorado. I have been requested by Defendants HRM Resources, LLC, HRM Resources II, LLC, HRM Resources III, LLC, HRM Resources IV, LLC (collectively, the "HRM Defendants"), L. Roger Hutson and Terry Pape to tender this report regarding my independent review of issues related to Colorado's oversight and regulation of oil and gas development, including the liability and obligations related to the plugging, abandonment, and reclamation ("PA&R") of orphaned wells pursuant to the Colorado Oil and Gas Conservation Act, C.R.S. 34-60-101, et seq. (the "Act") and the Colorado Energy and the Carbon Management Commission's ("Commission" or "ECMC"; f/k/a the Colorado Oil and Gas Conservation Commission) rules, guidance, policies, and practices.

My opinions are based on my experience as Director of the Commission between August 2012 and March 2018; my tenure as a Colorado Assistant Attorney General representing the Commission in all litigation, administrative, and rulemaking matters between 2009 and 2011; my tenure as Colorado's Governor-appointed representative to the Interstate Oil and Gas Compact Commission ("IOGCC") between 2013 and 2018; my 33 years of experience as an environmental and natural resources attorney in Colorado; and the pleadings, discovery documents, deposition transcripts, history, and evolution of the Colorado Oil and Gas Act and the Commission's rules, orders, policies, and reports, and other documents I have reviewed, which are listed below.

I am being compensated for my work on a time and materials basis at a rate of $450 per hour, except for deposition and trial preparation and testimony, for which the rate is $550 per hour.

## II. Qualifications

I received a Juris Doctor from Stanford University School of Law in 1993 and was admitted to the Colorado Bar that same year. I was admitted to the U.S. District Court, District of Colorado in February 1995. My private law practice focused on environmental and natural resources law, including litigation, and compliance counseling. From 2009 to 2011, I served as counsel to the Colorado Oil and Gas Conservation Commission while an Assistant Attorney General in the Colorado Attorney General's Office. I became the Director of the Commission in August 2012 and served in that position until March 2018. In 2013, I was appointed by Governor Hickenlooper to be Colorado's official representative to the Interstate Oil and Gas Compact Commission. I served as the Chairman of the IOGCC's Legal and Regulatory Affairs Committee and as First Vice-Chair of the IOGCC during my tenure as Colorado's Representative. Since 2018, I have counseled state and local governments, non-governmental organizations, and large and mid-sized

exploration and production operators in Colorado, New Mexico, and Utah regarding oil and gas regulatory and policy matters, and compliance and enforcement matters in Colorado. Additional qualification details are provided in my Curriculum Vitae, attached as **Appendix A**.

## III. Documents and Databases Reviewed

Please refer to **Appendix B** for a listing of the documents and databases reviewed and considered for purposes of the opinions below.

## IV. Summary of Opinions

Based on my expertise, I offer the following opinions, which are supported in further detail in **Section V.**:

1. The Colorado Energy and Carbon Management Commission has broad authority to regulate exploration and production of the State of Colorado's (the "State") oil and gas natural resources, including the plugging and abandonment of orphaned wells.
2. Under the Act and Commission regulations, a prior operator that is not a Responsible Party has no obligation to plug and abandon a well orphaned by a subsequent operator. HRM II was never deemed a Responsible Party.
3. HRM Resources II, LLC ("HRM II") was in compliance with the Commission's financial assurance rules when Painted Pegasus Petroleum, LLC ("P3") acquired the wells.
4. Although P3 proactively managed its financial assurance obligations, the Commission's demands for excess inactive well financial assurance from P3 in 2018 and 2021 were appropriate.
5. The Commission properly transferred the HRM II wells to P3. At that time, a transferor was not required to conduct operational or economic due diligence on a transferee.
6. The Commission's Orphaned Well Program ("OWP") has plugged and abandoned, and will continue to plug, abandon, and reclaim P3's Orphaned Wells and Orphaned Well Sites.
7. The Plaintiffs appear to seek relief, which if granted, would contravene the Commission's longstanding statutory and regulatory processes for managing Colorado's orphaned wells, contradict HRM II's rights under the Commission's Rules and Regulations regarding Responsible Parties, and be inconsistent with the Commission's approval to transfer HRM II's wells to P3.

## V. Opinions

**Opinion 1: The Colorado Energy and Carbon Management Commission has broad authority to regulate production of the State's oil and gas natural resources, including the plugging and abandonment of orphaned wells.**

Colorado regulates the oil and gas industry through a set of laws and regulations. Colorado has created a statewide regulatory Commission that regulates every aspect of oil and gas exploration and production in Colorado, including: where wells can be located; how they must be constructed, plugged, decommissioned, and reclaimed; financial assurance requirements on operators to ensure compliance with their plugging and reclamation obligations; safety and spill prevention requirements; and environmental and wildlife resources protection requirements, among other aspects. The Commission has broad statutory authority to inspect oil and gas operations, and to enforce compliance with, and impose substantial penalties for violations of, the applicable laws and regulations.

The Colorado General Assembly created the Gas Conservation Commission by statute in 1927, empowering it "to adopt such reasonable rules and regulations as may be proper for the conservation of the gas resources of the State and prevention of gas waste."[1] Two years later the General Assembly authorized and directed the Gas Commission to prescribe rules for the proper abandonment and plugging of oil and gas wells, "and to change such rules and regulations from time to time to the end that such rules and regulations shall conform to the most approved and up to date methods of oil field practices . . . ."[2]

The Colorado Oil and Gas Conservation Commission (now known as the ECMC)[3] was created by statute in 1951 as successor to the Gas Conservation Commission.[4] The General Assembly granted

---

[1] Colorado General Assembly, "To Promote the Conservation of Gas, Creating a Gas Conservation Commission with Authority to Adopt and Enforce Rules and Regulations to Prevent the Waste of Gas and Imposing Penalties for Such Waste." (1927). *Session Laws 1901-1950*. 3117. https://scholar.law.colorado.edu/session-laws-1901-1950/3117

[2] Colorado General Assembly, "Entitled an Act to Provide for Abandoning and Plugging Wells Drilled for Oil and Gas and Creating a Commission to Prescribe and Enforce Rules and Regulations Therefor; To Prescribe Penalties for the Violation Thereof and to Repeal Any and All Acts or Parts of Acts in Conflict Therewith." (1929). Session Laws 1901-1950. 3326. https://scholar.law.colorado.edu/session-laws-1901-1950/3326. (hereinafter, HB 1929-211).

[3] The General Assembly re-named the Oil and Gas Conservation Commission the Energy and Carbon Management Commission ("ECMC") in 2023 to reflect the expansion of its jurisdiction into deep geothermal energy and carbon sequestration. Senate Bill 23-285, Section 1, 34-60-104.3. Throughout this report, "Commission" refers to the COGCC between 1951 and June 30, 2023, and to the ECMC from July 1, 2023, to the date of this report.

[4] Colorado General Assembly, "Defining and Prohibiting the Waste of Oil and Gas in the State of Colorado; Creating and Establishing the Oil and Gas Conservation Commission; Defining the Powers and Duties of the Commission With Respect to Conservation of Oil and Gas; Providing for the Enforcement of the Act and the Rules, Regulations and Orders of Said Commission; Providing for the Filing and Hearing of Complaints Concerning Waste of Oil and Natural Gas, and for Oaths, Subpoenas, Records, Suits and Appeals; Providing for the Raising of Funds to Defray the Cost of Administering the Act; And Repealing Sections 39, 40, 41, 42, 43, 49, 50, 52, 64, 65, 66 and 67, Chapter 118, 1935 Colorado Statutes Annotated; and Providing for Effective Date." (1951). Session Laws 1951-2000. 3. https://scholar.law.colorado.edu/session-laws-1951-2000/3 (hereinafter, "HB 51-347").

the Commission sweeping jurisdiction over, and broad powers to regulate, the development and production of Colorado's oil and natural gas resources:

> The Commission shall have and is hereby given jurisdiction and authority over all persons and property public and private necessary to enforce the provisions of this Act and shall have the power and authority to make and enforce rules, regulations and orders pursuant to this Act, and do whatever may reasonably be necessary to carry out the provisions of this Act. Any delegation of authority to any other state officer, Board or Commission to administer any and all other laws of this state relating to the conservation of oil or gas, or either of them, is hereby rescinded and withdrawn and such authority is hereby unqualifiedly conferred upon the Commission as herein provided.

HB 51-347, Sec. 7(a). The Commission's sweeping jurisdiction and regulatory authority "over all persons and property, public and private," and to "do whatever may reasonably be necessary to carry out" has been retained in the Act, nearly word for word, over the ensuing seventy-five years. *See* CRS § 34-60-105(1)(a).[5] The Commission's statutory authority to regulate the plugging and abandonment of wells has also been a constant to this day.[6]

While the core elements of the Act were established in 1951, the Act has evolved over the ensuing decades in response to changing economic conditions, technological advances, increased environmental awareness, and shifting social values. Many amendments to the Act were narrow in scope and addressed topics that are not relevant to the issues at hand. Broader amendments to the Act occurred in 1985,[7] 1990,[8] 1994,[9] 2007,[10] and 2019.[11]

The Colorado General Assembly established the legal foundation for governing the development and production of oil and gas in the state more than seventy-five years ago and has continuously

---

[5] In 2019, Senate Bill 19-181 modified the HB 51-347's delegation of authority clause to clarify that several divisions of the Colorado Department of Public Health and Environment have regulatory authority over specific environmental media and that local governments, pursuant to CRS § 29-20-104, retain authority over certain aspects of above-ground land use within their respective jurisdictions. *See* Section 11, CRS § 34-60-105(1)(b), Colorado General Assembly, "Concerning Additional Public Welfare Protections Regarding the Conduct of Oil and Gas Operations, and, in Connection Therewith, Making an Appropriation." (2019). Session Laws 2001-Present. 8000. https://scholar.law.colorado.edu/session-laws-2001-2050/8000 (hereinafter, "SB 19-181").

[6] C.R.S. §§ 34-60-103(30)(b) ["Oil and Gas Operations" includes abandonment of an oil and gas well]; 106(2)(a).

[7] Colorado General Assembly, "Concerning Safety Regulations for the Oil and Gas Industry." (1985). Session Laws 1951-2000. 10717. https://scholar.law.colorado.edu/session-laws-1951-2000/10717

[8] HB 90-1232

[9] Colorado General Assembly, "Concerning Regulation of Oil and Gas, and Making an Appropriation in Connection Therewith." (1994). Session Laws 1951-2000. 14148. https://scholar.law.colorado.edu/session-laws-1951-2000/14148

[10] Colorado General Assembly, "Concerning the Conservation of Wildlife Habitat in Connection with the Development of Oil and Gas, and Making an Appropriation Therefor." (2007). Session Laws 2001-Present. 3094. https://scholar.law.colorado.edu/session-laws-2001-2050/3094

[11] SB 19-181.

modified the legal framework to meet evolving technological, scientific, and social landscapes. The General Assembly vested the Commission with broad authority to make and enforce rules and regulations (the "Rules") to implement the Act. Together, the Act and implementing regulations govern the prevention of waste, and plugging, abandoning, and reclaiming of wells, including creation of an Oil and Gas Environmental Responses Fund ("ERF") to mitigate adverse impacts to the environment, and financial assurance requirements for operators.

As discussed below, key amendments to the Act occurred in 2019, shortly after P3 acquired its wells from HRM II, which P3 could not have reasonably anticipated and which crippled its business model, resulting in the abandonment of its wells.

The Act Directs the Commission to Adopt and Enforce Financial Assurance Regulations

House Bill 51-347 introduced the concept of financial assurance, authorizing the Commission to require "the furnishing of reasonable security conditioned upon the performance of the duty to plug each dry or abandoned well." The General Assembly materially modified the Act's financial assurance provisions in 1994[12] and 2019.[13] Specific financial assurance obligations are set by the Commission through rulemaking, consistent with the Act.

Dramatic downturns in the price of oil from 2014 to 2015[14] led to increased scrutiny and enforcement of the Commission's financial assurance requirements, especially as related to "excess inactive wells." To address an increased risk that operators would orphan wells[15] in the wake of the price collapse, in 2018 the General Assembly authorized a tenfold increase in funding[16] for ERF,[17] to be used by the Commission to plug and abandon orphaned wells. The primary funding source for the ERF was a new severance tax imposed on all oil and gas produced in the State.[18]

---

[12] Colorado General Assembly, "Concerning Regulation of Oil and Gas, and Making an Appropriation in Connection Therewith." (1994). Session Laws 1951-2000. 14148, Section 6. https://scholar.law.colorado.edu/session-laws-1951-2000/14148.

[13] SB 19-181, Sec. 12, 34-60-106(13). Citations to SB 19-181 refer to the Bill language itself rather than as codified in the Act. In this instance, this provision of SB 19-181 is codified at C.R.S. §34-60-106(13).

[14] Spot prices for West Texas Intermediate crude oil averaged $49/barrel in 2015, 53% less than the average price in 2014. U.S. Energy Information Administration, "Today in Energy," January 6, 2016. In Colorado, the average active drilling rig count fell from 68 to 19 from 2014 to 2016; and annual new well starts declined from 2,243 to 1,018. COGCC Staff Report, March 19, 2018, pp. 24, 26.

[15] An "Orphaned Well" is one "for which no owner or operator can be found, or where such owner or operator is unwilling or unable to plug and abandon such well." 2 CCR 404-1, 100 Series, Definitions.

[16] House Bill 18-1322, Section 2, Long Bill Narrative, p. 135.

[17] The Oil and Gas Environmental Response Fund ("ERF") was established in 1990. Colorado General Assembly, "Concerning Oil and Gas Production, and, in Connection Therewith, Establishing Procedures for Mitigation of Hazards Related to Such Activities and Making an Appropriation" (1990). Session Laws 1951-2000. 12768. (hereinafter, "HB 90-1232"). https://scholar.law.colorado.edu/session-laws-1951-2000/12768. The primary funding source for the ERF was a new severance tax imposed on all oil and gas produced in the State. *Id.*, Sec. 2, 34-60-122(1)(b). The ERF was renamed the Energy and Carbon Management Cash Fund in 2023. *See* SB 23-285, Sec. 2, 34-60-122(5)(a).

[18] *Id.*, Sec. 2, 34-60-122(1)(b).

The 2019 Legislative Revision to the Definition of Waste Contributed to P3's Failure to Successfully Operate in Colorado

House Bill 51-347 also defined the term "waste" as applied to oil and gas resources for the first time.[19] Prohibiting the waste of oil and natural gas resources has been a core element of Colorado's legal and regulatory framework for developing those resources since 1927, as it has been for oil and gas producing states across the nation. In 1955, the General Assembly broadened the definition of "waste" to include physical waste and waste resulting from irresponsible drilling or production.[20] The definition of "waste" remained unchanged for 64 years thereafter, until 2019 and the passage of Senate Bill 19-181.

The 2019 modifications to the definition constituted a sea change for waste prevention and conservation of oil and natural gas resources as had been practiced in Colorado and all other oil and gas producing states for more than half a century.[21] Historically, "waste" as applied to oil included underground waste (i.e., leaving recoverable oil and gas in the ground), inefficient or excessive use or dissipation of reservoir energy (which diminishes the amount of oil that ultimately can be recovered), and locating, operating, or producing a well in a manner that causes a reduction in quantity of oil or gas ultimately recoverable.[22] Furthermore, preventing waste, including not leaving recoverable oil and gas in the ground, had been a core tenet of the Commission's mission since 1955:

> 100-6-22. Declaration of purpose–It is hereby declared to be in the public interest to foster, encourage and promote the development, production and utilization of the natural resources of oil and gas in the state of Colorado; and to protect the public and private interests *against the evils of waste* . . . by prohibiting waste as herein defined.

HB 55-309, Sec. 10 (emphasis added). The declaration of purpose (or legislative declaration) remained unchanged until it was modified in 2007 to read, "It is declared to be in the public interest to foster the responsible, balanced development, production, and utilization" of oil and gas, and to prevent rather than prohibit waste.[23]

---

[19] *Id.*, Secs. 4, 5.

[20] Colorado General Assembly, "Relating to the Conservation of Oil and Gas and to the Membership of the Oil and Gas Conservation Commission and Their Terms; Further Defining Waste and the Powers and Duties of the Oil and Gas Conservation Commission with Respect to Conservation of Oil and Gas and the Prevention of the Waste Thereof: Providing for the Protection of Correlative Rights and Requiring the Ratable and Non-Discriminatory Purchase of Oil and Gas Production from Any Pool; Providing Methods of Enforcement and Penalties for Violations; And Repealing Sections 6 and 18, Article 6, Chapter 100, Colorado Revised Statutes 1953." (1955). Session Laws 1951-2000. 1163. https://scholar.law.colorado.edu/session-laws-1951-2000/1163 (hereinafter, "HB 55-309").

[21] Senate Bill 19-181, Section 7, CRS § 34-60-103 (11), (12), (13).

[22] *See* HB 51-347, Secs. 4, 5; HB 55-309, Sec. 2.

[23] House Bill 07-1341. This Act struck "the evils of" modifier to waste. Colorado General Assembly, "Concerning the Colorado Oil and Gas Commission, and, in Connection Therewith, Directing the Commission to Foster Oil and Gas Development Consistent with the Protection of the Environment, Wildlife Resources, and Public Health, Safety, and Welfare and Making an Appropriation Therefor." (2007). Session Laws 2001–Present. 3056.

For decades, the statutory directives to maximize production, prohibit, and subsequently prevent waste enabled operators to obtain regulatory approvals to drill or produce oil and gas to the fullest extent reasonably possible. The Commission rarely denied an operator's application for a permit to drill a well or expand its operations if the operator owned or leased the minerals and complied with the Commission's Rules. In this context, it would have been reasonable for P3 (or any other operator in its position) to assume the Commission would allow it to produce oil from its wells even if the Third Creek pipeline (to which some of the wells it purchased from HRM II were connected) was not currently operational and associated gas would need to be flared until the pipeline was re-opened or replaced.

In April 2019, Senate Bill 19-181 toppled this status quo. The Bill changed the legislative declaration from fostering the responsible, balanced development of oil and gas to ***regulating*** development and production "in a manner that protects public health, safety, and welfare, including protection of the environment and wildlife resources."[24] Additionally, Senate Bill 19-181 added a broad, discretionary exclusion to the prevailing definitions of waste:

> "[Waste] does not include the nonproduction of oil from a formation if necessary to protect public health, safety, and welfare, the environment, or wildlife resources as determined by the commission."

S.B. 19-181, Section 7, CRS § 34-60-103(12)(b); *see also id*, § 103(13)(b).[25] These statutory changes prioritized protection of public health, safety, welfare, the environment, and wildlife resources over producing the state's oil and gas resources and ***allowed waste*** if necessary to protect people or the environment, rather than preventing it. These were landmark changes in the oil and gas regulatory environment in Colorado and the nation. In implementing these statutory changes, the Commission was more likely to deny applications for drilling permits and, in P3's case, requests to flare associated gas[26], that it most likely would have approved before Senate Bill 19-181 became law. Without the Commission's approval to flare associated gas, P3 was unable to produce the oil from the Third Creek wells and had no choice but to shut in the wells. It would have been difficult if not impossible for P3 to have anticipated such a seismic shift in Colorado's regulatory environment or how disruptive it would be to their business model.

The waste definitions from 1951, 1955, and 2019 are shown in **Appendix C**.

---

[24] Senate Bill 19-181, Section 6, codified at CRS § 34-60-102.(1)(a)(I).

[25] Codified at C.R.S. §§ 34-60-103(44)(b) & (45)(b), respectively.

[26] *See, e.g.*, Plaintiffs_007247, P3's Form 4 Sundry Notice (request to flare), filed April 9, 2019.

**Opinion 2: Under the Act and Commission regulations, a prior operator that is not a Responsible Party has no obligation to plug and abandon a well orphaned by a subsequent operator. HRM II was never deemed a Responsible Party.**

Since 1929, Colorado law has required oil or natural gas wells to be plugged when they no longer produce or cease to be operated. Specifically, in 1929, the General Assembly authorized the Gas Conservation Commission to:

> prescribe rules and regulations for the proper abandonment and plugging of wells drilled for oil and gas, and to change such rules and regulations from time to time to the end that such rules and regulations shall conform to the most approved and up to date methods of oil field practice, and to determine when, in what manner and under what circumstances, such wells shall be required to be plugged.[27]

In 1990, the General Assembly added two new sections to the Act: § 34-60-124 created the ERF, and § 34-60-125, "Mitigation of adverse environmental impacts," authorized the Commission to order a well owner to mitigate any adverse environmental impacts resulting from drilling, operating, or production of plugged or abandoned wells.[28] If the well owner cannot be identified or fails to perform the mitigation, the Commission may use ERF moneys to mitigate the adverse environmental impacts.[29] The Commission was granted broad authority to enter onto private or public lands or water to evaluate adverse environmental impacts, to monitor or test the well, soil, ground and surface water, and vegetation, and to sell for salvage any equipment and material removed from the well to cover the costs of the mitigation efforts.[30] The "owner" of a well for purposes of § 34-60-125 was defined as the person "who exercised the right to drill into and produce from a pool and to appropriate the oil or gas produced therefrom either for himself or others or for himself and others," including any assignee or grantee of an interest from a former owner.[31]

The General Assembly substantially revised the ERF provisions in 1994. Most relevant to these proceedings, under Senate Bill 94-177, the party liable for mitigating adverse environmental impacts arising from oil and gas operations was changed from the "owner" to the "Responsible Party."[32] Thus, when the Commission determines that oil and gas operations caused significant adverse environmental impacts that require mitigation, it "shall issue an order requiring the Responsible Party to perform such mitigation." *Id*. If the Responsible Party refuses to comply or is unknown, the Commission "shall authorize the necessary expenditures" from the ERF. *Id.* For

---

[27] HB 1929-211, Sec. 2.

[28] HB 90-1232, Secs. 3, 34-60-124, 125.

[29] *Id.*, § 34-60-125(1).

[30] *Id.*, § 34-60-125(2).

[31] *Id.*, § 34-60-125(3).

[32] Colorado General Assembly, "Concerning Regulation of Oil and Gas, and Making an Appropriation in Connection Therewith." (1994). Session Laws 1951-2000. 14148. https://scholar.law.colorado.edu/session-laws-1951-2000/14148. *See* Section 11, 34-60-124(7).

purposes of the Act, "Responsible Party" means:

> Any person who conducts an oil and gas operation in a manner which is in contravention of any then-applicable provision of this Article, or of any Rule, Regulation, or Order of the Commission, or of any Permit that threatens to cause or actually causes, a significant adverse environmental impact to any air, water, soil, or biological resource.[33]

The definition of Responsible Party and the Commission's authority to order a Responsible Party to mitigate significant adverse environmental impacts caused by oil and gas operations are materially the same today as in 1994.[34]

In this matter, the Commission determined that P3 is the Responsible Party for the Colorado wells it owned. Between June 2020 and February 2021, the Commission Staff issued Notices of Alleged Violations ("NOAVs") to P3 alleging it had violated seven different Commission Rules (some more than once, for a total of ten violations) at seven different wells that P3 had acquired from HRM II in 2018. *See* Order Finding Violation, Order No. 1V-780, Docket No. 211000188, March 9, 2022 (hereinafter, "OFV Order"), ¶¶ 3–46, 62, attached as **Exhibit 1**. In October 2021, the Commission enforcement staff commenced a formal enforcement action against P3 for these alleged violations by filing a Notice and Application for Hearing. *See* Notice and Application for Hearing, Docket No. 211000188, October 12, 2021, attached as **Exhibit 2**. To prosecute the enforcement action pursuant to the Act and Commission Rules, the Staff had to determine that P3 was the Responsible Party. C.R.S. §§ 34-60-124(7), (8)(b)(I). No other operator, including HRM II, was determined to be a Responsible Party for the wells last owned by P3.

In most enforcement cases, the Commission imposes monetary penalties for Rule violations. However, in late November 2021, shortly after the Commission commenced its enforcement action against P3, P3 filed for Chapter 7 Bankruptcy. Ex. 1, OFV Order, ¶¶ 47–50. The bankruptcy trustee sought and obtained an order to abandon approximately 203 oil and gas wells and associated equipment held by P3, in part because P3's estate could not pay for plugging and abandonment or ongoing environmental liability associated with the wells. *Id.,* ¶¶ 48–49. The Staff did not seek recovery of monetary penalties against P3 because:

> . . . there is no likelihood that the State of Colorado will recover any penalty amount from this operator, and the State's best interests are most expediently served by the prompt entry of this Order and transfer of the abandoned assets into the Orphaned Well Program.

Ex. 1, OFV Order, ¶ 63. Instead, the Staff sought and obtained an Order from the Commission to foreclose on and claim P3's financial assurance bonds, suspend its Certificates of Clearance, reject all new drilling or oil and gas location permits, and revoke P3's right to conduct oil and gas operations in Colorado. *Id.*, p. 7, ORDER Section, ¶ 2. The Commission further authorized the

---

[33] *Id.*, 34-60-124(8)(a).

[34] *See* C.R.S. §§ 34-60-124(7), (8)(b)(I).

Commission Director to declare P3's wells to be Orphaned Wells, and to use ERF moneys to investigate, prevent, monitor, or mitigate conditions that threaten or cause significant adverse environmental impacts at P3's wells and locations. *Id.*, pp. 7–8, ORDER Section, ¶ 3. Based on my experience, each of these remedies were within the Commission's statutory authority and were consistent with Commission practices under similar circumstances.

Upon entry of the OFV Order, the Commission brought the wells abandoned by P3 into its OWP in Fiscal Year 2022.[35] The OWP assumes responsibility for plugging, abandoning, and reclaiming all wells in the program, and it assesses, prioritizes, and oversees those wells pending plugging and abandonment to ensure they pose no threat to public health, safety, welfare, and the environment, as envisioned by the Colorado Legislature when it created the ERF.[36] P3 had no right to conduct oil and gas operations in Colorado after the OFV Order issued, which means it could not access the wells or well sites it abandoned, much less conduct plugging, abandonment, or reclamation operations.

<u>HRM II Is Not a Responsible Party.</u> Based on my review of the record, at no time did the Commission or P3 ever appear to view HRM II as the Responsible Party for the wells it transferred to P3 in 2018. Indeed, if P3 believed that HRM II was the Responsible Party, it could have alleged so as an affirmative defense to the Staff's enforcement action.[37] In such cases, the Commission will determine who the Responsible Party is "without regard to any contractual or legal disputes between the parties regarding assignments of liability or other legal defenses."[38] If there is more than one Responsible Party, liability is proportionate to their individual mitigation obligations; there is no joint and several liability among them.[39] In this case, P3 never asserted that HRM II was a Responsible Party.

Similarly, the Commission could have prosecuted an enforcement action against HRM II as the Responsible Party, even after the asset transfer, if it had evidence indicating that HRM II's oil and gas operations had violated then-applicable Commission Rules and caused or threatened to cause a significant adverse environmental impact to any air, water, soil, or biological resource.[40] Staff did not do so, and the Commission never suggested or directed it do so. Based on my experience, if Staff or the Commission believed it had any evidence to support such an accusation, it would have pursued the issue with HRM II.

Further, Plaintiffs themselves (and indeed, any surface owner that is a class member) could have petitioned the Commission to participate as a Party to the OFV Hearing and could have asserted that HRM II was a Responsible Party. Commission Rule 507 provides that any person who

---

[35] Fiscal Year 2022 Annual Report, Orphaned Well Program, September 1, 2022, Table 1, available at https://ecmc.colorado.gov/regulation/orphaned-well-program/owp-reports

[36] Orphaned Well Program FAQ, p. 3 (hereinafter "OWP FAQ"), ECMC "Orphaned Well Program FAQ" Available at https://sites.google.com/state.co.us/cogcc-owp/home, accessed January 13, 2026.

[37] 2 CCR 404-1, Rule 526, effective January 15, 2021.

[38] *Id.*, Rule 526.e.

[39] *Id.*, Rule 527.f.; C.R.S. 34-60-124(8)(b)(I), (9).

[40] C.R.S. § 34-60-124(8)(b)(I).

believes they have been adversely affected or aggrieved because of a matter being heard by the Commission may petition the Commission to "participate formally as a party" in the proceeding.[41] Alternatively, without needing to intervene as parties to the OFV Hearing, Plaintiffs or class members could have expressed any concerns to the Commission through written comments or informal public comments before or during the OFV Hearing, and their comments would have been included in the administrative record.[42] The Commission's OFV Hearing for P3's NOAVs was publicly noticed via publication in the Daily Journal, a newspaper of general circulation in the City and County of Denver, on November 11, 2021, and in the Brighton Standard Blade, a newspaper of general circulation published in Adams County, on November 17, 2021. Ex. 1, OFV Order, ¶¶ 54–55. Amended notices were published in these same newspapers on February 8 and February 17, 2022, respectively, and in the Greeley Tribune, a newspaper of general circulation in Weld County, on February 9, 2022. *Id.,* ¶¶ 57–59. No Plaintiff or other person petitioned the Commission to participate as a Party to the P3 OFV Hearing, and no Plaintiff or class member submitted written public comment.

<u>Other Administrative and Legal Remedies Were Available to Plaintiffs.</u> Finally, Plaintiffs also had other legal remedies available under the Act or Commission Rules to timely assert claims against HRM II. Had Plaintiffs sought to intervene in the P3 OFV Hearing, they could have sought judicial review of the OFV Order.[43] If Plaintiffs believed HRM II or P3 failed to "conduct oil and gas operations in a manner that accommodates the surface owner by minimizing intrusion upon and damage to the surface of the land," they could have filed suit under the Reasonable Accommodation provisions of the Act.[44] Alternatively, anyone can file a complaint with the Commission regarding oil and gas operations.[45] The Commission Staff investigate all complaints and can take corrective actions and pursue enforcement when warranted.[46] The complaining party can participate in the resolution of any enforcement action arising from their complaint.[47] Further, as of April 30, 2022, a Plaintiff surface owner could have filed an application to Plug and Abandon a Well or to close an Oil and Gas Location.[48] If the evidence at a Commission hearing showed a well was a threat to public health, safety, welfare, the environment, or wildlife resources, or was no longer Used or Useful,[49] and had been a Low Producing Well[50] for the previous three years,

---

[41] 2 CCR 404-1, Rule 507.a.

[42] 2 CCR 404-1, Rule 512.

[43] C.R.S. §§ 34-60-111; 24-4-106(3).

[44] *Id.* at § 34-60-127.

[45] 2 CCR 404-1, Rule 524. A search of ECMC's COGIS database shows no citizen complaints filed against HRM II from 1/1/2010 to present, while 14 complaints have been filed against P3 between 1/1/2018 and present.

[46] *Id.*

[47] *Id.*

[48] 2 CCR 404-1, Rules 503.g.(12) and 211.

[49] 2 CCR 404-1, 100 Series Definitions.

[50] *Id.*

the Commission could order the operator to Plug and Abandon the well or permanently close an Oil and Gas Location.[51] Plaintiffs pursued none of these remedies.

It should be noted that Colorado's government has chosen not to legally impose orphan well mitigation liability on a prior operator who is not deemed a Responsible Party. The creation of the ERF in 1990 and the 1994 amendments, including the Responsible Party determination, are how the Colorado General Assembly and the Executive Branch have chosen to determine liability for orphaned wells in Colorado for the past thirty-six years and counting. The Commission's OWP, discussed in Opinion 6, is the companion piece to ensure all orphaned wells will be plugged, abandoned, and reclaimed in accordance with the Commission's rigorous regulatory requirements. The Legislative and Executive Branches have amended the Act and regulations over time to strengthen protections for the environment and wildlife, and to ensure the Commission has the personnel and financial resources necessary to implement the Act and enforce the rules: they have elected not to impose orphaned well mitigation liability on a prior operator that was not a Responsible Party. *See, e.g.*, Executive Order D 2018-012, Directing the Colorado Oil and Gas Conservation Commission to Act to Plug, Remediate, and Reclaim Orphaned Oil and Gas Wells and Sites, July 18, 2018, attached at **Exhibit 3**.[52]

In seeking to impose orphaned well liability on the HRM Defendants, Plaintiffs appear to be asking the Court to do judicially what the Colorado Legislature and the Executive Branch have elected not to do for more than three decades. Indeed, these two branches of Colorado government have recently considered and rejected prior owner liability. *See* Executive Order D 2018-12 Financial Assurance Technical Working Group, Final Report, December 1, 2018, p. 14 (noting that holding past operators liable for orphaned well plugging, abandonment, and reclamation was discussed as an alternative means for plugging orphaned wells, but that imposing such liability after the transfer of a well to a new operator would require a statutory change to Section 124 of the Act, and additional analysis of the impacts to industry) attached as **Exhibit 4**; Senate Bill 19-181, Sec. 12., 34-60-106(13) (directing the Commission to modify its financial assurance rules and consider specific requirements that *did not include* prior operator liability); Senate Bill 24-159, Sec. 3, 34-60-124 (proposing to redefine "Responsible Party to include "any prior owner or operator, regardless of whether the prior owner or operator violated any provision of law during the prior owner's or operator's period of ownership"). Senate Bill 24-159 was voted down in Committee along a bipartisan vote.

In sum, under the Act and current Commission Rules, HRM II has no obligation to plug and abandon the wells it sold to P3 or otherwise mitigate adverse environmental impacts resulting from

---

[51] *Id.,* Rule 211.

[52] Among other actions, Governor Hickenlooper directed the Commission to use best efforts to reduce the number of medium- and high-priority sites by July 1, 2023, to promulgate rules to ensure the sufficiency of financial assurance to address future orphaned wells and establish a technical working group to review existing financial assurance requirements and report to the Governor or recommended changes by December 1, 2018.

P3's operation of the wells, including because the Commission never determined, and neither P3 nor any stakeholder alleged that HRM II was a Responsible Party.

---

**Opinion 3: HRM II was in compliance with the Commission's financial assurance rules when P3 acquired the wells.**

The requirement for a well operator to provide financial assurance to be held by the Commission until the operator fulfills its obligation to plug its non-producing wells (frequently referred to as "bonding") has been the law in Colorado since 1951.[53] The General Assembly strengthened the Act's financial assurance rules in 1994, directing the Commission to "require every operator to provide assurance that it is financially capable of fulfilling any obligation imposed" related to protecting public health, safety, welfare, and reclamation of the land and soil affected by oil and gas operations."[54]

The Commission, through rulemaking, determines the amount of financial assurance operators must provide to meet the statutory obligations.[55] The financial assurance requirements in place between 2009 and April 30, 2022, included three elements: single well bonds, blanket bonds, and inactive wells bonds. Under Commission Rule 706, "Soil protection and plugging and abandonment," the financial assurance amounts required were:[56]

| Well Depth | Single Well | Blanket < 100 Wells | Blanket > 100 wells |
|---|---|---|---|
| < 3,000 feet | $10,000 | $60,000 | $100,000 |
| ≥ 3,000 feet | $20,000 | $60,000 | $100,000 |

Single well and blanket well bonding are staples of financial assurance requirements across all oil and gas producing states, although the required amounts vary substantially.

Colorado's inactive well bonding requirement was an innovative mechanism that allowed the Commission to secure financial assurance over and above the standard blanket bond when the number of inactive wells in an operator's portfolio exceeded the possible number of plugging jobs their blanket financial assurance would cover (using the single well bonding amount as the denominator). Inactive wells above the threshold were referred to as "excess inactive wells," and an operator was required to provide an additional $10,000 (for shallow wells) or $20,000 (for deep

---

[53] *See* HB 51-347, Sec. 11.(d) (the Commission may require "the furnishing of reasonable security conditioned upon the performance of the duty to plug each dry or abandoned well").

[54] Senate Bill 94-177, Sec. 6.

[55] *Id.; see also* C.R.S. § 34-60-106(13), directing the Commission to require every operator to provide assurance that it is financially capable of fulfilling all obligations under the Act through a rulemaking.

[56] 2 CCR 404-1, Rule 706, circa 2009–April 29, 2022. From 1996 until 2009, single well bonds were $5,000 per well regardless of depth and blanket bonds were $30,000 for less than 100 wells and $100,000 for 100 or more wells. Senate Bill 19-181 required the Commission to update its financial assurance requirements, which resulted in a new financial assurance structure taking effect April 30, 2022, that imposed much higher bonding requirements on most operators.

wells) of financial assurance for each excess inactive well. 2 CCR 404-1 (2009-April 29, 2022), Rule 707. This excess inactive well bonding, or "bonding up," was a hedge against the higher risk that operators with many low- or non-producing wells would abandon their wells without plugging them.

HRM II had a Blanket Plugging bond of $100,000 in place with the Commission in 2018, which was the full amount required under Rule 706 at that time.[57] In August 2018, the Commission issued a Warning Letter to HRM II, alleging for the first time that it was required to provide Inactive Well financial assurance pursuant to Rule 707 by September 24, 2018. **Exhibit 5**, HRM0024177. At that time, P3 was on the cusp of buying the wells at issue and it provided the required Excess Inactive Well financial assurance after the HRM II transaction closed and before the September 24 deadline.[58] A review of HRM II's compliance history with the Commission dating back to June 9, 2014 shows no alleged violations of Rules 706, 707, or any other financial assurance obligations.[59]

---

**Opinion 4: Although P3 proactively managed its financial assurance obligations, the Commission's demands for excess inactive well financial assurance from P3 in 2018 and 2021 were appropriate.**

In the wake of the oil price collapse in late 2014 to early 2015, the Commission initiated a systematic pursuit of excess inactive well bonding from operators.[60] The Commission typically sent a Warning Letter to advise an operator of its excess inactive well count and how much additional bonding would be required. The Warning Letter allowed operators time to confirm or contest the inactive well count or reduce it by returning wells to production or plugging them, and to secure the required additional bonding. If an operator did not provide the required additional financial assurance, the Commission could prosecute an enforcement action and claim the operator's existing bonds to cover the costs of mitigating adverse environmental impacts and plugging and abandoning any orphaned wells. 2 CCR 404-1 (2018), Rules 701, 709.[61]

As noted in Opinion 3, HRM II received a Warning Letter in August 2018, which asserted that HRM II had 34 excess inactive wells and therefore was required to provide $580,000 in Inactive Well financial assurance on top of its existing $100,000 blanket plugging bond. Subsequent email communications between HRM II, P3, and the Commission Staff show that the number of excess inactive wells was adjusted from 34 to 14, reducing the Excess Inactive Well amount due to

---

[57] Warning Letter # 401739715, HRM0024177 (hereinafter, "Warning Letter").

[58] HRM0001451, Email from M. Ramos, ECMC, to P. McGraw, P3, September 18, 2018.

[59] ECMC COGIS Database, Operator No. 10548, Inspection/Incident; NOAV; June 9, 2014, to present.

[60] *See* Colorado Oil and Gas Commission Staff Report, December 7, 2015 (Warning Letters sent to 33 out of 103 operators evaluated in 2015 YTD, resulting in an additional $2,240,000 Rule 707 financial assurance); Staff Report, June 6, 2016 (heightened Staff oversight resulted in an additional $4 million Rule 707 financial assurance to date).

[61] When an operator's financial assurance is called, the Commission suspends the operator's Certificates of Clearance, Form 10, and no sales of oil or gas are allowed. 2 CCR 404-1 (2018), Rules 701, 709.

$180,000.[62] Allowing an operator to demonstrate that a well was no longer inactive was standard procedure in response to a Warning Letter. The reduction in the number of inactive wells identified by the Commission could have resulted from those wells being returned to production or plugged and abandoned.[63]

The Warning Letter was timely resolved as of September 18, 2018, when P3 (not HRM II) posted a blanket plugging bond of $100,000 pursuant to Rule 706 and an Inactive Well bond of $180,000 pursuant to Rule 707.[64] The fact that the Commission allowed P3 to post the blanket excess inactive well bonds indicates that it accepted and approved the transfer of wells from HRM II to P3 and that P3 was properly bonded under Rules 706, 707, 703 (surface owner protection) and 709.[65]

The record indicates that P3 sought to proactively manage its Inactive Well financial assurance obligations after it began operating the transferred wells. In late May to early June 2019, P3 submitted a plan under Rule 707.a. to return many of its inactive wells to production or to plug and abandon them. *See* **Exhibit 6**, Hoffman_000298-300; **Exhibit 7**, Payne_CORA_0000411-412; *see also* 2 CCR 404-1 (2018), Rule 707.a. (allowing modification to or a waiver of excess inactive well bonding upon Commission approval of a plan to return inactive wells to production or plug and abandon them on an acceptable schedule). P3's plan stated it had 126 Active Wells and 69 Inactive Wells as of May 2019. Ex. 6, at Hoffman_000299. It does not appear that the Commission ever approved P3's proposed alternative plan.

On September 9, 2021, the Commission notified P3 that P3 had an excessive number of Inactive Wells and was required to post additional financial assurance pursuant to Rule 707. **Exhibit 8**, Hoffman_000619-622. The Commission asserted that P3 had 87 Inactive Wells and was obligated to post an additional $1,460,000 in Inactive Well bonding on top of its then-existing $100,000 blanket plugging bond and $180,000 Inactive Well bond. *Id.* P3 did not provide the additional financial assurance and filed for Chapter 7 Bankruptcy in November 2021. Ex. 1, OFV Order, ¶ 47. Consequently, the Commission foreclosed on P3's existing financial assurance, revoked its right to conduct oil and gas operations in Colorado, and took its wells into the OWP, as described in Opinion 2.

The blanket and Inactive Well financial assurance the Commission required of P3 was consistent with my experience and C.R.S. §§34-60-106(13) and 124 and Commission Rules 701, 706, 707, and 709 in place from 2018 to 2021.

---

[62] *See* HRM0001451; HRM0001429; Hoffman_000597.

[63] *See, e.g.,* HRM0006959.

[64] HRM0001451, Email from M. Ramos, ECMC, to P. McGraw, P3, September 18, 2018.

[65] *See* 2 CCR 404-1 (2018).

**Opinion 5: The Commission properly transferred the HRM II wells to P3. At that time, a transferor was not required to conduct operational or economic due diligence on a transferee.**

Historically, the Commission had limited statutory authority to regulate private transactions between operators, including asset transfers. The primary condition for approval of a Form 10, Certificate of Clearance and/or Change of Operator in 2018, was the acquiring operator's ability to meet the financial assurance requirements associated with the transferred wells. Commission Rule 709.d., stated:

> The Director shall not approve a new Operator Registration, Form 1, or a new Certificate of Clearance, Form 10, when wells are sold or transferred until the successor operator has filed satisfactory financial assurance under the 700-Series Rules. [66]

As described in Opinion 3, HRM II was in compliance with its financial assurance requirements when it contracted to sell the wells to P3. As described in Opinion 4, P3 posted the required blanket and excess inactive well bonds as required by the Commission. On September 18, 2018, the Commission notified P3 that, "All documents for registration and financial assurance have been processed and approved for Painted Pegasus LLC." **Exhibit 9**, HRM0001429. In addition, HRM II and P3 jointly filed a Form 10 requesting a change of operator with the Commission on September 21, 2018, which listed all the transferred assets.[67] All these facts indicate that the transfer complied with the Act and applicable Commission Rules and was accepted by the Commission.

Consistent with my experience, no provisions of the Act or the Commission's Rules imposed a duty on a selling operator to determine a buying operator's fitness to conduct business in Colorado, whether from a financial, technical, or experiential point of view. Therefore, based on my experience, HRM II was not required under the Act or Commission Rules to evaluate, much less determine, whether P3 was fit to purchase and operate the wells, or could or would be a successful operator in Colorado.

---

[66] 2 CCR 404-1 (2018). In implementing SB 19-181, the Commission revised its well transfer requirements regarding the information a buying and selling operator must provide the Commission, and imposed stronger financial assurance requirements for transferred wells to provide greater regulatory oversight. *See* 2 CCR 404-1 (April 30, 2022), Rule 218.

[67] The Form 10 was not formally approved until February 2020, but this does not mean that the Commission did not consider P3 to be the operator of the wells as of September 21, 2018.

**Opinion 6: The Commission's OWP has plugged and abandoned, and will continue to plug, abandon, and reclaim P3's Orphaned Wells and Orphaned Well Sites.**

The Commission's OWP.

The Commission established its OWP in 1990 under authority granted by the General Assembly to plug orphaned wells using ERF monies.[68] The OWP "identifies, prioritizes, and addresses oil and gas wells, locations, and production facilities statewide for which there are no known responsible parties ('Orphaned Well Sites') or for which financial assurance instruments have been claimed."[69] The Commission has authority "to plug wells, remove production equipment and debris, investigate and remediate soil and groundwater impacts, install safety equipment such as fences, signs, and locks or tags, and reclaim well pads, remove production sites, and access roads."[70] The OWP Staff analyzes the Orphaned Well Sites using available file data, field inspection reports, aerial photographs, site photographs, and topographic maps to prioritize the sites into low, medium, and high rankings based on multiple risk factors, including population density and urbanization; environmental factors; years in service; active and historic spills; stormwater issues; noxious weeds; wildlife, livestock, or vegetation impacts; surface equipment; bradenhead pressure; mechanical integrity test data; and any documented history of venting or leaking.[71]

OWP Staffing

In fiscal year 2025 (July 1, 2024, through June 30, 2025), the Commission staffed the OWP with 13 full-time technical employees ("FTE").[72] The Commission expects to add three new FTEs and backfill three open positions so that it will be fully staffed with 19 FTE in FY 2026.[73]

OWP Funding

From its inception in 1990 through FY22, the OWP was funded through an annual State budget appropriation that draws on the production levy imposed on operators pursuant to C.R.S. § 34-60-122(1)(a), and penalty revenues collected from operators for violations of the Act or Commission Rules or Orders.[74] Bond claims on an operator's financial assurance when the operator fails to plug and abandon its wells provide a second OWP funding source.[75] Bond claims can only be spent on

[68] OWP FAQ, p. 2; *see also* Decl. of J. Murphy, ECF No. 116-21, ¶ 6.

[69] *Id.*, p. 1; *see also* Decl. of J. Murphy, ECF No. 116-21, ¶ 5.

[70] *Id.*, p. 2; *see also* Decl. of J. Murphy, ECF No. 116-21, ¶ 7.

[71] Fiscal Year 2025 Annual Report, OWP, September 8, 2025, p. 3. (hereinafter, "FY25 OWP Annual Report"), available at: https://ecmc.colorado.gov/regulation/orphaned-well-program/owp-reports

[72] *Id.* at p. 2.

[73] *Id.*

[74] *Id.* at p. 2.

[75] *Id.*

plugging or reclaiming Orphaned Well Sites and are spent first before other funding sources.[76] None of these sources draw on personal or corporate state income taxes (i.e., the General Fund).[77]

Following a sharp decline in oil prices and a downturn in the industry from late 2014 to 2015, the General Assembly increased the OWP appropriation to $5,000,000 for FY19.[78] This appropriation expired in FY24, as two new funding sources became available.[79]

*IIJA Grants.*

In August 2022, the U.S. Department of Interior ("DOI") issued an "Initial Grant" of $25,000,000 to the Commission for plugging and abandoning Orphaned Well Sites through the Infrastructure Investment and Jobs Act ("IIJA").[80] The DOI awarded the Commission a second $25,000,000 IIJA grant, effective September 1, 2024.[81] The Commission has submitted applications to DOI for two additional grants, one for $5.4 million and the second for $29 million.[82] As shown in Table 1 below, IIJA grant monies contributed to a doubling, and then tripling of OWP's annual expenditures on Orphaned Well Sites in FY23 through FY25, compared to prior years.

*Enterprise Fund.*

The Enterprise Fund is a cash fund established in FY23, funded by an annual fee paid by active operators for each unplugged well in their portfolio.[83] The Commission adopted the Annual Mitigation Fee Rule in March 2022 as part of its Financial Assurance Rulemaking.[84] The Commission set the annual fee amounts with the intention to generate $10,000,000 annually for a pooled "Orphaned Well Mitigation Enterprise Fund."[85] By statute and Commission Rule 205.c.(5), the Enterprise Fund can be used only to address Orphaned Well Sites.[86] In FY25, $8,113,338, approximately 53% of the OWP's total annual expenditures to plug, abandon, and remediate Orphaned Well Sites, came from the Enterprise Fund.[87]

---

[76] *Id.*

[77] OWP FAQ, p. 3

[78] House Bill 18-1322, Section 2, Long Bill Narrative, p. 135.

[79] *See* FY25 OWP Annual Report, p. 2.

[80] *Id.* at pp. 2–3.

[81] *Id.* at p. 3.

[82] *Id.*

[83] *See* Commission Rule 205.c.(3), Annual Mitigation Fee; *see also* FY25 OWP Annual Report, p. 2; *see also* Decl. of J. Murphy, ECF No. 116-21, ¶ 8.

[84] The Commission undertook this rulemaking to implement Senate Bill 19-181 Sec. 12, 34-60-106 (13), which required the Commission to increase the amount of financial assurance operators are required to provide. SB 19-181 required the Commission to consider specific mechanisms to increase financial assurance, including "creating a pooled fund to address orphaned wells . . ." SB 19-181, Sec. 13.

[85] Statement of Basis, Specific Statutory Authority, and Purpose, New Rules and Amendments to Current Rules of the Colorado Oil and Gas Conservation Commission, 2 C.C.R. § 404-1. Cause No. 1R Docket No. 210600097, Financial Assurance Rulemaking (hereinafter, "FA Rulemaking SBP"), pp. 27, 30.

[86] *See* C.R.S. § 34-60-106(13); FA Rulemaking SBP, p. 30.

[87] FY25 OWP Annual Report, p. 6.

By 2024, these two new sources had increased OWP's funding to plug, abandon, and reclaim Orphaned Well Sites by almost 300% compared to 2022. The OWP's annual expenditures and funding sources for FY21 through FY25 are shown in Table 1, below.

**Table 1: Annual Orphaned Well Fund Expenditures 2021-2025**

| Fiscal Year | Total Expenditures | Bond Claims | OWP Appropriation | Enterprise Fund | IIJA Grants | BLM Grant |
|---|---|---|---|---|---|---|
| **FY 25** | $15,329,957 | $834,026 | | $8,113,338 | $5,872,956 | $509,637 |
| **FY 24** | $14,995,068 | $767,371 | $3,848,632 | $242,949 | $10,136,116 | |
| **FY 23** | $10,200,211 | $274,772 | $2,801,972 | $379,542 | $6,743,925 | |
| **FY 22** | $5,373,482 | $474,086 | $4,899,395 | | | |
| **FY 21** | $3,165,132 | $148,334 | $3,016,798 | | | |

Source: OWP Annual Reports, FYs 2021–2025

OWP's Workload

The number of orphaned wells and orphaned sites in Colorado rose sharply between 2021 and 2022, and again between 2023 and 2024. In my experience, the 2020 COVID pandemic, which triggered a sudden, steep crash in oil prices, and an increasingly stringent regulatory environment at the Commission following passage of Senate Bill 19-181, including large financial assurance increases for smaller operators, contributed to the increase in orphaned wells. Table 2 shows the number of orphaned wells and sites in the OWP between FY21 and FY25.

**Table 2: Annual Orphaned Well and Orphaned Site Counts, July 1, 2021-2025**

| Fiscal Year | Orphaned Wells | Orphaned Sites |
|---|---|---|
| FY25 | 948 | 1,897 |
| FY24 | 941 | 1,747 |
| FY23 | 467 | 1,116 |
| FY22 | 528 | 981 |
| FY21 | 236 | 547 |

Source: OWP Annual Reports, FYs 2021–2025

As shown in Table 3 below,[88] the increases in staffing and funding for the OWP have allowed the Commission to continually increase the number of Orphaned Wells it plugs and Orphaned Well Sites it addresses annually. Actually plugging a well is just one aspect of the OWP's work: production equipment, such as separators and storage tanks, must be decommissioned and removed, flowlines must be abandoned, environmental sampling, laboratory analysis, and remediation may be required, and surface reclamation is needed.[89] Specific to P3's Orphaned

[88] In the OWP Annual Reports, a "Project" refers to an individual operator (with rare exceptions); a "site" refers to a specific facility, such as a flowline, a tank battery, a well, or other equipment that has a unique facility identification number.

[89] FY25 OWP Annual Report.

Wells and Sites, in FY 2025 the OWP plugged wells, abandoned flowlines, conducted final reclamation, gauged and drained storage tanks, removed drums, performed environmental sampling, analysis, and remediation, conducted drone surveys, performed weed control, and monitored for methane emissions, among other tasks.[90] Those kinds of operations are reflected in the "OW Sites Addressed" column in Table 3.

**Table 3: Annual OWP Projects & Sites Addressed; Orphaned Wells Plugged, FY21-25**

| Fiscal Year | Projects | # of OW Sites Addressed | # Orphaned Wells Plugged |
|---|---|---|---|
| **FY25** | 62 | 624 | 95 |
| **FY24** | 60 | 290 | 132 |
| **FY23** | 63 | 333 | 61 |
| **FY22** | 42 | 139 | 73 |
| **FY21** | 38 | 117 | 55 |

Source: OWP Annual Reports, 2021–2025

The Commission has Expended $6.61 Million Plugging, Abandoning, and Reclaiming P3's Orphaned Wells and Orphaned Well Sites; Additional Work is In Progress

The Commission's FY22 OWP Annual Report shows that approximately 200 P3 Locations (i.e., Orphaned Well Sites, not all of which include a well) entered the OWP after the OFV Order declared P3's wells to be "Orphaned Wells." The Report shows that the Commission claimed all $305,000 of P3's financial assurance (which went into the OWP) but did not expend any of it in FY22.[91] However, the OWP expended $1,190,352 from the Annual Appropriation Fund that year to address urgent work on P3 sites before the bond money was received.[92]

To date, the OWP has expended a total of $6,615,067 to plug, abandon, and reclaim P3 Orphaned Wells and Sites, including the decommissioning, environmental sampling, analysis, monitoring, and remediation, flowline abandonment, reclamation, and related operations noted above.[93] The OWP's work to fully plug, abandon, and reclaim all the P3 Orphaned Well Sites is ongoing. The OWP currently reports there are 222 P3 sites and 190 P3 wells in the program designated as "in progress." [94] This demonstrates the Commission's commitment to successfully plugging, abandoning, and reclaiming all the P3 wells in the OWP in full compliance with the Commission's rigorous plugging, abandonment, and reclamation Rules.[95]

---

[90] FY25 OWP Annual Report, Table 1.

[91] FY2022 OWP Annual Report, p. 23.

[92] *Id.,* pp. 23–24.

[93] ECMC Orphaned Well Program OWP Project List, available at https://ecmc.colorado.gov/regulation/orphaned-well-program/owp-project-list. Accessed April 14, 2026.

[94] *Id.*

[95] *See* 2 CCR 404-1, Rules 434, 435, 1004.

The OWP is the method by which the Colorado General Assembly and the Executive Branch have determined Colorado will plug and abandon orphaned wells, reclaim orphaned well sites, and mitigate conditions that cause or threaten to cause adverse environmental impacts arising from oil and gas operations since 1990. These two government branches have provided the legal and regulatory framework for the OWP, and continuously upgraded it, to ensure the program is adequately funded and has the human resources necessary to address Colorado's Orphaned Wells and Sites. The Legislature and Commission have also sought to reduce the likelihood of future Orphaned Wells by increasing the amount of financial assurance operators are required to provide and imposing restrictions on transferring inactive and low producing wells. The OWP is foundational to Colorado's Orphaned Well mitigation solution and is positioned to successfully plug, abandon, and reclaim P3's Orphaned Wells and Orphaned Well Sites.

---

**Opinion 7: The Plaintiffs appear to seek relief, which if granted, would contravene the Commission's longstanding statutory and regulatory processes for managing Colorado's orphaned wells, contradict HRM II's rights under the Commission's Rules and Regulations regarding Responsible Parties, and be inconsistent with the Commission's approval to transfer HRM II's wells to P3.**

Among other things, Plaintiffs ask the Court to:

> Avoid (sic) the Transfer to the extent necessary to satisfy Plaintiffs claims and reimpose the plugging, reclamation, and remediation obligations . . . back onto transferor HRM;

Class Action Complaint and Jury Demand, ECF No. 4, p. 36. In addition, Plaintiffs seek to create a fund from damages awarded against the Defendants to be used to plug and decommission P3's wells and remediate Plaintiffs' land, and to appoint a receiver to administer the fund. *Id.*, pp. 36-37.

The remedies Plaintiffs seek are contrary to three decades of the Colorado Legislature's chosen remedies for orphaned wells and its delegation of authority to the Commission to use ERF monies to plug, abandon, and reclaim Orphaned Wells and Sites and mitigate any threatened or actual adverse environmental impacts they caused. If granted, these remedies would be inconsistent with the Commission's application of the Act and its implementing regulations to transfer HRM II's wells to P3, its finding that P3 is the sole Responsible Party, and the assignment to the OWP to plug, abandon, and reclaim P3's Orphaned Wells and Orphaned Well Sites. Plaintiffs' request would result in circumvention Colorado's robust and enduring statutory and regulatory regimen for addressing orphaned wells and protecting public health, safety, welfare, the environment, and wildlife resources.

<u>Responsible Party Finding.</u>

Under the Act and Commission Rules, only a Responsible Party can be compelled to mitigate adverse environmental impacts caused by oil and gas operations. C.R.S. § 34-60-124. The

Commission, after a public hearing, determined that P3, and only P3, was the Responsible Party as to the wells it acquired from HRM II. Ex. 1, OFV Order. As detailed in Opinion 2, Plaintiffs did not seek to intervene as Parties to the Commission hearing or seek judicial review of the Commission's final order. Yet Plaintiffs here ask the Court to find the HRM Defendants legally responsible for PA&R with respect to the wells transferred to P3, which would be inconsistent with the Commission's Responsible Party finding without an actual appeal of the OFV Order or an evidentiary hearing at which HRM II could defend itself against such a determination. That unprecedented outcome would upend Colorado's longstanding statutory and regulatory framework for determining liability for plugging Orphaned Wells and mitigating adverse environmental impacts caused by oil and gas operations.

<u>The Commission Approved HRM II's Transfer of Wells to P3</u>

Plaintiffs' requested relief also would effectively reverse the sale from HRM II to P3 of the wells that P3 was permitted by the bankruptcy court to abandon. As stated in Opinion 4, the Commission approved the sale upon receipt of the required financial assurance from P3, the joint submittal of the Form 10 Change of Operator, and P3's operator registration. More than two years after the transfer, P3, already struggling operationally, was faced with a nearly $1.5 million increase in its Inactive Wells bonding. *See* Opinion 4. Following P3's Chapter 7 Bankruptcy filing, the Commission, through a public OFV Hearing, legally revoked P3's right to operate in Colorado, foreclosed on its existing financial assurance, and authorized the Commission Director to declare P3's wells to be Orphaned Wells and use ERF monies to mitigate conditions that threaten to cause or actually cause significant environmental impacts. Ex. 1, OFV Order, pp. 7–8, ORDER Section, ¶¶ 2, 3.

Drawing upon my seventeen years of professional experience with the Act and Commission Rules, both historically and in their current form, I am not aware of a legal process or established precedent in Colorado that supports the reassignment of Orphaned Wells or the associated liability for Orphaned Wells to a previous owner. HRM II's obligation to plug, abandon, and reclaim its wells and well sites ended when it transferred the wells, with the Commission's approval, to P3. Rather than prosecute prior owners for orphaned well liabilities, the Colorado General Assembly created the ERF to mitigate adverse environmental impacts from oil and gas operations, and the Commission established the OWP to assume responsibility for plugging and abandoning Orphaned Wells and reclaiming Orphaned Well Sites using ERF monies. The General Assembly has retained and reinforced this statutory framework for thirty-six years, through Republican- and Democratically-controlled (and divided) Congresses, and under Democratic and Republican Governors, including during recent years when the Act has been substantially revised.

<u>Disruptions to the OWP Program</u>

The OWP has expended more than $6 million taking certain emergency measures to protect public health, safety, welfare, the environment, and wildlife, plugging wells, removing equipment and associated facilities, reclaiming Sites, conducting environmental monitoring, sampling, analysis and remediation, and planning for future actions. *See* Opinion 6. Reassigning the plugging,

abandonment, reclamation, and remediation of these wells to HRM II would disrupt the OWP processes, unnecessarily burden Commission Staff, and potentially result in delaying the plugging, abandonment, and reclamation operations.

Even if the HRM Defendants are ordered to plug, abandon, and reclaim the P3 Orphaned Wells and Sites on the Plaintiffs' properties, the Commission will be responsible for overseeing those operations to ensure they comply with the Act and the Commission's Rules.[96] For example, HRM II (or, if applicable, a third-party administrator overseeing the PA&R work) would be required to submit, and Commission Staff to review, a Form 6 (Notice of Intent to Abandon) and a Form 6 Subsequent (Report of Abandonment) for every Orphaned Well.[97] Staff would likely choose to witness some and perhaps many of the plugging operations. HRM II (or a third-party administrator) would be obliged to engage contractors to perform the work, of which there are a finite number in Colorado. In FY 25, the OWP retained the services of 30 contractors to plug, abandon, and reclaims Orphaned Wells and Sites.[98] HRM II (or a third-party administrator) would be competing with the OWP for this constrained resource. If the Court mandated that the work on the P3 wells supersedes all other OWP work, or be done on an expedited timeline, work could be delayed on wells that the Commission has deemed to be higher priorities based on environmental or safety reasons. Because the OWP coordinates and schedules its plugging operations based on proximity of multiple locations, pulling the P3 wells out of the OWP could disrupt work for other nearby wells. Similar challenges would arise related to reclamation of Orphaned Well Sites.

A Managed Pooled Fund for Plugging Orphaned Wells Already Exists

Plaintiffs ask the Court to create a pooled fund to plug and decommission Plaintiffs' wells and remediate their land, with an appointed receiver to administer the fund. Effectively, they are asking the Court to create a private version of the OWP with this distinction: the OWP is staffed by a team of oil and gas professionals, including professional engineers, who collectively have decades of experience plugging, abandoning, and reclaiming wells. It is unlikely that any individual will have the expertise, experience, or established workflows that the personnel at the OWP have.

Additional Implications for the Requested Relief

Colorado has a long-established, equitable process for the plugging, abandonment, and reclamation of Orphaned Wells and Orphaned Well Sites. As shown in Opinion 6, the OWP is well-staffed and well-funded to meet its program needs, and the professionals that work in the OWP have a combined decades of experience. Consequently, surface owners can be assured that the Commission will address, in a risk-based way, any Orphaned Wells or Orphaned Well Sites on their property at no expense and minimal inconvenience to them—consistent with the policy decisions of the state.

---

[96] *See* 2 CCR 404-1, Rules 405.l, 434, 435, 1004.

[97] 2 CCR 404-1, Rule 435.

[98] OWP FY 25 Annual Report, September 8, 2025.

If the P3 wells are pulled from the OWP and reassigned to HRM II (or to a third-party administrator), it will suggest to surface owners that it is necessary, or at least advantageous to go to court to have Orphaned Wells on their property plugged, abandoned, or reclaimed outside of the OWP. The Colorado General Assembly and the Commission have sought to avoid imposing the hardships of litigation on surface owners who experience Orphaned Wells on their properties. At a minimum, Plaintiffs' request for relief, if granted, would create an unnecessary, costly, disruptive, and undesirable two-tiered structure, in which those with the means to litigate will be perceived as receiving preferential treatment over those who would follow the process provided for by Colorado's regulatory framework.

Executed this 20th Day of April, 2026

Matthew J. Lepore
Insight Energy Law, LLC

INSIGHT ENERGY LAW

Appendix A

# Matthew J. Lepore

604 W. Longview Ave., Littleton, Colorado 80120
720-660-4860
matt.lepore@insightenergylaw.com

## PROFESSIONAL EXPERIENCE

**Insight Energy Law**
**Principal & Founder**
April 2020-Present

Insight Energy Law is a private legal practice and policy consultancy focused on oil and gas law, regulation, and policy matters in the Western U.S. Mr. Lepore's clients have included state government regulatory agencies, local governments, nationally recognized environmental NGOs, and large and mid-sized exploration and production operators. Notable projects include:

- Successful multi-stakeholder collaboration with industry and environmental NGOs to develop and advocate for wellbore integrity regulations adopted by state oil and gas regulator through rulemaking. (2020).
- Developed and successfully advocated for strict restrictions on venting and flaring of gas at oil and gas locations and gathering lines, including monitoring and reporting requirements, that were adopted by state oil and gas regulator through rulemaking. (2020-2021).
- Counsel to industry exploration and production operators in Colorado financial assurance rulemaking. (2021-2022).
- Counsel to environmental NGO in financial assurance rulemaking at Utah Division of Oil, Gas, and Mining. (2022-present).

**State Review of Oil and Gas Environmental Regulations (STRONGER)**
**Executive Director**
October 2022-present

STRONGER is a national nonprofit organization dedicated to enhancing protection of human health and the environment by educating and providing services for the continuous improvement of state oil and gas environmental regulatory programs. All STRONGER efforts are led by multi-stakeholder workgroups comprised of subject-matter experts. STRONGER's work focuses primarily on developing rigorous, objective guidelines for state oil and gas environmental regulatory programs, and reviewing state oil and gas environmental regulatory programs against the guideline criteria.

**Adamantine Energy**
**Strategic Advisor & Legal Counsel**
March 2018-June 2020

Adamantine Energy is an energy policy consultancy that helps companies navigate the rapidly evolving challenges around energy development and forge inclusive, lasting solutions to those challenges.

**Director, Colorado Oil and Gas Conservation Commission**
August 2012-March 2018

**Counsel to Oil and Gas Commission**
July 2009-June 2011

Mr. Lepore was named Director of the Colorado Oil and Gas Conservation Commission in August 2012 and led the Commission through one of the most dynamic and contentious periods of oil and gas development in the state's history. Mr. Lepore resigned from the COGCC in March 2018. As Director, Mr. Lepore:

- ❖ Led a management team of seven and a staff of 110.
- ❖ Oversaw an annual operating budget of approximately $16.4 million.
- ❖ Spoke frequently on oil and gas legal, policy, and regulatory issues across Colorado and in neighboring oil and gas-producing states, and guest lectured at the University of Denver, Sturm College of Law and other university programs such as the Global Energy Management (GEM) Program at the University of Colorado Denver Business School, and the University of Colorado, Boulder.
- ❖ Was a member of U.S. Department of State Unconventional Gas Technical Engagement Program delegations to Argentina, Chile, and Indonesia to confer with federal, state, and local regulators, industry, and NGOs, regarding regulatory and social issues related to unconventional oil and gas development.
- ❖ Represented the Oil and Gas Conservation Commission on regulatory and technical issues during Governor's Task Force on State and Local Regulation of Oil and Gas Operations in 2014-15.
- ❖ Worked closely with the Governor's office and the Department of Natural Resources on legislative, policy, and legal matters.
- ❖ Routinely testified before the Colorado General Assembly's Joint Budget and Joint Agricultural Committees and confers with legislators on behalf of the executive branch regarding proposed or pending legislation.

Mr. Lepore was counsel to the Commission while serving as a Colorado Assistant Attorney General from 2009-2011. As counsel he represented the Commission in all litigation matters before the state trial and appellate courts; assisted the Commission in administrative enforcement matters; and counseled the Commission concerning interpretation and application of the Oil and Gas Conservation Act and the Commission's implementing regulations.

**Private Law Practice**

Licensed: Colorado since 1993

Holme Roberts & Owen, LLP
Denver, Colorado
Partner 2000-2009; Associate 1993-1999

Prior to his tenure with the Attorney General's office, Mr. Lepore was a partner in a large Denver-based regional private law practice, where he specialized in class action and multi-party personal injury, wrongful

death, and property damage claims arising from environmental contamination. His clients included Fortune 100 aerospace, transportation, and mining companies; alternative energy developers, lenders, and private investment companies; and small businesses and individuals in Colorado, California, New Mexico, Pennsylvania, and Texas. His experience includes:

- ❖ Regulatory enforcement proceedings under CERCLA, RCRA, NEPA, state oil and gas, storage tank, and asbestos abatement regulations.

- ❖ Successful defense of class action and multi-party property damage and personal injury claims arising from environmental impacts to surface water and groundwater (solvents, metals, BTEX, nitrates, perchlorate), soil (petroleum hydrocarbons, metals, PCBs), and indoor and ambient air (radiation, asbestos, lead paint, mold).

- ❖ Compliance counseling, liability assessment, and due diligence for utility-scale wind power projects, natural gas production operations, and uranium mining and exploration projects.

- ❖ Representing potentially responsible parties at Superfund sites including landfills, dry cleaners, used oil recycling facilities, and major chemical spill sites.

Beatty & Wozniak, LLP
Denver, Colorado
Partner, 2011-2012

Immediately prior to becoming COGCC Director, Mr. Lepore was a partner at Beatty & Wozniak, LLP, a boutique oil and gas law firm. His practice concentrated on regulatory matters, including administrative hearings, in front of the Colorado Oil and Gas Conservation Commission, and state and federal district court litigation matters for oil and gas company clients.

## <u>EDUCATION</u>

1993 - J.D., Stanford University

1987 - B.A., *summa cum laude*, University of Colorado, Boulder

## <u>PROFESSIONAL ACTIVITIES, HONORS, AND MEMBERSHIPS</u>

- Consultant to U.S. Department of Interior International Technical Assistance Program, South Africa Western Cape Government Natural Gas Sector Planning and Regulations. 2018-2019.
- U.S. Department of State Unconventional Gas Technical Engagement Program.
  - Member of State Department delegation to national government partners in Argentina, Chile, Columbia, and Jakarta, Indonesia evaluating development of unconventional hydrocarbon resources. 2012-2018.
- Interstate Oil and Gas Compact Commission – Official Colorado Representative, 2013 to 2019.
  - Steering Committee, First Vice Chair, October 2017-September 2018
  - Team Leader, Peer Assessment for Idaho Oil and Gas Conservation Commission, Fall 2016-17.
  - Chairman, Legal & Regulatory Affairs Committee, October 2014-Oct. 2016
- Chairman, Colorado Bar Association Environmental Law Section, 2011-2012
- Vice Chair, American Bar Association Tort and Insurance Practice Section, Toxic Tort and Environmental Law Committee, 2004-2009

- Associate editor, *The Stanford University Law Review*

## SELECT SPEECHES AND PRESENTATIONS

Mr. Lepore has extensive public speaking experience, including keynote presentations, law school and college guest lectures, an array of energy policy, regulatory, and environmental forums, and international oil and gas development forums sponsored by the U.S. Department of Energy and Department of State. Select engagements include:

- International Energy Agency
    - Network of Methane Policy and Regulatory Experts, Paris, France. January 2020
- Columbia Center on Global Energy Policy / University of Texas at Austin Energy Institute
    - Natural Gas Flaring Workshop, Austin, TX. January 2020
- U.S. Department of Commerce Commercial Law Development Program
    - "Workshop on Stakeholder Mapping and Community Engagement for Unconventional Oil and Gas Development." Bogota, Columbia June 26-27, 2018
- U.S. Department of State Unconventional Gas Technical Engagement Program.
    - "Argentina Workshop on the Sustainable Development of Unconventional Hydrocarbon Resources." Buenos Aires and Nequen Province, Argentina. June 27-July 1, 2016.
    - "Regulating Unconventional Oil and Gas Development – A State Government Perspective." Santiago and Patagonia, Chile. December 2014
    - "U.S. Federal and State Regulatory Perspectives: Pursuing a Working Regulatory Model for Shale Gas." Jakarta, Indonesia. May 2013.
- Society of Petroleum Engineers: Environmental Stewardship in Unconventional Resource Development: Keynote Speaker. Austin, Texas. November 7, 2018.
- Health Effects Institute: Research Planning Workshop. September 11-12, 2018. Austin, TX.
- The Aspen Institute Energy & Environment Program, Series on Energy Governance:
    - Dialogue on Energy Governance Working Group Meetings: August 12-14, 2018 (Co-Chair,); May 15-18, 2018.
    - Governance of Unconventional Oil and Gas Development. February 25-27, 2017; October 21-23, 2016.
    - Modern Shale Gas and Oil Production Forum. Aspen, CO. June 4-7, 2016; June 6-8, 2015; July 20-22, 2014.
- American Petroleum Institute National Meeting: Luncheon Keynote Speaker. Denver, CO. May 19, 2016
- Kate Bailey Hutchison Center for Energy, Law, & Business: UT Energy Week 2016. "Regulatory Responses to Fracking." Austin, TX. February 17, 2016.
- Oklahoma Governor's Energy Conference 2015: "Regional Realities: The Current Landscape." Oklahoma City, OK. November 10, 2015.

- Colorado State University Center for the New Energy Economy, 2015 Natural Gas Symposium: "Solving the Stat vs. Local Control Puzzle." Fort Collins, CO. October 28, 2015
- Colorado Environmental Managers Society 2015 Fall Conference: Luncheon Keynote Speaker. Denver, CO. October 13, 2015.
- 60th Annual Rocky Mountain Mineral Law Institute: Panelist, "Varying Perspectives on Local Oil and Gas Regulation." Vail, CO. July 2014.
- Secretary of Energy Advisory Board: FracFocus 2.0 Task Force. Washington, D.C. January 6, 2014.
- U.S. House Committee on Energy and Commerce, Subcommittee on Environment and the Economy: Testimony re: "The Role of the States in Protecting the Environment under Current Law." Washington, DC. February 2013.

**PUBLICATIONS**

- "Fundamentals of Drilling and Spacing Units and Statutory Pooling," *Mineral Title Examination*, Paper No. 17 (Rocky Mt. Min. L. Fdn. 2012) (Co-author with Michael Wozniak).
- "Legislating Carbon Sequestration: Pore Space Ownership and other Policy Considerations," The Colorado Lawyer, October 2011. (Co-author with Derek L. Turner).
- "Nanotechnology and Human Health: We Don't Know Nano," American Bar Association Toxic Tort and Environmental Law Committee Newsletter, Spring 2008.

# Appendix B

## Index of Documents Reviewed

### D. Colo. Case No. 24-cv-00823-CNS-MEH – Filings

1. Class Action Complaint [Dkt 004]
2. HRM Defendants' Motion to Dismiss or Strike [Dkt 30] and Exhibits
3. Plaintiffs' Response to Motion to Dismiss [Dkt 52]
4. HRM Defendants' Reply ISO Motion to Dismiss or Strike [Dkt 56] and Exhibits [Dkt 56 / 57]
5. Plaintiffs' Motion for Leave to File Surreply to HRM Defendants' MTD [Dkt 61] and Exhibits
6. HRM Defendants' Response to Motion for Leave to File Surreply [Dkt 62]
7. Order Denying MFL to File Surreply to Motion to Dismiss [Dkt 63]
8. Order Denying MTD [Dkt 90]
9. HRM Defendants' Answer [Dkt 94]
10. Plaintiffs' Motion for Class Certification [Dkt 107] and Exhibits
11. HRM Defendants' Response to Plaintiffs' Motion for Class Certification [Dkt 116] and Exhibits
12. HRM Defendants' Restricted Exhibits to Response to Class Certification [Dkt 117]
13. Plaintiffs' Reply ISO Motion for Class Certification [Dkt 123]
14. Order Granting Motion for Class Certification [Dkt 152]

### D. Colo. Case No. 24-cv-00823-CNS-MEH – Depositions

1. John Hoffman - 04-22-2025, and all exhibits thereto.
2. Keith Hubbard - 06-06-2025, and all exhibits thereto.
3. Patrick McGraw - 09-30-2025, and all exhibits thereto.
4. 30(b)(6) of Colorado Energy and Carbon Management Commission through J. Murphy - 10-22-2025, and all exhibits thereto.
5. Roger Hutson - 11-20-2025, and all exhibits thereto.
6. Jeremy Pate - 12-05-2025, and all exhibits thereto.
7. Troy Mouret - 12-10-2025, and all exhibits thereto.
8. 30(b)(6) of HRM Resources LLC through R. Hutson - 2-9-26, and all exhibits thereto.
9. 30(b)(6) of HRM Resources LLC through D. Flake - 2-9-26, and all exhibits thereto.
10. 30(b)(6) of HRM Resources II, LLC through R. Hutson - 2-11-26, and all exhibits thereto.
11. 30(b)(6) of HRM Resources II, LLC through D. Flake - 2-11-26, and all exhibits thereto.
12. 30(b)(6) of HRM Resources III, LLC through R. Hutson - 2-10-26, and all exhibits thereto.
13. 30(b)(6) of HRM Resources III, LLC through K. Doss - 2-10-26, and all exhibits thereto.

14. 30(b)(6) of HRM Resources IV, LLC through R. Hutson - 2-10-26, and all exhibits thereto.

15. 30(b)(6) of HRM Resources IV, LLC through K. Doss - 2-10-26, and all exhibits thereto.

**D. Colo. Case No. 24-cv-00823-CNS-MEH – Produced Documents**

1. HRM0001403
2. HRM0001407
3. HRM0001412
4. HRM0001414
5. HRM0001429
6. HRM0001438
7. HRM0001441
8. HRM0001443
9. HRM0001451
10. HRM0001455
11. HRM0001462
12. HRM0001466
13. HRM0001470
14. HRM0001472
15. HRM0006029
16. HRM0006077
17. HRM0006182
18. HRM0006187
19. HRM0006235
20. HRM0006253
21. HRM0006851
22. HRM0006856
23. HRM0006857
24. HRM0006869
25. HRM0006870
26. HRM0006959
27. HRM0007476
28. HRM0007568
29. HRM0008311
30. HRM0008312
31. HRM0008316
32. HRM0008320
33. HRM0008913
34. HRM0009280
35. HRM0024177
36. HRM0027612
37. HRM0027618
38. HRM0027623
39. EnergyNet_0000013
40. EnergyNet_0009724
41. Hoffman_000298
42. Hoffman_000597
43. Hoffman_000599
44. Hoffman_000602
45. Hoffman_000619
46. Hoffman_000621
47. Payne_CORA 0000184
48. Payne_CORA 0000188
49. Payne_CORA 0000411
50. Payne_CORA 0000477
51. Payne_CORA 0001849
52. Payne_CORA 0001851
53. Payne_CORA 0003350
54. Payne_CORA 0006961
55. Payne_CORA 0006965
56. Payne_CORA 0006966
57. Payne_CORA 0006976
58. Payne_CORA 0007206
59. Plaintiffs_007247

**Other Sources**

1. Colorado General Assembly, "To Promote the Conservation of Gas, Creating a Gas Conservation Commission with Authority to Adopt and Enforce Rules and Regulations to Prevent the Waste of Gas and Imposing Penalties for Such Waste." (1927). Session Laws 1901-1950. 3117. https://scholar.law.colorado.edu/session-laws-1901-1950/3117

2. Colorado General Assembly, "Entitled an Act to Provide for Abandoning and Plugging Wells Drilled for Oil and Gas and Creating a Commission to Prescribe and Enforce Rules and Regulations Therefor; To Prescribe Penalties for the Violation Thereof and to Repeal Any and All Acts or Parts of Acts in Conflict Therewith." (1929). Session Laws 1901-1950. 3326. https://scholar.law.colorado.edu/session-laws-1901-1950/3326

3. Colorado General Assembly, "Senate Joint Resolution No. 18" (1935). Session Laws 1901-1950. 4293. https://scholar.law.colorado.edu/session-laws-1901-1950/4293

4. Colorado General Assembly, "Providing for the Execution of an Agreement to Extend the Interstate Compact to Conserve Oil and Gas, and for Other Purposes." (1937). Session Laws 1901-1950. 4630. https://scholar.law.colorado.edu/session-laws-1901-1950/4630

5. Colorado General Assembly, "Defining and Prohibiting the Waste of Oil and Gas in the State of Colorado; Creating and Establishing the Oil and Gas Conservation Commission; Defining the Powers and Duties of the Commission With Respect to Conservation of Oil and Gas; Providing for the Enforcement of the Act and the Rules, Regulations and Orders of Said Commission; Providing for the Filing and Hearing of Complaints Concerning Waste of Oil and Natural Gas, and for Oaths, Subpoenas, Records, Suits and Appeals; Providing for the Raising of Funds to Defray the Cost of Administering the Act; And Repealing Sections 39, 40, 41, 42, 43, 49, 50, 52, 64, 65, 66 and 67, Chapter 118, 1935 Colorado Statutes Annotated; and Providing for Effective Date." (1951). Session Laws 1951-2000. 3. https://scholar.law.colorado.edu/session-laws-1951-2000/3

6. Colorado General Assembly, "Relating to the Conservation of Oil and Gas and to Amend the Law Relating Thereto" (1952). Session Laws 1951-2000. 347. https://scholar.law.colorado.edu/session-laws-1951-2000/347

7. Colorado General Assembly, "Relating to the Conservation of Oil and Gas in the State of Colorado, to Amend Section 5 and 13, Chapter 230, Session Laws of Colorado, 1951" (1952). Session Laws 1951-2000. 357. https://scholar.law.colorado.edu/session-laws-1951-2000/357

8. Colorado General Assembly, "Relating to the Conservation of Oil and Gas, and to Amend the Law Relating Thereto, Chapter 230 of the Session Laws of Colorado 1951, and as Amended" (1953). Session Laws 1951-2000. 709. https://scholar.law.colorado.edu/session-laws-1951-2000/709

9. Colorado General Assembly, "Relating to the Conservation of Oil and Gas and to the Membership of the Oil and Gas Conservation Commission and Their Terms; Further Defining Waste and the Powers and Duties of the Oil and Gas Conservation Commission with Respect to Conservation of Oil and Gas and the Prevention of the Waste Thereof: Providing for the Protection of Correlative Rights and Requiring the Ratable and Non-Discriminatory Purchase of Oil and Gas Production from Any Pool; Providing Methods of Enforcement and Penalties for Violations; And Repealing Sections 6 and 18, Article 6, Chapter 100, Colorado Revised Statutes 1953." (1955). Session Laws 1951-2000. 1163. https://scholar.law.colorado.edu/session-laws-1951-2000/1163

10. Colorado General Assembly, "Concerning Certain Procedures Utilized Before and by the Oil and Gas Conservation Commission of the State of Colorado." (1969). Session Laws 1951-2000. 4994. https://scholar.law.colorado.edu/session-laws-1951-2000/4994

Colorado General Assembly, "Concerning the Oil and Gas Conservation Commission, and Providing for Public Notice of Its Hearings." (1977). Session Laws 1951-2000. 7388. https://scholar.law.colorado.edu/session-laws-1951-2000/7388

11. Colorado General Assembly, "Concerning the Oil and Gas Conservation Commission." (1977). Session Laws 1951-2000. 7586. https://scholar.law.colorado.edu/session-laws-1951-2000/7586

12. Colorado General Assembly, "Imposing a Duty Oil and Gas Well Lessees to Restore Leased Premised to Their Prior Condition or Provide Compensation Therefor." (1977). Session Laws 1951-2000. 7533. https://scholar.law.colorado.edu/session-laws-1951-2000/7533

13. Colorado General Assembly, "Concerning Judicial Review of Rules, Regulations, and Orders of the Oil and Gas Conservation Commission" (1981). Session Laws 1951-2000. 9164. https://scholar.law.colorado.edu/session-laws-1951-2000/9164

14. Colorado General Assembly, "Concerning the Appointment of a Director of the Oil and Gas Conservation Commission" (1984). Session Laws 1951-2000. 10417. https://scholar.law.colorado.edu/session-laws-1951-2000/10417

15. Colorado General Assembly, "Concerning Increasing the Membership on the Oil and Gas Conservation Commission." (1985). Session Laws 1951-2000. 10741. https://scholar.law.colorado.edu/session-laws-1951-2000/10741

16. Colorado General Assembly, "Concerning Safety Regulations for the Oil and Gas Industry." (1985). Session Laws 1951-2000. 10717. https://scholar.law.colorado.edu/session-laws-1951-2000/10717

17. Colorado General Assembly, "Concerning Oil and Gas Production." (1988). Session Laws 1951-2000. 11684. https://scholar.law.colorado.edu/session-laws-1951-2000/11684

18. Colorado General Assembly, "Concerning Oil and Gas Production, and, in Connection Therewith, Establishing Procedures for Mitigation of Hazards Related to Such Activities and Making an Appropriaton" (1990). Session Laws 1951-2000. 12768. https://scholar.law.colorado.edu/session-laws-1951-2000/12768

19. Colorado General Assembly, "Concerning the Regulation of the Oil and Gas Business by the Oil and Gas Conservation Commission and the Public Utilities Commission, and, in Connection Therewith, Providing for the Formation of Drilling Units, the Operation of the Oil and Gas Conservation Commission, and the Rates Charged for the Transportation of Gas" (1991). Session Laws 1951-2000. 13054. https://scholar.law.colorado.edu/session-laws-1951-2000/13054

20. Colorado General Assembly, "Concerning Regulation of Oil and Gas, and Making an Appropriation in Connection Therewith." (1994). Session Laws 1951-2000. 14148. https://scholar.law.colorado.edu/session-laws-1951-2000/14148

21. Colorado General Assembly, "Concerning the Granting of Exclusive Jurisdiction to the Colorado Oil and Gas Conservation Commission to Manage Oil and Gas Wastes." (1995). Session Laws 1951-2000. 14605. https://scholar.law.colorado.edu/session-laws-1951-2000/14605

22. Colorado General Assembly, "Concerning the Colorado Oil and Gas Commission, and, in Connection Therewith, Directing the Commission to Foster Oil and Gas Development Consistent with the Protection of the Environment, Wildlife Resources, and Public Health, Safety, and Welfare and Making an Appropriation Therefor." (2007). Session Laws 2001-Present. 3056. https://scholar.law.colorado.edu/session-laws-2001-2050/3056

23. Colorado General Assembly, "Concerning the Conservation of Wildlife Habitat in Connection with the Development of Oil and Gas, and Making an Appropriation Therefor." (2007). Session Laws 2001-Present. 3094. https://scholar.law.colorado.edu/session-laws-2001-2050/3094

24. Colorado General Assembly, "Concerning Additional Inspections of Oil and Gas Facilities, and, in Connection Therewith, Making an Appropriation." (2013). Session Laws 2001-Present. 5754. https://scholar.law.colorado.edu/session-laws-2001-2050/5754

25. Colorado General Assembly, "Concerning Additional Public Welfare Protections Regarding the Conduct of Oil and Gas Operations, and, in Connection Therewith, Making an Appropriation." (2019). Session Laws 2001-Present. 8000. https://scholar.law.colorado.edu/session-laws-2001-2050/8000

26. Senate Bill 22-198 Concerning Measures to Address Orphaned Wells in Colorado, And in Connection Therewith, Creating the Orphaned Wells Mitigation Enterprise Fund.

27. Senate Bill 24-159, Concerning Modifications to Processes to Further Protect Public Health in Energy and Carbon Management. Bill History (includes Bill Text): https://leg.colorado.gov/bills/sb24-159.

28. Audio transcript of Senate Bill 24-159, committee hearing: https://sg001-harmony.sliq.net/00327/Harmony/en/PowerBrowser/PowerBrowserV2/20240328/-1/15667#info_

29. 2 CCR 404-1_1999

30. 2 CCR 404-1_2006_0730

31. 2 CCR 404-1_2007_0930

32. 2 CCR 404-1_2008_0530

33. 2 CCR 404-1_2009_0401

34. 2 CCR 404-1_2018_04_01

35. COGCC 300 Series Rules_2020_1102

36. COGCC 500 Series Rules _2019_0930

37. COGCC 500 Series Rules _2021_0115

38. COGCC 700-Series Rules_2020_0114

39. COGCC 700 Series Rules_2021_0115

40. COGCC 900_Series Rules_2020_0114

41. COGCC 900 Series Rules_2021_0115

42. Statement of Basis, Specific Statutory Authority, and Purpose, New Rules and Amendments to Current Rules of the Colorado Oil and Gas Conservation Commission, 2 C.C.R. § 404-1 Cause No. 1R, Docket No. 200300071 200-600 Mission Change, Cumulative Impacts, and Alternative Location Analysis Rulemaking.

43. Statement of Basis, Specific Statutory Authority, and Purpose, New Rules and Amendments to Current Rules of the Colorado Oil and Gas Conservation Commission, 2 C.C.R. § 404-1 Cause No. 1R, Docket No. 200600155, 800/900/1200 Mission Change, Cumulative Impacts, and Alternative Location Analysis Rulemaking.

44. Statement of Basis, Specific Statutory Authority, and Purpose, New Rules and Amendments to Current Rules of the Colorado Oil and Gas Conservation Commission, 2 C.C.R. § 404-1, Cause No. 1R Docket No. 210600097, Financial Assurance Rulemaking.

45. Financial Assurance: Questions, Answers, & Data, COGCC Staff Presentation, May 5, 2021.

46. 1R-47 Statement of Basis and Purpose_900624_1990

47. 1R-74 Order 1997

48. Hearing Notice 970528 1997 re financial assurance rulemaking

49. 2008 Rules Redline 700 Series Financial Assurance.

50. 2008 Rule Making training_presentation_700 Series Financial Assurance

51. 1995-1996 Major Rulemaking Overview, Colorado Energy & Carbon Management Commission, 2025

52. Rules and Policies Approved 1990-2008, (Updated 7/17/08)

53. COGCC Orphaned Well Program, June 2, 2020.

54. COGCC Financial Assurance Fact Sheet, March 2021.

55. COGCC Orphaned Well Program FAQ, March 2021, Available at https://sites.google.com/state.co.us/cogcc-owp/home, accessed January 13, 2026.

56. Notice to Operators, Rule 912. Venting or Flaring Produced Natural Gas, Statewide. March 18, 2016.

57. Executive Order D 2018-012 Directing the Colorado Oil and Gas Conservation Commission to Act to Plug, Remediate, and Reclaim Orphaned Oil and Gas Wells and Sites July 18, 2018.

58. Executive Order D 2018-12 Financial Assurance Technical Working Group Final Report, December 1, 2018.

59. COGCC Presentation, "Notice to Operators Rule 912. Venting or Flaring Produced Natural 'Gas – Statewide," April 7, 2016, update December 19, 2017.

60. U.S. Energy Information Administration, Today in Energy, January 6, 2016. "Crude Oil Prices Started 2015 Relatively Low, Ended the Year Lower."

61. World Bank Group Policy Research Note. The Great Plunge in Oil Prices: Causes, Consequences, and Policy Responses. March 2015.

62. World Economic Forum. What Caused the Big Fall In Oil Prices? February 25, 2015.

63. World Bank. Global Economic Prospects, January 2018. "With the Benefit of Hindsight: The Impact of the 2014-16 Oil Price Collapse.

64. Interstate Oil and Gas Compact Commission "State Financial Assurance Requirements," 2016.

65. Interstate Oil and Gas Compact Commission "Idle and Orphan Oil and Gas Wells: State and Provincial Regulatory Strategies," 2021.

66. Interstate Oil and Gas Compact Commission "Idle and Orphan Oil and Gas Wells: State and Provincial Regulatory Strategies, Supplemental Information on Orphan Well Plugging and Site Restoration" 2024.

67. Resources for the Future, "Plugging the Gaps in Inactive Well Policy," Ho, Krupnick, et al., May 2016.

68. National Council of State Legislators, "State Oil and Gas Bonding Requirements," updated January 26, 2022.

69. Western Organization of Resource Councils, "Reclaiming Oil and Gas Wells and Addressing Climate Impacts: State Policy Recommendations," March 2021.

70. Colorado Oil and Gas Conservation Commission "Fiscal Year 2021 Annual Report, Orphaned Well Program," September 1, 2021.

71. Colorado Oil and Gas Conservation Commission "Fiscal Year 2022 Annual Report, Orphaned Well Program," September 1, 2022 (revised September 6, 2022).

72. Colorado Oil and Gas Conservation Commission "Fiscal Year 2023 Annual Report, Orphaned Well Program," September 1, 2023.

73. Colorado Oil and Gas Conservation Commission "Fiscal Year 2024 Annual Report, Orphaned Well Program," September 5, 2024.

74. Energy and Carbon Management Commission, "Fiscal Year 2025 Annual Report, Orphaned Well Program," September 8, 2025.

75. Colorado Oil and Gas Conservation Commission, Orphan Well Program FAQ, February 2024.

76. COGCC Painted Pegasus Petroleum LLC, Interested Parties List, Cause No. 1V, Docket No. 211000188, filed October 12, 2021.

77. COGCC Notice and Application for Hearing, Cause No. 1V, Docket No. 211000188, In the Matter of Alleged Violations of the Rules and Regulations of the Colorado Oil and Gas Conservation Commission by Painted Pegasus Petroleum LLC, Adams County, Colorado, October 13, 2021.

78. COGCC Amended Notice and Application for Hearing, Cause No. 1V, Docket No. 211000188, In the Matter of Alleged Violations of the Rules and Regulations of the Colorado Oil and Gas Conservation Commission by Painted Pegasus Petroleum LLC, Adams County, Colorado, February 4, 2022.

79. Pegasus Petroleum LLC Public Comment, Adams County, Cause No. 1V, Docket No. 211000188, filed January 12, 2022.

80. Painted Pegasus Petroleum LLC Proof of Publication Affidavit, Cause No. 1V, Docket No. 211000188, filed March 1, 2022.

81. COGCC Order Finding Violation, Cause No. 1V, Docket No. 211000188, Order No. 1V-780, In the Matter of Alleged Violations of the Rules and Regulations of the Colorado Oil and Gas Conservation Commission by Painted Pegasus Petroleum LLC, Adams and Weld Counties, Colorado, March 10, 2022, as of the 9th day of March 2022.

82. Colorado Oil and Gas Conservation Commission Staff Report, January 26, 2015

83. Colorado Oil and Gas Conservation Commission Staff Report, September 14, 2015.

84. Colorado Oil and Gas Conservation Commission Staff Report, December 7, 2015.

85. Colorado Oil and Gas Conservation Commission Staff Report, June 6, 2016.

86. Colorado Oil and Gas Conservation Commission Staff Report, March 19, 2018.

87. Carbon Tracker, "Billion Dollar Orphans: Why millions of oil and gas wells could become wards of the state." September 2020.

88. Carbon Tracker, "Backfire: Why Colorado's bonding reform is not working." Drew Gibson, April 2023.

89. Carbon Tracker, "False Start: How Colorado's Bonding Rules Reduce Coverage." Drew Gibson, Rob Schuwerk, February 2024.

90. Carbon Tracker, "Rocky Mountain Highs and Lows: Decommissioning Colorado's Two Oil Industries," Jue 2024.

# Appendix C

**“Waste” as Defined by Statute in 1951, 1955, and 2019**

1951: House Bill No. 347

Section 4. The term "waste” as applied to oil shall include underground waste, inefficient, excessive or improper use or dissipation of reservoir energy, including gas energy and water drive, surface waste, open-pit storage and waste incident to the production of oil in excess of the producer’s above-ground storage facilities and lease and contractual requirements, but excluding storage (other than open-pit storage) reasonably necessary for building up or maintaining crude stocks and products thereof for consumption, use and sale.

Section 5. The term “ waste” as applied to gas shall include the escape, blowing or releasing, directly or indirectly, into the open air of gas from wells productive of gas only, or gas from wells producing oil or both oil and gas; and the production of gas in quantities or in such manner as will unreasonably reduce reservoir pressure or unreasonably diminish the quantity of oil or gas that might ultimately he produced; excepting gas that is reasonably necessary in the drilling, completing, testing and producing of wells.

1955: House Bill No. 309

Section 2, 100-6-3, Colorado Revised Statutes 1953, is hereby amended by adding thereto the following sub- sections:

(12) In addition to the meanings as set forth in sub- sections (9) and (10) hereof, the term "waste” means and includes (a) physical waste as that term is generally understood in the oil and gas industry, (b) the locating, spacing, drilling, equipping, operating or producing of any oil or gas well or wells in a manner which, causes or tends to cause reduction in quantity of oil or gas ultimately recoverable from a pool under prudent and proper operations or which causes or tends to cause unnecessary or excessive surface loss or destruction of oil or gas, (c) abuse of- the correlative rights of any owner in a pool due to non-uniform, disproportionate, unratable, or excessive withdrawals of oil or gas therefrom, causing reasonably avoidable drainage between tracts of land or resulting in one or more producers or owners in such pool producing more than his just and equitable share of the oil or gas from such pool.

2019: Senate Bill 19-181

Section 7

34-60-103 Definitions

(11) "Waste", as applied to gas:

(a) Includes the escape, blowing, or releasing, directly or indirectly into the open air, of gas fom wells productive of gas only, or gas in an excessive or unreasonable amount from wells producing oil or both oil and gas; and the production of gas in quantities or in such manner as

unreasonably reduces reservoir pressure or, subject to subsection (11) (b ) of this section, unreasonably diminishes the quantity of oil or gas that ultimately may be produced; excepting gas that is reasonably necessary in the drilling, completing, testing, and in furnishing power for the production of wells; and

(b) Does not include the nonproduction of gas from a formation if necessary to protect public health, safety, and welfare, the environment, or wild life resources as determined by the commission.

(12) "Waste", as applied to oil:

(a) Includes underground waste; inefficient, excessive, or improper use or dissipation of reservoir energy, including gas energy and water drive; surface waste; open-pit storage; and waste incident to the production of oil in excess of the producer’s aboveground storage facilities and lease and contractual requirements, but excluding storage, other than open-pit storage, reasonably necessary for building up or maintaining crude stocks and products thereof of crude stocks for consumption, use, and ale; and

(b) Does not include the nonproduction of oil from a formation if necessary to protect public health, safety, and welfare, the environment, or wild life resources as determined by the commission.

(13) "Waste", in addition to the meanings as set forth in subsections (11) and (12) of this section:

(a) Means, subject to subsection (13)(b) of this section:

(I) Physical waste, as that term is generally understood in the oil and gas industry;

(II) The locating, spacing, drilling, equipping, operating, or producing of any oil or gas well or wells in a manner that causes or tends to cause reduction in quantity of oil or gas ultimately recoverable from a pool under prudent and proper operations or that causes or tends to cause unnecessary or excessive surface loss or destruction of oil or gas; and

(III) Abuse of the correlative rights of any owner in a pool due to nonuniform, disproportionate, unratable, or excessive withdrawals of oil or gas from the pool, causing reasonably avoidable drainage between tracts of land or resulting in one or more producers or owners in the pool producing more than an equitable share of the oil or gas from the pool; and

(b) Does not include the nonproduction of oil or gas from a formation if necessary to protect public health, safety, and welfare; the environment; or wildlife resources as determined by the commission.

Section 12.

34-60-106. Additional Powers of the Commission – rules – repeal

(2.5)(b) The nonproduction of oil and gas resulting from a conditional approval or denial authorized by this subsection (2.5) does not constitute waste.

# Exhibit 1

BEFORE THE OIL AND GAS CONSERVATION COMMISSION
OF THE STATE OF COLORADO

| | | |
|---|---|---|
| IN THE MATTER OF ALLEGED VIOLATIONS OF THE RULES AND REGULATIONS OF THE COLORADO OIL AND GAS CONSERVATION COMMISSION BY **PAINTED PEGASUS PETROLEUM LLC,** ADAMS AND WELD COUNTIES, COLORADO | ) ) ) ) ) ) | CAUSE NO. 1V<br>DOCKET NO. 211000188<br>TYPE: ENFORCEMENT<br>ORDER NO. 1V-780 |

## ORDER FINDING VIOLATION

The Colorado Oil and Gas Conservation Commission ("COGCC" or "Commission") heard this matter on March 9, 2022, at the Colorado Oil and Gas Conservation Commission, 1120 Lincoln Street, Suite 801, Denver, Colorado, upon application from COGCC Staff to enter an Order Finding Violation ("OFV" or "Order") against Painted Pegasus Petroleum LLC (Operator No. 10711) ("P3"), pursuant to the Rules and Regulations of the Colorado Oil and Gas Conservation Commission, 2 C.C.R. 404-1 ("Rule" or "Rules"), and finds and states as follows:

## I. FACTUAL AND LEGAL FINDINGS

1. P3 is the operator of record of the following wells in Adams County:

   a. The Champlin 459 Amoco 2 Well, API No. 001-07588;

   b. The Moran 1 Well, API No. 001-06717;

   c. The Juanita State 1 Well, API No. 001-08187;

   d. The Crystal-Hubbs 1 Well, API No. 001-08281;

   e. The Oskarson 1 Well, API No. 123-09026;

   f. The UPRR-Sanden-Ehn 1-17 Well, API No. 001-06094; and

   g. The UPRR-Sanden-Ehn 2-17 Well, API No. 001-06142.

2. The Commission holds the following financial assurance for P3:

   a. Surety ID 2018-0152, an insurance plugging bond in the amount of $100,000.

   b. Surety ID 2018-0153, an insurance blanket surface bond in the amount of $25,000; and

   c. Surety ID 2018-0154, an insurance excess inactive well bond in the amount of $150,000.

**A. Notice of Alleged Violation No. 402418481 (Champlin 459 Amoco 2 Well)**

3. Pursuant to Rule 309[1], operators shall report every existing oil and gas well that is not plugged and abandoned on the Operator's Monthly Report of Operations ("Form 7") within 45 days after the end of each month. Operators shall report each well every month from the month it is spud until it has been reported for one month as abandoned.

4. On June 10, 2020, Commission Staff performed an audit of P3's production records for January 2020. The audit revealed that for the month of January 2020, P3 incorrectly reported production for the Champlin 459 Amoco 2 Well. P3 therefore violated Rule 309.

5. On June 12, 2020, Commission Staff issued Notice of Alleged Violation ("NOAV") No. 402418481 to P3, citing a violation of Rule 309.

6. On June 24, 2020, after receiving the NOAV via email, P3 filed an updated Form 7 to correct the errors in the original filing. Doc. No. 402430314.

7. On July 17, 2020, P3 received a hard copy of the NOAV via certified U.S. Mail.

**B. Notice of Alleged Violation No. 402523851 (Moran 1 Well)**

8. On October 7, 2020, Commission Staff received a complaint from the owner of the land on which the Moran 1 Well is located. Doc. No. 200449206. The complainant stated they could hear pipes hissing and smell a natural gas odor. *Id*.

Rule 210.b.

9. Pursuant to Rule 210.b., within 60 days after the completion of a well or the installation of a battery, operators shall install permanent signage at the wellhead and/or battery. This signage shall provide, among other required information, the name of the operator, a phone number at which the operator can be reached at all times, and a phone number for local emergency services.

10. On October 9, 2020, Commission Staff inspected the Moran 1 Well in response to the complaint. Doc. No. 699501794. During this inspection, Staff observed the casing valve venting gas to the atmosphere, and called the emergency number listed at the wellsite. *Id*. Staff was unable to leave a message due to a full voicemail inbox. *Id*.

11. P3 failed to install a sign with a phone number at which it could be reached at all times. P3 therefore violated Rule 210.b.

[1] Except for references to the 500-Series Rules, Rule numbers in this document refer to the Rules in effect prior to January 15, 2021.

Rule 605.d.

12. Pursuant to Rule 605.d., operators shall keep all valves, pipes, and fittings securely fastened, inspected at regular intervals, and maintained in good mechanical condition.

13. As noted above, on October 9, 2020, Commission Staff inspected the well and observed the casing valve venting gas to the atmosphere. Doc. No. 699501794.

14. P3 failed to shall keep all valves, pipes, and fittings securely fastened, inspected at regular intervals, and maintained in good mechanical condition. P3 therefore violated Rule 605.d.

15. On November 2, 2020, Commission Staff issued NOAV No. 402523851 to P3, citing violations of Rules 210.b. and 605.d.

16. Also on November 2, 2020, Commission Staff performed a follow up inspection on the Moran 1 Well. Doc. No. 699501851. During this inspection, Staff observed that the venting had been resolved. Doc. No. 699501854.

17. On November 19, 2020, P3 received the NOAV via certified U.S. Mail.

**C. Notice of Alleged Violation No. 402603355 (Juanita State 1 Well)**

Rule 210.d.

18. Pursuant to Rule 210.d., operators shall (1) label all tanks with a capacity of ten barrels or greater with the following information: name of the operator, operator's emergency contact telephone number, tank capacity, tank contents, and National Fire Protection Association ("NFPA") label; and (2) retain the markings, placards, and labels on all containers that are used to store, treat, or otherwise handle a hazardous material in accordance with the U.S. Department of Transportation's Hazardous Materials Regulations.

19. On January 14, 2021, Commission Staff inspected the Juanita State 1 Well. Doc. No. 699502133. During this inspection, Staff observed an open-top tank containing hydrocarbon liquids with no label. *Id*. Commission Staff required P3 to label the tank. *Id*.

20. Commission Staff performed follow up inspections on January 25, 2021 (Doc. No. 699502179); September 2, 2021 (Doc. No. 699503150); and October 1, 2021 (Doc. No. 699503214). During these inspections, Staff observed that P3 failed to label the tank. *Id*.

21. P3 failed to properly label the tank containing hydrocarbon liquids. P3 therefore violated Rule 210.d.

Rule 324A.a

22. Pursuant to Rule 324A.a, operators shall take precautions to prevent significant adverse environmental impacts to air, water, soil, or biological resources to the extent necessary to protect public health, safety, and welfare, including the environment and wildlife resources.

23. During the January 14, 2021, inspection of the Juanita State 1 Well, Commission Staff observed an open-top tank containing hydrocarbons. *Id*. Staff observed a deceased bird of prey inside the tank and no netting or cover on the tank. *Id*. Staff required P3 to install wildlife protection equipment by January 24, 2021. *Id*.

24. Commission Staff performed follow up inspections on January 25, 2021 (Doc. No. 699502179); September 2, 2021 (Doc. No. 699503150); and October 1, 2021 (Doc. No. 699503214). During these inspections, Staff observed that P3 failed to install wildlife protection equipment on the tank.

Rule 603.f.

25. Pursuant to Rule 603.f, operators shall keep locations free of the following: equipment, vehicles, and supplies not necessary for use on that lease; weeds; rubbish; and other waste material.

26. During the January 14, 2021, inspection of the Juanita State 1 Well, Commission Staff observed waste material on location, including a mattress and a hot tub, as well as unmanaged weeds throughout the location. Doc. No. 699502133.

27. Commission Staff performed follow up inspections on January 25, 2021 (Doc. No. 699502179); September 2, 2021 (Doc. No. 699503150); and October 1, 2021 (Doc. No. 699503214). During these inspections, Staff observed that P3 failed to address these conditions at the location.

28. On February 18, 2021, Commission Staff issued NOAV No. 402603355 to P3, citing violations of Rules 210.d, 324A.a, and 603.f.

29. On April 16, 2021, P3 received a hard copy of the NOAV via certified U.S. Mail.

**D. Notice of Alleged Violation No. 402603404 (Crystal-Hubbs 1 Well)**

30. Pursuant to Rule 326.b, operators are required to conduct a mechanical integrity test ("MIT") on shut-in wells within two years of the initial shut-in date, and then at five-year intervals after an initial successful MIT. Commission Rules do not permit bringing a well back into production to satisfy the requirement to conduct an MIT.

31. On December 22, 2020, Commission Staff performed an audit of MIT records for P3. During this audit, Staff observed that P3 reported the Crystal-Hubbs 1 Well as shut-in in October 2017. P3 was therefore required to conduct an MIT on the well by November 1, 2019. Production records show that in January 2020, P3 brought the well back into production without conducting an MIT.

32. P3 failed to conduct an MIT on the Crystal-Hubbs 1 Well by November 1, 2019. P3 therefore violated Rule 326.b.

33. On February 18, 2021, Commission Staff issued NOAV No. 402603404 to P3, citing a violation of Rule 326.b.

34. On April 16, 2021, P3 received a hard copy of the NOAV via certified U.S. Mail.

**E. Notice of Alleged Violation No. 402603418 (Oskarson 1 Well)**

35. On December 22, 2020, Commission Staff performed an audit of MIT records for P3. During this audit, Staff observed that P3 reported the Oskarson 1 Well as shut-in in January 2018. P3 was therefore required to conduct an MIT on the well by February 1, 2020. Production records show that in March 2020, P3 brought the well back into production without conducting an MIT.

36. P3 failed to conduct an MIT on the Oskarson 1 Well by February 1, 2020. P3 therefore violated Rule 326.b.

37. On February 18, 2021, Commission Staff issued NOAV No. 402603418 to P3, citing a violation of Rule 326.b.

38. On April 16, 2021, P3 received a hard copy of the NOAV via certified U.S. Mail.

**F. Notice of Alleged Violation No. 402603548 (UPRR-Sanden-Ehn 1-17 Well)**

39. On December 22, 2020, Commission Staff performed an audit of MIT records for P3. During this audit, Staff observed that the UPRR-Sanden-Ehn 1-17 Well was reported by a prior operator shut-in as of July 2005. The well was therefore required to have an MIT performed by August 1, 2007. P3 assumed operatorship of the well as of February 28, 2020. Commission records show that P3 has not conducted an MIT on the well since that time.

40. P3 failed to conduct an MIT on the UPRR-Sanden-Ehn 1-17 Well by August 1, 2007. P3 therefore violated Rule 326.b.

41. On February 18, 2021, Commission Staff issued NOAV No. 402603548 to P3, citing a violation of Rule 326.b.

42. On April 16, 2021, P3 received a hard copy of the NOAV via certified U.S. Mail.

**G. Notice of Alleged Violation No. 402608780 (UPRR-Sanden-Ehn 2-17 Well)**

43. On December 22, 2020, Commission Staff performed an audit of MIT records for P3. During this audit, Staff observed that the UPRR-Sanden-Ehn 2-17 Well

was reported by a prior operator as shut-in in January 2005. The well was therefore required to have an MIT performed by February 1, 2007. P3 assumed operatorship of the well as of February 28, 2020. Commission records show that P3 has not conducted an MIT on the well since that time.

44. P3 failed to conduct an MIT on the UPRR-Sanden-Ehn 2-17 Well by February 1, 2007. P3 therefore violated Rule 326.b.

45. On February 18, 2021, Commission Staff issued NOAV No. 402608780 to P3, citing a violation of Rule 326.b.

46. On April 16, 2021, P3 received a hard copy of the NOAV via certified U.S. Mail.

**H. Bankruptcy Proceedings**

47. On November 23, 2021, P3 filed for Chapter 7 Bankruptcy in the United States Bankruptcy Court for the Southern District of Texas, Bankruptcy Case No. 21-33772.

48. On December 15, 2021, the bankruptcy trustee filed an "Emergency Motion to Abandon all Oil and Gas Wells and Equipment Thereon, Oil and Gas Products in Tanks or Otherwise, Leases and Leasehold Interests, Inventory, and Other Equipment Effective as of the Date of Filing of Petition" in Bankruptcy Case No. 21-33772 ("Emergency Motion"). The Emergency Motion describes the assets to be abandoned as "approximately 203 oil and gas wells, all located in the State of Colorado. . . . approximately 50 of these wells are still producing natural gas and/or petroleum products, with the remainder being shut in." Emergency Motion at ¶ 4.iii.

49. As part of its justification for asking the Court to expedite the motion, the trustee states that "[t]here are insufficient estate resources to maintain the Assets effectively and legally, or to properly insure them," that "[t]here may be ongoing plugging and abandonment liability for which the estate cannot pay," and that "[t]here may be ongoing environmental liability for which the estate cannot pay." Emergency Motion at ¶ 9.

50. On January 4, 2022, the Court issued an Order granting the Emergency Motion and abandoning the property identified in the Emergency Motion, included the wells located in Colorado. *See* Order Granting Trustee's Emergency Motion to Abandon all Oil and Gas Wells and Equipment Thereon, Oil and Gas Products in Tanks or Otherwise, Leases and Leasehold Interests, Inventory, and Other Equipment Effective as of the Date of Filing of Petition.

**I. Procedural History**

51. On October 12, 2021, Staff filed a Notice and Application for Hearing ("NOH") and the Secretary docketed the matter under Docket No. 211000188.

52. On October 13, 2021, the Hearing Officer assigned to this matter issued the NOH and set the matter for a December 22, 2021 hearing before a Commission Hearing Officer.

53. On October 19, 2021, P3 received the NOAVs via Certified U.S. Mail.

54. On November 11, 2021, notice of this matter was published in the Daily Journal, a newspaper of general circulation printed and published in the City and County of Denver, in satisfaction of § 34-60-108(4), C.R.S.

55. On November 17, 2021, notice of this matter was published in the Brighton Standard Blade, a newspaper of general circulation printed and published in Adams County, in satisfaction of § 34-60-108(4), C.R.S.

56. On February 4, 2022, the Hearing Officer held a prehearing conference in response to a request by Staff for an Amended NOH. Following the prehearing conference, the Hearing Officer issued an Amended NOH to include notice for publication in Weld County.

57. On February 8, 2022, the Amended NOH in this matter was published in the Daily Journal, a newspaper of general circulation printed and published in the City and County of Denver, in satisfaction of § 34-60-108(4), C.R.S.

58. On February 9, 2022, the Amended NOH in this matter was published in the Greeley Tribune, a newspaper of general circulation printed and published in Weld County, in satisfaction of § 34-60-108(4), C.R.S.

59. On February 17, 2022, the Amended NOH in this matter was published in the Brighton Standard Blade, a newspaper of general circulation printed and published in Adams County, in satisfaction of § 34-60-108(4), C.R.S.

60. On March 1, 2022, Commission Staff filed a proposed Order Finding Violation in this matter.

61. On March 9, 2022, this matter came before the Commission for hearing on Staff's proposed Order Finding Violation.

**J. Violations and Penalty Determination**

62. Following a factual investigation and legal review of the violations alleged in the NOAV, the Commission finds that P3 has violated Commission Rules 210.b., 210.d., 309, 324A.a., 326.b., 603.f., and 605.d.

63. Notwithstanding Rule 525.b.(4)., given the ongoing Chapter 7 bankruptcy proceedings in Bankruptcy Case No. 21-33772, including the abandonment of oil and gas assets as detailed above, the insolvency of the Operator, and on advice of bankruptcy counsel at the Office of the Attorney General, the expenditure of State resources to calculate and assess a total penalty for the seven NOAVs in this matter is unwarranted

and futile. As noted above, there is no likelihood that the State of Colorado will recover any penalty amount from this operator, and the State's best interests are most expediently served by the prompt entry of this Order and transfer of the abandoned assets into the Orphaned Well Program.

**K. Jurisdiction**

64. The Commission has jurisdiction over the Parties and the subject matter of this proceeding, pursuant to §§ 34-60-101 *et seq.*, C.R.S. (the "Act"), and the Commission Rules, 2 C.C.R 404-1 (the "Rules").

65. Due notice of this proceeding has been given in all respects as required by the Act and the Rules.

**L. Conclusion**

66. The Commission has jurisdiction over the Parties and the subject matter of this proceeding, pursuant to §§ 34-60-101 *et seq.*, C.R.S. (the "Act"), and the Commission Rules, 2 C.C.R 404-1 (the "Rules").

67. Due notice of the time, place, and purpose of this proceeding has been given in all respects as required by the Oil and Gas Conservation Act and the Rules.

## ORDER

The Commission Orders That:

1. P3 is found in violation of Rules 210.b., 210.d., 309, 324A.a., 326.b., 603.f., and 605.d.

2. The Director is hereby required to take the following actions as soon as is practicable upon the e-mailing of this Order:

a. Suspend P3's Form 10s, Certificates of Clearance, for its wells, and withhold the issuance of any new drilling or oil and gas location permits;

b. Terminate P3's Operator Number (Operator No. 10677), rescind P3's Form 1 (Document No. 1346422), and revoke P3's right to conduct oil and gas operations in Colorado;

c. Foreclose P3's existing financial assurance (Surety ID Nos. 2018-0152, 2018-0153, and 2018-0154) and claim both the principal and any accrued, but undisbursed, interest that may exist and use those funds to remediate conditions that threaten to cause, or that actually cause, significant environmental impacts at non-federal and non-tribal wells and locations formerly operated by P3. To the extent Staff has already expended Oil and Gas Conservation and Environmental Response Funds at non-federal and

non-tribal wells and locations formerly operated by P3, foreclosed financial assurance can be used to repay those funds.

d. Require P3, and its successors or assigns, to comply with the Order and repay any funds expended by the Commission from the Oil and Gas Conservation and Environmental Response Fund for any work undertaken by COGCC Staff; and

e. Require any principal, majority owner, operational or general manager, or entity who otherwise controls Painted Pegasus Petroleum LLC to notify the Commission if (1) any of the above applies for a permit or submits a Form 9 for the Commission's approval, or (2) any of the above join an existing entity and becomes the principal, majority owner, operational or general manager, or otherwise controls that existing entity. Any of the above apply for a permit or submits a Form 9, the Director may not approve the request. The request must come before the Commission at a hearing, at which it may determine whether to grant the application, require a higher amount of financial assurance, or deny the application

3. The Commission authorizes, but does not require, the Director to take any or all of the following actions:

a. Declare P3's wells "Orphan Wells," as defined in the 100-Series Rules;

b. Use funds from the Oil and Gas Conservation and Environmental Response Fund to investigate, prevent, monitor, or mitigate conditions that threaten to cause, or that actually cause, significant adverse environmental impacts at non-federal and non-tribal wells and locations formerly operated by P3;

c. Claim all equipment, saleable product, and appurtenances related to P3's oil and gas operations at its wells as property of the Commission, provided that any proceeds from the disposition of the assets will be credited to the cost of plugging and abandonment of the Well(s) and/or the Oil and Gas Conservation and Environmental Response Fund; and

4. At the Director's request, P3 will assign equipment, saleable product, and appurtenances related to P3's oil and gas operations to the Commission or a third party to be determined by the Director.

5. In the event the Director determines, in the Director's discretion and consistent with the Director's independent determination of operational priorities, that there is a need to use the Commission's Emergency Response appropriation (Long Bill), which is funded by the Oil and Gas Conservation and Environmental Response Fund, to remediate conditions that threaten to cause, or that actually cause, significant environmental impacts at wells or locations formerly operated by P3, the Director will

confer with the Commission regarding expenditure of Emergency Response appropriation funds at the earliest practical opportunity.

6. The following will not affect P3's obligations under this OFV: (1) a change in ownership, corporate status, or partnership status; or (2) a conveyance of title or other interest relating to P3's oil and gas operations. P3 will give written notice of this Order to any purchaser, successor, or assignee prior to transferring ownership or title to its oil and gas operations. P3 will give written notice to the Director prior to any change in title, ownership, or status. If there are outstanding corrective actions at the time of a change in title or ownership, P3's successors or assigns will be responsible for completing those corrective actions at P3's former oil and gas locations.

7. Upon the Director's notice of a claim as described above, P3 will not remove, transfer, or dispose of any equipment, saleable product, or appurtenances related to its oil and gas operations, unless permission is granted by the Director.

8. This Order is effective as of the date it is emailed by the Commission. It constitutes final agency action for purposes of judicial review.

9. The Commission expressly reserves its right after notice and hearing, to alter, amend, or repeal any and/or all of the above orders.

==============================================================

ENTERED this 10th day of March, 2022 as of the 9th day of March, 2022.

OIL AND GAS CONSERVATION COMMISSION
OF THE STATE OF COLORADO

By ______________________________
Mimi C. Larsen, Commission Secretary

CERTIFICATE OF MAILING

On the below described date, a true and accurate copy of Commission Order 1V-780 was uploaded into the Commission's eFiling system and emailed to the following:

Painted Pegasus Petroleum, LLC
Attn: Keith Hubbard
16820 Barker Springs Road, #521
Houston, TX 77084
khubbard@p3petro.com

Steven J. Kirschner
Colorado Oil and Gas Conservation Commission
1120 Lincoln Street, Suite 801
Denver, CO 80203
steven.kirschner@state.co.us

Margaret Humecki
2022.03.10 10:45:17 -07'00'

Margaret Humecki

# Exhibit 2

BEFORE THE OIL AND GAS CONSERVATION COMMISSION
OF THE STATE OF COLORADO

| | | |
|---|---|---|
| IN THE MATTER OF ALLEGED VIOLATIONS OF THE RULES AND REGULATIONS OF THE COLORADO OIL AND GAS CONSERVATION COMMISSION BY **PAINTED PEGASUS PETROLEUM LLC**, ADAMS COUNTY, COLORADO | ) ) ) ) ) | CAUSE NO. 1V<br><br>DOCKET NO. 211000188<br><br>TYPE: ENFORCEMENT |

NOTICE AND APPLICATION FOR HEARING

TO ALL INTERESTED PARTIES AND TO WHOM IT MAY CONCERN:

Pursuant to Rule 523.d, the Colorado Oil and Gas Conservation Commission ("Commission" or "COGCC") Staff hereby applies to the Commission for an Order Finding Violation ("OFV") against **Painted Pegasus Petroleum LLC** (Operator No. 10711) ("Painted Pegasus Petroleum"). The Commission has scheduled this matter for hearing before a COGCC Hearing Officer at the date, time, and location stated below. This Notice and Application is being served to adjudicate the allegations made in the below-described Notices of Alleged Violation ("NOAV"), the allegations of which are incorporated herein:

1. NOAV No. 402418481, issued to Painted Pegasus Petroleum on June 12, 2020;
2. NOAV No. 402483488, issued to Painted Pegasus Petroleum on September 8, 2020;
3. NOAV No. 402523851, issued to Painted Pegasus Petroleum on November 2, 2020;
4. NOAV No. 402603355, issued to Painted Pegasus Petroleum on February 18, 2021;
5. NOAV No. 402603404, issued to Painted Pegasus Petroleum on February 18, 2021;
6. NOAV No. 402603418, issued to Painted Pegasus Petroleum on February 18, 2021;
7. NOAV No. 402603548, issued to Painted Pegasus Petroleum on February 18, 2021; and
8. NOAV No. 402608780, issued to Painted Pegasus Petroleum on February 18, 2021.

Staff requests that the Commission: (1) find that Painted Pegasus Petroleum is in violation of the Rules cited in the NOAVs above; (2) order Painted Pegasus Petroleum to return to compliance; (3) assess a penalty pursuant to Rule 525; (4) impose other necessary and appropriate relief as authorized by law; and (5) require the Director to take the following actions, if Painted Pegasus Petroleum fails to pay the penalty and/or return to compliance within 35 days of the mailing of the Order:

a. Suspend Painted Pegasus Petroleum's Forms 10, Certificates of Clearance, for Painted Pegasus Petroleum's well(s), and withhold the issuance of any new drilling or oil and gas location permits, unless and until Painted Pegasus Petroleum demonstrates to the satisfaction of the Director that it has brought all violations cited in this matter into compliance and that any penalty assessed has been paid;

b. Terminate Painted Pegasus Petroleum's Operator Number (Operator No. 10711), rescind Painted Pegasus Petroleum's Form 1 (Doc. No. 1347416), and revoke Painted Pegasus Petroleum's right to conduct oil and gas operations in Colorado, until Painted Pegasus Petroleum demonstrates at a hearing conducted pursuant to Rule 503.c. that Painted Pegasus Petroleum has brought all violations cited in this matter into compliance, any penalty assessed has been paid, and that re-instating Painted Pegasus Petroleum's Form 1 will not threaten to or actually create adverse impacts to public welfare or the environment;

c. Foreclose Painted Pegasus Petroleum's existing financial assurance (Surety ID Nos. 2018-0152, 2018-0153, and 2018-0154) and claim both the principal and any accrued, but undisbursed, interest that may exist and use those funds to remediate conditions that threaten to cause, or that actually cause, significant environmental impacts at non-federal and non-tribal wells and locations formerly operated by Painted Pegasus Petroleum. To the extent Staff has already expended Oil and Gas Conservation and Environmental Response Funds at non-federal and non-tribal wells and locations formerly operated by Painted Pegasus Petroleum, foreclosed financial assurance can be used to repay those funds; and

d. Require Painted Pegasus Petroleum, and its successors or assigns, to comply with a final Order in this matter and repay any funds expended by the Commission from the Oil and Gas Conservation and Environmental Response Fund for any work undertaken by COGCC Staff.

The Commission authorize, but not require, the Director to take any or all the following actions, if Painted Pegasus Petroleum fails to pay the penalty and/or return to compliance within 35 days of the mailing of a final Order in this matter:

a. Declare Painted Pegasus Petroleum's wells "Orphaned Wells", as defined in the 100-Series Rules;

b. Use funds from the Oil and Gas Conservation and Environmental Response Fund to investigate, prevent, monitor, or mitigate conditions that threaten to cause, or that actually cause, significant adverse environmental impacts at non-federal and non-tribal wells and locations formerly operated by Painted Pegasus Petroleum;

c. Claim all equipment, saleable product, and appurtenances related to Painted Pegasus Petroleum's oil and gas operations at its wells as property of the Commission, provided that any proceeds from the disposition of the assets will be credited to the cost of plugging and abandonment of the Well and/or the Oil and Gas Conservation and Environmental Response Fund; and

d. At the Director's request, Painted Pegasus Petroleum will assign equipment, saleable product, and appurtenances related to Painted Pegasus Petroleum's oil and gas operations to the Commission or a third party to be determined by the Director.

In the event the Director determines, in the Director's discretion and consistent with the Director's independent determination of operational priorities, that there is a need to use the Commission's Emergency Response appropriation (Long Bill), which is funded by the Oil and Gas Conservation and Environmental Response Fund, to remediate conditions that threaten to cause, or that actually cause, significant environmental impacts at wells or locations formerly operated by Painted Pegasus Petroleum, the Director will confer with the Commission regarding expenditure of Emergency Response appropriation funds at the earliest practical opportunity.

NOTICE IS HEREBY GIVEN, pursuant to: 1) the general jurisdiction of the Oil and Gas Conservation Commission of the State of Colorado under § 34-60-105, C.R.S.; 2) specific powers granted pursuant to § 34-60-106, C.R.S.; 3) the Colorado Administrative Procedures Act at § 24-4-105, C.R.S.; and 4) the Commission's Series 500 Rules at 2 C.C.R. 404-1, that the Commission has scheduled this matter for hearing before a COGCC Hearing Officer at the following date, time, and location (subject to change):

Date: December 22, 2021

Time: 9:00 a.m.

Place: Colorado Oil & Gas Conservation Commission
1120 Lincoln Street, Suite 801
Denver, CO 80203

At the hearing, the Commission Hearing Officer will enter appropriate orders to protect public health, safety, and welfare, including the environment and wildlife resources, and to carry out the purposes of the Act and Commission rules, orders, or permits.

**DEADLINE FOR AFFECTED PERSONS TO PETITION: November 22, 2021**

Any Affected Person who wishes to participate formally as a party must file a written petition with the Commission no later than the deadline provided above. The above-named Operator is considered a party to this matter, and therefore is not required to file a petition. Please see Commission Rules 507, 509, and 510 at https://cogcc.state.co.us, under "Regulation," then select "Rules." Please note that, under Commission Rule 510.I, the deadline for Affected Persons to participate is not necessarily continued even if the hearing is continued beyond the date that is stated above.

Any Affected Person wishing to file a petition must register with the COGCC's eFiling system online at https://oitco.hylandcloud.com/DNRCOGExternalAccess/Account/Login.aspx, and select "Request Access to Site." Additional guidance regarding the registration and use of the eFiling system is available online in the Commission's "eFiling Users Guidance Book" at https://cogcc.state.co.us/documents/reg/Hearings/External_Efiling_System_Users_Guidebook_20201109.pdf.

Anyone who files such a petition must be able to participate in a prehearing conference during the week of **November 22, 2021**, if a prehearing conference is requested by Staff, the Operator, or by any person who has filed a petition.

Additional information regarding this matter can be found on our "Hearing eFiling System Document Search" page at https://oitco.hylandcloud.com/DNRCOGPublicAccess/index.html. Select "Search for Docket Related Documents" from the pull-down menu, use the above "Docket Number," and select "Search."

Please contact Margaret Humecki at Cogcc.Hearings_Unit@state.co.us prior to the hearing if any party requires special accommodations as a result of a disability. Special accommodations will be provided in accordance with the Americans with Disabilities Act.

OIL AND GAS CONSERVATION COMMISSION
OF THE STATE OF COLORADO

By________________________________
Mimi C. Larsen, Commission Secretary

Dated: October 13, 2021

Colorado Oil and Gas Conservation Commission
1120 Lincoln Street, Suite 801
Denver, Colorado 80203
Website: https://cogcc.state.co.us
Phone: (303) 894-2100
Fax: (303) 894-2109

Exhibit 3

# STATE OF COLORADO

**OFFICE OF THE GOVERNOR**
136 State Capitol
Denver, Colorado 80203
Phone (303) 866-2471
Fax (303) 866-2003

John W. Hickenlooper
Governor

## D 2018-012

### EXECUTIVE ORDER

### Directing the Colorado Oil and Gas Conservation Commission to Act to Plug, Remediate, and Reclaim Orphaned Oil and Gas Wells and Sites

Pursuant to the authority vested in the Governor of the State of Colorado and, in particular, Article IV, Section 2 of the Colorado Constitution, I, John W. Hickenlooper, Governor of the State of Colorado, hereby issue this Executive Order to expand existing efforts to plug, remediate, and reclaim existing orphaned oil and gas wells and sites, and to prevent additional wells and sites from being orphaned in the future.

I. Background, Need, and Purpose

The State of Colorado oversees numerous orphaned oil and gas wells and sites for which no owner, operator, or responsible party presently exists or can be identified, or where such owner, operator, or responsible party is unwilling or unable to conduct plugging, remediation, or reclamation. The Colorado Oil and Gas Conservation Commission ("Commission") is currently tracking 262 orphaned wells that require plugging and 373 associated orphaned sites that require remediation and/or reclamation. The Commission estimates that the total cost to plug, remediate, and reclaim these orphaned wells and sites is over $25 million.

The number of oil and gas operators that have filed for bankruptcy or do not have the funds to operate in compliance with the law continues to increase. These and other operators have and will continue to add new orphaned wells and sites to the existing orphaned wells and sites. In addition, hundreds of undiscovered orphaned wells are located in historic oil and gas fields around the State, such as the Florence and Rangely fields.

On a per-well basis, Commission data show the average cost to plug an orphaned well is six times greater than the amount of financial assurance held by the State. If costs to remediate environmental impacts and reclaim an orphaned site are included, the average actual costs exceed available financial assurance by a factor of fourteen. The Commission currently lacks the resources necessary to cover this deficit in financial assurance and to plug, remediate, and reclaim known orphaned wells and sites and orphaned wells and sites that will be identified in the future. As a result, the State's number of orphaned wells and sites is steadily increasing, and will continue to do so under the current system of financial assurance.

A more coordinated effort, in collaboration and cooperation with industry and advocacy partners, to plug, remediate, and reclaim orphaned wells and sites, and prevent future orphaned wells and sites, will improve the environment, public health, and safety of Coloradans.

II. Definitions

"Orphaned Well" means a well for which no Owner or Operator can be found, or where such Owner or Operator is unwilling or unable to plug and abandon such well.

"Orphaned Site" means a site, where a significant adverse environmental impact may be or has been caused by oil and gas operations for which no responsible party can be found, or where such responsible party is unwilling or unable to mitigate such impact.

"Operator" means any person who exercises the right to control the conduct of oil and gas operations.

"Owner" means the person who has the right to drill into and produce from a pool and to appropriate the oil or gas produced therefrom either for such owner or others or for such owner and others, including owners of a well capable of producing oil or gas, or both.

III. Declaration and Directives

A. I hereby declare that it shall be the goal of the State of Colorado to achieve the following:

1. A reduction in the number of medium- and high-priority Orphaned Wells and Orphaned Sites in the State to zero;

2. Engagement of the oil and gas industry in the plugging, remediation, and reclamation of Orphaned Wells and Orphaned Sites; and

3. A system of financial assurance that prevents future Orphaned Wells and Orphaned Sites by providing sufficient funding for plugging, remediation, and reclamation activities.

B. The Commission shall update its comprehensive list of all Orphaned Wells and Orphaned Sites known to exist on August 1, 2018 and shall update the list on July 1 in each subsequent year. The Commission shall prioritize the list of Orphaned Wells and Orphaned Sites into low-, medium-, and high-priority categories based on risk factors, including but not limited to population density, environmental impacts, history of spills or releases, and testing history.

C. The Commission shall use its best efforts to plug, remediate, and reclaim Orphaned Wells and Orphaned Sites, including the removal of equipment, and to reduce the number of medium - and high-priority Orphaned Wells and Orphaned Sites, as developed pursuant to Section III.B., to zero by July 1, 2023.

D. The Commission shall endeavor to plug, remediate, and reclaim any new medium- or high-priority Orphaned Well or Orphaned Site added to the

comprehensive list of Orphaned Wells and Orphaned Sites developed pursuant to Section III.B. within two years of its addition to the list.

E. The Commission shall annually report progress on plugging, remediation, and reclamation of Orphaned Wells and Orphaned Sites, including the existing list by September 1 of each year. The report shall be made available to the public, and presented to the Governor and General Assembly committees of reference with oversight authority over the Commission.

F. In accordance with increased spending authority of $5 million as enacted by the General Assembly in Senate Bill 18-1322, the Commission shall adjust the charge authorized under C.R.S. § 34-60-122(1)(a), as necessary, in an amount determined by the Commission to fully conduct plugging, remediation, and reclamation of all medium- and high-priority Orphaned Wells and Orphaned Sites by July 1, 2023.

G. By September 1, 2019, the Commission shall promulgate rules to ensure the sufficiency of financial assurance, including funding plugging, remediation, and reclamation activities for future Orphaned Wells and Orphaned Sites. The Commission shall establish a technical working group to review existing financial assurance requirements and report to the Governor on recommended changes by December 1, 2018.

H. By January 1, 2019, the Commission shall issue guidance regarding the process for Operators to access Orphaned Wells and Orphaned Sites to conduct voluntary plugging, remediation, and/or reclamation activities. This guidance shall include a process for the reimbursement of costs incurred by operators conducting such activities approved by the Commission, including earning a credit against the mill levy as provided for in C.R.S. § 34-60-124(1)(c).

IV. Duration

This Executive Order shall remain in effect until modified or rescinded by a future Executive Order of the Governor.

GIVEN under my hand and the Executive Seal of the State of Colorado, this 18th day of July, 2018.

John W. Hickenlooper
Governor

Exhibit 4



COLORADO
Oil & Gas Conservation Commission
Department of Natural Resources

# Executive Order D 2018-12

# Financial Assurance Technical Working Group

## Final Report

## December 1, 2018

## Table of Contents

A. Introduction .......... 3
B. Summary of Key Recommendations .......... 3
I. Increase Bonding and Clarify Definitions for Inactive Wells .......... 3
II. Develop a Risk Model for use in Form 10 Transfer Analysis .......... 4
III. Create a Plugging, Remediation, and Reclamation Fund .......... 4
IV. Consider Increases to Existing Bond Amounts .......... 5
C. Existing Financial Assurance Rules and Challenges .......... 5
D. Technical Working Group Discussion Topics .......... 7
I. Risk-Based Models .......... 7
II. Change of Operator / Form 10 Process .......... 8
III. Per-well and Blanket Bonding Amounts .......... 9
IV. Sinking Funds .......... 10
V. Bonding for Other Aspects of Production .......... 10
VI. “Inactive Well” and other Definitions .......... 11
VII. Pooled Bonding .......... 12
VIII. Other Alternatives to Bonding .......... 13
IX. Other Considerations .......... 14
E. Appendix: List of Technical Working Group Participants .......... 15

## A. Introduction

Governor Hickenlooper signed Executive Order D 2018-12 on July 18, 2018 to improve the environment, public health, and safety of Coloradans by directing the Colorado Oil and Gas Conservation Commission ("COGCC") to plug, remediate, and reclaim orphaned wells and sites and prevent future orphaned wells and sites.[1] The Executive Order requires COGCC to establish a technical working group to review financial assurance requirements and report to the Governor on recommended changes by December 1, 2018. COGCC is then required to promulgate rules by September 1, 2019 to ensure the sufficiency of financial assurance, including funding plugging, remediation, and reclamation activities for future orphaned wells and sites.

The Financial Assurance Technical Working Group ("Working Group") was composed of members with significant experience with Colorado's financial assurance rules and processes, including representatives from local, state, and federal government agencies, the environmental community, the oil and gas industry, and private citizens (*See* Appendix). The Working Group met four times during the fall of 2018 with COGCC and DNR staff to review Colorado financial assurance requirements, best practices in other states, and proposals for modernizing Colorado's financial assurance rules. COGCC gathered information during these meetings for the purpose of developing recommendations for revisions to Colorado's financial assurance rules. Working group members had an opportunity to review and comment on the draft recommendations prior to finalization.

## B. Summary of Key Recommendations

Taking into account the Working Group's discussions, COGCC recommends that the following steps be considered in a financial assurance rulemaking in 2019. This rulemaking will ensure that sufficient resources are available to conduct remediation and reclamation activities and address orphaned wells and associated oil and gas facilities, both current and future, in the state of Colorado. COGCC will continue to engage Working Group members to further develop these recommendations prior to the rulemaking.

While the implementation costs of these measures were not evaluated, it is important to note that all will require additional state resources, including increased staffing. Action on these recommendations should also take into account Colorado's strong efforts, compared to other states, to minimize the number of wells that are orphaned. The Commission should also consider the possibility that additional financial assurance requirements for smaller, undercapitalized operators could increase the number of orphaned wells in the short term.

### I. Increase Bonding and Clarify Definitions for Inactive Wells

Inactive well bonding drives Colorado's financial assurance system and accounts for the vast majority of all financial assurance for oil and gas wells in the state. COGCC should consider increasing bonding amounts for excess inactive wells above current $10,000/$20,000 levels. The threshold for what constitutes excess inactive wells under Rule 707 should also be lowered, which would require an increase in the amount an operator's total financial assurance is divided by (likely mirroring increases to the $10,000/$20,000 bonding amounts) when calculating the number of excess inactive wells that require additional financial

[1] Executive Order D 2018-12, available at https://www.colorado.gov/governor/2018-executive-orders.

assurance. These actions will incentivize operators to reduce the number of wells they maintain in inactive status.

In addition, the Commission should clarify the definition of an “inactive well,” including how it relates to other well status definitions such as “shut-in” and “temporarily abandoned,” and clean up related definitions to prohibit efforts to avoid inactive status though activities such as swabbing and selling past production from a tank.

## II. Develop a Risk Model for use in Form 10 Transfer Analysis

The Form 10 process presents a clear opportunity for COGCC to review the sufficiency of financial assurance for a specific group of wells, especially adherence to inactive well bonding requirements. In addition to this sufficiency review, COGCC should develop a simple, multi-factor model that identifies assets with high estimated remediation and reclamation costs that could outstrip a new operator’s resources and available financial assurance. The model could be made available to operators for use in their due diligence process as well. Higher levels of risk related to inactive wells, inactive equipment, remediation, or reclamation needs could result in additional mandatory bonding at the time of transfer. However, the Commission should take care not to involve COGCC in an assessment of the viability of an operator’s business plan, as the agency lacks the expertise to undertake such analysis.

## III. Create a Plugging, Remediation, and Reclamation Fund

Increased bond amounts present a financial challenge for smaller operators that must pay cash or provide 100% collateral for their bonds. COGCC should explore alternatives for smaller operators such as the creation of a plugging, remediation, and reclamation fund. Fines and penalty revenue in the Environmental Response Account (“ERA”) and some Oil and Gas Conservation Mill Levy (“Mill Levy”) funds are already supporting the orphaned wells program, and the Commission has existing authority to implement permit fees up to $200 per application.

The Commission could also request authority from the legislature to charge higher application fees (for example, BLM charges $10,050 per application[2]) or to impose a per-well fee or a per-location fee (for sites without wells) at the time of transfer to a new operator. A portion of any new revenue could stay with the well or location to ensure that funds are available for plugging in the future, and these dollars could be supplemented by a sinking fund or other mechanism to generate additional well-specific or location-specific funds. Some proceeds could also be used by COGCC to address future orphaned wells.

As an alternative to per-well or per-location funds, COGCC should explore the concept of a pooled fund like the Petroleum Storage Tank Fund (“PSTF”). Similar to the PSTF, fees could be raised or lowered depending on the balance of the fund and could be suspended when the fund reaches a maximum allowable amount. The fund would reimburse operators for all or a portion of work related to plugging wells, reclamation, and remediation, after payment of a deductible, as long as the operator is in compliance with COGCC rules and regulations.

[2] BLM Instruction Memorandum 2019-001, available at https://www.blm.gov/policy/im-2019-001.

### IV. Consider Increases to Existing Bond Amounts

The Commission should consider increases to per-well and blanket bonding amounts and the creation of more tiers of blanket bonding, as the existing two-tiered structure allows many operators with hundreds, and sometimes thousands, of wells to maintain less than $1,000 of financial assurance per well. Existing $10,000/$20,000 per-well bonding amounts should be raised to correspond with increases to excess inactive well bonding amounts. However, the Commission should refrain from increasing blanket bonding amounts significantly because most companies already maintain excess inactive well bonding that dwarfs blanket bonding amounts. Future increases in bonding amounts should also be scheduled on a regular basis to take into account inflation, though annual increases should be avoided as there are significant transaction costs associated with procuring new bonds.

Additional bonding should also be considered for new sites that will require significant reclamation, such as those with long roads and steep slopes. And blanket and individual bonding or increases to existing bonding levels should be considered for surface owner protection (especially when bonding on to a surface location), underground injection control wells or facilities, and facilities with no wells such as remote tank battery facilities. COGCC should also consider hiring additional staff to assist with bond release requests and related inspections.

Finally, COGCC should conduct financial assurance audits of large operators and a percentage of medium and small operators each year. The agency should also redouble its efforts to provide data about financial assurance, orphaned wells, remediation, and reclamation efforts to the public through its website and in its annual reporting.

## C. Existing Financial Assurance Rules and Challenges

C.R.S. § 34-60-106(13) requires oil and gas operators to provide financial assurance to COGCC to demonstrate that they can meet their obligations under the agency's rules. As defined in statute, financial assurance can take the form of a guarantee of performance, certificate of general liability insurance, bond or other surety instrument, letter of credit, certificate of deposit, or other financial instrument, escrow account or sinking fund, or lien or other security interest in real or other property. As reported by COGCC, the vast majority of financial assurance instruments are bonds or other surety instruments, with some operators using certificates of deposit or cash bonds. This is likely because Rule 702 expresses a preference for surety bonds and requires all other instruments to obtain approval by the Commission.

Financial assurance requirements and procedures are set out in COGCC's 700-Series Rules.[3] COGCC claims a bond when an operator fails to perform statutory and regulatory obligations, and releases a bond when an operator has complied with all such obligations. The amount of financial assurance and purpose of different types of bonds within the Commission's jurisdiction are outlined in the table below.

[3] COGCC 700 Series Rules, available at https://cogcc.state.co.us/documents/reg/Rules/LATEST/700Series.pdf.

### *Table 1: COGCC 700 Series Financial Assurance Rules Overview*

| | |
|---|---|
| Rule 703: Surface Bond | - Provides a monetary award to a surface owner who neither owns the minerals nor has a surface use agreement with the operator for unreasonable crop loss or land damage that cannot be remediated.<br>- Requires a $2,000 (non-irrigated) or $5,000 (irrigated) individual bond by well or a $25,000 state-wide blanket bond. |
| Rule 704: E&P waste man. facilities bond | - Bonding must equal the total estimated cost to properly reclaim, close, and abandon a facility, including those on federal land. |
| Rule 705: Seismic operations bond | - Provides for plugging of shot holes and surface reclamation.<br>- Requires a $25,000 state-wide blanket bond. |
| Rule 706: Plugging Bond | - Provides for protection of the soil, proper plugging and abandonment of the well, and reclamation of the site.<br>- Requires a $10,000 individual bond for a well less than 3,000 feet in total measured depth or $20,000 if equal to or more than 3,000 feet in total measured depth.<br>- Alternatively, requires a $60,000 state-wide blanket bond for less than 100 wells or $100,000 for 100 wells or more. |
| Rule 707: Inactive Wells Bond | - Provides additional financial assurance for excess inactive wells.<br>- Requires a $10,000 bond for each excess inactive well less than 3,000 feet in total measured depth or $20,000 if equal to or more than 3,000 feet in total measured depth.<br>- Requirements can be modified or waived if the Commission approves a plan for returning wells to production in a timely manner or for plugging wells on an acceptable schedule. |
| Rule 711: Natural gas Gathering, Processing, or Underground Storage Facilities Bond | - Ensures compliance with rules pertaining to methods of E&P waste management, procedures for spill/release response and reporting, and sampling and analysis for remediation activities.<br>- Was revised in 2018 to include produced water transfer systems.<br>- Requires a $50,000 statewide blanket bond or $5,000 individual bond for small gas gathering systems or processing less than 5 MMSCFD or 700 barrels of water per day. |
| Rule 712: Bond for Facilities/Structures Associated with Class II UIC wells | - Ensures compliance with rules pertaining to methods of E&P waste management, procedures for spill/release response and reporting, and sampling and analysis for remediation activities.<br>- Requires a $50,000 bond for each facility. |

Rule 702 also allows the Director to petition the Commission for an increase in any individual or blanket financial assurance when there is reasonable cause to believe that the Commission may become burdened with the costs of fulfilling the statutory obligations. In addition, Rule 708 requires all operators to maintain general liability insurance of $1,000,000 per occurrence to cover property damage and bodily injury to third parties. Oil and gas operations on federal or tribal lands and on State Trust lands are generally covered by separate bonds.

As a supplement to these financial assurance mechanisms, the COGCC has an emergency response fund of $750,000 annually to address environmental needs. In 2018, the Colorado General Assembly also increased COGCC's spending authority for plugging and reclaiming abandoned wells ("PROW") from $445,000 to $5 million to address the state's backlog of orphaned wells and sites. The revenue that allows COGCC to utilize this spending authority is currently generated from the Mill Levy and, to a lesser extent, from fines and penalties.

COGCC uses any available financial assurance for a particular orphan well or site prior to using funds from the PROW appropriation. Financial assurance, if available, can offset some of the costs for plugging, remediating, and reclaiming orphaned sites. However, financial assurance is often insufficient to complete all necessary work. COGCC estimates that it costs an average of $82,500[4] to plug, reclaim and remediate a single-well orphaned location. In comparison, the average amount of financial assurance available from bond claims for orphan well work done from 2010 through September 2018 was $8,088 per site. This drops to $4,218 per site when taking into account sites with no financial assurance or that did not increase bonding to comply with the 2008 rulemaking.

## D. Technical Working Group Discussion Topics

The Working Group met four times to discuss potential changes to COGCC's financial assurance rules and processes. An introductory presentation was provided for each discussion topic. This was followed by an open discussion about the challenges and advantages of that particular approach. The following is a summary of the Working Group's discussions.

### I. Risk-Based Models

The Working Group discussed the possibility of developing a risk-based model to determine when operators would be required to increase financial assurance. Case studies of orphaned well projects for Benchmark Energy and Red Mesa Holdings were presented to illustrate specific indicators that could be used to assess the risk of a site becoming orphaned. While inactive well bonding increased over time, it was still insufficient to cover all plugging, waste removal, and equipment removal costs at these sites. In addition, the operator history in both case studies illustrated a pattern of transfers from larger, well-capitalized operators to those with fewer financial resources as production from the wells tapered off.

Current rules contain some consideration of risk through excess inactive well bonding and higher bonding amounts for deeper wells, however a more robust model could be established that takes into account the age of the well, type of well, production curve, testing history, remediation and reclamation liability (tanks, pits, etc.), spill history, and other potential liabilities. Additional bonding or other financial assurance could be required for a well or group of wells as risk increases or at the time of transfer to another operator.

[4] Operators in the Working Group generally agreed that $82,500 was a reasonable estimate for the cost of plugging, reclaiming, and remediating a one-well site, though some stated that their costs were substantially less than COGCC's and varied considerably based on geographic location. Removal of equipment, pits, long roads and other intensive reclamation, and remediation of historic spills are some key cost drivers in orphaned wells projects.

**Challenges**

- Large/complex risk model for individual wells would take considerable staff time to develop and keep up-to-date.
- Risk model does not work if COGCC does not have correct information from operators.
- Delaying an increase in financial assurance until later in the life of the well misses the opportunity to generate sufficient plugging funds when the well is most productive.

**Advantages**

- Catches declining wells before they are at risk of becoming orphaned.
- Simple, publicly-available risk model would also be helpful for operator due diligence.

## II. Change of Operator / Form 10 Process

The change of operator or "Form 10" process was identified as a key point when wells/operators could be assessed and additional financial assurance could potentially be required. COGCC currently reviews Form 10s to determine that both the buyer and seller are in compliance with Rule 707, including reviewing the buyer for proper bonding to accommodate any inactive wells to be transferred by the seller. COGCC also reviews each line item listed on the Form 10 to ensure that all related liability, such as active pits, spills, and tank batteries, are addressed and/or transferred. Active Remediation projects need to be closed out by the current operator or transferred by the new operator with a supplemental Form 27. Enforcement matters that are open or unresolved may also halt the Form 10 approval process (e.g., Notice of Alleged Violation, Administrative Orders, warning letters).

The group discussed the possibility of additional review through the Form 10 process, noting that the time of transfer was a reasonable point to reassess the viability of a well, a group of wells, or other oil and gas facilities. Some group members also suggested the need for COGCC to obtain additional information about the financial health of the operators involved in the transaction, such as financial statements. The group also acknowledged that the Form 10 process would be an appropriate time to add additional bonding requirements or to implement a risk model.

**Challenges**

- COGCC does not currently have access to information about the financial health of operators and lacks the resources to assess the viability of operator business strategies.
- Operators often sign agreements to transfer assets before submitting a Form 10.

**Advantages**

- Could be combined with other strategies like increased bonding or a risk model to prevent larger operators from selling off plugging and abandonment liabilities.

## III. Per-well and Blanket Bonding Amounts

Three Working Group participants offered to provide their companies' perspectives of the existing financial assurance system. A smaller operator with just over 100 wells expressed the concern that most private companies have trouble getting bonds without providing substantial collateral. For example, to meet the blanket bond requirement of $100,000 of financial assurance, the operator delivered a $30,000 bond that was procured in 1984 at a premium cost of $250 per year and a $70,000 cash CD. The smaller operator considers that $70,000 to be stranded capital.

A medium-sized operator with over $1 billion in market capitalization was able to obtain surety bonds at a premium of around 2% per year. That operator holds roughly $2 million in bonds to comply with various local, state, and federal requirements. Finally, a representative from a large operator with thousands of wells in Colorado stated that the operator paid $65,000 in premiums each year to obtain $44 million in bonding, a premium of less than 1%.

As of October 2018, COGCC records show $131.8 million in total bonds/financial assurance for 43,474 wells held by 333 operators. 90 operators posted bonds of at least $100,000 (the blanket bond amount for 100 wells or more), with the three most heavily-bonded operators posting total bonds of $44.1 million, $32.5 million, and $4.6 million, respectively. Financial assurance per well ranged from $107 for one larger operator with 935 wells to $100,000 each for two one-well operators. The average financial assurance per well was $3,031.

The Working Group generally agreed that bonding amounts should be reevaluated to ensure that future orphaned wells are addressed. While increases are likely justified if the current tiered system of financial assurance is retained, an analysis of October 2018 financial assurance data shows that doubling the blanket bond amount for 100 plus wells to $200,000 would impact only 14 operators and result in $1,285,000 in additional financial assurance. Even an increase in the 100-plus-well blanket bond to $500,000 would impact only 21 companies and result in $6.7 million in additional financial assurance. This is because total bonding amounts in the state are driven by inactive well bonding, not blanket bonding. Of the 42 operators with 100 plus wells, most have bonds much greater than $100,000.

The group also discussed operator challenges with bond release requests. Every well that has a status of plugged and abandoned, dry and abandoned, or abandoned location is required to pass a final reclamation inspection to have a bond or other financial assurance instrument released. COGCC estimates that there are approximately 1,986 wells encompassing $9.66 million in financial assurance with pending formal bond release requests. COGCC currently has limited staffing to process release requests, so the agency prioritizes requests with completed Form 4s and those with six or fewer wells requiring inspections.

The group had no specific recommendations regarding the per-well and blanket bonding increase that is warranted, preferring to leave that question to rulemaking because any other changes to the financial assurance system could reduce the need to increase bonding.

**Challenges**

- Surety bonds are inefficient for smaller operators as they require 100% collateral and strand capital that could be used for other business purposes.
- Increases to blanket bond amounts have little impact on the total amount of financial assurance held by the state.
- COGCC has limited staffing to process bond release requests.

**Advantages**

- Surety bonds are an efficient form of financial assurance for larger operators.
- Surety bonds are usually easy for COGCC to collect and thus provide certainty that the amount of the bond will be available if needed.

## IV. Sinking Funds

A sinking fund is an alternative form of financial assurance that was suggested by a number of operators. The concept is that an operator would put regular payments into a fund from the proceeds of production, instead of obtaining a bond and stranding capital up-front. This mechanism could work with single wells or a sinking fund could apply to all of an operator's wells. The fund would stay with the well or group of wells in the event of a transfer to another operator. Sinking funds are currently allowed in statute, but it is the perception of some operators that the Commission would not allow this method of financial assurance.

**Challenges**

- Development of sinking fund formula could be challenging because too low of a contribution would leave little funds for plugging and too high of a contribution would strand capital for the life of the well.
- Oversight of sinking funds for numerous wells/operators would require significant additional COGCC staffing.

**Advantages**

- Would address the problem of transferring plugging liability because the sinking fund would be tied to a well.
- An aggressive sinking fund formula could front-load payments to provide significant resources for plugging and reclamation during a well's most productive years.

## V. Bonding for Other Aspects of Production

During its third meeting, the Working Group reviewed the main cost drivers for orphaned well projects. Through these discussions, it became clear that high-cost sites usually exhibit similar attributes, such as age of the wells and equipment, challenging pits, steep slopes, long access roads, water issues, extensive tank batteries or flowlines, and a history of spills. As a result, the group considered whether increased scrutiny should be required for sites that exhibit these specific high-risk attributes.

Industry representatives expressed a concern that high reclamation costs for existing orphaned wells were the result of applying modern reclamation requirements to older wells. However, COGCC noted that the agency has a variance process to help address reclamation challenges, and the Commission must comply with its own reclamation rules when addressing orphaned wells and sites. Some participants also noted that more stringent regulatory standards in recent years will minimize plugging and reclamation costs for modern wells and that horizontal drilling concentrates surface impacts so reclamation costs should be smaller. However, it was pointed out that the liability associated with plugging, reclaiming, and remediating a modern multi-well pad is unknown because one has yet to be orphaned.

**Challenges**

- Establishing separate bonding for other aspects of a site would make the financial assurance system more complicated and could be difficult to administer.

**Advantages**

- Would increase funds available for sites with high reclamation and remediation costs.

## VI. "Inactive Well" and other Definitions

The Working Group reviewed numerous overlapping definitions in regulation and statute related to the state's financial assurance system. There is no definition of "idle well" in Colorado, and many states have different definitions for the term. However, COGCC's 100 Series Rules define an "inactive well" as "any shut-in well from which: no production has been sold for a period of twelve (12) consecutive months; any well which has been temporarily abandoned for a period of six (6) consecutive months; or, any injection well which has not been utilized for a period of twelve (12) consecutive months. The 100 Series also distinguish between a "shut-in well," which could resume production quickly by opening valves and turning on equipment, and a "temporarily abandoned well," which lacks functioning surface equipment or is blocked with downhole plugs, requiring more extensive work to resume production.

Members of the Working Group pointed out that some operators maintain "active" status for wells by selling past production from leasehold tank inventory or by "swabbing" the well to extract and sell a small amount of fluid product each year. Produced water "production" can also currently keep a well "active." While COGCC's production group looks for data that could indicate the use of these techniques, many marginal wells do not receive additional scrutiny. The Working Group discussed the possibility of addressing these issues by revising the definition of "inactive well" to sync with the definition of "stripper well" in statute, and potentially adding new definitions or changing existing definition for a "low flow well," "suspended operations well," and "waiting on completion" well. These new classifications of wells would then be scrutinized during the Form 10 process and perhaps at other times.

**Challenges**

- Over 70% of wells in Colorado are classified as "stripper wells" in statute, so additional scrutiny of that category of well could require significant new COGCC staffing.
- Additional regulatory burdens placed on a large number of "low flow wells" could result in a significant short-term increase in the number of orphaned wells.

**Advantages**

- Would clarify regulatory definitions both for COGCC staff and operators.
- Prohibiting techniques such as selling from tank inventory and "swabbing" to maintain "active" status would remove some marginal wells from inactive well bonding and prevent operators from further delaying liability for plugging and abandonment costs.

## VII. Pooled Bonding

The group also discussed the possibility of developing a mandatory, operator-supported fund to address future orphaned wells and sites. A representative from the Department of Labor and Employment attended the Working Group's third meeting to provide information about the Petroleum Storage Tank Fund (PSTF), which imposes a fee of up to $100 per load on fuel tanker trucks for the remediation of spills.[5] The fee is raised or lowered depending on the balance of the fund, with the fee diminishing to $0 per load if the balance of the fund exceeds $12 million and climbing to $100 per load if the fund balance is less than $3 million.

The fund reimburses an average of $36 million each year to clean up fuel contamination at gas stations and other facilities. Through this self-insurance process, operators are eligible to receive 100% reimbursement on all costs up to $2 million (after a $10,000 deductible) as long as they are in compliance with rules and regulations. Operators in partial compliance may be eligible to receive partial reimbursement. Over the past five years, the fund has had an average of 167 unique requests for reimbursement, with 13% of the applications on average for newly discovered contamination. Arkansas has a similar abandoned well plugging fund that is separate from its bonding framework, though per-well contributions to the fund are small.[6]

[5] Petroleum Storage Tank Fund overview, available at https://www.colorado.gov/pacific/ops/Fund.

[6] Interstate Oil and Gas Compact Commission, State Financial Assurance Requirements (2016), available at http://iogcc.ok.gov/Websites/iogcc/images/Financial_Assurances_FINAL_web.pdf.

**Challenges**

- The PSTF is focused on spills, not on challenges associated with facilities at the end of their useful life (i.e. tank removal is currently not reimbursable under the PSTF).
- In the oil and gas context, some operators may rely on the fund instead of maintaining their own funds to address plugging and abandonment.
- Establishing a sizable fund could require statutory authorization and would take time to build up to the desired minimum threshold.

**Advantages**

- Would provide a predictable source of funding for future orphaned well projects.
- A smaller fund could be created with existing Commission authority, such as the establishment of a $200 permit application fee or a Mill Levy increase.

## VIII. Other Alternatives to Bonding

The group discussed a number of alternatives to address orphaned wells using existing resources instead of increased bonding. Some Working Group members suggested that additional funds could be allocated from the Environmental Response Account (a component of the Oil and Gas Conservation Environmental Response Fund) that have accumulated as a result of increased fines and penalties collected by COGCC. COGCC indicated that fines and penalties increased to $1 million in both FY2016-17 and 2017-18. These funds currently support a portion of the orphaned well program, but are insufficient to cover all of the $5M in spending authority granted by the General Assembly. Other alternatives discussed by the Working Group include using Severance Tax and Mill Levy revenue to address orphaned wells.

**Challenges**

- Other COGCC revenue streams such as fines and penalties, Mill Levy, and Severance Tax revenue are already utilized for orphaned wells or are dedicated to other important programs.
- Existing COGCC revenue streams are highly variable and dependent on market forces.
- Use of Severance Taxes is subject to annual legislative approval and would likely require a redirection of funding from other important programs, such as funds currently used for water projects, forest health, etc.

**Advantages**

- Would tap existing funding derived from a broad swath of the oil and gas industry.

## IX. Other Considerations

The Working Group also briefly considered the following topics that are beyond the scope of this report. While not directly related to financial assurance requirements, further consideration of these tools by COGCC is warranted.

### a. Insurance Requirements

One Working Group member, Brad Gibson, presented detailed recommendations for revising Rule 708, including increasing the general liability insurance requirement for operators from $1 million to $5 million per occurrence, requiring sudden and accidental pollution liability insurance, and requiring gradual pollution liability insurance for newly-drilled wells. While not directly related to the orphaned well issue, adequate insurance could help an operator stay in business should an incident occur.

### b. Liability of Past Operators

Holding past operators liable for plugging, reclamation, and remediation of orphaned wells and locations was also discussed. BLM representatives provided details about efforts in Wyoming to secure funds from lease holders that had transferred operating rights to other companies.[7] However, COGCC is a regulatory agency and not in the same position as BLM as a mineral lessor. Imposing liability on past operators through a "quasi CERCLA program" that extends liability after the transfer of a well to a new operator would require a statutory change, and additional analysis would be necessary to assess the impacts of this type of measure on the oil and gas industry.[8]

### c. Liens on Inventory and Equipment

The Group also discussed the possibility of strengthening the Commission's authority to claim and sell for salvage equipment or product stored at an orphaned site to provide reimbursement for plugging and reclamation costs. This measure would require legislation to provide COGCC with a first priority lean over equipment and product, as opposed to its existing authority to sell product and equipment subject to "any valid liens, security interests, or other legal interests in such equipment asserted by any taxing authority or by any creditor."[9] The Commission rarely uses its existing authority because the undefined process to identify superior interests creates liability concerns for the state. Legislation to provide COGCC with a first priority lien would result in a small amount of additional revenue to address orphaned wells, but would likely face strong opposition from financial institutions.

---

[7] *See Monahan v. U.S. Dept. of Interior*, No. 05-8068 (10th Cir. 2007), available at https://cases.justia.com/federal/appellate-courts/ca10/05-8068/05-8068-2011-03-14.pdf?ts=1411084726.

[8] *See* Jacqueline Ho, et al., *Plugging the Gaps in Inactive Well Policy*, Resources for the Future (May 2016), available at http://www.rff.org/files/document/file/RFF-Rpt-PluggingInactiveWells.pdf.

[9] C.R.S. §34-60-124(6)(c)

## E. Appendix: List of Technical Working Group Participants

- Scott Anderson (Environmental Defense Fund)
- Tracee Bentley (Colorado Petroleum Council)
- Brian Cain (Extraction)
- Chad Calvert (Noble Energy)
- Ashley Campbell (Crestone Peak Resources)
- Andrew Casper (Colorado Oil and Gas Association)
- Morgan Cullen (Colorado Municipal League)
- Jonathan Fairbairn (BLM)
- Brad Gibson (Private Citizen, Broomfield Oil and Gas Task Force)
- Roger Hutson (HRM Resources)
- Warren King (The Wilderness Society)
- Sam Knaizer (BP)
- Dave Kulmann (SRC)
- Jason Maxey (Weld County)
- Kim Mendoza-Cooke (Anadarko)
- Neil Ray (CAMRO)
- Mick Richardson (CO Assoc. of Homebuilders)
- Jep Seman (Conoco)
- Catie Stitt (State Land Board)
- Jimmy Walker (Petron)
- Ken Wonstolen (HighPoint Resources)
- Kirby Wynn (Garfield County)

COLORADO
Oil & Gas Conservation Commission
Department of Natural Resources

1120 Lincoln Street, Suite 801
Denver, CO 80203

Exhibit 5

# WARNING LETTER # 401739715

HRM RESOURCES II LLC (# 10548)
ROGER HUTSON
lrhutson@hrmres.com

410 17TH STREET #1600
DENVER, CO 80202

**This Warning Letter is to inform you that HRM RESOURCES II LLC ("Operator") may be in violation of the rules and regulations of the Colorado Oil and Gas Conservation Commission ("COGCC") and corrective action is required.**

The COGCC has reasonable cause to believe that the Operator has committed one or more violations of the Oil and Gas Conservation Act, or of a rule, regulation, or order of the Commission, or of a permit issued by the Commission. The Operator is required to comply with this Warning Letter by the **Corrective Action Deadline Date(s)** to resolve the alleged violation(s). Failure to do so will result in the issuance of a Notice of Alleged Violation and initiation of enforcement proceedings in which COGCC will seek monetary penalties for the alleged violations pursuant to § 34-60-121, C.R.S. and Rule 523, COGCC Rules of Practice and Procedure, 2 CCR 404-1.

## Alleged Violation(s) and Required Corrective Action(s):

707 Inactive Wells

Violation Date: 08/21/2018

Violation Discovery Date: 08/21/2018

Description of Alleged Violation: Pursuant to Rule 707.a., to the extent that Operator's inactive well count exceeds Operator's financial assurance amount divided by ten thousand dollars ($10,000) for inactive wells less than three thousand (3,000) feet in total measured depth or twenty thousand dollars ($20,000) for inactive wells greater than or equal to three thousand (3,000) feet in total measured depth, such additional wells shall be considered "excess inactive wells."

Inactive wells are defined in the 100 Series Rule as any shut-in well from which no production has been sold for a period of twelve (12) consecutive months; any well which has been temporarily abandoned for a period of six (6) consecutive months; or, any injection well which has not been utilized for a period of twelve (12) consecutive months.

For each excess inactive well, Operator's required financial assurance amount under Rule 706 shall be

COLORADO
Oil & Gas Conservation Commission
Department of Natural Resources

1120 Lincoln Street, Suite 801
Denver, CO 80203

increased by ten thousand dollars ($10,000) for inactive wells less than three thousand (3,000) feet in total measured depth or twenty thousand dollars ($20,000) for inactive wells greater than or equal to three thousand (3,000) feet in total measured depth. This requirement shall be modified or waived if the Commission approves a plan submitted by Operator for reducing such additional financial assurance requirement, for returning wells to production in a timely manner, or for plugging and abandoning such wells on an acceptable schedule.

COGCC Staff conducted an audit of Operator's inactive wells and the amount of financial assurance with the Commission. This audit identified that Operator has thirty-four (34) inactive wells that have a total measured depth equal to or greater than 3,000 feet. The financial assurance required for these inactive wells is $680,000, based upon $20,000 for each of the wells. Operator presently has a Blanket Plugging bond of $100,000. Pursuant to Rule 707.a., a balance of $580,000 Excess Inactive financial assurance is required.

Required Corrective Action: Operator shall either:

1) Submit additional financial assurance for Plugging Excess Inactive Wells in the amount of $580,000 in an acceptable form of:

(a) a surety bond via a fully executed Form 3, Performance Bond, or
(b) a cash bond via a cashier's check payable to COGCC with a completed Form 3, or
(c) a Certificate of Deposit created as public fund account with an eligible public depository bank, or

2) Submit for Commission review a proposed plan for reducing such additional financial assurance requirement by returning wells to production in a timely manner, or plugging and abandoning such wells on an acceptable schedule.

The Operator should contact the undersigned COGCC representative to discuss such a plan prior to submission to the Commission. Please find the Excess Inactive Well List, Form 3 Performance Bond, Cash Financial Assurance Instructions, Certificate of Deposit Instructions, and Inactive Well Plan Guidance Document attached.

Corrective Action Deadline Date: 09/24/2018

**How to Comply with Warning Letter:**

Operator shall complete the Required Corrective Action(s) above within the deadline(s) provided. Upon completion of the Corrective Action(s), Operator shall provide notice and evidence of completion to the COGCC staff identified below by the Corrective Action Deadline Date(s):

COGCC Enforcement: Kira Gillette
Email: kira.gillette@state.co.us

Title: NOAV Specialist
Phone Num: (303) 894-2100 x5165

Title: Financial Assurance Super
Phone Num: (303)894-2100x5123



CONFIDENTIAL 

COLORADO
Oil & Gas Conservation Commission
Department of Natural Resources

1120 Lincoln Street, Suite 801
Denver, CO 80203

COGCC Representative: Martha Ramos

Email: martha.ramos@state.co.us

If you have any procedural questions about this Warning Letter, please contact Kira Gillette.
If you have any technical questions about this Warning Letter, please contact the COGCC Representative identified above.

**Failure to Comply with Warning Letter**:
If the Operator fails to perform Required Corrective Action(s) on or before the Corrective Action Deadline Date(s) stated above the COGCC will issue a Notice of Alleged Violation and seek penalties pursuant to § 34-60-121, C.R.S. and Rule 523, COGCC Rules of Practice and Procedure, 2 CCR 404-1.

All well data, rules and forms are available on our website at www.colorado.gov/cogcc.

Sincerely,

Martha Ramos
Financial Assurance Super
(303)894-2100x5123
martha.ramos@state.co.us

**Attachments**
View Attachments in Imaged Documents on COGCC website http://ogccweblink.state.co.us/ Search by Document Number.

| Document Number | Description |
|---|---|
| 401739756 | WARNING LETTER CORRESPONDENCE |
| 401739760 | WARNING LETTER DOCUMENTATION |
| 401739762 | WARNING LETTER DOCUMENTATION |
| 401739763 | WARNING LETTER DOCUMENTATION |
| 401739764 | WARNING LETTER DOCUMENTATION |
| 401739769 | WARNING LETTER CERTIFIED MAIL RECEIPT |

Total Attach: 6 Files

Exhibit 6

Painted Pegasus Petroleum, LLC
11511 Katy Freeway, Ste. 600C
Houston, TX 77079
Main: 281.738.3382
Fax: 281.738.3418
[ HYPERLINK "http://www.p3petro.com" ]

MAY 21, 2019

Colorado Oil and Gas Conservation Commission
Attn: Financial Assurance
1120 Lincoln St., Ste 801
Denver, CO 80203

RE: Inactive Well Bond Plan

Dear Financial Assurance:

We have prepared a Plan regarding the rule in section 707.a. The plan will cover and meet the nine criteria defined in section 707a. As discussed previously with the COGCC, P3 intends to perform work, make repairs and bring wells back to production in a timely manner, however at this time we are facing Excess Bonding due to Inactive wells. Given the circumstances surrounding our acquisition from HRM, HRM's current outstanding environmental issues, as well as HRM's inability to transfer the Title to these wells in a timely matter.

Several issues have impeded our ability to bring these wells back to production. At this time, we have put together a detailed plan of our intentions to bring wells back to production.

P3 would like to ask that the COGCC take this plan into consideration regarding additional bonding that may be required, as this could further impede our ability to operated in this field.

A Sincere Thanks,

Jeremy Pate
Chief Operating Officer
Painted Pegasus Petroleum, LLC

**1. Excess Inactive Wells:** See attachment document "A" which details all Inactive wells for P3.

**2. Cost to plug:** P3 has obtained two P&A cost estimates for typical wells in our field. We have included these bids in the attachment section of this plan. In summary, the cost to P&A a well in our field as per the cost estimates will be $79,642. P3 normally would utilize a 15% contingency cost to cover any unforeseen costs, that value would be $11,946. In total the P&A cost including contingency would be $91,588. Please see attached P&A cost estimates included in the back of this Plan.

**3. Proportion of Inactive well to the total number of wells:** 126 Active as of May 2019, 69 In-active, 6 P&A, and 1 T&A, for a total of 203.

**4. Business reason for SI or TA wells**: P3 acquired HRM Resources II assets in September 2018. At the time of acquisition, approximately 52 well out of 223 wells were producing at the time. From that point P3 constructed a plan to bring any Shut-In well back to production.

In October of 2018, P3 could not come to terms financially with the previous pumpers HRM had employed. The pumpers quit working for P3 without notice, then took it upon themselves to shut-in ALL wells that were producing, without P3's consent.

Moving forward, P3 hired new pumpers in November and started producing the 52 wells that had been previously producing prior to the Pumper shut in.

P3 began 2019 with a plan and hopes to bring wells back to production, however we faced immediate challenges with the Title transfer of the assets to P3 from HRM Resources. HRM incorrectly filled out the Form 10 sent to COGCC, causing the Title transfer to be delayed and in some cases or wells it's still not complete. Additionally, the Title transfer is being delayed due to HRM's outstanding environmental issue with COGCC, per COGCC. These issues have impeded P3's ability to operate or perform repair needed to bring SI wells back to production.

Our current, operational plan to bring wells back to production is set up for the next 120 days. Detailed below is how P3 intends to move forward operationally bringing wells back to production.

Phase I: Install 11 combustors on 11 3rd Creek tank batteries (23 wells total), preliminary AFE cost is $199,073. We estimate 30 days to finish the Phase I.

Phase II: Top 15 of 127 2nd tier inactive wells: Preliminary AFE cost $400,000 - $500,000. Estimated 1020 BOPM + 4.5MMCFPM production increase. $70,000 Net revenue increase. Payout in approximate 6 -8 months. We estimate 14 days to finish Phase II.

PHASE III:
Workovers: 41 candidates.
Approx. AFE Cost: $574k

Recompletions: 49 wells.
Approx. AFE Cost: $1.470M

In total, P3 estimates that it can perform all work stated and have the same completed in a 4-month time frame with our experienced personnel and SIMOPS.

**5. The extent to which such wells may cause or have caused a significant adverse environmental impact**: At present P3 has berms in place on all locations that are SI/IA to prevent leakage and/or spillage, as well as Pressure Safety Valves on separator units.

P3 has performed an initial evaluation of each SI well our intentions are to incorporate Vent Gas Recovery units to process the condensate and monetize the gas, as well as reducing the gas volume. In doing this we will reduce the size of the combustor needed at each well, while also realizing the cost savings on combustor cost, additionally monetizing the gas.

The combustor units being purchased and installed will be equal to the standard Cimarron Equipment 98+ enclosed combustors. Any combusting will be compliant to all CDPHE requirements.

An environmental consultant has been deployed to assist in securing all necessary permits as well as preventing any environmental challenges or issues that may occur.

**6. Financial Conditions of the Operator:** At present P3 is financially stable. We have attached a current reserve report for COGCC review. Additionally, we have attached a current LOE for COGCC review.

**7. The capability of the operator to manage such plan in an orderly fashion:** P3's intention is to bring all SI and IA wells back to production where possible and feasible. Our current, staff includes Operational management and support from our corporate office in Houston, as well as local support from our 3 employed pumpers who have physical oversight daily in our field.

If a well or wells cannot be brought back to production through our efforts, P3 is prepared to Plug and Abandon such wells as necessary.

**8. Availability of plugging services:** Through our due diligence in obtaining cost estimates for the P&A work, we have found that the lead time for rig availability is 60 days minimum and can be as much as 90 days. Please see attached cost estimates regarding P&A work.

**9. If an increase in financial is ordered pursuant to**

Exhibit 7

**From:** Jeremy Pate [jeremy@P3petro.com]
**Sent:** 6/6/2019 11:14:47 AM
**To:** Lutz - DNR, Deborah [debbie.lutz@state.co.us]
**CC:** Joey Mustacchia [jmustacchia@p3petro.com]
**Subject:** FW: Final P3 Well status list
**Attachments:** P3 Well Status list.xlsx

Ms. Deborah,

I have attached "our" In-Active and Active well list for your review. We have completed an "Inactive well plan" as well however we would like to discuss/confirm this list with you prior to submitting so that everyone is on the same page.

Sorry I missed your call earlier. I can call this afternoon with Joey if you are available around 3 your time.

Thanks,

**Jeremy Pate**
***Chief Operations Officer***
***P3 Petroleum, LLC***
**11511 Katy Freeway #600C**
**Houston, TX 77079**
**(office) 832-849-5521**
**(mobile) 832-731-6247**
**(email)** Jeremy@p3petro.com
This message is confidential. It may also be privileged or otherwise protected by work product immunity or other legal rules. If you have received it by mistake, please let us know by e-mail reply and delete it from your system; you may not copy this message or disclose its contents to anyone. The integrity and security of this message cannot be guaranteed on the Internet.

**From:** Joey Mustacchia <jmustacchia@p3petro.com>
**Sent:** Thursday, June 6, 2019 9:27 AM
**To:** Jeremy Pate <jeremy@P3petro.com>
**Subject:** Final P3 Well status list

**Joey Mustacchia**
*Geosciences Manager*
$P_3$ Petroleum, LLC
www.p3petro.com
(direct) 281.667.6732
(main) 281.738.3382

P3

This message is confidential. It may also be privileged or otherwise protected by work product immunity or other legal rules. If you have received it by mistake, please let us know by e-mail reply and delete it from your system; you may not copy this message or disclose its contents to anyone. Please send us by fax any message containing deadlines as incoming e-mails are not screened for response deadlines. The integrity and security of this message cannot be guaranteed on the Internet.

# Exhibit 8

**Keith Hubbard**

**From:** Eric Nickell - DNR <eric.nickell@state.co.us>
**Sent:** Thursday, September 09, 2021 9:57 AM
**To:** Keith Hubbard
**Cc:** Deborah Lutz - DNR
**Subject:** Excess Inactive Well Bonding
**Attachments:** PAINTED PEGASUS PETROLEUM LLC - 10711.xls; PAINTED PEGASUS PETROLEUM LLC - 10711.pdf

Mr. Hubbard,

Pursuant to Rule 707, the Colorado Oil and Gas Conservation Commission (COGCC) is reviewing all inactive well records to determine the sufficiency of each operator's excess inactive well bonding. You will find attached a list of inactive wells and a "Bond Amount Worksheet" for **PAINTED PEGASUS PETROLEUM LLC – Operator #10711.**

Please submit the required financial assurance within 30 calendar days of the send date on this email. The COGCC will move forward with a Notice of Alleged Violation (NOAV) if the additional Financial Assurance is not received by the requested due date of **October 9, 2021.**

All Financial Assurance should be mailed to the **attention of Deborah Lutz, Financial Assurance Supervisor**. The COGCC accepts financial assurance in the form of any one of the following:

1) Cashier's check payable to the COGCC with a Form 3 completed;
2) Surety Bond with a Form 3 Performance Bond fully executed by your insurance company; or
3) CD set up as a public fund account from an eligible public depository bank. Colorado PDPA laws apply.

Pertinent forms and instructions are hyperlinked below. If you have any questions about the bond amount or inactive well data, please contact me by replying to this email (preferred), or by calling (303) 894-2100 x5179 during business hours.

Thank you for your prompt attention to this matter. It is important that excess inactive well bonding amounts from each operator as of September 2021 be brought into compliance with current State rules.

Eric Nickell
c/o Financial Assurance Section, COGCC

**Four Important Inactive Well Financial Assurance Links**

700 Series Rules available at https://cogcc.state.co.us/documents/reg/Rules/LATEST/700%20Series%20-%20Financial%20Assurance%20and%20Oil%20and%20Gas%20and%20Environmental%20Response%20Fund.pdf

Form 3 available at https://cogcc.state.co.us/documents/reg/Forms/PDF_Forms/Form3_20180501.pdf

Certificate of Deposit instructions available at https://cogcc.state.co.us/documents/reg/Forms/instructions/Form_Instructions/CERTIFICATE%20OF%20DEPOSIT%20INSTRUCTIONS_Revised_2014_0805__with%20Division%20of%20Banking%20Links.pdf

Cash bond instructions available at https://cogcc.state.co.us/documents/reg/Forms/instructions/Form_Instructions/CASH FINANCIAL ASSURANCE INSTRUCTIONS_Revised_2014_0805.pdf

Eric Nickell (he/him)
Budget Analyst

COLORADO
Oil & Gas Conservation Commission
Department of Natural Resources

P 303.894.2100 x5179 | F 303.894.2109
1120 Lincoln Street, Suite 801, Denver, CO 80203
eric.nickell@state.co.us | cogcc.state.co.us

## Bond Amount Worksheet

*Based on the best information available on the date below*

| | |
|---|---|
| Operator: | **PAINTED PEGASUS PETROLEUM** |
| Operator #: | **10711** |
| Date: | **September 8, 2021** |

| | | | |
|---|---|---|---|
| **Bonding Required for Inactive Wells, Fee and State Minerals** | | | |
| Inactive Well Count, TMD less than 3,000 feet | 0 | x $10,000 | $ - |
| Inactive Well Count, TMD greater than or equal to 3,000 feet | 87 | x $20,000 | $1,740,000 |
| **Subtotal, Bonding Required** | | | **$1,740,000** |
| **Rules 706 and 707 Bonding from Operator to Date** | | | $ 280,000 |
| **Rule 707a. Bonding Due** | | | **$1,460,000** |

LLC

Exhibit 9

**From:** Patrick McGraw[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=4D5C6A06D717413D9576C2FE0A313ABA-PMCGRAW]
**Sent:** Tue 9/18/2018 10:15:01 PM Coordinated Universal Time
**To:** John Hoffman[jh@p3petro.com]; Roger Hutson[lrhutson@hrmres.com]
**Subject:** RE: Registration and Financial Assurance

---

Good to hear. Thank you, John. I will forward you the APC lease consent by separate cover. Please review, execute and send me a copy by email. We will sign on our end and provide to APC. Thanks.

Patrick

---

**From:** John Hoffman <jh@p3petro.com>
**Sent:** Tuesday, September 18, 2018 2:15 PM
**To:** Patrick McGraw <pmcgraw@hrmres.com>; Roger Hutson <lrhutson@hrmres.com>
**Subject:** FW: Registration and Financial Assurance

LATEST COMMUNICATION FROM THE COGCC BELOW

Sent from Mail for Windows 10

---

**From:** Ramos - DNR, Martha <martha.ramos@state.co.us>
**Sent:** Tuesday, September 18, 2018 3:13:23 PM
**To:** John Hoffman; Frank Bair
**Subject:** Registration and Financial Assurance

All documents for registration and financial assurance have been processed and approved for Painted Pegasus Petroleum LLC - Operator #10711. All contact information must stay current per Rule 302.a and 302.b.

On January 5, 2015, the Commission adopted new rules concerning penalties for violations of the Oil and Gas Conservation Act, or Commission rules, orders, or permits. The rule changes implement HB-14-1356, which increased the Commission's statutory penalty authority from $1,000 to $15,000 per day per violation and eliminated a $10,000 cap on penalties for a single violation. The new rules also advance enforcement policies and procedures implemented by the Commission in response to Executive Order D 2013-004.

All operators are encourage to visit our website at www.colorado.gov/cogcc on a regular basis for any updates on policies, rules and regulations, guidance documents, new eform developments, hearings, etc.

Operators with pipelines over which the COGCC has jurisdiction are required by Rule 1102.d to be members of the Utility Notification Center of Colorado and participate in Colorado's One Call notification system.

All operator information is available on our website at www.colorado.gov/cogcc by clicking on the "database" link, then the "name, address and financial assurance" link, and entering your company name or operator number and submit. Any blue highlights are links to more detailed information.

Many of our forms are now available for electronic submittal through Colorado eforms. A list of these forms and instructions can be found at the "Regulations/Form" links. The principle agent and designated agents should have received an email activating their email address, username and password, and a link to the eform Training Manual.

Please use the Surety ID# assigned to your financial assurance for any permits, Form 10's, and Form 12's. All financial assurances are perpetual instruments which shall remain in force and effect until all obligations have been met and released by COGCC.

**Please be advised that Form 12 Gas Facility Registration/Change of Operator must be received and approved before operators are granted Gatherer and Downstream Gas Facility operations.**

**COMPANY DETAIL REPORT** - Employee List Doc
PAINTED PEGASUS PETROLEUM LLC - #10711
11511 KATY FREEWAY #600C
HOUSTON , TX 77079
USA
PHONE (713) 510-0150 EMERGENCY (713) 818-8152

**APPROVED OPERATION(S)** - 3 record(s) returned.

| Operation Type | Start Date |
|---|---|
| INJECTION WELL OPER | 9/18/2018 |
| OPERATOR | 9/18/2018 |
| PRODUCER | 9/18/2018 |

**SURETY INFORMATION** - 3 record(s) returned.

| Surety ID | Status | Bond Type | Amount | Coverage | Received | Instrument | Inst.# |
|---|---|---|---|---|---|---|---|
| 2018-0152 | ACTIVE | PLUGGING | $100,000.00 | BLANKET | 9/18/2018 | INSURANCE | 1160702 |
| 2018-0153 | ACTIVE | SURFACE | $25,000.00 | BLANKET | 9/18/2018 | INSURANCE | 1160693 |
| 2018-0154 | ACTIVE | PLUGGING | $180,000.00 | EXCESS INACTIVE | 9/18/2018 | INSURANCE | 1160695 |

**Martha Ramos**

**Financial Assurance Supervisor**

P 303.894.2100 x5123 | F 303.894.2109 |

1120 Lincoln Street, Suite 801, Denver, CO 80203

martha.ramos@state.co.us | www.colorado.gov/cogcc